IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABLEST INC., et al.,[1] | ) | Case No. 14-10717 (____) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

## DECLARATION OF RANDALL S. EISENBERG
## IN SUPPORT OF FIRST DAY MOTIONS

I, Randall S. Eisenberg, hereby declare that the following is true to the best of my

knowledge, information and belief:

### INTRODUCTION

1.      I am a Managing Director at AlixPartners, LLP, which, through its

subsidiary AP Services, LLC (together, "AlixPartners"), has served as restructuring advisor to

each of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the

"Company") and is the proposed restructuring advisor to such Debtors.  From Spring 2012 until

August 2013, I advised the Debtors while at FTI Consulting, Inc. ("FTI") and through a

subcontracting agreement between AlixPartners and FTI.  I submit this declaration (the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification numbers are: Ablest Inc. (8462); Koosharem, LLC (4537); New Koosharem Corporation (9356); Real Time Staffing Services, Inc. (8189); Remedy Intelligent Staffing, Inc. (0963); Remedy Staffing, Inc. (0080); RemedyTemp, Inc. (0471); Remedy Temporary Services, Inc. (7385); RemX, Inc. (7388); Select Corporation (6624); Select Nursing Services, Inc. (5846); Select PEO, Inc. (8521); Select Personnel Services, Inc. (8298); Select Specialized Staffing, Inc. (5550); Select Temporaries, Inc. (7607); Select Trucking Services, Inc. (5722); Tandem Staffing Solutions, Inc. (5919); Westaff, Inc. (6151); Westaff (USA), Inc. (5781); Westaff Support, Inc. (1039); RemSC LLC (8072); and RemUT LLC (0793).  The mailing address for each of the Debtors is:  3820 State Street, Santa Barbara, CA 93105.

"Declaration") in support of the Debtors' petitions and "first day" motions and applications, described further below (collectively, the "First Day Motions").

2.     Except as otherwise indicated, I have personal knowledge of the information contained herein, either directly or through professionals at AlixPartners or FTI working at my direction, members of management of the Debtors, or the Debtors' other advisors, and am competent to testify as to the matters set forth herein.  Specifically, I have been one of the principal restructuring advisors for the Debtors for nearly two years and in that capacity I have been directly involved in the matters leading up to these chapter 11 filings, including financial planning, forecasting, and the restructuring process.  I also have been directly involved in negotiations with key creditor constituencies and the sale process described herein.  I am authorized to submit this declaration on behalf of the Debtors.

3.     I have held the position of Managing Director at AlixPartners since January 2013, where I co-lead its Transformation and Restructuring Advisory Practice.  Prior to that time, I was a Senior Managing Director in FTI's Corporate Finance Practice.  I was a member of FTI's Corporate Finance Practice leadership team during most of the approximately 10 year period following FTI's acquisition of PricewaterhouseCoopers, LLP's Business Recovery Services U.S. Practice, which was acquired by FTI in September 2002.  Prior to this acquisition, I was a Partner at PricewaterhouseCoopers, LLP.

4.     Over the past 23 years, I have advised senior management and boards of directors of companies in numerous industries to devise and implement sound turnaround and restructuring strategies in out-of-court turnarounds, chapter 11 restructurings and foreign

insolvency proceedings.  In addition, I have advised creditor constituencies who often become the new owners of a business upon consummation of a restructuring.  During the course of my career, I have been involved in numerous large and complex restructurings, including, but not limited to, Delphi Corporation, US Airways Group, Inc., Visteon Corp., Jackson Hewitt, Vertis, Inc., Anthracite Capital, Inc., Kmart Corporation, Planet Hollywood International, Inc., RSL Communications, Ltd. and Rotech Healthcare, Inc.  I am a Certified Turnaround Professional and a Certified Public Accountant.  In addition, I am a Fellow in both the American College of Bankruptcy and the International Insolvency Institute.  During the course of my career, I have served as the President and Chairman of the Turnaround Management Association and the Association of Certified Turnaround Professionals, the latter of which was merged into the Turnaround Management Association.

5.     The Debtors' chapter 11 cases (the "Cases") are "pre-packaged" cases. Part I of this Declaration summarizes the "pre-packaged" Plan (as defined below) and the extent of creditor support that exists for the Plan based on a prepetition solicitation process.  Part II of this Declaration describes the business of the Debtors and the developments that led to their filing for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Part III of this Declaration sets forth the relevant facts supporting certain of the First Day Motions filed concurrently herewith and incorporates by reference the facts of the other First Day Motions (as defined below).[2]

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

## PART I

### The Pre-Packaged Plan of Reorganization

6.      Contemporaneously with the filing of these proceedings, the Debtors filed

their *Joint Plan of Reorganization for Ablest Inc., et al* (the "Plan"). The Plan is a "pre-

packaged" plan of reorganization. The Plan provides for a significant deleveraging of the

Debtors' balance sheet through the infusion of $225 million of new equity capital, the raising of

$470 million of new debt ($350 million of which will be funded at Plan consummation), the

satisfaction or other resolution of certain other liabilities of the Debtors and the contribution of

additional staffing businesses by affiliates of the Debtors' principal equity holder, the Sorensen

Trust (the "Consenting Equity Holder").

