IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABLEST INC., et al.,[1] | ) | Case No. 14-10717 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO
11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507: (I) APPROVING POSTPETITION
FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL, (III) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE
STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING
AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

Koosharem, LLC (the "Borrower"), New Koosharem Corporation ("Parent"), and each of

the Guarantors (as defined in the DIP Loan Agreement (as defined herein)), each as a debtor and

debtor-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases

(collectively with any successor cases, the "Cases"), hereby move the Court (this "Motion"),

pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code, 11

U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Bankruptcy

Rules for the District of Delaware (the "Local Rules"), for entry of an interim order substantially

in the form attached hereto as **Exhibit 1** (the "Interim Order"),[2] *inter alia*:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification numbers are: Ablest Inc. (8462); Koosharem, LLC (4537); New Koosharem Corporation (9356); Real Time Staffing Services, Inc. (8189); Remedy Intelligent Staffing, Inc. (0963); Remedy Staffing, Inc. (0080); RemedyTemp, Inc. (0471); Remedy Temporary Services, Inc. (7385); RemX, Inc. (7388); Select Corporation (6624); Select Nursing Services, Inc. (5846); Select PEO, Inc. (8521); Select Personnel Services, Inc. (8298); Select Specialized Staffing, Inc. (5550); Select Temporaries, Inc. (7607); Select Trucking Services, Inc. (5722); Tandem Staffing Solutions, Inc. (5919); Westaff, Inc. (6151); Westaff (USA), Inc. (5781); Westaff Support, Inc. (1039); RemSC LLC (8072); and RemUT LLC (0793). The mailing address for each of the Debtors is:  3820 State Street, Santa Barbara, CA 93105.

[2] Capitalized terms used, but not defined herein, shall have the meaning ascribed to them in the Interim Order.

(i)  authorizing the Debtors to obtain secured postpetition financing on a superpriority priming basis (the "DIP Facility") in an aggregate principal amount of up to **$50,000,000**, of which up to **$20,000,000** shall be available upon entry of the Interim Order, pursuant to the terms and conditions of that certain *Debtor-in-Possession Financing Agreement*, dated as of April 1, 2014 (as amended, supplemented, restated, or otherwise modified from time to time, the "DIP Loan Agreement"), by and among the Debtors, and the lenders from time to time party thereto (collectively, the "DIP Lenders"), and Credit Suisse AG, Cayman Islands Branch, as administrative and collateral agent (in such capacity, the "DIP Agent"), substantially in the form attached hereto as **Exhibit 2**;

(ii)  authorizing the Debtors to execute and deliver the DIP Loan Agreement and the other related credit documents (the "DIP Loan Documents") by and among the Debtors and the DIP Agent, and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(iii)  granting the DIP Facility and all obligations owing thereunder and under the DIP Loan Documents to the DIP Agent and the DIP Lenders (collectively, and including all "Obligations" as described in the DIP Loan Agreement, the "DIP Obligations") allowed superpriority administrative expense claim status in each of the Cases;

(iv)  granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens upon all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in

2

section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth

herein and the Interim Order;

(v)    authorizing and directing the Debtors to pay the principal, interest, fees, expenses,

and other amounts payable under the DIP Loan Documents and the Interim Order as such

become due, including, without limitation, closing fees and the reasonable fees and

disbursements of the attorneys, advisers, accountants, and other consultants of the DIP Agent and

the DIP Lenders, all to the extent provided in and in accordance with the terms of the DIP Loan

Documents and the Interim Order;

(vi)    authorizing the use of Cash Collateral of the Prepetition Agents under the

Prepetition Credit Documents (each as defined herein), and providing adequate protection to the

Prepetition Agents for any Diminution in Value of their interests in the Prepetition Collateral (as

defined herein), including the Cash Collateral;

(vii)    vacating and modifying the automatic stay imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of

the DIP Loan Documents and the Interim Order, as limited pursuant hereto; and

(viii)    scheduling a final hearing (the "Final Hearing") to consider entry of a final order

(the "Final Order" and, together with the Interim Order, the "DIP Orders") on the relief

requested in this Motion and approving the form of notice with respect to the Final Hearing.

## Jurisdiction

1.    This Court has jurisdiction over these proceedings and over the persons

and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended*

3

*Standing Order of Reference* from the United States District Court for the District of Delaware,

dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. §

157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules

to the entry of a final order by the Court in connection with this Motion to the extent that it is

later determined that the Court, absent consent of the parties, cannot enter final orders or

judgments in connection herewith consistent with Article III of the United States Constitution.

> 2.      Venue for the Cases and proceedings on this Motion is proper in this

district pursuant to 28 U.S.C. §§ 1408 and 1409.

> 3.      The statutory bases for the relief requested herein are Bankruptcy Code

sections 105, 361, 362, 363, 364, and 507, and Bankruptcy Rules 2002, 4001, and 9014.

## Background

### A.    General

> 4.      On the date hereof (the "Petition Date"), the Debtors commenced these

Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

> 5.      The Debtors have continued in the possession of their property and have

continued to operate and manage their business as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

> 6.      No official committee has been appointed by the Office of the United

States Trustee.

> 7.      Certain of the Debtors were founded in Santa Barbara, California in 1985,

and today the Debtors are a leading national provider of temporary staffing services in the United

4

States and are the largest provider of temporary staffing services in California.  Through a

network of company-owned and franchise agent offices, the Debtors offer a wide range of

temporary staffing solutions across many service categories, including light industrial, clerical,

accounting and finance, and information technology.  The Debtors' customers include Fortune

1000 companies as well as small and mid-sized local and regional companies that operate in a

variety of industries, such as manufacturing, services, retail, and banking as well as

governmental agencies.

        8.      The Debtors provide these services on temporary, "temp-to-hire," and

project-by-project bases through a network of 312 offices in 48 states.  As of the Petition Date,

the Debtors had 167 company-owned offices and 145 independently managed franchise agent

offices.  The Debtors currently employ approximately 75,000 full and part time employees in

hourly, salaried, supervisory, management, and sales positions (the "Associates").  In addition,

the Debtors employ approximately 1,500 corporate and branch employees (together with the

Associates, the "Employees") that manage the work assignments of the Associates.  Most of the

Debtors' Employees work on assignment at over 10,000 client companies.  During the fiscal year

ended December 29, 2013, the Debtors placed approximately 300,000 temporary Employees and

provided staffing services to approximately 11,500 customers.  For the 2013 fiscal year, the

Debtors had approximately $2 billion in gross revenue.