7.      The Plan is supported by the holders of the vast majority of the Claims

under the Prepetition First Lien Credit Agreement (as defined below) and the Prepetition Second

Lien Credit Agreement (as defined below), as well as the Consenting Equity Holder. The Plan

leaves general unsecured claims unimpaired.

8.      The Debtors solicited and obtained, prior to commencing these Cases, the

requisite acceptances of their Prepetition First Lien Lenders (as defined below) and Prepetition

Second Lien Lenders (as defined below), which constitute the only impaired creditor classes

under the Plan who are entitled to vote on the Plan. The following is a summary of how

Prepetition First Lien Lenders and Prepetition Second Lien Lenders voted on the Plan:

| Class | % Accepted (Number) | % Accepted (Amount) | Accept/Reject |
|---|---|---|---|
| 4 - Prepetition First Lien Loan Claims | 78% | 87% | Accept |
| 5 - Prepetition Second Lien Loan Claims | 100% | 100% | Accept |

## PART II

### A.    Overview of the Debtors and Their Operations

9.    On the date hereof (the "Petition Date"), the Debtors commenced these Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

10.    The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.    No official committee has been appointed by the Office of the United States Trustee.

12.    Certain of the Debtors were founded in Santa Barbara, California, in 1985, and today the Debtors are a leading national provider of temporary staffing services in the United States and are the largest provider of temporary staffing services in California. Through a network of company-owned and franchise agent offices, the Debtors offer a wide range of temporary staffing solutions across many service categories, including light industrial, clerical, accounting and finance, and information technology. The Debtors' customers include Fortune 1000 companies as well as small and mid-sized local and regional companies that operate in a variety of industries, such as manufacturing, services, retail, and banking as well as governmental agencies.

13.    The Debtors provide these services on temporary, "temp-to-hire," and project-by-project bases through a network of 312 offices in 48 states. As of the Petition Date, the Debtors had 167 company-owned offices and 145 independently managed franchise agent offices. The Debtors currently employ approximately 75,000 full and part time employees in hourly, salaried, supervisory, management and sales positions (the "Associates"). In addition, the Debtors employ approximately 1,500 corporate and branch employees (together with the Associates, the "Employees") that manage the work assignments of the Associates. Most of the Debtors' Employees work on assignment at over 10,000 client companies. During the fiscal year ended December 29, 2013, the Debtors placed approximately 300,000 temporary Employees and provided staffing services to approximately 11,500 customers. For the 2013 fiscal year, the Debtors had approximately $2 billion in gross revenue.

**B.    Business Operations**

14.    Temporary staffing falls into two principal categories: "contract labor" and "temp-to-hire" workers. Contract labor is the placement of temporary employees in positions that are unlikely to become permanent, and are typically associated with customer demands that are non-recurring, seasonal or project-specific. Temp-to-hire positions, on the other hand, are positions that are likely to eventually be filled by a permanent staff employee of the customer, and the positions are often filled through the temporary staffing process. The Debtors' temporary employee candidates are typically individuals between jobs or careers, individuals re-entering the job market, or individuals who prefer the flexibility and variety of temporary work assignments. These candidates are recruited through local and regional

advertising and through referrals by other temporary employees and temporary employee candidates, government employment agencies and customers of the Debtor.

15.    The Debtors operate under the banner of the "Select Family of Companies." Staffing services are provided either through the Company Branch Offices or the Franchise Offices while Select Temporaries, Inc. ("Select Temporaries") performs back office services for the Company Branch Offices and the Franchise Offices, including processing the payment of Employees' wages, administration of workers' compensation claims, accounting and bill collections.

16.    The chart attached hereto as **Exhibit A** shows the key operating divisions that compose the "Select Family of Companies" and provides a general overview of their business operations.

17.    The Company Branch Offices are generally maintained in large markets. Each Company Branch Office generally operates autonomously and generates its own sales. The Company Branch Offices are operated primarily through Real Time Staffing Services, Inc., which does business as Select Staffing, and RemX Specialty Staffing.

18.    The Franchise Offices are in geographic locations generally not served by the Company Branch Offices. Under the Debtors' licensed franchise agreements, the licensee pays the Debtors an initial franchise fee and pays all lease and operating costs relating to its office. The licensee employs all management staff affiliated with its Franchise Office. The Debtors employ all temporary personnel affiliated with the licensed Franchise Office, handle all invoicing and collection of clients' accounts, and then remit to the licensee a percentage of the

Franchise Office's gross margin. The Debtors' licensed Franchise Offices have the exclusive contractual right to sell certain of the Debtors' services and to use the Debtors' service mark, business name and systems in a specified geographic territory.

19.     The Franchise Offices are operated under the Debtors' franchise brands that were separately acquired by the Debtors – Remedy Intelligent Staffing and Westaff.