        9.      The factual background relating to the Debtors' commencement of these

Cases is set forth in detail in the *Declaration of Randall S. Eisenberg in Support of First Day*

*Motions*, filed contemporaneously with this Motion and incorporated herein by reference.

**B.      The Prepetition Facilities**

10.      As of the date hereof, the Debtors have funded debt facilities in place with a face amount of approximately $651 million, including (a) an approximately $492 million revolving credit loan and term loan (the "Prepetition First Lien Credit Facility") (pursuant to, as amended, the "Prepetition First Lien Credit Agreement") with the Prepetition First Lien Lenders (as defined below); (b) an approximately $159 million term loan (the "Prepetition Second Lien Credit Facility" and, together with the First Lien Credit Facility, the "Prepetition Facilities") (pursuant to, as amended, the "Prepetition Second Lien Credit Agreement") with the Prepetition Second Lien Lenders (as defined below).

11.      The Borrower[3] is a party to the Prepetition First Lien Credit Agreement among the Borrower, its Parent as guarantor, and subsidiary Guarantors party thereto, Bank of the West, as administrative agent and/or collateral agent (in either such capacity, the "Prepetition First Lien Agent"), and the lenders party thereto (the "Prepetition First Lien Lenders"). Pursuant to the Prepetition First Lien Facility, the Prepetition First Lien Lenders provided revolving credit and term loans to or for the benefit of the Debtors. The Prepetition First Lien Credit Agreement and all instruments and documents executed at any time in connection therewith, shall be referred to collectively as the "Prepetition First Lien Credit Documents." As of the Petition Date, the outstanding amount of principal and accrued and unpaid interest due under the Prepetition First Lien Credit Documents is $492,171,766.

---

[3] The original party to the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Credit Agreement, and the Intercreditor Agreement (defined below) was Koosharem Corporation, which was subsequently merged into the Borrower.

12.    The Borrower is a party to the Prepetition Second Lien Credit Agreement, among the Borrower, the subsidiary Guarantors party thereto, Wilmington Trust, National Association (as successor by merger to Wilmington Trust FSB), as successor to BNP Paribas Securities Corp., as administrative agent and/or collateral agent (in either such capacity, the "Prepetition Second Lien Agent" and, collectively with the Prepetition First Lien Agent, the "Prepetition Agents"), and the lenders party thereto (the "Prepetition Second Lien Lenders" and, together with the Prepetition First Lien Lenders, the "Prepetition Lenders"). Pursuant to the Prepetition Second Lien Facility, the Prepetition Second Lien Lenders provided term loans to or for the benefit of the Debtors. The Prepetition Second Lien Credit Agreement and all instruments and documents executed at any time in connection therewith shall be referred to collectively as the "Prepetition Second Lien Credit Documents" and together with the Prepetition First Lien Credit Documents, the "Prepetition Credit Documents." The obligations under the Prepetition Credit Documents are referred to herein as the "Prepetition Loan Obligations." As of the Petition Date, the outstanding amount of principal and accrued and unpaid interest due under the Prepetition Second Lien Credit Documents is $158,781,750.

13.    To secure the obligations under the Prepetition Facilities, the Debtors granted to the Prepetition First Lien Agent (the "Prepetition First Liens") first-priority security interests in and liens on substantially all of the assets of the Debtors described in the Prepetition First Lien Credit Documents (the "Prepetition First Lien Collateral"), and granted to the Prepetition Second Lien Agent (the "Prepetition Second Liens" together with the Prepetition First Liens, the "Prepetition Liens") second-priority security interests in and liens on

7

substantially all of the assets of the Debtors described in the Prepetition Second Lien Credit Documents (the "Prepetition Second Lien Collateral" and, together with the Prepetition First Lien Collateral, the "Prepetition Collateral").

14.    The Borrower also is a party to that certain *Intercreditor Agreement*, dated as of July 12, 2007, among the Borrower, the Prepetition First Lien Agent, and the Prepetition Second Lien Agent (as amended, the "Intercreditor Agreement").  As of the Petition Date and pursuant to the Intercreditor Agreement, the Prepetition First Liens are senior in priority to the Prepetition Second Liens.

### C.    The Solicitation of Pre-Packaged Chapter 11 Plan

15.    The Debtors engaged in months of good faith, arm's length negotiations with certain Prepetition Lenders that hold a majority of the claims under the Prepetition First Lien Credit Documents and under the Prepetition Second Lien Credit Documents, as well as the Debtors' principal equity holder.  These negotiations culminated in a global compromise embodied in an *Amended and Restated Restructuring Support Agreement*, dated as of March 11, 2014 (the "Restructuring Support Agreement").

16.    Under the terms of the Restructuring Support Agreement, the Debtors agreed to file, and the other parties to the Restructuring Support Agreement agreed to support and vote for, a "pre-packaged" plan of reorganization (the "Plan").  Pursuant to the Plan, *inter alia*, (a) the Debtors will reduce their total secured debt obligations upon exit from these Cases by over $350 million, (b) the Debtors, pursuant to a rights offering to the Prepetition First Lien Lenders for the purchase of shares of new common stock of the reorganized Parent ("Rights

Offering") to be backstopped by the Backstop Provider Group (as defined in the DIP Loan Agreement), will have access to $225 million of new incremental funding that will enable the Debtors to pay allowed unimpaired claims in full while supporting their go-forward business needs, (c) the Debtors will satisfy the Prepetition First Lien Lenders, which are owed approximately $492 million, with the payment of $365 million in cash and the right to subscribe to and participate in the Rights Offering, (d) the Debtors will satisfy the Prepetition Second Lien Lenders, which are owed approximately $159 million, with the payment of $12 million in cash and the receipt of new warrants in reorganized Parent, and (e) the Debtors will pay general unsecured claims in full, as of the effective date of the Plan or as such claims become due and payable in the ordinary course of the Debtors' business.

17.    Prior to the Petition Date, and pursuant to the Restructuring Support Agreement, the Debtors solicited votes of the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders, the only two impaired classes of creditors under the Plan that are entitled to vote (Class 4 and Class 5, respectively), to accept or reject the Plan. The Plan received overwhelming support and acceptance by those classes. Out of those Prepetition Lenders who submitted votes on the Plan: (a) Prepetition First Lien Lenders representing approximately 87% in amount of the Prepetition First Lien claim and approximately 78% in number have consented to the Plan and (b) Prepetition Second Lien Lenders representing approximately 100% in amount of the Prepetition Second Lien claim and approximately 100% in number have similarly consented.