20.     Select Temporaries provides all of the corporate overhead functions of the Company Branch Offices and Franchise Offices. Select Temporaries employs approximately 1,100 employees who perform the payroll, accounting, and human resource functions for the Debtors.

21.     Select Temporaries invoices the respective clients of the Company Branch Offices and Franchise Offices for services rendered, and collects outstanding accounts receivable. Select Temporaries does not generate any revenue. It also employs risk management specialists who investigate and conduct safety inspections of proposed clients' facilities in order to ascertain risks to the temporary employees, obtains workers' compensation coverage for temporary employees and processes workers compensation claims.

22.     Select Temporaries has a risk management team of approximately 76 full-time staff members, including claims analysts, safety professionals, investigators, auditors, and underwriters. This system permits the Debtors to identify claims early and to quickly and effectively handle claims from inception to resolution.

C.    **The Debtors' Corporate Structure and Management**

23.    Attached hereto as **Exhibit B** is a detailed chart that sets forth the corporate structure and organization for each entity.  Debtor New Koosharem Corporation ("New Koosharem") is the ultimate parent of all of the Debtors.  New Koosharem owns 100% of the membership interests of Koosharem, LLC ("Koosharem"), which itself is a holding company that is the sole borrower on the Debtors' Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement.

24.    Koosharem Corporation, the predecessor of Koosharem, was incorporated in California in 1989.  In 2000, Koosharem Corporation purchased the stock of Select Temporaries Inc., founded in Santa Barbara, California in 1985, and began doing business as "Select Staffing."  The Debtors operate under various names, including but not limited to Select Staffing, Remedy Intelligent Staffing, RemX Financial Staffing, RemX IT Staffing, RemX OfficeStaff, RemX Scientific, RemX Engineering, Select Truckers Plus, Select Medical Staffing, SelectRemedy, Power Training Institute and Westaff.

25.    On February 1, 2010, to create a new holding company structure, Koosharem Corporation entered into a merger agreement with New Koosharem, then a newly formed direct subsidiary of Koosharem Corporation, and New Koosharem Merger Sub, a newly formed direct subsidiary of New Koosharem.  Pursuant to this merger agreement, New Koosharem Merger Sub was merged with and into Koosharem Corporation and all of the shares of capital stock of Koosharem Corporation were exchanged for shares of capital stock of New Koosharem.  As a result, New Koosharem became the parent entity of the reorganized

group. Immediately following the merger, Koosharem Corporation converted into a California limited liability company, and was renamed Koosharem LLC.

26.     D. Stephen Sorensen has served as Chairman and Chief Executive Officer of the then-existing Debtors since January 2007. Prior to taking over as Chairman and Chief Executive Officer, D. Stephen Sorensen served as President of the then-existing Debtors from February 1996 to January 2007.

27.     Paul Sorensen, the brother of D. Stephen Sorensen, has served as President of the Debtors since January 2007. Prior to taking over as President, Paul Sorensen served as Regional Vice President of the Debtors from August 2006 to January 2007, and a Regional Manager from January 2003 to August 2006. Paul Sorensen joined the Debtors in 2001.

28.     The Sorensen Trust (*i.e.*, the Consenting Equity Holder), an affiliate of D. Stephen Sorensen, owns 96% of the stock of New Koosharem. The remaining stock of New Koosharem is owned by Paul Sorensen.

**D.      Summary of Prepetition Debt**

**1.      Prepetition First Lien Loans**

29.     Pursuant to that certain *First Lien Credit and Guaranty Agreement* dated as of July 12, 2007 (as amended or supplemented, the "Prepetition First Lien Credit Agreement" and, together with all related loan and security documents, the "Prepetition First Lien Credit Documents"), between Koosharem, as borrower, certain subsidiaries of Koosharem (as defined in the Prepetition First Lien Credit Documents), as guarantors, Bank of the West, as administrative agent and/or collateral agent (in either such capacity, the "Prepetition First Lien

Agent") and the lenders party thereto (the "<u>Prepetition First Lien Lenders</u>"), the Prepetition First

Lien Lenders provided a revolving credit and term loan facility to or for the benefit of the

Debtors (collectively, the "<u>Prepetition First Lien Facility</u>").

   30. The Prepetition First Lien Facility provided the Debtors with, *inter alia*,

term loans and revolving loans in the aggregate principal amount of $450,000,000. The

scheduled maturity date for the revolving loan commitment was July 12, 2012. The scheduled

maturity date for the term loan is June 30, 2014. As of the Petition Date, the outstanding

principal amount of the Prepetition First Lien Loans, plus accrued and unpaid interest, is

approximately $492 million. The Debtors ceased making principal and interest payments with

respect to the Prepetition First Lien Loans on June 30, 2013.

   31. The remaining Debtors, referenced below as the Prepetition Guarantors,

jointly and severally guaranteed all obligations under the Prepetition First Lien Credit

Agreement.