18.     Pursuant to the Restructuring Support Agreement, the Debtors have requested that the Court confirm the Plan within thirty-five (35) days of the Petition Date.

19.     The financing and cash collateral use that is sought through this Motion will provide the liquidity during these Cases that is essential to the Debtors' ability to operate in Chapter 11 through the effective date of the Plan, to implement the restructuring contemplated thereby, and to otherwise maintain and maximize the going concern value of the Debtors' estates, while preserving the jobs of approximately 75,000 of the Debtors' Employees.

## Relief Requested

20.     By this Motion, the Debtors seek entry of the DIP Orders, *inter alia*:

(i)     authorizing the Debtors to obtain secured postpetition financing on a priming superpriority basis pursuant to the terms and conditions of the DIP Loan Agreement;

(ii)    authorizing the Debtors to execute and deliver the DIP Loan Documents;

(iii)   granting the DIP Facility and all obligations owing thereunder and under the DIP Loan Documents to the DIP Agent and the DIP Lenders, and allowing superpriority administrative expense claim status in each of the Cases and any successor cases;

(iv)    granting to the DIP Agent, for the benefit of itself and the DIP Lenders, automatically perfected priming security interests in and liens upon all of the DIP Collateral, including, without limitation, Cash Collateral;

(v)     authorizing and directing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Loan Documents and the DIP Orders as such become due, including, without limitation, closing fees and the reasonable fees and disbursements of the attorneys, advisers, accountants, and other consultants of the DIP Agent and the DIP Lenders, all to the extent provided in and in accordance with the terms of the DIP Loan Documents;

(vi)    authorizing the use of Cash Collateral of the Prepetition Agents under the Prepetition Credit Documents, and providing adequate protection to the Prepetition Agents for any diminution in value of their interests in the Prepetition Collateral, including the Cash Collateral;

10

(vii)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the DIP Orders; and

(viii)    scheduling the Final Hearing to consider entry of the Final Order and approving the manner of notice with respect to the Final Hearing.

### Terms of the DIP Facility

21.    The principal terms of the DIP Facility are as follows:[4]

| Parties | **Debtors**: Koosharem, LLC, as the Borrower, and its subsidiaries and Parent, as Guarantors. |
|---|---|
|  | **DIP Lenders**: Lenders from time to time party thereto. |
|  | **DIP Agent**: Credit Suisse AG, Cayman Island Branch. |
| **DIP Facility/ Use of Proceeds** | **Amount**: A superpriority priming term loan in an aggregate principal amount of $50,000,000, of which $20,000,000 will be available upon entry of the Interim Order. DIP Loan Agreement § 2.1. Amounts paid or prepaid under the DIP Facility may not be reborrowed. |
|  | **Use of Proceeds**: The proceeds of the DIP Facility will be used in a manner not inconsistent with the financial covenants, including: (i) to pay (a) all fees due to the DIP Lenders as provided under the DIP Facility and (b) administration costs of the Cases and claims or amounts approved by the Bankruptcy Court, (ii) to provide working capital for the Debtors, and (iii) for other general corporate purposes of the Debtors. DIP Loan Agreement § 2.3. |
|  | **Limitation on Use of Proceeds**: No portion of the Debtors' Cash Collateral, the DIP Facility, the DIP Collateral or the Carve-Out Expenses may be used: |
|  | (a)    for any purpose that is prohibited under the Bankruptcy Code, the Interim Order, the Final Order or the DIP Loan Documents; |
|  | (b)    to finance in any way any adversary action, suit, arbitration, proceeding, application, motion or other litigation or challenge of any type adverse to the interests of any or all of the DIP Agent, the DIP Lenders, or the Prepetition Agents or their respective rights and remedies under the DIP Loan Documents, the Interim Order, the Final Order, or the Prepetition Credit Documents, *provided, however*, that the Carve-Out Expenses and such collateral proceeds and loans under the DIP Loan Documents may be used for allowed fees and expenses, in an amount not to exceed $50,000 in the aggregate, incurred solely by the Creditors Committee, if appointed, in investigating the validity, enforceability, perfection, priority, or extent of the Prepetition Liens during the Challenge Period; |
|  | (c)    to make any distribution under a plan of reorganization except as agreed in writing by the DIP Lenders holding more than 50% of the aggregate undrawn commitments and outstanding DIP Loans (the "Required DIP Lenders") as required to amend, waive or modify the DIP Facility; and |
|  | (d)    to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Agent acting at the direction of the Required DIP Lenders. Interim Order ¶ 30. |

---

[4] This summary is only meant to outline the salient terms of the DIP Loan Documents and the proposed DIP Orders. In the event of a conflict between this summary and the DIP Loan Documents or DIP Orders, the DIP Loan Documents or DIP Orders shall govern.

DOCS_SF:84266.16 50005/001

| | |
|---|---|
| **Availability** | <u>Interim Facility</u>: $20,000,000.<br><br><u>Full Availability</u>: $50,000,000.<br><br>DIP Loan Agreement § 2.1; Interim Order ¶ 4. |
| **Budget/ Agent Account** | <u>Budget</u>: The Debtors' use of cash shall be governed by a budget ("**Budget**") with sources and uses for the next 13 weeks, broken down by week, including the anticipated uses of the DIP Facility for such period (a "**13-week Projection**"), and thereafter, commencing on May 2, 2014, at the end of each 2-week period an updated 13-week Projection for the subsequent 13-week period (provided that (i) any changes from a prior Budget and (ii) any amounts in periods not included in the prior Budget shall be satisfactory to the Required DIP Lenders). The initial budget for the interim period through the Final Hearing is attached to the Interim Order as Exhibit A.<br><br>The initial $20,000,000 of proceeds under the DIP Facility will be directed to the Debtors' main concentration account and made available to the Debtors for immediate disbursement. Following entry of the Final Order, additional proceeds will be directed to the Debtors' main concentration account and the remaining proceeds will be maintained by the DIP Agent (the "**Agent Account**"). The proceeds in the Agent Account shall be released periodically at the request of the Debtors consistent with the terms of the DIP Loan Agreement. If the Maturity Date occurs, all proceeds in the Agent Account shall be immediately applied by the DIP Agent to repay the DIP Loans on a pro rata basis. DIP Loan Agreement § 2.1. |
| **Priority and Liens/ Ranking/ Security/ Collateral** | <u>Collateral</u>: "**DIP Collateral**" shall mean any and all assets of the Debtors, unless otherwise agreed by the Required DIP Lenders, including, subject to entry of the Final Order, the proceeds of Avoidance Actions. DIP Loan Agreement § 10.1; Interim Order ¶ 6.<br><br><u>Priority</u>: Subject to payment of the Carve-Out Expenses, all obligations of the Debtors under the DIP Loan Documents, including all loans made under the DIP Facility, shall at all times:<br><br>   (a) pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Cases, which claims in respect of the DIP Facility shall be superior to all other claims;[5]<br><br>   (b) pursuant to Bankruptcy Code section 364(c)(2), have a first priority lien on all unencumbered assets of the Debtors (now or hereafter acquired, and all proceeds thereof);<br><br>   (c) pursuant to Bankruptcy Code section 364(c)(3), have a junior lien on all encumbered assets of the Debtors excluding the liens pursuant to the Prepetition Facilities (now or hereafter acquired, and all proceeds thereof); and<br><br>   (d) pursuant to Bankruptcy Code section 364(d), have a first priority priming lien on all assets of the Debtors (now or hereafter acquired and all proceeds thereof) that were subject to a lien securing the Prepetition Facilities as of the Petition Date.<br><br>It is understood and agreed that the priming liens described above shall prime the liens securing the Prepetition Facilities and other secured obligations including foreign exchange, currency and interest rate hedged obligations (collectively, the "**Existing Primed Secured Facilities**"), but that the liens so created as described in clauses (b), (c), and (d) above shall be subject to "**Permitted Senior Liens**" (as such term is defined in the DIP Loan Documents).<br><br>The liens to be granted by the Bankruptcy Court shall cover all property of the Debtors (now or hereafter acquired and all proceeds thereof), including property or assets that do not secure the Existing Primed Secured Facilities, except until entry of the Final Order, proceeds of Avoidance Actions.<br><br>Interim Order ¶¶ 7, 8, 12, 13. |