   32. The Prepetition First Lien Loans are secured by liens on substantially all

of the assets of the Debtors, with limited exclusions.

**2.** **<u>Prepetition Second Lien Loans</u>**

   33. Pursuant to that certain *Second Lien Credit and Guaranty Agreement*

dated as of July 12, 2007 (as amended or supplemented, the "<u>Prepetition Second Lien Credit</u>

<u>Agreement</u>" and, together with all related loan and security documents, the "<u>Prepetition Second</u>

<u>Lien Credit Documents</u>"), between Koosharem, as borrower, certain subsidiaries of Koosharem

(as defined in the Prepetition second Lien Credit Documents), as guarantors, Wilmington Trust

National Association (as successor by merger to Wilmington Trust FSB), as successor to BNP Paribas Securities Corp., as administrative agent and/or collateral agent (in either such capacity, the "Prepetition Second Lien Agent") and the lenders party thereto (the "Prepetition Second Lien Lenders"), the Prepetition Second Lien Lenders provided a term loan to or for the benefit of the Debtors (collectively, the "Prepetition Second Lien Facility"). The Prepetition First Lien Lenders and the Prepetition Second Lien Lenders are referred to herein as the "Prepetition Lenders".

34.    The Prepetition Second Lien Facility provided the Debtors with a term loan in the original principal amount of $100 million (collectively, the "Prepetition Second Lien Loans"). The scheduled maturity date is December 1, 2014. As of the Petition Date, the outstanding principal amount of the Prepetition Second Lien Loans, plus accrued and unpaid interest, is approximately $159 million. The Debtors ceased making principal and interest payments with respect to the Prepetition Second Lien Loans in July 2011.

35.    The Prepetition Guarantors jointly and severally guaranteed all obligations under the Prepetition Second Lien Credit Agreement.

36.    Certain of the Debtors, the Prepetition First Lien Lenders, and the Prepetition Second Lien Lenders are also party to that certain *Intercreditor Agreement*, dated July 12, 2007.

### 3.    Other Debt Financing

37.    In addition to the Prepetition First Lien Loans and the Prepetition Second Lien Loans, the Debtors have the following types of indebtedness: (a) several unsecured notes

payable related to previous business acquisitions ("Seller Notes"), (b) debts relating to letters of credit or collateral posted in connection with workers' compensation obligations, and (c) obligations in connection with certain aircraft lease agreements.

### a.  Seller Notes

38.  The Seller Notes have various payees and some are payable to persons currently employed by the Debtors.  The Seller Notes have several interest rates ranging from 6.5% to 8.0% and have maturity dates ranging from 2010 through 2015.  As of March 30, 2014, the aggregate outstanding principal amount of the Seller Notes is approximately $1.9 million.

### b.  Debts Relating to Workers' Compensation Insurance

39.  Certain of the Debtors' workers' compensation obligations are secured by letters of credit (a) for which the account party is an employee of the Debtors and which are guaranteed by a person related to the employee or (b) for which the account party is a Debtor and which obligations are guaranteed by the Debtors' employees or persons related to the Debtors' employees.  While the Debtors agreed to pay the interest that accrues on such letters of credit, the Debtors have not made interest payments relating to them since December 2011.   For the fiscal years ended December 30, 2012 and December 29, 2013, the aggregate accrual amount of such interest expense is approximately $2.6 million.  The total aggregate amount of letters of credit referenced above is $16.5 million.

### c.  Aircraft Lease Obligations

40.  Until March 2012, the Debtors leased one Falcon 50 aircraft from General Electric Capital Corporation ("GECC") and two Falcon 900 aircraft from related parties owned

by the Sorensen Trust. However, in June 2012, the Falcon 50 was surrendered back to GECC. Thus, the Debtors are currently making payments to GECC on two aircraft. The leases are "dry" leases in that the Debtors pay for virtually all aircraft maintenance, fuel, insurance and other carrying costs.

41.     Pursuant to an *Aircraft Dry Lease Agreement*, dated March 15, 2007, the Debtors lease a Dassault-Breguet Model Mystere Falcon 900 aircraft from Kerry Acquisitions, LLC, a company owned by Trishan Air, Inc., which is wholly owned by the Sorensen Trust. The lease has a one-year term with automatic one-year renewals at the option of the lessor. Monthly sublease payments of $136,000 are made by the Debtors to Trishan Air, Inc., which in turn remits the payments to Kerry Acquisitions, LLC to fund financing costs paid by Kerry Acquisitions, LLC to a non-affiliated leasing company. Monthly lease payments remitted by the Company are passed through to the ultimate owner and lessor of the aircraft.

42.     Pursuant to a *Sublease Agreement* entered into on May 19, 2008, the Debtors sublease a Dassault Falcon 900B aircraft from Trishan Air, LLC. The Debtors remit monthly payments of approximately $139,000. Monthly lease payments remitted by the Company are passed through Trishan Air, Inc. to the ultimate owner and lessor of the aircraft.