---

[5] The DIP Superpriority Claims will have recourse to proceeds of Avoidance Actions only upon entry of the Final Order.

DOCS_SF:84266.16 50005/001

| | |
|---|---|
| **Carve-Out Expenses** | The Debtors' obligations to the DIP Lenders and the liens and superpriority claims granted as provided in clauses (a) through (d) above shall be subject in each case only to the Carve-Out Expenses which shall be the sum total of (i) all statutory fees payable to the clerk of the Bankruptcy Court or the United States Trustee pursuant to 28 U.S.C. § 1930; (ii) allowed and unpaid professional fees, expenses and disbursements incurred prior to the Termination Declaration Date by professionals of the estates retained by final order of the Court (which order has not been vacated or stayed, unless the stay has been vacated), including professionals of the Debtors employed under Sections 327, 328 or 363 of the Bankruptcy Code ("**Estate Professionals**") and professionals of the official committee of unsecured creditors (the "**Creditors Committee Professionals**") up to the amount provided for such Creditors Committee Professionals in the Budget (including the reimbursement of expenses allowed by the Bankruptcy Court incurred by a creditors committee member in the performance of its duties, but excluding fees and expenses of third party professionals employed by such members); and (iii) the allowed and unpaid professional fees, expenses and disbursements incurred on or after the date the DIP Agent declares a termination, reduction, or restriction on the ability of the Debtors to use any Cash Collateral derived solely from the proceeds of the DIP Collateral (and the earliest date any such declaration is made shall be referred to herein as the "**Termination Declaration Date**") under Sections 327 or 1103(a) of the Bankruptcy Code, in the aggregate not to exceed $600,000 for Estate Professionals and $50,000 for Creditors Committee Professionals.  Interim Order ¶ 29. |
| **Adequate Protection** | **Senior Adequate Protection:** |
| | (a) _Senior Adequate Protection Liens._  Pursuant to Sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition First Lien Agent in the Prepetition Collateral against any diminution in the value of its interests in the Prepetition Collateral on account of the granting of the DIP Liens (including Cash Collateral) resulting from the Debtors' use, sale, or lease (or other decline in value) of such collateral, the imposition of the automatic stay, the priming of the Prepetition Liens on the Prepetition Collateral, and the subordination to the Carve-Out Expenses (collectively, and solely to the extent of any such diminution in value, the "**Diminution in Value**"), the Debtors will grant to the Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, continuing valid, binding, enforceable, and perfected postpetition security interests in and liens on the DIP Collateral (the "**Senior Adequate Protection Liens**"). |
| | (b) _Senior Superpriority Claim._  As further adequate protection of the interests of the Prepetition First Lien Agent in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral on account of the granting of the DIP Liens, the Debtors' use of Cash Collateral, the use, sale, or lease of any other Prepetition Collateral, and the imposition of the automatic stay, the Prepetition First Lien Agent will be granted as and to the extent provided by Section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any successor cases (the "**Senior Superpriority Claim**"). |
| | Interim Order ¶¶ 12-13.  The Senior Adequate Protection Liens and Senior Superpriority Claim shall be junior to the DIP Liens and DIP Superpriority Claim.  Interim Order ¶ 12(c). |
| | **Junior Adequate Protection:** |
| | (a) _Junior Adequate Protection Liens._  Pursuant to Sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Second Lien Agent in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors hereby grant to the Prepetition Second Lien Agent, for the benefit of itself and the Prepetition Second Lien Lenders, continuing valid, binding, enforceable, and perfected postpetition security interests in and lien on the DIP Collateral (the "**Junior Adequate Protection Liens**" and, together with the Senior Adequate Protection Liens, the "**Adequate Protection Liens**").  The Prepetition Second Lien Agent shall receive adequate protection liens subject, junior and subordinate to the adequate protection given to the Prepetition First Lien Agent. |