### 4.     SCIF Settlement and Litigation Claims

43.     On September 1, 2011, the San Francisco County Superior Court entered a judgment in the amount of $50,779,165 (the "SCIF Judgment") in favor of the State Compensation Insurance Fund ("SCIF") against Select Personnel Services, Inc. ("SPS"). The SCIF Judgment arose out of an action alleging, among other things, fraud in connection with the

submission of workers' compensation claims by employees of SPS under the workers' compensation policies of other entities which paid lower premiums for such coverage than SPS otherwise would have paid independently. The Debtors appealed the SCIF Judgment. On November 7, 2011, SCIF commenced a federal lawsuit against certain of the Debtors and other parties alleging Civil RICO claims and state law fraudulent transfer claims arising out of the same conduct that gave rise to the SCIF Judgment (the "Federal Action"). SCIF and the Debtors thereafter settled the disputes arising in connection with the SCIF Judgment and the Federal Action. Pursuant to the settlement, the Debtors agreed to pay SCIF $25 million. The Debtors have made certain principal payments to SCIF in connection therewith and the principal balance due as of the Petition Date is $22.3 million.

44.    The Debtors are also involved in various claims and litigation arising principally in the ordinary course of business. Such claims and litigation involve, among other issues, employer related litigation, contract, workers' compensation insurance and subrogation matters. During 2013, the Debtors were party to approximately 90 active litigation matters, which is consistent with prior years.

### 5.    Unsecured Trade Debt

45.    The Debtors incur trade debt in the ordinary course of their business. As of the Petition Date, the Debtors estimate that their outstanding unsecured trade debt totaled approximately $17.5 million, the vast majority of which is owed to franchisees, subcontractors and other critical service providers.

6.    **Employment Tax Obligations**

46.    In the ordinary course of business, the Company collects and pays different employment/payroll taxes.  Some of these taxes are employee withholdings and others are employer taxes.  Specifically, the Company collects and pays: (a) Federal Income Tax (employee withholding), (b) Social Security Tax (both employee withholding and employer taxes), (c) Medicare Tax (both employee withholding and employer taxes), (d) State Income Tax (employee withholding), (e) Federal unemployment tax (employer tax), and (f) State unemployment tax (employer tax) (collectively, the "Employment Tax Obligations").  Due to the Company's liquidity constraints, certain of the Employment Tax Obligations were not paid when due.  The Debtors estimate that, as of the Petition Date, their deferred Employment Tax Obligations, including interest and penalties, total approximately $145 million and anticipate that such Employment Tax Obligations will be paid in full upon the Debtors' emergence from chapter 11.

E.    **Related Party Transactions**

47.    As set forth in more detail in the *Disclosure Statement for the Prepackaged Joint Plan of Reorganization for Ablest Inc., et al. under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") filed concurrently herewith, the Debtors advance monies to, or pay costs on behalf of, the Debtors' principal shareholder, the Sorensen Trust.  These amounts are currently expensed by the Debtors as owners' compensation.  In prior years, a portion of these monies were recorded to notes receivable from the Sorensen Trust.  In addition, numerous transactions exist involving the Sorensen Trust or other related parties involving real

estate, aircraft, executives' residences and guarantees of letters of credit, all as disclosed in detail in the Disclosure Statement.

**F.    Events Leading to Chapter 11 Filing**

    **1.    Overview**

    48.    Because unemployment rates and labor productivity both materially impact customer hiring rates, the staffing market is highly correlated with GDP (gross domestic product) growth and therefore strongly influenced by economic cycles.  The economic slowdown that began in 2007 depressed demand for both permanent and temporary staff in the ensuing years.  To cope with the economic downturn and the liquidity issues that resulted, the Debtors entered into a definitive agreement and plan of merger in December of 2009 with Atlas Acquisition Holding Corporation, a special purpose acquisition company or "SPAC" established in January of 2008.  However, the agreement failed to receive approval from the SPAC shareholders in early 2010 and that entity was liquidated.

    49.    In May 2010, the Debtors were unable to deliver audited financial statements to their Prepetition Lenders for fiscal year 2009, as required under the terms of the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement.  Since that date, the Debtors have been in default under these credit agreements.  Accordingly, the Debtors and the Prepetition Lenders began to work towards a resolution of defaults and to implement a comprehensive restructuring of the Debtors' capital structure.

    50.    As set forth below, the process of building consensus around a restructuring alternative has been ongoing since 2010.  The Debtors have been faced with severe

liquidity constraints as a result of growth in the Company's business, increased workers'

compensation requirements, and costs associated with various restructuring professionals. The

Company's liquidity constraints, combined with the lack of an available working capital credit

line, resulted in, among other challenges, substantial deferred Employment Tax Obligations

(which the Company anticipates will be paid in full upon its emergence from chapter 11). To

preserve liquidity, the Debtors ceased making certain principal and interest payments to

Prepetition First Lien Lenders during 2013 and certain interest payments to Prepetition Second

Lien Lenders in July 2011.