DOCS_SF:84266.16 50005/001

|  | (b)  Junior Superpriority Claim.  As further adequate protection of the interests of the Prepetition Second Lien in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Prepetition Second Lien Agent will be granted as and to the extent provided by Section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any successor cases (the "**Junior Superpriority Claim**" and, together with the Senior Superpriority Claim, the "**Adequate Protection Superpriority Claims**").[6]<br><br>Interim Order ¶¶ 12-13.  The Junior Adequate Protection Liens and Junior Superpriority Claim shall be junior to the DIP Liens, DIP Superpriority Claim, Senior Adequate Protection Liens, and Junior Superpriority Claims.  Interim Order ¶ 12(c)<br><br>In addition, the Debtors will be authorized and directed to pay the reasonable unpaid prepetition and postpetition fees and disbursements of the attorneys, advisors, accountants, and other consultants of each of the Prepetition First Lien Agent, the Prepetition Second Lien Agent, the DIP Agent, the DIP Lenders, and the Backstop Provider Group.  Interim Order ¶ 14. |
|---|---|
| **Closing Date** | The interim facility closing date is the date of entry of the Interim Order (the "**Interim Order Entry Date**"), subject to satisfaction (or waiver by the Required DIP Lenders) of the applicable conditions precedent set forth in the DIP Loan Agreement.  The final facility closing date is the date of entry of the Final Order (the "**Final Order Entry Date**"), subject to satisfaction of applicable conditions.  DIP Loan Agreement §§ 3.1-3.3. |
| **Maturity Date** | The earliest of (i) the date which is 30 days following the Interim Order Entry Date, if the Final Order Entry Date shall not have occurred by such date, (ii) three months from the Interim Facility Closing Date, (iii) the earlier of the effective date and the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code), in each case, of a plan of reorganization in any of the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, and (iv) the date of the acceleration of the Loans or termination of the Commitments under the DIP Loan Agreement, including, without limitation, as a result of the occurrence of an Event of Default (as defined in the DIP Loan Documents).  DIP Loan Agreement § 1.1 ("**Final Maturity Date**"). |
| **Interest/Fees** | The interest rate shall be:  if a Base Rate Loan, the Base Rate (minimum 3.25%) plus the Applicable Margin (7.50%), or if a Eurodollar Rate Loan, the Adjusted Eurodollar Rate (minimum 1.25%) plus the Applicable Margin (8.50%).  DIP Loan Agreement § 2.5.  The default rate is 3% in excess of the interest rate otherwise payable.  DIP Loan Agreement § 2.7.<br><br>In terms of fees, there is an upfront fee of 1.50% of the aggregate loan commitments of $50,000,000 ($750,000), plus the DIP Agent will charge a non-refundable fee of $50,000.  DIP Loan Agreement § 2.8 (plus side letter with DIP Agent). |
| **Conditions to DIP Closing** | Customary and appropriate for financings of this type, including entry of certain first day orders, implementation of acceptable cash management system, perfection and priority of liens, no material adverse effect, and continued effectiveness of financing.  DIP Loan Agreement §§ 3.1-3.3. |
| **Covenants** | Customary and appropriate information, affirmative, negative and financial covenants for financings of this type and consistent with the covenants contained in the Prepetition First Lien Credit Agreement (with necessary modifications to reflect current business conditions).  DIP Loan Agreement §§ 5-6. |
| **Prepayments** | Customary and appropriate for financings of this type, including mandatory prepayments for: (i) asset sales, (ii) insurance proceeds, (iii) incurrence of indebtedness and (iv) issuance of equity.  DIP Loan Agreement §§ 2.10-2.11. |
| **Events of Default** | Customary and appropriate for financings of this type, including failure to make payments when due, breach of representations or covenants, change of control, conversion of the Cases to chapter 7, and failure to meet certain milestones associated with confirmation and effectiveness of the Plan, entry of the |

---

[6]  The Adequate Protection Superpriority Claims will have recourse to proceeds of Avoidance Actions only upon entry of the Final Order.

14

| | |
|---|---|
| | DIP Orders, and approval of the Backstop Agreement and Restructuring Support Agreement.  DIP Loan Agreement § 8.1. |
| **Indemnity** | The Debtors shall, jointly and severally, be obligated to indemnify and hold harmless the DIP Agent, each of the DIP Lenders, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys and representatives from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, out-of-pocket fees and disbursements of counsel) in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility (except to the extent found by a final nonappealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such indemnified person or its affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys or other representatives).  DIP Loan Agreement § 12.3. |
| **Release** | Subject to the pendency of the Challenge Period, the Debtors will stipulate to the validity and priority of the Prepetition Obligations and the Prepetition Liens and release the Prepetition Agents, the Prepetition Lenders that are DIP Lenders or Backstop Providers, and/or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees, from any claims arising out of, based upon, or related to the Prepetition Credit Documents.  Interim Order ¶ E. |
| **Governing Law** | The Debtors will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county and city of New York, borough of Manhattan; and shall waive any right to trial by jury.  New York law shall govern the DIP Loan Documents, except as superseded by the Bankruptcy Code.  DIP Loan Agreement §§ 12.14-12.15. |

## Disclosure Pursuant to Local Rule 4001-2

22.     In accordance with Local Rule 4001-2, the Debtors note the following:

- No Cross-Collateralization:  The DIP Orders do not provide for the granting of cross-collateralization protection to any prepetition secured creditors, other than replacement liens with the same validity and priority as the Prepetition Agents' prepetition security interests.  In certain circumstances, however, the Interim Order provides the Prepetition Agents with relief from the automatic stay with respect to the DIP Collateral and the Prepetition Collateral.  Although there is no "roll-up," the DIP Facility is a priming facility.  *See* Interim Order ¶¶ 18 and 24.

- Validity of Prepetition Loan Obligations and Related Liens:  The DIP Orders contemplate, subject to certain challenge rights set forth in Paragraph 31 of the Interim Order, findings that would bind the Debtors with respect to the validity, perfection and amount due and owing on account of the Prepetition Loan Obligations and granting general releases in favor of the Prepetition Agents and the Prepetition Lenders that are DIP Lenders or Backstop Providers (as defined in the DIP Loan Agreement).  *See* Interim Order ¶¶ E(i)-(xi).

- Waiver of Section 506(c) Rights:  The Interim Order contemplates the waiver of Bankruptcy Code section 506(c) rights as part of the Final Order.  *See* Interim Order ¶¶ H and 33.

- Prepetition Secured Lien on Avoidance Actions:  The Interim Order contemplates that, upon entry of the Final Order, the proceeds of Avoidance Actions will be

15

subject to the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, and Adequate Protection Superpriority Claims. *See* Interim Order ¶¶ 6, 8, 12 & 13.

- <u>Adequate Protection</u>: The DIP Orders contemplate providing adequate protection to the Prepetition Agents. *See* Interim Order ¶¶ 12 and 13.

- <u>Treatment of Committee Professionals</u>: The DIP Orders propose disparate treatment for professionals retained by a Creditors' Committee from professionals retained by the Debtors in that the Committee Professionals' Carve-Out Expenses are limited to the amounts set forth in the Budget. *See* Interim Order ¶ 29.

- <u>Waiver or Modification of the Automatic Stay</u>: The DIP Orders contemplate, as to the DIP Agent, the DIP Lenders, and the Prepetition Agents, waiver or modification of the automatic stay upon the occurrence of an event of default, subject to certain notice and cure periods. *See* Interim Order ¶ 24.