### 2.    Prepetition Forbearance Agreements

51.    On November 19, 2012, the Debtors entered into a forbearance agreement

(the "First Forbearance Agreement") with two-thirds of their lenders under both the Prepetition

First Lien Facility and the Prepetition Second Lien Facility. The First Forbearance Agreement

provided for a forbearance by the lenders for a specified time period in order for the Debtors to

arrange a refinancing of their debt through a capital raise and/or sale of the business. The First

Forbearance Agreement provided for differing levels of debt payoffs based on the total

consideration provided to lenders under the Prepetition First Lien Facility and lenders under the

Prepetition Second Lien Facility. The First Forbearance Agreement was extended on May 6,

2013 and expired by its terms on May 31, 2013.

52.    On July 12, 2013, the Debtors entered into a second forbearance

agreement (the "Second Forbearance Agreement") with two-thirds of their lenders under both the

Prepetition First Lien Facility and the Prepetition Second Lien Facility. The Second Forbearance

Agreement provided additional time for the Debtors to continue their efforts to raise capital and/or sell the business. The Second Forbearance Agreement expired by its terms on August 9, 2013.

### 3.   Evaluation of Strategic Alternatives

53.    During the forbearance periods and with the concurrence of a majority of the Prepetition Lenders, the Debtors, through their investment banker, Goldman Sachs, & Co. reached out to approximately 94 parties to explore potential acquisition scenarios. These parties included strategic buyers and financial sponsors, both domestic and international. Following this outreach, 46 of these parties signed non-disclosure agreements and were granted access to information about the Debtors. On January 24, 2013, six initial indications of interest were received. The Debtors chose not to proceed with three of these parties as two of them required "exclusivity" and the other did not provide a competitive bid from a valuation perspective. After January 24, 2013, during the due diligence stage, two additional parties entered the process after providing competitive bid indications.

54.    On April 8, 2013, three second round indications were received from the five parties remaining in the process. The other two parties chose not to proceed after it became clear that their bids would not be competitive. The Debtors presented the bids to the Prepetition Lenders in May 2013, pursuant to the terms of the First Forbearance Agreement and continued to work with the parties to develop the bids following feedback from the Prepetition Lenders. By August 2013, the process had narrowed to a single party ("Party A").

55.    The Debtors determined, however, that the proposal advanced by Party A was uncertain and not viable because, among other concerns:

- Party A required significant due diligence to complete its proposal, which Party A had refused to complete unless the Debtors agreed to substantial expense reimbursement and an agreement to deal exclusively with Party A;

- Party A's proposal contemplated a contemporaneous combination of the Debtors with one of the Debtors' competitors, and Party A was unwilling to provide responses to important diligence questions relating to that combination and the conditionality associated with it; and

- Party A's proposal had failed to obtain support from the largest lenders under the Prepetition First Lien Facility and the Prepetition Second Lien Facility.

56.    Given the lack of viable purchasers, the Debtors were unable to complete a sale transaction that met the various criteria (including, among other things, meeting or exceeding the target sale price) set forth in the First Forbearance Agreement.  In July 2013, a subset of the Prepetition Lenders advised the Company of their intent to develop a proposal for a standalone restructuring (the "Creditor-Led Plan"), which is outlined in the Plan.  In light of the inability of the Debtors and their advisors to establish the certainty and viability of the Party A proposal, the liquidity needs of the Debtors and the relative certainty associated with the Creditor-Led Plan, the Debtors and their advisors determined that the Creditor-Led Plan represented the best available alternative and recommended the Creditor-Led Plan to the Prepetition Lenders in September 2013.

57.    Since September 2013, the Debtors have worked to implement the Creditor-Led Plan through either an out-of-court workout or a pre-packaged chapter 11 plan.  A minority of the Prepetition Lenders did not support the Creditor-Led Plan, and on December 16,

2013 commenced a lawsuit against the Debtors' principal – D. Stephen Sorensen – alleging that Mr. Sorensen breached his fiduciary duties by proceeding with the Creditor-Led Plan in light of the alternative proposal received from Party A.[3]

58.    On February 25, 2014, the Company received a proposal regarding a potential alternative transaction involving an acquisition of the Company by a publicly-traded special purpose acquisition company (the "SPAC Proposal") sponsored by an affiliate of Party A.  The SPAC Proposal is described in greater detail in Exhibit J to the Disclosure Statement. Although the SPAC Proposal includes a base cash purchase price and therefore purported recoveries that appear to be higher than the cash values to be distributed under the Creditor-Led Plan, the Company and its advisors have concluded that it is highly unlikely these recoveries would be achievable for a number of reasons, including:

(i)    lack of creditor support for the SPAC Proposal, thereby requiring that the SPAC Proposal be pursued on a non-consensual basis over the objections of the majority of the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders;

(ii)    the ensuing cost and time delays that a non-consensual bankruptcy would have on the Company's business and operations, and the risk of significant business deterioration resulting from a longer and non-consensual bankruptcy;

(iii)    the fact that the SPAC Proposal requires significantly more time to consummate due to the need for the SPAC to obtain clearance from the Securities and Exchange

---

[3] *Bowery Opportunity Fund, L.P., et al v. Sorensen*, Case No. CV-19275(C.D. Cal) (the "Bowery Complaint").  The Debtors and Mr. Sorensen vigorously dispute the allegations in the Bowery Complaint.