- <u>Applicability of Non-Bankruptcy Law Relating to Perfection</u>: The DIP Orders include provisions that provide for the automatic perfection and validity of the liens, security interests and adequate protection provided in the DIP Loan Agreement, the Interim Order, and the Final Order without the necessity of any further filing or recording under the laws of any jurisdiction. *See* Interim Order ¶ 19.

### <u>Basis for Relief</u>

**A.**    **<u>Legal Standard for Obtaining Credit Under 11 U.S.C. § 364(c)</u>**

23.     Section 364(c) of the Bankruptcy Code allows the obtaining of credit or incurrence of debt on an unsecured superpriority basis, or secured by liens on unencumbered property and junior liens on encumbered property. *See* 11 U.S.C. § 364(c). The statutory requirement for obtaining post-petition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code]." 11 U.S.C. § 364(c); *see In re Ames Dept. Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section

16

364(c)(2) of the Bankruptcy Code is authorized, after notice and a hearing, upon showing that

unsecured credit cannot be obtained).  Courts have applied the following three-part test to

determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code:

(1)    the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

(2)    the credit transaction is necessary to preserve the assets of the estate; and

(3)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*Crouse Group*, 71 B.R. at 549.  As discussed below, each of these elements is satisfied.

**B.**    **Legal Standard for Obtaining Credit Under 11 U.S.C. § 364(d)**

24.    If a debtor is unable to obtain credit under the provisions of section 364(c)

of the Bankruptcy Code, the debtor may obtain credit secured by a "priming" senior or equal lien

on property of the estate that is already subject to a lien under section 364(d) of the Bankruptcy

Code.  Specifically, section 364(d)(l) of the Bankruptcy Code provides that a court may, after

notice and a hearing, authorize the obtaining or the incurring of debt secured by a senior or equal

lien on property of the estate that is subject to a lien only if -

(1)    the trustee is unable to obtain such credit otherwise; and

(2)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1); *see also In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631-32 (Bankr.

S.D.N.Y. 1992) (allowing post-petition lenders' liens to prime existing security interests because

(i) debtor was unable to obtain financing otherwise and (ii) debtor's use of proceeds would

provide adequate protection to existing secured creditors by increasing value of property

17

securing their claims).

25.    As discussed below, the Debtors were unable to obtain credit more favorable than that proposed under the DIP Facility.  Moreover, by virtue of their overwhelming support for the Plan, a substantial majority of the Prepetition Lenders also support the relief requested herein.  The material terms of the DIP Facility were disclosed in the disclosure statement submitted in support of the Plan (the "Disclosure Statement"), which was delivered to the Prepetition Lenders as part of the Debtors' prepetition solicitation packages.  As set forth in the ballots to the Plan, a vote in favor of the Plan constitutes consent to the DIP Facility.  Indeed, the DIP Facility is a necessary stepping stone to the Plan.  Based upon the substantial Prepetition Lender support demonstrated by the Debtors' prepetition solicitation of votes on the Plan, it is the Debtors' understanding that neither of the Prepetition Agents intends to contest the relief requested herein.  The Prepetition Agents are the sole holders of the security interests under the Prepetition Credit Documents that are entitled to adequate protection.

26.    In addition, as set forth more fully in the Disclosure Statement, the value of the property securing the Prepetition Lenders' claims will be preserved and enhanced by approval of the DIP Loan by this Court.  Absent such approval, the Debtors would be unable to pay their Employees and other critical expenses in the ordinary course of business, which would lead to a significant disruption and, perhaps, cessation of operations.  Such disruption or cessation would likely cause a forced liquidation of what would remain of the Debtors' business and assets.  A failure to preserve the Debtors' going concern operations would have a dramatic adverse impact on the value of these estates.  The higher and lower estimates of liquidation

18

proceeds as set forth in the Disclosure Statement are between $154 million and $208 million. By comparison, the postconfirmation reorganization enterprise value of the reorganized Debtors is approximately $680 million to $780 million.

## C.    Standards for Use of Cash Collateral

27.    The Bankruptcy Code entitles the Prepetition Agents to adequate protection for the Debtors' use of Cash Collateral. Section 363(c)(2) of the Bankruptcy Code sets forth the requirements for a debtor's proposed use of cash collateral, and provides, in pertinent part that:

> [t]he trustee [or debtor in possession] may not use, sell, or lease cash collateral . . . unless—(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).[7] Section 363(e) provides that: "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary *to provide adequate protection of such interest.*" 11 U.S.C. § 363(e) (emphasis added); *see also Harvis Trien & Beck, P.C. v. Federal Home Loan Mortg. Corp. (In re Blackwood Assocs., L.P.)*, 153 F.3d 61, 67 (2d Cir. 1998) (noting the secured lender's "absolute

---

[7] Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

> cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property ... subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

right to receive adequate protection payments before any [non-consensual] use of [its] cash collateral by" the debtor).

**D.     Adequate Protection Standards**

28.     What constitutes sufficient adequate protection, whether for a priming lien under section 364(d) or for the use of cash collateral under section 363, is fact-specific and is determined on a case-by-case basis. *See Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc).,* 16 F.3d 552, 564 (3d Cir. 1994) (holding that "courts [have] discretion in fashioning the protection . . . a determination of whether there is adequate protection is made on a case by case basis"); *In re Mosello*, 195 B.R. 277, 288-89 (Bankr. S.D.N.Y. 1996) (holding that"'[i]ts application is left to the vagaries of each case.'") (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)). Examples of adequate protection are provided in section 361 of the Bankruptcy Code and include, but are not limited to: (1) "periodic cash payments" to the extent that such use "results in a decrease in value of such entity's interest in such property;" (2) "additional or replacement lien[s] to the extent that [the use of cash collateral] results in a decrease in the value of such entity's interest in such property;" and (3) "granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.

29.     Bankruptcy courts have broad flexibility under section 361 in deciding what constitutes adequate protection:

> This section specifies the means by which adequate protection may be provided. It does not require the court to provide it. To do so would place the court in an administrative role. Instead, the trustee or debtor in possession will provide or propose a protection method. If the party that is affected by the proposed action objects,

20

> the court will determine whether the protection provided is adequate. The purpose of this section is to illustrate means by which it may be provided and to define the contours of the concept.

H.R. Rep. No. 95-595, at 303, (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6295; *see also*

*Swedeland Dev. Group*, 16 F.3d at 564; *495 Central Park Ave.*, 136 B.R. at 631 ("The statute

confers upon 'the parties and the courts flexibility by allowing such other relief as will result in

the realization by the protected entity of the value of its interest in the property involved.'")