Commission with respect to certain filings, as well as the SPAC's need to obtain a shareholder vote to approve the transaction and to comply with certain redemption rights;

(iv)    the uncertainties associated with attempting to effect a concurrent closing with a third-party competitor for which due diligence by the Company had not commenced; and

(v)    the risk of substantial diminution of recoveries available to creditors due to increasing liabilities and obligations during the delay in consummation of the transaction.

59.    For these and other reasons, the Debtors believe that the Creditor-Led Plan, as described in the Disclosure Statement, is preferable to the SPAC Proposal or any proposed alternative restructuring transaction for purposes of maximizing recovery to creditors, and that view has been validated by the overwhelming support of the Prepetition Lenders.

60.    Out of those Prepetition Lenders who submitted votes on the Plan:  (a) Prepetition First Lien Lenders representing approximately 87% in amount of the Prepetition First Lien Claims and approximately 78% in number have consented to the Plan and (b) Prepetition Second Lien Lenders representing approximately 100% in amount of the Prepetition Second Lien Claims and approximately 100% in number have similarly consented.

### 4.    **The Creditor-Led Plan**

61.    The Company and its advisors believe the Plan is the most certain and only viable alternative available to the Company today, and therefore represents the highest and best recovery for creditors.  The Company and its advisors carefully evaluated all other

reasonably available alternatives, including the Party A proposal and the SPAC Proposal, and concluded that these proposals are not viable and could create protracted delays and uncertainties that pose material downside risk to creditor recoveries.

62.    The Creditor-Led Plan is superior to the Party A proposal and the SPAC Proposal for several reasons.  Among the benefits of the Creditor-Led Plan are:

(i)    The recovery to creditors is well-defined, certain and reasonable;

(ii)    All diligence requirements and documentation are complete;

(iii)    Independent, carefully screened and experienced board members have been selected to install improved corporate governance and adoption of best practices;

(iv)    It represents the only alternative that can be consummated in a reasonable amount of time without risk of material deterioration to the business; and

(v)    As reflected in the voting results, the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders voted to overwhelmingly support the Plan.

63.    The Plan provides for distributions to the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders, and full reinstatement of the rights of holders of general unsecured claims, as well as the payment of the Employment Tax Obligations and SCIF's claim.

64.    To satisfy creditor claims in accordance with the Plan, the Debtors have secured commitments for new equity aggregating $225 million, consisting of a commitment for an equity investment in cash, to be consummated pursuant to the Rights Offering (as such term is defined in the Plan), on the terms set forth in the Plan and the Backstop Agreement (as such term

is defined in the Plan). In addition, Credit Suisse and Royal Bank of Canada ("RBC") have been retained to arrange a new $350 million term loan and $120 million asset-based revolving loan facility, respectively. Both Credit Suisse and RBC have expressed their confidence in the Company's ability to obtain the requisite financing. The Debtors intend to utilize the proceeds of the $225 million equity investment and the $350 million term loan, which will be funded at Plan consummation, to meet their obligations under the Plan. The $120 million asset-based revolving loan facility will be used to fund the Debtors' working capital requirements and, if needed, to meet the Debtors' obligations under the Plan.

65.    Importantly, the Plan provides the Company with substantial additional liquidity, the lack of which has impeded the Company's operating performance in the past. The Plan also will provide an efficient restructuring through the prepackaged process, designed to minimize disruption to the Debtors' business, stabilize the Debtors' balance sheet, and provide a platform for renewed success. Through confirmation of the Plan, the Debtors will restructure and substantially deleverage their consolidated balance sheet, reduce their cash interest expense, provide working capital, and retain additional flexibility to invest in growth initiatives.

## PART III

### A.    First Day Motions

66.    In order to enable the Debtors to minimize the adverse effects of the commencement of these Cases, the Debtors have requested various types of relief in the motions filed concurrently with this Declaration (each, a "First Day Motion" and collectively, the "First Day Motions").

67.    I have reviewed each of these First Day Motions (including the exhibits and schedules thereto), and I incorporate by reference the factual statements set forth in the First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions is: (a) necessary to enable the Debtors to operate under chapter 11 with minimal disruption to their current business operations; and (b) essential to maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

68.    It is my further belief that, with respect to those First Day Motions requesting the authority to pay prepetition claims or to continue selected prepetition programs (*e.g.*, those First Day Motions seeking relief related to the Debtors' obligations to their employees, customers, vendors, and certain taxing authorities), the relief requested is essential to the Debtors' efforts to preserve and maximize value in these cases and avoid immediate and irreparable harm to the Debtors and their estates.