(quoting H.R. Rep. No. 95-595, at 340 (1978)).

30.     The focus of the adequate protection requirement is to preserve the

secured creditor's position at the time of the bankruptcy filing and protect the secured creditor

from diminution in the value of its collateral during the reorganization process. *Mosello*, 195

B.R. at 288; *Beker*, 58 B.R. at 736; *In re WorldCom, Inc.*, 304 B.R. 611, 618-19 (Bankr.

S.D.N.Y. 2004) (finding that"[t]he legislative history for section 361 of the Bankruptcy Code,

which sets forth how adequate protection may be provided under section 363, makes clear that

the purpose is to insure that the secured creditor receives the value for which the creditor

bargained for prior to the debtor's bankruptcy."). "However, neither the legislative history nor

the Bankruptcy Code require the Court to protect a creditor beyond what was bargained for by

the parties." *WorldCom*, 304 B.R. at 619; *see also Beker*, 58 B.R. at 741 ("Adequate protection,

not absolute protection, is the statutory standard.").

31.     The interest to be protected by virtue of the adequate protection

requirement is the lesser of the amount of the debt or the value of assets securing the debt as of

the Petition Date. *See Bankers Life Ins. Co. of Neb. v. Alyucan Interstate Corp. (In re Alyucan*

*Interstate Corp.)*, 12 B.R. 803, 808 (Bankr. D. Utah 1981) ("[T]he 'interest in property' entitled to protection is not measured by the amount of the debt but by the value of the lien.").

### Application of Law to the Facts

A.    **The DIP Facility Will Provide Necessary Liquidity to These Estates**

32.    The Debtors require additional working capital – beyond that which would be generated as Cash Collateral – in order to preserve and maintain their business during the Cases. The Debtors operate a staffing business. Without access to adequate liquidity, the Debtors could not continue to pay their 75,000 Employees or to otherwise maintain the going concern value of their business.

33.    Hence, by obtaining the DIP Facility and having access to the Cash Collateral, the Debtors will be in a position to preserve the value of their assets during the Cases for the benefit of all creditors. The DIP Facility and the continued use of Prepetition Collateral and Cash Collateral also will provide the Debtors with necessary liquidity to facilitate the Debtors' successful prepackaged reorganization. Absent approval of the relief sought herein, the Debtors face a substantial risk of severe disruption to their business and irreparable damage to the value of their assets, and the Debtors would be unable to proceed to confirmation of the Plan. *See In re Sun Healthcare Group, Inc.*, 245 B.R. 779, 781 (Bankr. D. Del. 2000) (noting that the court had approved debtor-in-possession financing to "permit the Debtors to continue to operate to preserve their estates").

34.    When debtors show that the continued operation of their business during the relevant period will not pose an unreasonable risk or decline in the collateral's value, there is

22

no need for any additional adequate protection. *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993). If a debtors' protections are reasonable, a bankruptcy court will generally permit the debtors to use cash collateral if the restructuring or rehabilitative goals are achievable. *Id.* at 395.

35.     Here, the terms of the DIP Facility are fair and reasonable under the circumstances, reflect the Debtors' prudent exercise of their business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration for the obligations and liens and security interests granted in exchange. It should be noted that the Debtors are *not* seeking to prime any liens that are senior to liens held by the Prepetition First Lien Agent as of the Petition Date.

**B.     No Adequate Alternative to the DIP Facility is Currently Available**

36.     A debtor need only demonstrate that, notwithstanding its good faith efforts, credit was unavailable without the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code. *See Bray v. Shenandoah Fed. Savs. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (affirming district court's grant of a priming lien, where "the trustee had demonstrated by a good faith effort that credit was not available without the senior lien."); *Ames Dept. Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving section 364(c) financing facility and holding that the debtor made reasonable efforts to obtain less onerous terms where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders); *495 Central Park Ave.*, 136 B.R. at 630-31 (noting that, although "the debtor must make an effort to obtain

23

credit without priming a senior lien," it does not need "to seek alternate financing from every possible lender.").

37.    In making their decision to seek financing from the DIP Lenders, the Debtors considered many factors. First, the Prepetition Lenders are already lenders to the company. Second, the Debtors were unable to obtain alternative postpetition financing terms from other lenders that on balance were more favorable to their estates than the proposed DIP Facility through credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, unsecured credit allowable under sections 364(a) and 364(b) of the Bankruptcy Code, or credit secured by liens on the Debtors' assets junior to the liens securing the Prepetition Agents, as is contemplated by section 364(c)(3) of the Bankruptcy Code.

38.    In an effort to obtain alternative financing, the Debtors approached eight different financial institutions, including banks and alternative funding sources. In particular, the Debtors solicited these parties' interest in providing funding on either a priming or junior basis to the Prepetition Lenders. Five of the eight parties were not interested, one did not respond, and two made initial proposals that contemplated loans on a priming basis. No party was interested in taking a junior position to the Prepetition Lenders. Of the two initial proposals received, both contemplated significant break-up compensation and due diligence expenses, and carried substantial closing and timing risks, that far outweighed any marginal pricing benefits compared to the proposed DIP Facility. Hence, in light of the terms of the proposed DIP Facility and the fact that such financing is provided in the context of a global consensual restructuring under the

24

Plan, the Debtors determined that the financing with the DIP Lenders constitutes the most advantageous to these estates.

## C.     The DIP Facility Terms Are Fair, Reasonable, and Appropriate

39.     The proposed terms of the DIP Facility are fair and reasonable under the circumstances and were negotiated at arm's length and in good faith by separately represented parties. As discussed more fully above, the Debtors made concerted efforts to obtain credit on the most favorable terms available. Although the Debtors contacted various alternate lending institutions, no other lender was willing to provide an adequate stand-alone financing facility on terms more favorable than the proposed DIP Facility. Against this backdrop, the Debtors carefully evaluated the proposed financing structure from the DIP Lenders, engaged in extensive negotiations with the DIP Lenders regarding the proposed terms, worked with their various advisors to obtain the best possible pricing from the DIP Lenders, and ultimately agreed to the proposed DIP Facility as the financing structure best suited to the Debtors' needs.

40.     The terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arm's length and, as outlined above, were instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 and preserving the going concern status of the Debtors, in addition to allowing the Debtors to move forward with confirmation of the pre-packaged Plan.