69.    As described therein, the Plan will unimpair or reinstate all prepetition claims other than those of the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders, while all other creditors will in effect receive full recovery pursuant to applicable contract, law or other agreement.

70.    I believe that any diminution in the relief requested in the First Day Motions could have an immediate and irreparably harmful impact upon the going concern value of the estates, to the detriment of all of the Debtors' stakeholder constituencies. The Debtors believe that payment of the prepetition claims identified in the First Day Motions will forestall

such irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief requested therein.

**B.      DIP Financing Motion**

71.      As one of the First Day Motions, the Debtors have filed a motion seeking authority to obtain secured postpetition financing on a superpriority priming basis of up to $50,000,000 (the "DIP Facility"), of which $20,000,000 would be available following the entry of an interim order.  The DIP Facility has been made available to the Debtors by a subset of the Prepetition Lenders (the "DIP Lenders") in order to ensure that the Debtors have sufficient liquidity to meet their financial obligations as they continue operations while in chapter 11.

72.      Without the proposed postpetition DIP Facility and continued access to cash collateral, the Debtors will have insufficient liquidity to operate their business, and will be unable to fund their ordinary course expenditures or pay the expenses necessary to administer the Cases, the most significant of which are payroll expenses of the Debtors' approximately 75,000 employees.  Simply put, without access to financing, the Debtors will be required to cease operations and liquidate other than as a going concern, causing irreparable harm to the Debtors, their estates and their creditors.  For this reason, I believe that the Debtors have an urgent and immediate need for the DIP Facility.

73.      Further, I believe that the financing to be provided by the DIP Lenders pursuant to the terms of the DIP Facility represents the best financing presently available to the Debtors and is well supported by the Debtors' prudent exercise of business judgment.  The DIP Facility is the bridge to the Plan, which has been overwhelmingly supported by impaired creditor

classes and will leave all classes unimpaired other than the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders.

74.     In making their decision to seek financing from the DIP Lenders, the Debtors considered many factors. First, the Prepetition Lenders are already lenders to the Debtors. Second, the Debtors were unable to obtain alternative postpetition financing terms from other lenders that on balance were more favorable to their estates than the proposed DIP Facility.

75.     In an effort to obtain alternative financing, the Debtors' representatives approached eight different financial institutions, including banks and alternative funding sources. In particular, the Debtors solicited these parties' interest in providing funding on either a priming or junior basis to the Prepetition Lenders. Five of the eight parties were not interested, one did not respond, and two made initial proposals that contemplated loans on a priming basis. No party was interested in taking a junior position to the Prepetition Lenders. Of the two initial proposals received, both contemplated significant break-up compensation and due diligence expenses, and carried substantial closing and timing risks, that far outweighed any marginal pricing benefits compared to the proposed DIP Facility. Hence, in light of the terms of the proposed DIP Facility and the fact that such financing is provided in the context of a global consensual restructuring under the Plan, the Debtors determined that the financing with the DIP Lenders constitutes the most advantageous to these estates.

76.     I believe that the proposed terms of the DIP Facility are fair and reasonable under the circumstances and were negotiated at arm's length and in good faith by

separately represented parties. As discussed more fully above, the Debtors made concerted efforts to obtain credit on the most favorable terms available. Although the Debtors contacted various alternate lending institutions, no other lender was willing to provide an adequate stand-alone financing facility on terms more favorable than the proposed DIP Facility. Against this backdrop, the Debtors carefully evaluated the proposed financing structure from the DIP Lenders, engaged in extensive negotiations with the DIP Lenders regarding the proposed terms, worked with their various advisors to obtain the best possible pricing from the DIP Lenders, and ultimately agreed to the proposed DIP Facility as the financing structure best suited to the Debtors' needs.

77.     Attached hereto as **Exhibit C** is the Debtors' initial four-week budget (the "Interim Budget") prepared in connection with these Cases. The Interim Budget was prepared at my direction and accurately estimates the Debtors' spending requirements during the applicable period. I believe that the urgent need to preserve the Debtors' business, and avoid immediate and irreparable harm to the estates, makes it imperative that the Debtors be authorized to access postpetition financing on an interim basis and use cash collateral pending the final hearing on the DIP Facility, in order to continue their operations and administer their Cases.

78.     I also believe that the value of the property securing the Prepetition Agents' claims will be maximized through approval of the DIP Facility and confirmation of the Plan. Without the DIP Facility, the Debtors would face a hard-stop liquidation. The higher and lower estimates of liquidation proceeds as set forth in the Disclosure Statement are between $154

million and $208 million.  By comparison, the post-confirmation reorganization enterprise value of the reorganized Debtors is approximately $680 million to $780 million.

79.     The bottom line is that the Debtors require the DIP Facility in order to maintain operations and going concern value and to effectuate an orderly exit from bankruptcy that maximizes recoveries by all creditors.  For these reasons, I urge the Court to approve the DIP Facility.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 1, 2014

_____/s/ Randall S. Eisenberg_____
By:    Randall S. Eisenberg