## D.     The Debtors' Use of Cash Collateral is Necessary and Appropriate

41.     Pursuant to section 363(e) of the Bankruptcy Code, the Debtors' use of Cash Collateral is conditioned upon adequate protection being provided to the Prepetition Lenders. *See* 11 U.S.C. § 363(e). The Debtors respectfully submit that the proposed use of Cash

25

Collateral, in conjunction with the DIP Facility and in accordance with the Budget, is necessary for the Debtors to have sufficient liquidity during the chapter 11 process to preserve their assets and property (including the Prepetition Collateral). The Debtors' proposed use of Cash Collateral thus prejudices no one; it affirmatively and directly benefits the Debtors' estates and creditors, including the Prepetition Agents, and enhances the prospects of a successful outcome of these Cases.

E.    **The Proposed Adequate Protection for the Prepetition Agents Should Be Approved**

      42.    To the extent that their interests in the Prepetition Collateral constitute valid and perfected security interests and liens as of the Petition Date, absent consent, the Prepetition Agents are entitled, pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral.

      43.    By this Motion, the Debtors are requesting authority to provide adequate protection in the form of replacement liens to the Prepetition Agents, claims under section 507(b) of the Bankruptcy Code, payment of reasonable fees and expenses of certain of the professionals of the Prepetition Agents and the Backstop Provider Group, all as set forth in the proposed DIP Orders. The Debtors believe that the majority of the Prepetition Lenders support the relief requested herein. It is also the Debtors' understanding that the Prepetition Agents will not oppose the relief sought herein.

      44.    Further, the alternative in these cases is "to force the debtors to close down their operations and thus doom any effort at reorganization which will hopefully extract the

26

maximum value of the assets involved to the benefit of *all* classes of creditors and other

constituencies involved in this case." *Dynaco Corp.,* 162 B.R. at 396. Because this result

would be at fundamental odds to the rehabilitative purposes of chapter 11, approval of the cash

collateral motions is routinely granted where necessary to preserve going concern value. *Id.* at

394 (noting that "it is apparent that the Congress intended business under reorganization to

proceed in as normal a fashion as possible") (*quoting In re Prime, Inc.*, 15 B.R. 216, 219 (Bankr.

W.D. Mo. 1981))

45.    Here, the Prepetition Agents are adequately protected because the value of

the property securing the Prepetition Agents' claims will be maximized through approval of the

DIP Facility and confirmation of the Plan. Without the DIP Facility, the Debtors would face a

hard stop liquidation. The higher and lower estimates of liquidation proceeds as set forth in the

Disclosure Statement are between $154 million and $208 million. By comparison, the

postconfirmation reorganization enterprise value of the reorganized Debtors is approximately

$680 million to $780 million.

46.    The bottom line is that the Debtors require the DIP Facility in order to

maintain operations and going concern value and to effectuate an orderly exit from bankruptcy

that maximizes recoveries by all creditors. For these reasons, the Debtors urge the Court to

approve the relief requested by this Motion.

### Interim Approval Should Be Granted

47.    The Debtors request that the Court conduct an expedited preliminary

hearing on this Motion and authorize the Debtors, from and after the entry of the Interim Order

27

and pending the Final Hearing, to obtain credit under the DIP Facility in the amount of not more than **$20,000,000**, which the Debtors shall, among other things, use as critical working capital. Such authority will ensure that the Debtors maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest pending the Final Hearing.

48.     Absent this Court's approval of the interim relief sought by this Motion, the Debtors face a substantial risk of severe disruption to their business operations and irreparable damage to their relationships with Employees, customers, and service providers.

49.     Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the fourteen-day period following the filing of a motion requesting authorization to obtain postpetition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2).  In examining requests under this Rule, courts apply the same business judgment standard as is applicable to other business decisions. *See, e.g., Ames*, 115 B.R. at 38. After the fourteen-day period, the Bankruptcy Rules do not limit the request to those amounts necessary to prevent the destruction of the debtor's business, and the debtor can borrow those amounts it views as prudent to the operation of its business. *Id.* at 36.

50.     The Debtors submit that, for the reasons set forth herein, immediate approval of borrowings under the DIP Facility in an amount up to **$20,000,000**, plus use of Cash Collateral in accordance with the Budget, upon entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates.

DOCS_SF:84266.16 50005/001

### Request for Final Hearing

51.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors

request that the Court schedule the Final Hearing.

52.     The Debtors request that they be authorized to serve a copy of the signed

Interim Order, which fixes the time and date for the filing of objections, if any, by first-class mail

upon the notice parties listed below.  The Debtors further request that the Court consider such

notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

### Waiver of Bankruptcy Rules 6004(a) and (h)

53.     Should the Court grant this Motion and enter the Interim Order and the

Final Order, the Debtors seek, in order to implement the DIP Facility successfully, a waiver of

the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order

authorizing the use, sale or lease of property under Bankruptcy Rule 6004(h).

### Notice

54.     Notice of this Motion has been provided by the Debtors, whether by

facsimile, email, overnight courier, or hand delivery, to certain parties in interest, or, in lieu

thereof, to their counsel, if known, including:  (i) the United States Trustee for the District of

Delaware; (ii) the United States Attorney for the District of Delaware; (iii) the parties included

on the Debtors' list of thirty-five (35) largest unsecured creditors on a consolidated basis; (iv) all

persons or entities known to the Debtors that have asserted a lien or interest in any of the DIP

Collateral; (v) counsel to the DIP Agent; (vi) counsel to the DIP Lenders and the Backstop

Provider Group; (vii) counsel to the Prepetition Agents; and (viii) all parties entitled to notice

29

pursuant to Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief

requested, no other or further notice need be given.

### No Prior Request

55.    No previous request for the relief sought herein has been made to this or

any other Court.  Pursuant to Local Bankruptcy Rule 9013-1(f), the Debtors consent to the entry

of a final judgment or order with respect to this Motion if it is determined that this Court would

lack Article III jurisdiction to enter such final order or judgment absent the consent of the parties.

WHEREFORE, the Debtors respectfully request entry of the Interim Order and,

following the Final Hearing, entry of the Final Order, granting the relief requested herein and

such other and further relief as the Court may deem just and appropriate.


Dated:  April 1, 2014

PACHULSKI STANG ZIEHL & JONES LLP

Jeffrey N. Pomerantz (CA Bar No. 143717)
Debra Grassgreen (CA Bar No. 169978)
James E. O'Neill (Bar No. 4042)
Maxim B. Litvak (CA Bar No. 215852)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
E-mail:    jpomerantz@pszjlaw.com
           dgrassgreen@pszjlaw.com
           joneill@pszjlaw.com
           mlitvak@pszjlaw.com


Proposed Co-Counsel to Debtors and
Debtors in Possession

30