IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABLEST INC., et. al,[1] | ) | Case No. _____ |
| | ) | |
| Debtors. | ) | |
| | ) | |

## PREPACKAGED JOINT PLAN OF
## REORGANIZATION FOR ABLEST INC., et al.

Dated:  March 11, 2014

Anthony W. Clark (I.D. No. 2051)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
T: (302) 651-3000
F: (302) 651-3001

– and –

Kenneth S. Ziman
Glenn S. Walter
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
T: (212) 735-3000
F: (212) 735-2000

– and –

Jeffrey N. Pomerantz
Debra Grassgreen
James E. O'Neill (I.D. No. 4042)
PACHULSKI STANG ZIEHL & JONES LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
T: (302) 652-4100
F: (302) 652-4400

Proposed Counsel to Debtors and Debtors in Possession

---

[1]The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are set forth on Schedule 1 hereto.

## <u>TABLE OF CONTENTS</u>

**ARTICLE I.** RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS....................................................1
    **A.**    Rules of Interpretation, Computation of Time and Governing Law.......................1
    **B.**    Defined Terms .............................................................................2
**ARTICLE II.** ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX
CLAIMS..................................................................................17
    **A.**    Administrative Claims ..................................................................17
    **B.**    DIP Facility Claims.....................................................................18
    **C.**    Priority Tax Claims .....................................................................18
**ARTICLE III.** CLASSIFICATION AND TREATMENT OF  CLASSIFIED CLAIMS
AND EQUITY INTERESTS ...............................................................19
    **A.**    Summary ..................................................................................19
    **B.**    Classification and Treatment of Claims and Equity Interests.......................20
    **C.**    Special Provision Governing Unimpaired Claims .................................25
    **D.**    Discharge of Claims....................................................................25
**ARTICLE IV.** ACCEPTANCE OR REJECTION OF THE PLAN ...........................25
    **A.**    Presumed Acceptance of Plan .........................................................25
    **B.**    Presumed Rejection of Plan ...........................................................26
    **C.**    Voting Classes ..........................................................................26
    **D.**    Acceptance by Impaired Classes of Claims.........................................26
    **E.**    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code...................26
**ARTICLE V.** MEANS FOR IMPLEMENTATION OF THE PLAN..........................26
    **A.**    General Settlement of Claims .........................................................26
    **B.**    Corporate Existence ....................................................................26
    **C.**    Vesting of Assets in the Reorganized Debtors .....................................27
    **D.**    Post-Emergence Term Loan Agreement, Post-Emergence ABL Loan
Agreement and Sources of Cash for Plan Distribution.............................27
    **E.**    New Common Stock Issued Under the Plan.........................................27
    **F.**    New Warrants Issued Under the Plan ................................................27
    **G.**    Rights Offering and Backstop Commitment.........................................28
    **H.**    Sorensen Party Transactions ..........................................................29
    **I.**    Management Incentive Plan............................................................30
    **J.**    Issuance of New Securities and Related Documentation ...........................30
    **K.**    Release of Liens, Claims and Equity Interests......................................31
    **L.**    Certificate of Incorporation and Bylaws.............................................31
    **M.**    Directors and Officers of Reorganized Parent.......................................31
    **N.**    Corporate Action........................................................................32
    **O.**    Cancellation of Notes, Certificates and Instruments................................32
    **P.**    Intercompany Claims ...................................................................33
    **Q.**    Lease Amendments......................................................................33
    **R.**    Plan Supplement, Other Documents and Orders and Consents Required
Under the Lender RSA and the Backstop Agreement .............................33
**ARTICLE VI.** TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES.................................................................................33

**Page**

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ..........33
B.    Assignment of Executory Contracts or Unexpired Leases ...................................34
C.    Rejection of Executory Contracts or Unexpired Leases .....................................35
D.    Claims on Account of the Rejection of Executory Contracts or Unexpired
       Leases.................................................................................................................35
E.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .........35
F.    Assumption of Director and Officer Insurance Policies.....................................36
G.    Indemnification Provisions................................................................................36
H.    Compensation and Benefit Programs.................................................................36
I.     Workers' Compensation Benefits.......................................................................37
**ARTICLE VII.** PROVISIONS GOVERNING DISTRIBUTIONS....................................37
A.    Dates of Distributions.......................................................................................37
B.    Distribution Agent ............................................................................................37
C.    Cash Distributions.............................................................................................38
D.    Rounding of Payments.......................................................................................38
E.    Distributions on Account of Claims Allowed After the Effective Date ...............38
F.    General Distribution Procedures........................................................................38
G.    Address for Delivery of Distributions................................................................39
H.    Undeliverable Distributions and Unclaimed Property........................................39
I.     Withholding Taxes.............................................................................................39
J.     Setoffs. ..............................................................................................................39
K.    Surrender of Cancelled Instruments or Securities ............................................40
L.    Lost, Stolen, Mutilated or Destroyed Securities ...............................................40
**ARTICLE VIII.** PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS ...............................................................40
A.    Disputed Claims.................................................................................................40
B.    Procedures Regarding Disputed Claims ............................................................40
C.    Allowance of Claims..........................................................................................41
**ARTICLE IX.** CONDITIONS PRECEDENT TO CONFIRMATION  AND
CONSUMMATION OF THE PLAN ...............................................................................42
A.    Conditions Precedent to Confirmation...............................................................42
B.    Conditions Precedent to Consummation.............................................................46
C.    Waiver of Conditions ........................................................................................47
D.    Effect of Non Occurrence of Conditions to Consummation................................47
**ARTICLE X.** DEBTORS' RELEASES...........................................................................48
**ARTICLE XI.** RELEASE, INJUNCTION AND RELATED PROVISIONS ............................48
A.    General ..............................................................................................................48
B.    Release ..............................................................................................................48
**ARTICLE XII.** THIRD PARTY RELEASE .....................................................................49
A.    Creditors Release ..............................................................................................49
B.    Sorensen Parties and Affiliates Release.............................................................50
C.    Discharge of Claims..........................................................................................50
D.    Exculpation .......................................................................................................51
E.    Preservation of Rights of Action.......................................................................51
F.    Injunction ..........................................................................................................52

**Page**

**ARTICLE XIII.** BINDING NATURE OF PLAN ............................................................52
**ARTICLE XIV.** RETENTION OF JURISDICTION ...................................................52
    **A.**    Retention of Jurisdiction ...........................................................52
    **B.**    Failure of Bankruptcy Court to Exercise Jurisdiction.....................54
**ARTICLE XV.** MISCELLANEOUS PROVISIONS..................................................54
    **A.**    Dissolution of the Committee ....................................................54
    **B.**    Payment of Statutory Fees ........................................................54
    **C.**    Payment of Fees and Expenses of Prepetition Agents........................54
    **D.**    Modification of Plan ................................................................54
    **E.**    Revocation of Plan ..................................................................55
    **F.**    Successors and Assigns.............................................................55
    **G.**    Reservation of Rights...............................................................55
    **H.**    Further Assurances...................................................................55
    **I.**    Additional Debtors..................................................................55
    **J.**    Severability ..........................................................................56
    **K.**    Service of Documents..............................................................56
    **L.**    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code ..................................................................58
    **M.**    Governing Law ......................................................................59
    **N.**    Tax Reporting and Compliance ..................................................59
    **O.**    Schedules ...............................................................................59
    **P.**    No Strict Construction .............................................................59
    **Q.**    Conflicts...............................................................................59
    **R.**    Confirmation Request ..............................................................59

PLAN SCHEDULES

Plan Schedule 1          List of Debtors

Plan Schedule 2          Specified Related Party Claims

PLAN EXHIBITS

Exhibit A                Backstop Agreement

Exhibit B                Lender RSA

Exhibit C                Sorensen Support Agreement

Exhibit D                DRV Purchase Agreement

Exhibit E`               Option Agreement

Exhibit F                Stockholders Agreement

Exhibit G                Covenants In Connection with Sale of Business Agreement

Exhibit H                Employment Agreement with Mr. Sorensen

Exhibit I                Restricted Stock Award Agreement

Exhibit J                Lease Amendments

Exhibit K                Term Sheet for New Warrants

JOINT PLAN OF REORGANIZATION FOR
ABLEST INC., et al.

Ablest Inc., a Delaware corporation ("Ablest"), New Koosharem Corporation, a California corporation and the indirect parent entity of Ablest (the "Parent"), Koosharem, LLC (f/k/a Koosharem Corporation), a California limited liability company, a wholly-owned subsidiary of the Parent and the direct parent entity of Ablest (the "Borrower"), and each of the other debtors and debtors-in-possession listed on Plan Schedule 1 hereto, propose the following joint plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtors. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of the Plan. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, results of operations, historical financial information, events leading up to Solicitation of the Plan, projections and properties, and for a summary and analysis of this Plan and the treatment provided for herein. There are also other agreements and documents that will be filed with the Bankruptcy Court, that are referenced in this Plan, the Plan Supplement or the Disclosure Statement as Exhibits and Plan Schedules. All such Exhibits and Plan Schedules are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions set forth in the Lender RSA, the Backstop Agreement, and requirements set forth in 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its Consummation.

If the Plan cannot be confirmed as to some or all of the Debtors, then, in the Debtors' sole discretion, but without prejudice to the respective parties' rights under the Lender RSA, or the Backstop Agreement, (a) the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor (and any such Debtor's Chapter 11 Case may be converted to a chapter 7 liquidation, continued or dismissed in the Debtors' sole discretion) and confirm the Plan as to the remaining Debtors to the extent required. The Debtors reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims.

Notwithstanding any rights of approval that may exist pursuant to the Lender RSA, the Backstop Agreement, or otherwise, as to the form or substance of the Disclosure Statement, the Plan or any other document relating to the transactions contemplated hereunder or thereunder, neither the Prepetition Secured Lenders, the Prepetition Agents, the Participating Lenders, the Steering Committee, the Backstop Investors, nor their respective representatives, members, Affiliates, financial or legal advisors or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties, or should be relied upon, whatsoever concerning the information contained herein.

## ARTICLE I.
### RULES OF INTERPRETATION, COMPUTATION OF TIME,
### GOVERNING LAW AND DEFINED TERMS

**A.**    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other

agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles", "Sections", "Exhibits" and "Plan Schedules" are references to Articles, Sections, Exhibits and Plan Schedules hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America.  The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**B.**    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.      "2010 Term Loan Lender Warrants" has the meaning ascribed in the Prepetition Credit Agreements.

2.      "Ablest" means Ablest Inc., a Delaware corporation.

3.      "Accrued Professional Compensation" means, with respect to a particular Professional, an Administrative Claim of such Professional for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date (including, without limitation, expenses of the members of any Committee incurred as members thereof in discharge of their duties as such).

4.      "Additional Debtor" means any affiliate or other related party of a Debtor that files a chapter 11 petition at any time prior to the Confirmation Date and that files a motion to have such debtor's chapter 11 case jointly administered with the Chapter 11 Cases.

5.      "Administrative Claim" means a Claim for costs and expenses of administration of the Chapter 11 Cases that is Allowed under section 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, and commissions for services and payments for inventory, leased equipment, and leased premises); (b) Accrued Professional Compensation and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of title 28, United States Code; (d) the DIP Facility Claims, including, without limitation, the fees and expenses of the DIP Agent and the DIP Lenders, including their respective professional and advisory fees and expenses; and (e) the Transaction Expenses.

6.      "Affiliate" means an "affiliate" as defined in section 101(2) of the Bankruptcy Code.

7.      "Allowed" means, with respect to any Claim, such Claim or any portion thereof that the Debtors have assented to the validity of or that has been (a) allowed by an order of the Bankruptcy Court, (b) allowed pursuant to the terms of this Plan, (c) allowed by agreement between the Holder of such Claim and the Debtors or Reorganized Debtors, or (d) allowed by an order of a court in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; provided, however, that, notwithstanding anything herein to the contrary, by treating a Claim as an "Allowed Claim" the Debtors do not waive their rights to contest the amount and validity of such Claim to the extent it is disputed, contingent or unliquidated, in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; and provided, further that the amount of any Allowed Claim shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code.

8.      "Allowed Claim or Equity Interest" means a Claim or an Equity Interest of the type that has been Allowed.

9.      "Avoidance Actions" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510 or 542-553 of the Bankruptcy Code.

10.     "Backstop Agreement" means the Backstop Agreement attached hereto as Exhibit A.

11.     "Backstop Agreement Assumption Motion" means a motion, in form and substance reasonably acceptable to the Required Backstop Investors, the Debtors and the Consenting Equity Holder that must be filed by the Debtors on or after the Petition Date seeking Bankruptcy Court approval of the Backstop Agreement and authorizing the Debtors to assume the Backstop Agreement.

12.     "Backstop Agreement Assumption Order" means an order of the Bankruptcy Court authorizing, among other things, the assumption of the Backstop Agreement and the provision of an indemnity by the Debtors in favor of the Backstop Investors to the extent set forth in the Backstop Agreement.

13.     "Backstop Commitment" means the agreement by each Backstop Investor (that is an Eligible Participant) pursuant to the Backstop Agreement to: (a) subscribe for its Backstop Proportion of all of the Rights Offering Securities that are eligible to be subscribed for by the Prepetition First Lien Lenders (that are Eligible Participants) that are not subscribed for by such Prepetition First Lien Lenders and (b) subscribe for its Backstop Proportion of additional Rights Offering Securities for an aggregate purchase price in Cash equal to $50 million.

14.     "Backstop Investor" means each Person signatory to the Backstop Agreement from time to time and identified as "Backstop Party" therein, including each permitted assignee thereunder and any Person added as a "Backstop Party" under the terms thereof.

15.     "Backstop Proportion" means the portion of the Backstop Commitment committed or agreed to by each Backstop Investor as set forth on Exhibit A to the Backstop Agreement.

16.    "Ballots" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote may, among other things, indicate their acceptance or rejection of this Plan.

17.    "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Cases.

18.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over the Chapter 11 Cases.

19.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Rules, or the local rules of any other court having jurisdiction over the Chapter 11 Cases, in each case as amended from time to time and as applicable to the Chapter 11 Cases.

20.    "Borrower" means Koosharem, LLC (f/k/a Koosharem Corporation), a California limited liability company and a wholly-owned subsidiary of the Parent.

21.    "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

22.    "Butler Companies" means, collectively, Butler America Inc., Butler America TCS, Inc., Butler America Staffing LLC  and Butler Technical Services India (P) Ltd.

23.    "Cash" means the legal tender of the United States of America or the equivalent thereof.

24.    "Causes of Action" means any claims, causes of action (including Avoidance Actions), demands, actions, suits, obligations, liabilities, cross-claims, counter-claims, recoupments, offsets, or setoffs of any kind or character whatsoever, in each case whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, whether asserted or assertable directly or derivatively in law or equity or otherwise by way of claim, counterclaim, cross-claim, third party action, action for indemnity or contribution or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

25.    "Chapter 11 Cases" means the chapter 11 bankruptcy cases that may be commenced by the Debtors on the Petition Date in the Bankruptcy Court.

26.    "Chapter 11 Transaction Expenses" means the aggregate amount of reasonable fees and expenses payable by the Debtors in connection with the Chapter 11 Cases, including (a) the fees and expenses payable to the DIP Agent and the DIP Lenders and (b) the Transaction Expenses and any other fees, expenses, and indemnities contemplated by the Backstop Agreement and the Lender RSA.

27.    "Claim" means any "claim" against any Debtor as defined in section 101(5) of the Bankruptcy Code.

28.    "Claims Register" means the official register of Claims maintained by the Voting Agent.

29.    "Class" means a category of Holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

30. "Committee" means any committee of unsecured creditors in the Chapter 11 Cases, if any, appointed pursuant to section 1102 of the Bankruptcy Code.

31. "Company" means the Debtors, collectively.

32. "Confirmation" means the confirmation of this Plan by the Bankruptcy Court pursuant to section 1129 of the Bankruptcy Code.

33. "Confirmation Date" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

34. "Confirmation Hearing" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

35. "Confirmation Order" means the order of the Bankruptcy Court both confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement.

36. "Consenting Equity Holder" means D. Stephen Sorensen.

37. "Consummation" means the occurrence of the Effective Date.

38. "Creditor Releasing Party" means (a) each Holder of a Claim in the Voting Classes that affirmatively elects to grant the third party release provided in Article XII of the Plan by checking the appropriate box on the Ballot provided to such Holder in connection with solicitation of such Holder's vote to accept or to reject the Plan and (b) each of the following parties that affirmatively elects to grant the third party release provided in Article XII of the Plan by giving written notice to that effect to each of the Notice Parties: (i) the DIP agent, (ii) the Prepetition Agents and (iii) any other creditor in the Chapter 11 Cases that is not entitled to vote on the Plan.

39. "Debtor Releasing Party" has the meaning set forth in Article XI.B hereof.

40. "Debtor(s)" means individually, Parent and each of its subsidiaries listed on Plan Schedule 1 hereto, and, collectively, Parent and all of its subsidiaries listed on Plan Schedule 1 hereto, in each case, in their capacities as debtors in the Chapter 11 Cases.

41. "Debtor(s) in Possession" means, individually, each Debtor, as debtor in possession in their Chapter 11 Cases as of the Petition Date and, collectively, all Debtors, as debtors in possession in the Chapter 11 Cases.

42. "DIP Agent" means the administrative agent and collateral agent under the DIP Facility, and any successors thereto.

43. "DIP Facility" means that certain senior secured superpriority post-petition credit facility to be made available to the Debtors pursuant to the terms set forth in the term sheet attached as Exhibit H to the Disclosure Statement.

44. "DIP Facility Claim" means any Claim of the DIP Agent, any DIP Lender or any other party arising from, under or in connection with the DIP Facility.

45. "DIP Facility Motion" means the motion filed by the Debtors to obtain entry of the DIP Orders.

46.    "DIP Facility Secured Loan Agreement" means, collectively, the agreement(s) documenting the terms of the DIP Facility, including any and all schedules and exhibits thereto.

47.    "DIP Lenders" means the banks, financial institutions and other parties identified as lenders under the DIP Facility from time to time.

48.    "DIP Orders" means, collectively, the Interim DIP Order and Final DIP Order.

49.    "Disallowed Claim" means a Claim, or any portion thereof, that is: (a) not listed on the schedules filed by the Debtors pursuant to section 521 of the Bankruptcy Code, or is listed therein as contingent, unliquidated, disputed or in an amount equal to zero, and whose Holder has failed to file a timely proof of claim; or (b) disallowed by Final Order of the Bankruptcy Court.

50.    "Disclosure Statement" means that certain Disclosure Statement for the Prepackaged Joint Plan of Reorganization for Ablest Inc., et al. under Chapter 11 of the Bankruptcy Code, as amended, supplemented, or modified from time to time and describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

51.    "Disputed Claim or Equity Interest" means a Claim or Equity Interest, or any portion thereof:  (a) that is the subject of an objection or request for estimation filed or is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law and which objection has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court; or (b) that is otherwise disputed by any of the Debtors or any other party in interest in accordance with applicable law, which dispute has not been withdrawn, resolved, or overruled by Final Order.

52.    "Distribution Agent" means Reorganized Parent or any party designated by Reorganized Parent to serve as distribution agent under this Plan.  For purposes of distributions under this Plan to the Holders of Allowed DIP Facility Claims and Allowed Prepetition Secured Loan Claims, the DIP Agent and the Prepetition Agents, respectively, will be and shall act as the Distribution Agent.

53.    "D&O Liability Insurance Policies" means all insurance policies for directors' and officers' liability maintained by the Debtors as of the Petition Date.

54.    "DRV Purchase Agreement" means the Purchase Agreement to be entered into among Reorganized Parent, the Consenting Equity Holder, SB Group Holdings, Inc. and Esperer Holdings, Inc., substantially in the form attached as Exhibit D hereto, pursuant to which Reorganized Parent will purchase on the Effective Dave (a) all of the outstanding capital stock of Decca Consulting, Inc., Decca Consulting Ltd., Resdin Industries Ltd., and Vaughan Business Solutions, Inc. and (b) certain agreements to which Esperer Holdings, Inc. is a party in consideration for New Common Stock.

55.    "Effective Date" means the Business Day that this Plan becomes effective as provided in Article IX hereof.

56.    "Eligible Participant" means each Prepetition First Lien Lender that, as of the Rights Offering Record Date, is an "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act.

57.     "Entity" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

58.     "Equity Interest" means any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock, together with: (a) any options, warrants or contractual rights to purchase or acquire any such Equity Securities at any time with respect to such Debtor, and all rights arising with respect thereto and (b) the rights of any Entity to purchase or demand the issuance of any of the foregoing and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and put rights; and (4) stock-appreciation rights.

59.     "Equity Security" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60.     "Estates" means the bankruptcy estates of the Debtors created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

61.     "Exculpated Parties" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the current and former members of the Steering Committee; (d) the DIP Agent; (e) the DIP Lenders; (f) the Prepetition Secured Lenders; (g) the Backstop Investors; (h) the Prepetition Agents; (i) the Sorensen Parties; (j) the Participating Lenders and (k) the respective Related Persons of each of the foregoing Entities.

62.     "Exculpation" means the exculpation provision set forth in Article XII.D hereof.

63.     "Executory Contract" means a contract to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

64.     "Exhibit" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time).

65.     "Fifth Amendment First Lien Lender Warrants" has the meaning ascribed in the Prepetition First Lien Credit Agreement.

66.     "Fifth Amendment Second Lien Lender Warrants" has the meaning ascribed in the Prepetition Second Lien Credit Agreement.

67.     "File" or "Filed" or "Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

68.     "Final DIP Order" means the order approving the DIP Facility on a final basis.

69.     "Final Order" means an order of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, no stay pending appeal has been granted or such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing

shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

71.     "Governmental Unit" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

70.     "General Unsecured Claim" means any Claim against any Debtor that is not a/an: (a) DIP Facility Claim; (b) Administrative Claim; (c) Priority Tax Claim; (d) Secured Tax Claim, (e) other Priority Claim; (e) Other Secured Claim; (f) Prepetition Secured Loan Agreement Claim; (g) Intercompany Claim; or (i) Equity Interest.

72.     "Holder" means an Entity holding a Claim against, or Equity Interest in, any Debtor as of the applicable date of determination or any authorized agent of such Entity who has completed and executed a Ballot in accordance with the voting instructions that are attached to the Ballot.

73.     "Impaired" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

74.     "Indemnification Provision" means each of the indemnification provisions currently in place (whether in the bylaws, certificates of incorporation, board resolutions, employment contracts or otherwise) for the current and former directors, officers, employees, attorneys, other professionals and agents of the Debtors who served in such capacity on or any time after the Petition Date.

75.     "Initial Distribution Date" means, subject to the "Classification and Treatment of Claims and Equity Interests" sections in Article III hereof, the date that is as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims.

76.     "Intercompany Claims" means any Claims of a Debtor against any other Debtor.

77.     "Interim DIP Order" means the order entered by the Bankruptcy Court approving the DIP Facility on an interim basis.

78.     "Lease Amendments" means the Lease Amendments, substantially in the form attached as Exhibit J hereto.

79.     "Lender RSA" means that certain Amended and Restated Restructuring Support Agreement by and among the Debtors, the Consenting Equity Holder, and each of the Participating Lenders signatories thereto, substantially in the form attached as Exhibit B hereto.

80.     "Lender RSA Motion" means a motion, in form and substance reasonably acceptable to the Required Backstop Investors, the Debtors and the Consenting Equity Holder that must be filed by the Debtors on or after the Petition Date seeking Bankruptcy Court approval of the Lender RSA and authorizing the Debtors to assume the Lender RSA.

81.    "Lender RSA Order" means an order of the Bankruptcy Court granting the relief requested in the Lender RSA Motion and approving the Lender RSA and authorizing the Debtors to assume the Lender RSA Postpetition.

82.    "Lien" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

83.    "Litigation Claims" means the claims, rights of action, suits or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or Estate may hold against any Entity, including, without limitation, the Causes of Action of the Debtors.

84.    "Local Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

85.    "Majority Participating Lenders" shall have the meaning set forth in the Lender RSA.

86.    "Management Incentive Plan" means a post-Effective Date employee Management Incentive Plan, on the terms set forth in the Lender RSA, providing for the issuance from time to time of shares of the New Common Stock of the Reorganized Parent, including the grant of incentive stock options within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended.  The Management Incentive Plan shall be included in the Plan Supplement.

87.    "New Board" means the initial board of directors of Reorganized Parent as designated pursuant to Section M of Article V of this Plan.

88.    "New Capital Stock" means the New Common Stock and, where applicable, the New Warrants, all as authorized to be issued pursuant to this Plan.

89.    "New Common Stock" means shares of common stock of Reorganized Parent, par value $0.01 per share, to be issued on the Effective Date pursuant to this Plan.

90.    "New Securities and Debt Documents" means collectively, the New Common Stock, the New Warrants, the Post-Emergence Term Loan Agreement, the Post-Emergence ABL Loan Agreement, the Subordination and Intercreditor Agreement, and any and all other securities, notes, stock, instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to this Plan.

91.    "New Warrants" means the Warrants, on the terms set forth in Exhibit K hereto, to be issued by the Reorganized Parent to the Prepetition Second Lien Lenders pursuant to this Plan, exercisable for New Common Stock.

92.    "Notice Parties" means the entities listed in Article XV.K hereof.

93.    "Option Agreement" means the Option Agreement, substantially in the form attached as Exhibit E hereto, to be entered into between Reorganized Parent and a newly formed holding company that will be the parent of the Butler Companies.

94.    "Ordinary Course Professionals Order" means an order of the Bankruptcy Court, if any, approving a motion to employ ordinary course professionals in the Chapter 11 Cases.

95.    "Other Secured Claim" means any Secured Claim other than an Administrative Claim, DIP Facility Claim, Secured Tax Claim, or Prepetition Secured Loan Agreement Claim.

96.    "Parent" means New Koosharem Corporation, a California corporation."Parent Equity Interests" means all Equity Interests in Parent.

97.    "Participating Lenders" shall have the meaning set forth in the Lender RSA.

98.    "Person" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

99.    "Petition Date" means the date on which the Debtors commence the Chapter 11 Cases.

100.    "Plan" means this Prepackaged Joint Plan of Reorganization for Ablest Inc., et al., including the Exhibits and Plan Schedules and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

101.    "Plan Schedule" means a schedule annexed to either this Plan or as an appendix to the Disclosure Statement (as amended, modified or otherwise supplemented from time to time).

102.    "Plan Supplement" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits and Plan Schedules, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, which shall be filed with the Bankruptcy Court on or before 10 days prior to the Confirmation Hearing.  For the avoidance of doubt, the Plan Supplement will include the Management Incentive Plan, the New Securities and Debt Documents, the Reorganized Parent Organizational Documents, the disclosure related to officers and directors required under Article V.M, and list of contracts, if any, to be rejected under Article VI.

103.    "Post-Emergence ABL Agent" means Royal Bank of Canada in its capacity as administrative agent and/or collateral agent under the Post-Emergence ABL Loan Agreement, and its successors.

104.    "Post-Emergence ABL Loan Agreement" means that certain agreement providing for a secured asset based revolving loan, which shall be contained or described in the Plan Supplement.

105.    "Post-Emergence Term Loan Agent" means Credit Suisse AG, acting through one or more of its branches or affiliates,  in its capacity as administrative agent and/or collateral agent under the Post-Emergence Term Loan Agreement, and its successors.

106.    "Post-Emergence Term Loan Agreement" means that certain agreement providing for a secured term loan in the principal amount of $350 million, which shall be contained or described in the Plan Supplement.

107.    "Postpetition" means the time period beginning immediately upon the filing of the Chapter 11 Cases and ending on the Effective Date.

108.    "Prepetition Agents" means collectively, the Prepetition First Lien Agent and the Prepetition Second Lien Agent.

109.    "Prepetition First Lien Agent" means Bank of the West in its capacity as administrative agent and/or collateral agent under the Prepetition First Lien Credit Agreement, and its successors.

110.    "Prepetition First Lien Agent Professionals" means Katten Muchin Rosenman LLP and Cousins Chipman & Brown LLP.

111.    "Prepetition First Lien Credit Agreement" means that certain First Lien Credit and Guaranty Agreement (as amended, restated, supplemented or otherwise modified from time to time), dated as of July 12, 2007, by and among the Borrower, as borrower, the Prepetition Guarantors, as guarantors, the Prepetition First Lien Agent, as administrative and collateral agent, and the Prepetition First Lien Lenders party thereto.

112.    "Prepetition First Lien Lender Warrants" has the meaning ascribed to "First Lien Lender Warrants" in the Prepetition First Lien Credit Agreement.

113.    "Prepetition First Lien Lenders" means the banks, financial institutions and other parties identified as "Lenders" in the Prepetition First Lien Credit Agreement from time to time.

114.    "Prepetition First Lien Loan Claim" means any Claim arising under the Prepetition First Lien Credit Agreement and the "Transaction Documents" as defined therein.

115.    "Prepetition First Lien Loans" means "Loans" as such term is defined in the Prepetition First Lien Credit Agreement that are outstanding on the Petition Date.

116.    "Prepetition Guarantors" means the Debtors other than the Parent and the Borrower.

117.    "Prepetition Intercreditor Agreement" means that certain Intercreditor Agreement (as amended, restated, supplemented or otherwise modified from time to time), dated as of July 12, 2007, by and among the Borrower, Bank of the West, in its capacity as collateral agent under the Prepetition First Lien Credit Agreement and BNP Paribas, in its capacity as collateral agent under the Prepetition Second Lien Credit Agreement.

118.    "Prepetition Second Lien Agent" means Wilmington Trust, National Association (as successor by merger to Wilmington Trust FSB)  in its capacity as successor administrative agent and/or collateral agent to BNP Paribas, under the Prepetition Second Lien Credit Agreement and the Prepetition Intercreditor Agreement, respectively, and its successors.

119.    "Prepetition Second Lien Agent Professionals" means Dechert LLP.

120.    "Prepetition Second Lien Credit Agreement" means that certain Second Lien Credit and Guaranty Agreement (as amended, restated, supplemented or otherwise modified from time to time), dated as of July 12, 2007, by and among the Borrower, as borrower, the Prepetition Guarantors, as guarantors, BNP Paribas, as administrative and collateral agent, and the Prepetition Second Lien Lenders party thereto.

121.    "Prepetition Second Lien Lender Warrants" has the meaning ascribed to "Second Lien Lender Warrants" in the Prepetition Second Lien Credit Agreement.

122.    "Prepetition Second Lien Lenders" means the banks, financial institutions and other parties identified as "Lenders" in the Prepetition Second Lien Credit Agreement from time to time.

123.    "Prepetition Second Lien Loan Claim" means any Claim arising under the Prepetition Second Lien Credit Agreement and the "Transaction Documents" as defined therein.

124.    "Prepetition Second Lien Loans" means "Loans" as such term is defined in the Prepetition Second Lien Credit Agreement that are outstanding on the Petition Date.

125.    "Prepetition Secured Lenders" means collectively, the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders.

126.    "Prepetition Secured Loan Agreements" means collectively, the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement.

127.    "Prepetition Secured Loans" means collectively, the Prepetition First Lien Loans and the Prepetition Second Lien Loans.

128.    "Prepetition Secured Loan Claim" means any Prepetition First Lien Loan Claim or Prepetition Second Lien Loan Claim.

129.    "Prepetition Warrants" means, collectively, the 2010 Term Loan Lender Warrants, the Fifth Amendment First Lien Lender Warrants, the Prepetition First Lien Lender Warrants, the Fifth Amendment Second Lien Lender Warrants and the Prepetition Second Lien Lender Warrants.

130.    "Priority Claim" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

131.    "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

132.    "Pro Rata" means the proportion that (a) the Allowed principal amount of a Claim in a particular Class (or several Classes taken as a whole) bears to (b) the aggregate Allowed principal amount of all Claims in such Class (or several Classes taken as a whole), unless this Plan provides otherwise.

133.    "Professional" means: (a) any Entity employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

134.    "Professional Fee Claim" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for Accrued Professional Compensation.

135.    "Professional Fee Escrow Account" means an account to be funded by the Debtors upon receipt of the proceeds of the Rights Offering, pursuant to Article II.A.1 of the Plan, in an amount equal to the Professional Fee Reserve Amount.

136.    "Professional Fee Reserve Amount" means the aggregate amount of unpaid Professional Fee Claims through the Effective Date, as estimated in accordance with Article II.A.1 of the Plan.

137.    "Proof of Claim" means a proof of Claim or Equity Interest Filed against any Debtor in the Chapter 11 Cases.

138.    "Reinstated" means, with respect to any Claim: (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the holder of such Claim in accordance with Section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

139.    "Related Persons" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective current and former officers, directors, principals, employees, shareholders, members (including ex officio members), general partners, limited partners, agents, managers, managing members, financial advisors, attorneys, accountants, investment bankers, investment advisors, consultants, representatives, and other professionals, in each case acting in such capacity on or any time before or after the Petition Date, and any Person claiming by or through any of them.

140.    "Related Party Notes" means those certain notes listed on Schedule 1 to the Sorensen Support Agreement and identified as "Related Party Notes" therein.

141.    "Release Matter" means: (a) the Debtors, (b) the Debtors' restructuring, (c) the conduct of the Debtors' businesses, (d) the Chapter 11 Cases, (e) the Prepetition Secured Loans, (f) the subject matter of, or the transactions or events giving rise to, any Claim or interest that is treated in the Plan, (g) the business or contractual arrangements between any Debtor and any agent thereof, (h) the Rights Offering, (i) the Backstop Agreement, (j) the Lender RSA, (k) the Sorensen Support Agreement, (l) the DIP Facility, (m) the Disclosure Statement, (n) the Plan, (o) the solicitation of votes on the Plan and any transactions related thereto, and (p) the restructuring of Claims and interests prior to or in the Chapter 11 Cases, which Claims are based in whole or in part on any act, omission, transaction, event or other occurrence taking place before the Effective Date.

142.    "Released Party" means collectively, each in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the current and former members of the Steering Committee; (d) the DIP Agent; (e) the DIP Lenders; (f) the Prepetition Secured Lenders; (g) the Backstop Investors; (h) the Prepetition Agents; (i) the Sorensen Parties; (j) the Participating Lenders and (k) the respective Related Persons of each of the foregoing Entities.

143.    "Reorganized Borrower" means the Borrower, as reorganized pursuant to his Plan on or after the Effective Date.

144.    "Reorganized Debtors" means: (a) Reorganized Parent and (b) each other Debtor, as reorganized pursuant to this Plan on or after the Effective Date.

145.    "Reorganized Parent" means the Parent, as reorganized pursuant to this Plan on or after the Effective Date.

146.    "Reorganized Parent Organizational Documents" means the certificate of incorporation and by-laws or other applicable organizational documents of the Reorganized Parent.

147.    "Required Backstop Investors" means Backstop Investors representing 60% or more of the Backstop Proportions of all Backstop Investors.

148.    "Restricted Stock Award Agreement" means the Restricted Stock Award Agreement, substantially in the form attached as Exhibit I hereto.

149.    "Rights Offering" means that certain rights offering of Rights Offering Securities to be offered to the Eligible Participants, the terms of which are set forth in Article V.G of this Plan.

150.    "Rights Offering Purchase Price" means $225.0 million in Cash for the Rights Offering Securities.  When used with respect to a particular Rights Offering Purchaser, an amount of Cash equal to $175.0 million of the Rights Offering Purchase Price multiplied by such Rights Offering Purchaser's subscribed-for portion of the Rights Offering Securities.  When used with respect to a particular Backstop Investor, the sum of: (a) an amount of Cash equal to $50.0 million of the Rights Offering Purchase Price multiplied by such Backstop Investor's Backstop Proportion; and (b) an amount of Cash equal to $175.0 million of the Rights Offering Purchase Price multiplied by such Backstop Investor's Backstop Proportion of all of the Rights Offering Securities that are eligible to be subscribed for by the Prepetition First Lien Lenders (that are Eligible Participants) that are not subscribed for by such Prepetition First Lien Lenders.

151.    "Rights Offering Purchaser" means an Eligible Participant who timely and properly executes and delivers the Subscription Documents to the Debtors or other Entity specified in the Subscription Documents prior to the expiration of the Subscription Deadline.

152.    "Rights Offering Record Date" means the date for determining which Prepetition Secured Lenders are Eligible Participants and shall be March 20, 2014.

153.    "Rights Offering Securities" means the New Common Stock.

154.    "SCIF" means the State Compensation Insurance Fund.

155.    "SCIF Claims" means all Claims by SCIF against any of the Debtors in connection with the SCIF Settlement Agreement, which Claims shall not exceed $22,900,000.

156.    "SCIF Settlement Agreement" means that certain Confidential Settlement Agreement dated as of November 3, 2012  by and between SCIF and  Parent and its subsidiaries, as amended by that certain First Amendment to Confidential Settlement Agreement dated October 7, 2013.

157.    "Secured Claim" means a Claim that is secured by a Lien on property in which any Debtor's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

158.    "Secured Tax Claim" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

159.    "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, and any similar federal, state or local law.

160.    "Solicitation" means the solicitation of votes of those parties in Classes 4 and 5 to accept or reject the Plan.

161.    "Sorensen Parties" means, collectively, (i) the Consenting Equity Holder, (ii) the Butler Companies, (iii) Shannon Sorensen, Stephanie Sorensen, John Sorensen, Paul Sorensen, Allyson Sorensen, the Sorensen Family Trust U/D/T July 26, 1991, as amended, SB Group Holdings, Inc., Battle Mountain Specialty Insurance, Inc., Esperer Holdings, Inc., SSST Holdings, LLC, 1640 Grove, LLC, and (iv) New Butler Holdco (as defined in the Sorensen Support Agreement".

162.    "Sorensen Support Agreement" means the Sorensen Support Agreement, entered into by and among (i) the Parent (ii) the Backstop Investors and (iii) each of the Sorensen Parties, substantially in the form attached as <u>Exhibit C</u> hereto.

163.    "SSA Motion" means a motion, in form and substance reasonably acceptable to the Required Backstop Investors, the Debtors and the Consenting Equity Holder that must be filed by the Debtors on or after the Petition Date seeking Bankruptcy Court approval of the Sorensen Support Agreement and authorizing the Debtors to assume the Sorensen Support Agreement.

164.    "SSA Order" means an order of the Bankruptcy Court granting the relief requested in the SSA Motion and approving the Sorensen Support Agreement and authorizing the Debtors to assume the Sorensen Support Agreement Postpetition.

165.    "Stamp or Similar Tax" means any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

166.    "Steering Committee" means that certain committee comprised of certain Lenders under the Prepetition First Lien Credit Agreement and certain Lenders under the Prepetition Second Lien Credit Agreement, represented by the Steering Committee Professionals.

167.    "Steering Committee Professionals" means, collectively: (a) Milbank, Tweed, Hadley & McCloy LLP, (b) Morris, Nichols, Arsht & Tunnell LLP, (c) Zarco Einhorn Salkowski & Brito, P.A., (d) Halloran & Sage LLP., (e) Winston & Strawn, LLP, (f) Stikeman

Elliot LLP, (g) any other attorneys or financial and diligence advisors retained by the Steering Committee as provided for in the Lender RSA and (h) any successor law firm or financial or diligence advisor to any of the foregoing entities or individuals.

168.    "Stockholders Agreement" means the Stockholders Agreement, substantially in the form attached as <u>Exhibit F</u> hereto.

169.    "Subordination and Intercreditor Agreement" means the intercreditor agreement to be entered into as of the Effective Date, by and among the Reorganized Parent, the Post-Emergence Term Loan Agent and the Post-Emergence ABL Agent.

170.    "Subscription Commencement Date" means the date on which the Subscription Period commences, which shall be March 11, 2014.

171.    "Subscription Deadline" means the date on which the Rights Offering shall expire as set forth in the Subscription Documents, which shall be March 27, 2014.

172.    "Subscription Documents" means, collectively, that certain subscription form and subscription agreement to be distributed to Eligible Participants pursuant to which each Eligible Participant may exercise its Subscription Rights.

173.    "Subscription Period" means the time period during which the Eligible Participant may subscribe to purchase the Rights Offering Securities, which period shall commence on the Subscription Commencement Date and expire on the Subscription Deadline.

174.    "Subscription Right" means the right of Eligible Participant to participate in the Rights Offering, which right shall be non-Transferable and non-certificated as set forth in Article V.G of this Plan.

175.    "Subsidiaries" means the Entities listed on Plan Schedule 1 other than the Parent.

176.    "Transaction Expenses" means the Transaction Expenses as defined in Section 35 of the Lender RSA.

177.    "Transfer" or "Transferable" means, with respect to any security or the right to receive a security or to participate in any offering of any security, including the Rights Offering: (a) the sale, transfer, pledge, hypothecation, encumbrance, assignment, constructive sale, participation in, or other disposition of such security or right or the beneficial ownership thereof, (b) the offer to make such a sale, transfer, constructive sale, or other disposition, and (c) each option, agreement, arrangement, or understanding, whether or not in writing and whether or not directly or indirectly, to effect any of the foregoing.  The term "constructive sale" for purposes of this definition means (i) a short sale with respect to such security or right, (ii) entering into or acquiring an offsetting derivative contract with respect to such security or right, (iii) entering into or acquiring a futures or forward contract to deliver such security or right, or (iv) entering into any transaction that has substantially the same effect as any of the foregoing.  The term "beneficially owned" or "beneficial ownership" as used in this definition shall include, with respect to any security or right, the beneficial ownership of such security or right by a Person and by any direct or indirect subsidiary of such Person.

178.    "Unexpired Lease" means a lease to which any Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

179.    "Unimpaired" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

180.    "Voting Agent" means Kurtzman Carson Consultants LLC, and any successor.

181.    "Voting Classes" means, collectively, Classes 4 and 5.

182.    "Voting Deadline" means March 27, 2014 at 5:00 p.m. prevailing Pacific Time for all Holders of Claims, which is the date and time by which all Ballots must be received by the Voting Agent, or such other date and time as may be established by the Debtors with respect to any Voting Class.

183.    "Voting Record Date" means the date for determining which Holders of Claims are entitled to receive the Disclosure Statement and vote to accept or reject this Plan, as applicable, which date is March 20, 2014 for all Holders of Claims.

## ARTICLE II.
## ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS

**A.**    Administrative Claims

Subject to sub-paragraph (1) below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

1.    Professional Compensation and Reimbursement Claims

Professional Fee Claims.  Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim; provided that the Reorganized Debtors will pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.  Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 60 days after the Effective Date or (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim.

Professional Fee Escrow Account.  On the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.  If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such Allowed Professional Fee Claim by the Reorganized Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.  All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to the Debtors and be distributed pursuant to the Plan.

Professional Fee Reserve Amount.  Prior to the Effective Date, the Professionals have provided good faith estimates of their Professional Fee Claims through the Effective Date for the purpose of determining the amount held in the Professional Fee Escrow Account and have deliver such estimates to the Debtors. If a Professional has not provided such an estimate, the Debtors may, in their reasonable discretion, estimate the Professional Fee Claims of such Professional for the purpose of determining the amount held in the Professional Fee Escrow Account.

Transaction Expenses, DIP Agent Fees and Expenses, DIP Lenders' Fees and Expenses. The Transaction Expenses and the reasonable fees and expenses, including the reasonable fees and expenses of attorneys or financial advisors, incurred by the Backstop Investors, the Prepetition Agents, the DIP Agent's, the DIP Lenders' and the Steering Committee members' professionals will be paid as administrative expenses as set forth in any applicable orders entered by the Bankruptcy Court or in the ordinary course or pursuant to the Backstop Agreement or the Lender RSA, as the case may be.  Nothing herein shall require any professionals, including the Prepetition First Lien Agent Professionals, the Prepetition Second Lien Agent Professionals, other parties entitled to be paid its Transaction Expenses, DIP Agent fees and expenses, DIP Lenders' fees and expenses, or Prepetition Agents' fees and expenses, to file an application with, or otherwise seek approval of, the Bankruptcy Court as a condition precedent to the payment of such fees and expenses.

**B.**     DIP Facility Claims

Unless otherwise agreed to by the DIP Lenders, the Allowed DIP Facility Claims will be indefeasibly paid and satisfied in full in Cash on the Effective Date in full satisfaction, settlement, discharge and release of, and in exchange for, such DIP Facility Claims in accordance with any applicable order entered by the Bankruptcy Court.  Upon indefeasible payment and satisfaction in full of all Allowed DIP Facility Claims, the DIP Facility Secured Loan Agreement as well as all related and ancillary documents thereto, and all Liens and security interests granted to secure the DIP Facility Claims, will be immediately terminated, extinguished and released, and the DIP Agent will promptly execute and deliver to the Reorganized Debtors, at the Reorganized Debtors' sole cost and expense, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.  Notwithstanding the above, any indemnity provisions contained in any agreement or related document in connection with the DIP Facility will survive such termination, release and satisfaction in the manner and to the extent set forth therein.

**C.**     Priority Tax Claims

On or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the

date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtors or Reorganized Debtors:  (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree or order converting or dismissing the Chapter 11 Cases provided, however, that the Debtors may prepay any or all such Claims at any time, without premium or penalty.

### ARTICLE III.
CLASSIFICATION AND TREATMENT OF
CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.**    Summary

The Plan is a single plan of reorganization for the jointly administered Chapter 11 Cases, but does not constitute a substantive consolidation of the Debtors' Estates.  The Plan, though proposed jointly, constitutes a separate plan for each of the Debtors.  Therefore, except as expressly specified herein, all Claims against a particular Debtor are placed in Classes for each of the Debtors (as designated by subclasses A through V for each of the twenty two Debtors). Class 9 Claims shall not have any subclasses and Class 10 Claims shall only have subclasses A through U for each of the twenty one Subsidiaries.  All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified as described in Article III.B of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| 4 | Prepetition First Lien Loan Claims | Impaired | Entitled to Vote |
| 5 | Prepetition Second Lien Loan Claims | Impaired | Entitled to Vote |
| 6 | SCIF Claims | Unimpaired | Deemed to Accept |
| 7 | General Unsecured Claims | Unimpaired | Deemed to Accept |

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 8 | Prepetition Warrants | Impaired | Deemed to Reject |
| 9 | Equity Interests in Parent | Impaired | Deemed to Reject |
| 10 | Equity Interests in Subsidiaries | Unimpaired | Deemed to Accept |

**B.**    Classification and Treatment of Claims and Equity Interests

1.    Class 1 – Priority Claims

- Classification:  Class 1 consists of the Priority Claims.

- Treatment:  The legal, equitable and contractual rights of the Holders of Class 1 Claims are unaltered by the Plan.  With respect to each Class 1 Claim that becomes due and payable prior to the Effective Date, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.

- Voting:  Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

- Classification:  Each Class 2 Claim is an Other Secured Claim against the applicable Debtors.  With respect to each applicable Debtors this Class will be further divided into subclasses designated by letters of the alphabet (Class 2.1, Class 2.2 and so on), so that each holder of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Other Secured Claims.

- Treatment:  The legal, equitable and contractual rights of the Holders of Class 2 Claims are unaltered by the Plan.  With respect to each Class 2 Claim that becomes due and payable prior to the Effective Date, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 2 Claim is an

Allowed Class 2 Claim on the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors: (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (C) any defaults shall be cured and shall be paid or satisfied in accordance with and pursuant to the terms of the applicable agreement between the Debtors and the Holder of the Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code. Each Holder of an Allowed Other Secured Claim will retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Other Secured Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

- Voting: Class 2 is an Unimpaired Class, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims will not be entitled to vote to accept or reject the Plan.

3.    Class 3 – Secured Tax Claims

- Classification: Each Class 3 Claim is a Secured Tax Claim against the applicable Debtors. With respect to each applicable Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 3.1, Class 3.2 and so on), so that each holder of any Secured Tax Claim against such Debtor is in a Class by itself, except to the extent that there are Secured Tax Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Secured Tax Claims.

- Treatment: The legal, equitable and contractual rights of the Holders of Class 3 Claims are unaltered by the Plan. On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors: (A) Cash in an amount equal to the amount of such Allowed Class 3 Claim; or (B) such other less favorable treatment as agreed to in

writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Class 3 Claim at a later date; provided, further, that Class 3 Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.  Each Holder of an Allowed Class 3 Claim will retain the Liens securing its Allowed Class 3 Claim as of the Effective Date until full and final payment of such Allowed Class 3 Claim is made as provided herein.  On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Class 3 Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

- Voting:  Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 Claims will not be entitled to vote to accept or reject the Plan.

4. Class 4 – Prepetition First Lien Loan Claims

- Classification:  Class 4 consists of all Allowed Prepetition First Lien Loan Claims.

- Allowance:  The Prepetition First Lien Loan Claims are deemed Allowed in an aggregate principal amount equal to $492 million, plus accrued interest and fees.

- Treatment:  Treatment:

-  On the Initial Distribution Date, in full and final satisfaction, settlement, release, and discharge and in exchange for all Allowed Class 4 Claims, all Allowed Class 4 Claims shall be indefeasibly satisfied through the distribution by the Reorganized Debtors to each Holder of an Allowed Class 4 Claim of:

  1) its Pro Rata share of $365 million in Cash; and

  2) a Subscription Right.

- Voting:  Class 4 is Impaired, and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

5. Class 5 – Prepetition Second Lien Loan Claims

- Classification:  Class 5 consists of all Allowed Prepetition Second Lien Loan Claims.

- Allowance:  The Prepetition Second Lien Loan Claims are deemed Allowed in an aggregate principal amount equal to $159 million, plus accrued interest and fees.

- Treatment:  Treatment:

- On the Initial Distribution Date, in full and final satisfaction, settlement, release, and discharge and in exchange for all Allowed Class 5 Claims, all Allowed Class 5 Claims shall be indefeasibly satisfied through the distribution by the Reorganized Debtors to each Holder of an Allowed Class 5 Claim of:

  1) its Pro Rata share of $12 million in Cash; and

  2) its Pro Rata share of the New Warrants.

- Voting:  Class 5 is Impaired, and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

6.    Class 6 – SCIF Claims

- Classification:  Class 6 consists of the SCIF Claims.

- Allowance:  On the Effective Date, the SCIF Claims will be deemed Allowed in an aggregate amount equal to all amounts outstanding under the SCIF Settlement Agreement.

- Treatment:  The legal, equitable and contractual rights of the Holders of Class 6 Claims are unaltered by the Plan.  On the Initial Distribution Date, the Holders of Allowed Class 6 Claims will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 6 Claims: (A) Cash equal to the unpaid amount under the SCIF Settlement Agreement; or (B) such other treatment as to which the Debtors or Reorganized Debtors and the Holders of Allowed Class 6 Claims will have agreed upon in writing with the consent of the Required Backstop Investors.

- Voting:  Class 6 is an Unimpaired Class, and the Holders of Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

7.    Class 7 – General Unsecured Claims

- Classification:  Class 7 consists of the General Unsecured Claims.

- Treatment:  With respect to each Class 7 Claim that becomes due and payable prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date, solely to the extent that any of the legal, equitable and contractual rights in respect of any Class 7 Claim under applicable non-bankruptcy law, each Allowed Class 7 Claim will be, at the Debtors' option:  (i)

Reinstated, and paid without default interest, subject to the terms and conditions thereof, in Cash on the later to occur of the Effective Date or when such Claims become due in the ordinary course of the Debtors' business operations; or (ii) otherwise rendered not impaired pursuant to section 1124 of the Bankruptcy Code, including with respect to payment on the Effective Date or as soon as practicable thereafter, except to the extent that the Reorganized Debtors and such Holder agree to other less favorable treatment in writing.

- Related Party Notes:  On the Initial Distribution Date, in full and final satisfaction, settlement and discharge of all Claims related to or arising under the Related Party Notes, the Holders of Related Party Notes shall contribute such Related Party Notes to the Company in exchange for New Common Stock as set forth in the Sorensen Support Agreement.

- Specified Related Party Claims:  In full and final satisfaction, settlement and discharge of certain specified related party claims identified in <u>Schedule 2</u> hereto, the Debtors and certain non-debtor parties have agreed to the treatment of such claims as set forth in <u>Schedule 2</u> hereto.

- Voting:  Class 7 is an Unimpaired Class, and the Holders of Class 7 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, Therefore, Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.

8.    Class 8 – Prepetition Warrants

- Classification:  Class 8 consists of the Prepetition Warrants.

- Treatment:  On the Effective Date, all Class 8 Prepetition Warrants will be deemed canceled, settled, released, and discharge and the Class 8 Prepetition Warrants will be of no further force and effect, whether surrendered for cancellation or otherwise.  Holders of Class 8 Claims will not receive any distribution on account of their Prepetition Warrants.

- Voting:  Class 8 is Impaired, and the Holders of Class 8 Claims are deemed to reject the Plan.

9.    Class 9 - Equity Interests in Parent

- Classification:  Class 9 consists of the Parent Equity Interests.

- Treatment:  On the Effective Date, all Class 9 Parent Equity Interests will be deemed canceled and Class 9 Parent Equity Interests will be of no further force and effect, whether surrendered for cancellation or otherwise.  Holders of Class 9 Claims will not receive any distribution on account of their Parent Equity Interests.

- Voting:  Class 9 is Impaired, and the Holders of Class 9 Claims are deemed to reject the Plan.

10. Class 10 – Equity Interests in Subsidiaries

- Classification:  Class 10 consists of the Equity Interests in the Subsidiaries.

- Treatment:  On the Effective Date, the Reorganized Parent or the Reorganized Borrower, as applicable, will own, directly or indirectly, 100% of the Equity Interests in the Subsidiaries.

- Voting:  Class 10 is an Unimpaired Class, and the Holders of Class 10 Equity Interests will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 10 Equity Interests are not entitled to vote to accept or reject the Plan.

**C.** Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to cure any arrears or defaults that may exist with respect to contracts to be assumed under the Plan.

**D.** Discharge of Claims

Except as otherwise provided in the Plan and effective as of the Effective Date:  (i) the rights afforded herein and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all Entities will be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

**ARTICLE IV.**
ACCEPTANCE OR REJECTION OF THE PLAN

**A.** Presumed Acceptance of Plan

Classes 1, 2, 3, 6, 7, and 10 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

**B.**     Presumed Rejection of Plan

Classes 8 and 9 are Impaired and Holders of Class 8 and 9 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**C.**     Voting Classes

Each Holder of an Allowed Claim as of the applicable Voting Record Date in each of the Voting Classes (Classes 4 and 5) will be entitled to vote to accept or reject the Plan.

**D.**     Acceptance by Impaired Classes of Claims

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

**E.**     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors (subject to any consents that may be required under the Lender RSA or the Backstop Agreement) reserve the right to modify the Plan or any Exhibit thereto or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**ARTICLE V.**
MEANS FOR IMPLEMENTATION OF THE PLAN

**A.**     General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan (including, without limitation, the treatment of the Consenting Equity Holder under the Plan) will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  Without limiting the foregoing, the treatment of the Sorensen Parties as set forth in the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests among the Sorensen Parties and the Debtors pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan.

**B.**     Corporate Existence

On or prior to the Effective Date, the Parent will be merged with and into a newly formed Delaware corporation, with the newly formed Delaware corporation surviving the merger and becoming the parent entity of the Debtor entities.  Following this merger, the certificate of incorporation and by-laws of the surviving  corporation will be substantially in the form of the Reorganized  Parent Organizational Documents.  All other Debtors will continue to exist after the Effective Date as separate legal entities, with all the powers of corporations, limited liability companies, memberships and partnerships pursuant to the applicable law in their respective jurisdictions of incorporation or organization.

**C.**    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and assets of the Estates (including, without limitation, Causes of Action and, unless otherwise waived or released pursuant to an order of the Bankruptcy Court or the Plan, Avoidance Actions) and any property and assets acquired by the Debtors pursuant to the Plan, will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances.  Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

**D.**    Post-Emergence Term Loan Agreement, Post-Emergence ABL Loan Agreement and Sources of Cash for Plan Distribution

On the Effective Date, the applicable Reorganized Debtors will be authorized to execute and deliver the Post-Emergence Term Loan Agreement and the Post-Emergence ABL Loan Agreement, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the Post-Emergence Term Loan Agreement or the Post-Emergence ABL Loan Agreement, as applicable).

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the Reorganized Debtors' Cash balances, including Cash from operations, the Rights Offering Purchase Price, and the Post-Emergence Term Loan Agreement.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

**E.**    New Common Stock Issued Under the Plan

On the Effective Date, Reorganized Parent will distribute the New Common Stock pursuant to the terms set forth in the Plan, including, without limitation, pursuant to the Rights Offering, the Backstop Agreement, the DRV Purchase Agreement, the Restricted Stock Award Agreement and the Sorensen Support Agreement, in each case subject to each such recipient entering into the Stockholders Agreement.

**F.**    New Warrants Issued Under the Plan

On the Effective Date, Reorganized Parent will issue the New Warrants to the Holders of Class 5 Claims, pursuant to the terms set forth herein and in the Reorganized Parent Organizational Documents.

**G.**     Rights Offering and Backstop Commitment

1.      Issuance of Subscription Rights.

Each Prepetition First Lien Lender (that is an Eligible Participant) will receive Subscription Rights to subscribe for its Pro Rata share of the Rights Offering Securities for an aggregate purchase price in Cash equal to $175 million.  In accordance with the terms and conditions of the Backstop Agreement, each Backstop Investor (that is an Eligible Participant) has committed to subscribe for its Backstop Proportion of all of the Rights Offering Securities that are eligible to be subscribed for by the Prepetition First Lien Lenders (that are Eligible Participants) that are not subscribed for by such Prepetition First Lien Lenders.  Furthermore, in accordance with the terms and conditions of the Backstop Agreement, each Backstop Investor (that is an Eligible Participant) has committed to subscribe for its Backstop Proportion of additional Rights Offering Securities for an aggregate purchase price in Cash equal to $50 million.  The Rights Offering Securities will be issued to the Eligible Participants (including the Backstop Investors), for the Rights Offering Purchase Price.

2.      Subscription Period.

The Rights Offering will commence on the Subscription Commencement Date and expire on the Subscription Deadline.  Each Eligible Participant that wishes to participate in the Rights Offering will be required to affirmatively elect to exercise its Subscription Rights, and provide written notice thereof to the Entities specified in the Subscription Documents, on or prior to the Subscription Deadline in accordance with the terms of the Plan and the Subscription Documents.  All remaining Rights Offering Securities will be allocated to the Backstop Investors on the Subscription Deadline, and will be purchased by the Backstop Investors on the Effective Date, all in accordance with the terms and conditions of the Backstop Agreement.

3.      Exercise of Subscription Rights and Payment of Rights Offering Purchase Price.

On the Subscription Commencement Date, the Prepetition First Lien Agent posted on the Prepetition First Lien Lenders' website on Intralinks the Subscription Documents and the related materials listed below.  Each Eligible Participant known as of the Rights Offering Record Date had access through Intralinks to the Subscription Documents, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Documents, as well as instructions for the payment of the eventual Rights Offering Purchase Price for that portion of the Subscription Rights sought to be exercised by such Person.  The Debtors may adopt such additional detailed procedures consistent with the provisions of the Plan as the Debtors may deem necessary to effectuate, or desirable to more efficiently administer the exercise of the Subscription Rights and ascertain payment of the Rights Offering Purchase Price, to the extent authorized by the Bankruptcy Court.

4.      No Assignment; No Revocation.

Except as set forth in the Backstop Agreement, the Subscription Rights will not be assignable, and cannot be assigned by the Eligible Participants.  Any impermissible assignment, or attempted assignment, will be null and void.  Once an Eligible Participant has exercised any of its Subscription Rights by properly executing and delivering the Subscription Documents to the Debtors or other Entity specified in the Subscription Documents, such exercise may only be revoked, rescinded or annulled in the sole discretion of the Debtors or Reorganized Debtors or as provided for in the Backstop Agreement.

5.       Distribution of Rights Offering Securities.

On the Effective Date, Reorganized Parent or another applicable Distribution Agent will distribute the Rights Offering Securities purchased by each Rights Offering Purchaser or Backstop Investor to such Rights Offering Purchaser or Backstop Investor; provided, however, that, as a condition precedent to the Rights Offering Purchaser or Backstop Investor to receive its share of Rights Offering Securities, such Rights Offering Purchaser or Backstop Investor must first execute the Stockholders Agreement.

6.       Validity of Exercise of Subscription Rights.

All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights will be determined by the Debtors or Reorganized Debtors. The Debtors, in their discretion reasonably exercised in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights. Subscription Documents will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in their discretion reasonably exercised in good faith. The Debtors will use commercially reasonable efforts to give written notice to any Eligible Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Person and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors and Reorganized Debtors nor any of their Related Persons will incur any liability for giving, or failing to give, such notification and opportunity to cure.

7.       Rights Offering Proceeds.

The proceeds of the Rights Offering will fund Cash payments required to be made under the Plan, including, without limitation, payments in respect of Allowed Claims, Chapter 11 Transaction Expenses and repayment of the DIP Facility Claims, and be used for general corporate purposes by the Debtors to the extent approved by the Bankruptcy Court, and by the Reorganized Debtors after the Effective Date.

H.       Sorensen Party Transactions

On the Effective Date, the applicable Reorganized Debtors will be authorized to deliver the DRV Purchase Agreement and the Restricted Stock Award Agreement and will be authorized to execute and deliver any other agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the DRV Purchase Agreement or the Restricted Stock Award Agreement).

Concurrently with the closing of the Rights Offering, the Reorganized Parent will deliver or grant to certain of the Sorensen Parties who have timely executed the Stockholders Agreement: (a) New Common Stock of the Reorganized Parent in consideration for contributing new assets to the Reorganized Parent under the terms of the DRV Purchase Agreement, (b) New Common Stock under the terms of the Restricted Stock Award Agreement, (c) New Common Stock in connection with the conversion of certain Related Party Notes under the terms of the Sorensen Support Agreement, and (d) an option to designate and purchase additional New

Common Stock for Cash in an aggregate amount of $4 million under the terms of the Sorensen Support Agreement.

On the Effective Date, the applicable Reorganized Debtors will be authorized to deliver the Option Agreement, and will be authorized to execute and deliver any other agreements in connection therewith without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the Option Agreement).

**I.**     Management Incentive Plan

Following the Effective Date, the Reorganized Parent will adopt and implement the Management Incentive Plan, which would, subject to certain terms and conditions, provide for, the issuance of up to 9.35% of the New Common Stock for grant to key  executives of the Company, of which, up to 4% may be granted to executives of the Company, other than the Consenting Equity Holder, on the Effective Date.  At least 5.35% of such New Common Stock will be held for potential future grants to executives, including the Consenting Equity Holder, at the discretion of the compensation committee of the New Board.

**J.**     Issuance of New Securities and Related Documentation

On the Effective Date, the Reorganized Parent will be authorized to, and will, issue and execute, as applicable, the New Securities and Debt Documents, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  The (a) issuance, distribution and exercise of the Subscription Rights, (b) issuance and distribution of the New Common Stock in connection with the Subscription Rights, Backstop Agreement, DRV Purchase Agreement, Sorensen Support Agreement, and Restricted Stock Award Agreement, (c) issuance and distribution of the New Warrants, and (d) issuance and distribution of New Common Stock upon exercise of the New Warrants, will be made in reliance on the exemption from registration provided by section 1145(a) of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and will be exempt from registration under applicable securities laws.  Without limiting the effect of section 1145 of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, all financing documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including, without limitation, the Post-Emergence Term Loan Agreement, the Post-Emergence ABL Loan Agreement, the Post-Emergence Term Loan Agreement, the DRV Purchase Agreement, the Sorensen Support Agreement, the New Common Stock and any other agreement or document related to or entered into in connection with any of the foregoing, will become, and the Backstop Agreement will remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of the Reorganized Debtors will be that number of shares of New Capital Stock as may be designated in the Reorganized Parent Organizational Documents.  In connection with the distribution of New Capital Stock to current or former employees of the Debtors, the Reorganized Parent may take whatever actions are necessary to comply with applicable federal, state, local and international tax withholding obligations, including withholding from distributions a portion of the New Capital Stock and selling such

securities to satisfy tax withholding obligations including, without limitation, income, social security and Medicare taxes.

**K.**     Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

**L.**     Certificate of Incorporation and Bylaws

The Reorganized Parent Organizational Documents shall succeed the certificate of incorporation, by-laws and other organizational documents of the Parent to satisfy the provisions of the Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Capital Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.  After the Effective Date, the Reorganized Parent may amend and restate its certificate of incorporation, by-laws, and other applicable organizational documents, as permitted by applicable law.

**M.**     Directors and Officers of Reorganized Parent

The New Board will initially be comprised of the following five individuals:  Alvaro Jose Aguirre, Greg Netland, Steve Giusto, Gary DiCamillo and D. Stephen Sorensen.  Further details regarding these individuals is provided in Exhibit I to the Disclosure Statement.

As of the Effective Date, D. Stephen Sorensen will be the Chief Executive Officer of the Reorganized Parent, employed on the terms set forth in the employment agreement, substantially in the form attached as Exhibit H hereto.  As of the Effective Date, the initial officers of the Reorganized Debtors, other than as described above will be the officers of the Debtors existing immediately prior to the Effective Date and the existing directors of the Reorganized Debtors, other than Reorganized Parent, will be the directors of such Debtors existing immediately prior to the Effective Date.

To the extent not previously disclosed, the Debtors will disclose, prior to the Confirmation Hearing, the affiliations of each Person proposed to serve on the initial board of directors or as an officer of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person.  Each such director and each officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Reorganized Parent Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors.  The existing board of directors of Parent will be deemed to have resigned on and as of the Effective Date, in each

case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

**N.**      Corporate Action

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors and as applicable or by any other Person (except for those expressly required pursuant to the Plan).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors or members of any Debtor (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or partners of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtors, as applicable, and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of any Debtor or any Reorganized Debtors, as applicable, or by any other Person. On the Effective Date, the appropriate officers of each Debtor and each Reorganized Debtors, as applicable, are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and each Reorganized Debtors, as applicable, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The secretary and any assistant secretary of each Debtor and each Reorganized Debtor, as applicable, will be authorized to certify or attest to any of the foregoing actions.

**O.**      Cancellation of Notes, Certificates and Instruments

On the Effective Date and provided that the New Securities and Debt Documents have been authorized by the Bankruptcy Court, executed by the Reorganized Debtors and delivered, all notes, stock, instruments, certificates, agreements and other documents evidencing the DIP Facility Claims, the Prepetition First Lien Loan Claim, the Prepetition Second Lien Loan Claim, the Prepetition Intercreditor Agreement, the Related Party Notes, the Prepetition Warrants and the Parent Equity Interests will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. On the day following the date that the final distribution is made by Prepetition Agents, the Prepetition Agents will be released and discharged from any further

responsibility under the Prepetition Secured Loan Agreements; provided, however, that any and all rights of indemnification applicable to the Prepetition Agents, respectively, under the Prepetition Secured Loan Agreements and related documents shall survive and remain in full force and effect; provided further, however, until the Prepetition Agents' fees and expenses have been paid in full, the Prepetition Agents will retain their respective charging liens under the Prepetition Secured Loan Agreements with respect to any cash distributions to be made under the Plan by the Prepetition Agents.

**P.**     Intercompany Claims

On the Effective Date, all net Allowed Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors or between one or more Debtors and any Affiliate of one of the Debtors that is not itself a Debtor shall, at the election of the Reorganized Debtors, be either (a) Reinstated, (b) released, waived, and discharged, (c) treated as a dividend, or (d) contributed to capital or exchanged for equity.

**Q.**     Lease Amendments

On the Effective Date, the applicable Reorganized Debtors will be authorized to deliver the Lease Amendments and will be authorized to execute and deliver any other agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the Lease Amendments).

**R.**     Plan Supplement, Other Documents and Orders and Consents Required Under the Lender
         RSA and the Backstop Agreement

So long as the Lender RSA or the Backstop Agreement, as applicable, have not been terminated, the Plan, the Confirmation Order and all other documents to be Filed as part of the Plan Supplement and the other documents and orders referenced herein, or otherwise to be executed in connection with the transactions contemplated hereunder, shall be subject to the consents and the approval rights, as applicable, of (a) the Backstop Investors to the extent set forth in the Lender RSA and the Backstop Agreement, (b) the Participating Lenders to the extent set forth in the Lender RSA and (c) the Consenting Equity Holder to the extent set forth in the Lender RSA and the Sorensen Support Agreement. To the extent that there is any inconsistency between the Lender RSA, the Backstop Agreement, or the Sorensen Support Agreement, on the one hand, and the Plan, on the other hand, as to such consents and the approval rights and the Lender RSA, the Backstop Agreement, or the Sorensen Support Agreement, as applicable, has not been terminated, then the consents and the approval rights required in the Lender RSA, the Backstop Agreement, or the Sorensen Support Agreement, as applicable, shall govern.

**ARTICLE VI.**
TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.**     Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including, without limitation, employment agreements) and Unexpired Leases that:

- have been rejected by order of the Bankruptcy Court;

- are the subject of a motion to reject pending on the Effective Date;

- are identified in the Plan Supplement with the consent of the Required Backstop Investors (in either case which list may be amended by the Debtors to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended list and serving it on the affected contract parties at least ten (10) days prior to the Confirmation Hearing); or

- are rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Each Executory Contract and Unexpired Lease assumed pursuant to this Article of the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

**B.**     Assignment of Executory Contracts or Unexpired Leases

In the event of an assignment of an Executory Contract or Unexpired Lease, at least twenty (20) days prior to the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will:  (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts. Any applicable cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by the Debtors at least five (5) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease. The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to assignment or

cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

**C.**      Rejection of Executory Contracts or Unexpired Leases

All Executory Contracts and Unexpired Leases designated for rejection in the Plan Supplement will be deemed rejected as of the Effective Date.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in this Article of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

**D.**      Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  The Debtor or Reorganized Debtor, as the case may be, will provide notice of such rejection and specify the appropriate deadline for the filing of such Proof of Claim.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article XII.F of the Plan.  All claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.  Rejection damages claims are Class 7 Claims.

**E.**      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be filed, served and actually received by the Debtors at least ten (10) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented and will be deemed to have forever released and waived any objection to the proposed assumption other than with respect to any alleged cure amount, which may be asserted at any time.  In the event of a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  If an objection to cure is sustained by the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**F.**     Assumption of Director and Officer Insurance Policies

The Debtors, and upon the Effective Date, the Reorganized Debtors, will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under the D&O Liability Insurance Policies.

**G.**     Indemnification Provisions

All indemnification provisions currently in place (whether in the by-laws, certificate of incorporation, board resolutions, contracts, or otherwise) for the following:  (i) Prepetition Agents; (ii) Prepetition Secured Lenders; (iii) the current and former members of the Steering Committee; (iv) the Backstop Investors; (v) the Participating Lenders; and (vi) directors, officers and employees of the Debtors who served in such capacity as of the Petition Date with respect to or based upon any act or omission taken or omitted in such capacities will be Reinstated (or assumed, as the case may be), and will survive effectiveness of the Plan.  No such Reinstatement or assumption shall in any way extend the scope or term of any indemnification provision beyond that contemplated in the underlying contract or document as applicable.

**H.**     Compensation and Benefit Programs

Except as otherwise provided in the Plan (including the compensation for the Consenting Equity Holder pursuant to an employment agreement as described herein, which will exclusively address the benefits for the Consenting Equity Holder), or any order of the Bankruptcy Court, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to its employees, retirees, and non-employee directors and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans (other than equity incentive plans, which will be replaced by the Management Incentive Plan), life, and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Any payment obligations under any assumed employment contracts and benefit plans that have been or purport to have been accelerated as a result of the commencement of the Chapter 11 Cases or the consummation of any transactions contemplated by the Plan will be Reinstated and such acceleration will be rescinded and deemed not to have occurred.

The Debtors maintain what is commonly referred to as a non-qualified deferred compensation plan that defers payment of compensation of approximately 50 current or former employees of the Debtors. Such plan is administered pursuant to that certain Select Staffing Amended and Restated Deferred Compensation Plan, effective December 28, 2008 (the "Deferred Compensation Plan"), and that certain Amended and Restated Trust Under the Select Staffing Deferred Compensation Plan, dated December 18, 2008 (the "Trust"). The Deferred Compensation Plan was frozen or suspended on December 27, 2011 such that further deferrals are no longer permitted under the Deferred Compensation Plan. As of November 3, 2013, the cash surrender value of the assets in the Trust was $4,797,196.70 and the benefit liability to

Deferred Compensation Plan participants was $5,394,831.89. The Trustee of the Deferred Compensation Plan is Reliance Trust Company and the Third Party Plan Administrator is The Newport Group.

**I.**     Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under:  (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance, All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

### ARTICLE VII.
### PROVISIONS GOVERNING DISTRIBUTIONS

**A.**     Dates of Distributions

Except as otherwise provided in the plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions provided in the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Reorganized Debtors shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order.  All payments and all distributions made by the Reorganized Debtors under the Plan shall be in full and final satisfaction, settlement and release of all Claims against the Reorganized Debtors.

**B.**     Distribution Agent

Except as provided therein, all distributions under the Plan shall be made by the Reorganized Parent or the Prepetition Agents, respectively, as Distribution Agent, or by such other Entity designated by the Reorganized Parent as a Distribution Agent on the Effective Date. The Distribution Agent shall not be required to give any bond or surety or other security for the performance of the Reorganized Debtors' duties as Distribution Agent unless otherwise ordered by the Bankruptcy Court.  For purposes of distributions under this Plan to the Holders of Allowed DIP Facility Claims and Allowed Prepetition Secured Loan Claims, the DIP Agent and the Prepetition Agents, respectively, will be and shall act as the Distribution Agent.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.  If the Distribution Agent is an entity other than the Reorganized Parent, such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

**C.**     Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**D.**     Rounding of Payments

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one dollar.  To the extent Cash, notes, warrants, shares, stock are to be distributed under the Plan remain undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash, notes, or shares shall be treated as "Unclaimed Property" under the Plan.

Whenever payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar.  To the extent that any Cash or any shares of New Capital Stock to be distributed under the Plan remain undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash or shares shall be treated as "Unclaimed Property" under the Plan.

No fractional shares shall be issued or distributed under the Plan.  Each Person entitled to receive shares of New Capital Stock shall receive the total number of whole shares of New Capital Stock to which such Person is entitled.  Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of New Capital Stock, the actual distribution of shares of such stock shall be rounded to the next lower whole number.

**E.**     Distributions on Account of Claims Allowed After the Effective Date

Except as otherwise agreed by the Holder of a particular Claim, or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order.  Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest dollar.

**F.**     General Distribution Procedures.

The Reorganized Debtors, or any other duly appointed Distribution Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically

provides otherwise.  All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

**G.**      Address for Delivery of Distributions.

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the address set forth on any proofs of claim filed by such Holders (to the extent such proofs of claim are filed in the Chapter 11 Cases), (2) at the addresses set forth in any written notices of address change delivered to the Debtors, (3) at the addresses in the Debtors' books and records, (4) in accordance with the DIP Facility Secured Loan Agreement, (5) in accordance with the Prepetition First Lien Credit Agreement, or (6) in accordance with the Prepetition Second Lien Credit Agreement.

**H.**      Undeliverable Distributions and Unclaimed Property.

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtors as undeliverable, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder, unless and until the Reorganized Debtors is notified in writing of such Holder's then current address.

Any Entity which fails to claim any Cash within one year from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan. Entities which fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtors or the Reorganized Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Reorganized Debtors.

**I.**      Withholding Taxes.

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on it by any Governmental Unit in accordance with applicable law with respect to such withholding taxes. As a condition to receiving any distribution under the Plan, the Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws.

**J.**      Setoffs.

The Reorganized Debtors may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claims, rights and causes of action that the Reorganized Debtors possesses against such Holder.

**K.**     Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation canceled pursuant to Article V.O of the Plan, the Holder of such Claim will tender the applicable instruments, securities, notes or other documentation evidencing such Claim (or a sworn affidavit identifying the instruments, securities, notes or other documentation formerly held by such Holder and certifying that they have been lost), to Reorganized Parent or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.

**L.**     Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to Reorganized Parent and other applicable Distribution Agents:  (x) evidence reasonably satisfactory to Reorganized Parent and other applicable Distribution Agents of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by Reorganized Parent and other applicable Distribution Agents to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Allowed Equity Interest.  Upon compliance with Article VII.K of the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to Reorganized Parent and other applicable Distribution Agents.

**ARTICLE VIII.**
PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS

**A.**     Disputed Claims

In the event a Claim is not an Allowed Claim as of the Effective Date, the Holder of such Claim or the Reorganized Debtors may commence an action or proceeding to determine the amount and validity of such Claim in (a) any venue in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced, or (b) the Bankruptcy Court; provided, that the parties may agree that any dispute will be determined, resolved or adjudicated in the appropriate non-bankruptcy forum and not before the Bankruptcy Court.

**B.**     Procedures Regarding Disputed Claims

No payment or other distribution or treatment shall be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount of such Allowed Claim is determined by a Final Order or by stipulation between the Debtors and the Holder of the Claim.  No distribution or other payment or treatment shall be made on account of a Disallowed Claim at any time.

The Debtors (prior to the Effective Date) or the Reorganized Debtors (after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain

jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to such objection.  Any Final Order of the Bankruptcy Court that estimates a Disputed Claim pursuant to the Plan shall irrevocably constitute and be a conclusive and final determination of the maximum allowable amount of Claim, should it become an Allowed Claim.  Accordingly, the Holder of a Disputed Claim that is estimated by the Bankruptcy Court pursuant to the Plan will not be entitled to any subsequent reconsideration or upward adjustment of the maximum allowable amount of such Claim as a result of any subsequent adjudication or actual determination of the allowed amount of such Disputed Claim or otherwise, and the Holder of such Claim shall not have recourse to the Debtors or the Reorganized Debtors in the event the allowed amount of the Claim of such Holder is at any time later determined to exceed the estimated maximum allowable amount.

**C.**    Allowance of Claims

Following the date on which a Disputed Claim becomes an Allowed Claim after the Initial Distribution Date, the Reorganized Debtors shall pay directly to the Holder of such Allowed Claim the amount provided for under the Plan, as applicable, and in accordance therewith.

1.    Allowance of Claims

Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors will have and will retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed under the Plan or by orders of the Bankruptcy Court.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order and the DIP Orders), no Claim or Equity Interest will become an Allowed Claim unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Equity Interest.

2.    Prosecution of Objections to Claims and Equity Interests

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors, will have the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims or Equity Interests are in an Unimpaired Class or otherwise; provided, however, this provision will not apply to Professional Fee Claims, the Transaction Expenses, or the DIP Facility Claim.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim or Equity Interest without any further notice to or action, order or approval of the Bankruptcy Court.  The Reorganized Debtors will have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

3.    Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Equity Interest pursuant to applicable law and (b) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C.  §§ 157 and 1334 to estimate any Disputed Claim or Equity Interest,

contingent Claim or Equity Interest or unliquidated Claim or Equity Interest, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection.  All of the aforementioned Claim or Equity Interests and objection, estimation and resolution procedures are cumulative and not exclusive of one another, Claim or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.  The rights and objections of all parties are reserved in connection with any such estimation proceeding.

**ARTICLE IX.**
CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN

**A.**     Conditions Precedent to Confirmation

Confirmation of the Plan will be conditioned upon the satisfaction or waiver pursuant to the provisions of Article IX.C of the Plan of the following:

- The Plan and all schedules, documents, supplements and exhibits to the Plan will have been filed in form and substance acceptable to the Debtors, the Required Backstop Investors and the Consenting Equity Holder and consistent with the terms of the Lender RSA and Backstop Agreement.

- None of the Plan, the Disclosure Statement or any other Plan-related documents, notices, exhibits, appendices of the Debtors, or orders of the Bankruptcy Court (including, without limitation, documents included in the Plan Supplement), shall have been amended or modified, or shall have become the subject of a motion seeking to amend or modify same, if such amendment, modification or filing is materially inconsistent with the Lender RSA or the Backstop Agreement in a manner that is not acceptable to the Required Backstop Investors and the Majority Participating Lenders, in their sole discretion.

- The Lender RSA Order shall have been entered by the 45th day after the Petition Date (or, if such day is not a Court Date (as defined in the Lender RSA), the next succeeding Court Date), (ii) the Confirmation Hearing shall have concluded by the 90th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date) and (iii) the Confirmation Order shall have been entered by the Bankruptcy Court by the earlier of the 92nd day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date) and June 30, 2014.

- The entry of an order by the Bankruptcy Court approving the Disclosure Statement and other Solicitation materials shall have occurred by the 60th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date), (ii) the Confirmation Hearing shall have concluded by the 100th day after the Petition Date (or if such day is not a Court Date, the next succeeding Court Date) and (iii) the Confirmation Order shall have been entered by the Bankruptcy Court by the 102nd day after the Petition Date (or if such day is not a Court Date, the next succeeding Court Date).

- The Confirmation Order, as entered, is in form and in substance reasonably satisfactory to the Debtors, the Required Backstop Investors and the Consenting Equity Holder and consistent with the terms of the Lender RSA and the Backstop Agreement.

- The Debtors shall have filed the Lender RSA Motion, the Backstop Agreement Assumption Motion and the SSA Motion by the third Court Date after the Petition Date.

- Each of the Lender RSA Order, the SSA Order and the Backstop Agreement Assumption Order shall have been entered by the Bankruptcy Court by the 45th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date) and shall be in form and in substance reasonably satisfactory to the Debtors, the Required Backstop Investors and the Consenting Equity Holder and consistent with the terms of the Lender RSA and the Backstop Agreement.

- The Debtors shall have filed the DIP Facility Motion on or before the first Court Date after the Petition Date.

- Each of the DIP Orders shall be in form and substance acceptable to the Required Backstop Investors. The Interim DIP Order shall have been entered on by the 7th day after the Petition Date and the Final DIP Order shall have been entered by the 45th day after the Petition Date.

- No Debtor shall have breached any of its representations, warranties, covenants and agreements under the Lender RSA or the Backstop Agreement in any material respect.

- The Lender RSA shall not have been terminated by the Required Backstop Investors, the Debtors or the Consenting Equity Holder.

- The Sorensen Support Agreement shall not have been terminated.

- No Event of Default (as defined in the DIP Facility Secured Loan Agreement) under the DIP Facility shall have occurred.

- Neither of the DIP Orders shall have been vacated by any court of competent jurisdiction.

- No material term or condition of the DIP Facility or either DIP Order shall have been modified, amended, or supplemented in a manner that is materially adverse to the Backstop Investors without the prior consent of the Required Backstop Investors,

- Each of the Reorganized Parent Organizational Documents and the organizational documents of each of the other Debtors are in form and substance satisfactory to the Required Backstop Investors.

- There has been no material breach by any of the Debtors or by the Consenting Equity Holder of any of their respective obligations under the Lender RSA, or any other agreement governing the

restructuring contemplated therein, or, if any such breach has occurred and is curable, such breach has been cured by 10 days after receipt of written notice and opportunity to cure from the Majority Participating Lenders or the Required Backstop Investors.

- No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, or prohibiting the restructuring transactions contemplated in the Lender RSA or this Plan, in a manner that cannot be reasonably remedied by the Debtors or the Backstop Investors.

- None of the Debtors or the Consenting Equity Holder has filed any motion in the Chapter 11 Cases under section 363, 364, or 365 of the Bankruptcy Code that is materially inconsistent with the terms and conditions of the Lender RSA in a manner that is not reasonably acceptable to the Required Backstop Investors and the Majority Participating Lenders.

- The Backstop Agreement has not terminated or been terminated and remains in full force and effect.

- No order has been entered by the Bankruptcy Court invalidating or disallowing any Prepetition First Lien Lender Claim or any Prepetition Second Lien Lender Claim of any Backstop Investor or any documents governing or giving rise to such Claim.

- No governmental authority, including any regulatory authority or court of competent jurisdiction, shall have issued of any ruling or order enjoining the consummation of a material portion of the Plan.

- No event, development, condition or state of affairs will exist or have occurred which resulted, or would reasonably be expected to result in, a material adverse effect on (i) the business, properties, financial condition or results of operations of the Companies, taken as a whole, or (ii) the ability of the Debtors to implement the restructuring of the Companies in accordance with the Lender RSA (together, a "Material Adverse Effect"); provided, however, that the voluntary filing or announcement of the voluntary Chapter 11 Cases made pursuant to the Lender RSA shall not constitute a Material Adverse Effect, or be taken into account in determining whether any Material Adverse Effect has occurred.

- Each other Backstop Investor shall have fulfilled its obligations under Section 2 of the Backstop Agreement; provided, however, that such condition shall be deemed to be satisfied and each non-defaulting Backstop Investor shall be obligated to fund its share of such defaulting Backstop Party's Purchase Commitment (as defined in the Backstop Agreement) and Backstop Commitment (as defined in the Backstop Agreement), each to the extent provided in Section 5(c) of the Backstop Agreement, if (x) the aggregate amount to be funded by the non-defaulting Backstop Investors pursuant to Section 2 of the Backstop Agreement and

after giving effect to the funding contemplated by this proviso is less than or equal to (y) the amount that would have been required to be funded by the non-defaulting Backstop Investors pursuant to Section 2 of the Backstop Agreement assuming no other persons participated in the Rights Offering and the defaulting Backstop Investors performed their respective obligations under Section 2 of the Backstop Agreement.

- The representations and warranties of the Debtors contained in the Backstop Agreement shall be true and correct in all material respects at and as of the Confirmation Date as if made at and as of such time (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period), and the Debtors shall have performed or complied in all material respects with all agreements and covenants required by the Backstop Agreement to be performed or complied with by them prior to or at and as of the Confirmation Date.

- Each of the Plan and all documents related to the Plan that are to be approved by the Bankruptcy Court are be in form and substance reasonably acceptable to the Required Backstop Investors.

- One of the Debtors or a non-Debtor subsidiary of a Reorganized Debtor shall have entered into an employment agreement with each of Barry Ahearn and Dean Foley, in each case, in form and substance reasonably acceptable to the Required Backstop Investors.

- No taxing authority having appropriate jurisdiction over the Company shall have reasonably and in good faith asserted a claim for the payment of taxes by the Company relating to periods on or prior to the consummation of the restructuring that exceeds, in the aggregate, the amount of tax liabilities of the Company reasonably expected by the Backstop Investors to exist as of the date of consummation of the restructuring.

- The Required Backstop Investors shall be reasonably satisfied with the proposed allocation of shares of common stock to be issued on or promptly following the Effective Date under the MIP (as defined in the Lender RSA).

- The Subscription Documents shall be in form and substance reasonably acceptable to the Required Backstop Investors.

- Each of the Debtors and the Consenting Equity Holder and the other Sorensen Parties have performed all obligations required of them under the Lender RSA, the Backstop Agreement and the Sorensen Support Agreement.

**B.**    Conditions Precedent to Consummation

Consummation of the Plan will be conditioned upon the satisfaction or waiver pursuant to the provisions of Article IX.C of the Plan of the following:

- Immediately prior to the effectiveness of the Plan pursuant to Article IX, each of the conditions precedent to confirmation of the Plan either remain satisfied or have been waived pursuant to the provisions of Article IX.C of the Plan.

- The Confirmation Order shall have been entered and either (a) become a Final Order or (b) the 14-day stay contemplated by Bankruptcy Rule 3020(e) in respect thereof shall have been terminated unless waived by the Debtors, and (c) the Confirmation Order shall otherwise be in a form and in substance reasonably satisfactory to the Debtors, the Required Backstop Investors and the Consenting Equity Holder and consistent with the terms of the Lender RSA and Backstop Agreement, and no stay of the Confirmation Order will have been entered and be in effect.  The Confirmation Order will provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases and other agreements or documents created in connection with or described in the Plan.

- The Bankruptcy Court will have entered one or more Final Orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated in the Plan and the Plan Supplement.

- The representations and warranties of the Debtors contained in the Backstop Agreement shall be true and correct in all material respects at and as of the Effective Date as if made at and as of such time (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period), and the Debtors shall have performed or complied in all material respects with all agreements and covenants required by the Backstop Agreement to be performed or complied with by them prior to or at and as of the Effective Date.

- All documents and agreements and all schedules, exhibits, and ancillary agreements thereto necessary to implement the Plan, including, without limitation, the Post-Emergence Term Loan Agreement, the Post-Emergence ABL Loan Agreement and the Subordination and Intercreditor Agreement will have been (a) approved by the Required Backstop Investors, (b) tendered for delivery, and (c) effected by, executed by, or otherwise deemed binding upon, all Entities party thereto.  All conditions precedent

to such documents and agreements will have been satisfied or waived pursuant to the terms of such documents or agreements.

- All material consents, actions, documents, certificates and agreements necessary to implement the Plan will have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

- The Debtors will have received the Rights Offering Purchase Price, in Cash, net of any fees or expenses authorized by order of the Bankruptcy Court to be paid from the Rights Offering Purchase Price.

- The Debtors will have received (i) the stock to be purchased under the DRV Purchase Agreement, (ii) any and all consents necessary to consummate the transactions set forth in the DRV Purchase Agreement, (iii) the Transferred Agreement (as defined in the DRV Purchase Agreement), and (iv) the Option Agreement.

- All Transaction Expenses have been paid in full.

- The Confirmation Date will have timely occurred.

- The Effective Date will have occurred within 17 days after the entry of the Confirmation Order.

**C.**    Waiver of Conditions

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in this Article IX may be waived by the Debtors without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan subject to any consents that may be required under the Lender RSA or the Backstop Agreement to the extent that such agreements have not been terminated.  To the extent that a condition to Consummation of the Plan requires the consent of the Required Backstop Investors, or the Majority Participating Lenders, respectively, such conditions may only be waived by the Debtors with the consent of the Required Backstop Investors or the Majority Participating Lenders, as the case may be.  The failure to satisfy or waive a condition to Consummation may be asserted by the Debtors or the Reorganized Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtors or Reorganized Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

**D.**    Effect of Non Occurrence of Conditions to Consummation

If the Consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (c) constitute an allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

## ARTICLE X.
### DEBTORS' RELEASES

Notwithstanding anything to the contrary in the Plan, the failure of the Bankruptcy Court to approve any or all of the provisions set forth in Article XI of the Plan shall not constitute a failure of any condition to either Confirmation or the effectiveness of the Plan, but without prejudice to the respective parties' rights under the Lender RSA or the Backstop Agreement.

## ARTICLE XI.
### RELEASE, INJUNCTION AND RELATED PROVISIONS

**A.**    General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise. As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan will be settled, compromised, terminated and released pursuant to the Plan; provided, however, that nothing contained in the Plan will preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan.

In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (1) the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle Claims against them and (2) the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle Causes of Action against other Entities.

**B.**    Release

EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTORS AND REORGANIZED DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS IN POSSESSION (COLLECTIVELY, THE "DEBTOR RELEASING PARTIES") WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER AND RELEASE TO THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE DEBTOR RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, LITIGATION CLAIMS AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES

EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING
FROM OR RELATED IN ANY WAY IN WHOLE OR IN PART TO THE DEBTORS, THE
CHAPTER 11 CASES, INCLUDING, WITHOUT LIMITATION, THE PREPETITION
SECURED LOANS, THE BACKSTOP AGREEMENT, THE LENDER RSA, THE RIGHTS
OFFERING, THE SORENSEN SUPPORT AGREEMENT, THE DIP FACILITY, THE
DISCLOSURE STATEMENT, THE PLAN OR THE SOLICITATION OF VOTES ON THE
PLAN THAT SUCH DEBTOR RELEASING PARTY WOULD HAVE BEEN LEGALLY
ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT
ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD
HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF THE
DEBTORS, THEIR ESTATES OR THE REORGANIZED DEBTORS (WHETHER
DIRECTLY OR DERIVATIVELY) AGAINST ANY OF THE RELEASED PARTIES;
PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE
SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION
EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN
SUPPLEMENT; (II) ANY CAUSES OF ACTION ARISING FROM FRAUD, GROSS
NEGLIGENCE, OR WILLFUL MISCONDUCT AS DETERMINED BY FINAL ORDER OF
THE BANKRUPTCY COURT OR ANY OTHER COURT OF COMPETENT JURISDICTION;
AND/OR (III) THE RIGHTS OF SUCH DEBTOR RELEASING PARTY TO ENFORCE THE
PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER
AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH
THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO
FINAL ORDER OF THE BANKRUPTCY COURT.  THE FOREGOING RELEASE SHALL
BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR
ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW,
REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR
APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL
PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY
PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF
ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS,
RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS
RELEASE.  NOTWITHSTANDING THE FOREGOING, THE DEBTORS ARE NOT
RELEASING THE DEBTORS (BUT THEY ARE RELEASING THE RELATED PERSONS
TO THE DEBTORS PURSUANT TO THIS PARAGRAPH.

## ARTICLE XII.
### THIRD PARTY RELEASE

**A.**     Creditors Release

AS OF AND SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, EACH
CREDITOR RELEASING PARTY, FOR ITSELF AND ITS RESPECTIVE RELATED
PERSONS, IN EACH CASE IN THEIR CAPACITY AS SUCH RELATED PERSON, SHALL
BE DEEMED TO HAVE RELEASED (I) EACH OTHER CREDITOR RELEASING PARTY
AND (II) THE SORENSEN PARTIES AND EACH NON-DEBTOR AFFILIATE OF ANY
SORENSEN PARTY FROM ANY AND ALL DIRECT CLAIMS AND CAUSES OF ACTION
HELD BY SUCH CREDITOR RELEASING PARTY WHATSOEVER, OR IN ANY
MANNER ARISING FROM OR RELATED TO, IN WHOLE OR IN PART, THE RELEASE
MATTERS; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS
RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (i) ANY CAUSES OF
ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN
SUPPLEMENT AND/OR (ii) THE RIGHTS OF SUCH CREDITOR RELEASING PARTY TO
ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND
OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION

WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT.

THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS RELEASE.

**B.**    Sorensen Parties and Affiliates Release

AS OF AND SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, EACH OF THE SORENSEN PARTIES AND EACH OF THEIR NON-DEBTOR AFFILIATES SHALL BE DEEMED TO HAVE RELEASED EACH OF THE CREDITOR RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES, EACH IN ITS CAPACITY AS SUCH  RELATED PERSON, FROM ANY AND ALL DIRECT CLAIMS AND CAUSES OF ACTION HELD BY SUCH SORENSEN PARTY OR ANY NON-DEBTOR AFFILIATE OF SUCH SORENSEN PARTY WHATSOEVER, OR IN ANY MANNER ARISING FROM OR RELATED TO, IN WHOLE OR IN PART, THE RELEASE MATTERS; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (i) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT AND/OR (ii) THE RIGHTS OF SUCH SORENSEN PARTY OR ANY NON-DEBTOR AFFILIATE OF SUCH SORENSEN PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT.

THE FOREGOING RELEASES SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THESE RELEASES.

**C.**    Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtors or any of their assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and

other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**D.**     Exculpation

The Exculpated Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, the Disclosure Statement, the Lender RSA, the Backstop Agreement, the Sorensen Support Agreement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or confirmation or Consummation of the Plan; provided, however, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement.

**E.**     Preservation of Rights of Action

1.     Maintenance of Causes of Action

Except as otherwise provided in Article XI or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases.  The Reorganized Debtors, as the successors in, interest to the Debtors and the Estates, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court.

2.     Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action or Litigation Claim against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtors expressly reserve such Cause of Action or Litigation Claim for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action or Litigation Claims upon or after the Confirmation of the Plan or Consummation of the Plan based on the

Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action or Litigation Claims have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the release contained in Article XI of the Plan) or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

**F.**      Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.  BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION.  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

## ARTICLE XIII.
### BINDING NATURE OF PLAN

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## ARTICLE XIV.
### RETENTION OF JURISDICTION

**A.**      Retention of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

2.      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Confirmation Date; provided, however, that, from and after the Effective Date, the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

3.      resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.      resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

5.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

6.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, provided that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

8.      resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

9.      hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10.      issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of this Plan, except as otherwise provided in this Plan;

11.      enforce the terms and condition of this Plan and the Confirmation Order;

12.      resolve any cases, controversies, suits or disputes with respect to the release, the Exculpation, the Indemnification and other provisions contained in Article XII hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

13.      hear and determine the Litigation Claims by or on behalf of the Debtors or Reorganized Debtors;

14.     enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

15.     resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

16.     enter an order concluding or closing the Chapter 11 Cases.

**B.**     Failure of Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set for in Article XIV.A of the Plan, the provisions of this Article XIV shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

**ARTICLE XV.**
MISCELLANEOUS PROVISIONS

**A.**     Dissolution of the Committee

On the Effective Date, the Committee (if any) and any other statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases.

**B.**     Payment of Statutory Fees

All outstanding fees payable pursuant to section 1930 of title 28, United States Code shall be paid on the Effective Date.  All such fees payable after the Effective Date shall be paid prior to the closing of the Chapter 11 Case when due or as soon thereafter as practicable.

**C.**     Payment of Fees and Expenses of Prepetition Agents

On the Effective Date or as soon as reasonably practicable thereafter, to the extent not previously paid during the pendency of the Chapter 11 Cases and subject to the terms of the Prepetition Secured Loan Agreements, the Reorganized Debtors shall pay in full in Cash all outstanding reasonable and documented fees and expenses of the Prepetition Agents and their respective counsel, including, without limitation, all prepetition and Postpetition expenses incurred by the Prepetition Agents and their respective counsel.

**D.**     Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan and in the Lender RSA and the Backstop Agreement: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.  A

Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Equity Interest of such Holder.

**E.**     Revocation of Plan

The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to File subsequent chapter 11 plans, but without prejudice to the respective parties' rights under the Lender RSA or the Backstop Agreement. If the Debtors revoke or withdraw this Plan, or if confirmation of this Plan or Consummation of this Plan does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

**F.**     Successors and Assigns

This Plan shall be binding upon and inure to the benefit of the Debtors, and their respective successors and assigns, including, without limitation, the Reorganized Debtors. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**G.**     Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and this Plan is Consummated. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

**H.**     Further Assurances

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order. On or before the Effective Date, the Debtors shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**I.**     Additional Debtors

The Debtors reserve the right to commence Chapter 11 Case(s) on behalf of Additional Debtor(s) through the Confirmation Date. Upon entry of an order jointly administering such Additional Debtor's chapter 11 case with the Chapter 11 Cases, such Additional Debtor shall automatically become a party to this Plan. Each holder of a Claim that accepts distributions

pursuant to this Plan is conclusively deemed to have agreed to the inclusion of any Additional Debtors to all of the provisions set forth in this Plan.

**J.**     Severability

         If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, but subject to the consent of the Required Backstop Investors, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K.**     Service of Documents

         All notices, requests, and demands to or upon the Debtors or the Reorganized Debtors to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

         ABLEST INC.
         3820 State Street
         Santa Barbara, California 93105
         Attn: D. Stephen Sorensen
         Tel: (805) 882-2200
         Fax: (805) 898-7111
         Email: steve@select.com

                 with copies to counsel for the Debtors (which shall not constitute notice):

         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
         4 Times Square
         New York, New York 10036
         Attention: Kenneth S. Ziman
         Tel: (212) 735-3310
         Email: ken.ziman@skadden.com

         – and –

         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
         300 South Grand Avenue, Suite 3400
         Los Angeles, CA 90071
         Attention: Glenn S. Walter
         Tel: (213) 687-5149
         Email: glenn.walter@skadden.com

– and –

PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Attention: Jeffrey N. Pomerantz
Tel: (310) 277-6910
Email: jpomerantz@pszjlaw.com

– and –

PACHULSKI STANG ZIEHL & JONES LLP
150 California St., 15th Floor
San Francisco, CA 94111
Attention: Joshua M. Fried
Tel: (415) 263-7000
Email: jfried@pszjlaw.com

     with copies to counsel for the Steering Committee (which shall not constitute notice):

MILBANK, TWEED, HADLEY & MCCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017
Attention: Mark Shinderman
Tel: (213) 892-4411
Email: mshinderman@milbank.com
Attention: Brett Goldblatt
Tel: (213) 892-4471
Email: bgoldblatt@milbank.com

     with copies to counsel for the Consenting Equity Holder (which shall not constitute notice):

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
301 Commerce Street, Suite 1700
Fort Worth, TX 76102
Attention: Michael D. Warner
Tel: (817) 810-5265
Email: mwarner@coleschotz.com

– and –

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Court Plaza North
25 Main Street

Hackensack, NJ 07601
Attention: Adam J. Sklar
Tel: (201) 525-6234
Email: asklar@coleschotz.com

      with copies to counsel for the Prepetition First Lien Agent (which shall not constitute notice):

KATTEN MUCHIN ROSENMAN LLP
515 S. Flower Street, Suite 1000
Los Angeles, CA 90071-2212
Attn: William B. Freeman
Tel: (213) 788-7450
Email: bill.freeman@kattenlaw.com

– and –

KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Attn: Karen B. Dine
Tel: (212) 940-8772
Email: karen.dine@kattenlaw.com

      with copies to counsel for the Prepetition Second Lien Agent (which shall not constitute notice):

DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036-6797
Attn: Allan S. Brilliant, Craig P. Druehl and James O. Moore
Tel: (212) 641-5616
Email: allan.brilliant@dechert.com
Email: craig.druehl@dechert.com
Email: james.moore@dechert.com

**L.**    Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code

      To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forgo the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment.  Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to evidence and implement the provisions of and the distributions to be made under this Plan, including the Post-Emergence Term Loan Agreement and the Post-Emergence ABL Loan

Agreement, (ii) the issuance of New Common Stock and the New Warrants (under this Plan and pursuant to the Rights Offering), (iii) the maintenance or creation of security or any Lien as contemplated by the Post-Emergence Term Loan Agreement and the Post-Emergence ABL Loan Agreement; and (iv) assignments executed in connection with any transaction occurring under the Plan.

**M.**     Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

**N.**     Tax Reporting and Compliance

The Reorganized Debtors are hereby authorized, on behalf of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors are for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O.**     Schedules

All exhibits and schedules to this Plan, including the Exhibits and Plan Schedules, are incorporated and are a part of this Plan as if set forth in full herein.

**P.**     No Strict Construction

This Plan is the product of extensive discussions and negotiations between and among, inter alia, the Debtors, the Backstop Investors, the Steering Committee, the Prepetition Secured Lenders and their respective professionals.  Each of the foregoing was represented by counsel of its choice who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, Exhibits and Plan Schedules, and the agreements and documents ancillary or related thereto.  Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, Exhibits and Plan Schedules, and the documents ancillary and related thereto.

**Q.**     Conflicts

In the event that a provision of the Disclosure Statement conflicts with a provision of this Plan, the terms of this Plan shall govern and control to the extent of such conflict.

**R.**     Confirmation Request

The Debtors request the Bankruptcy Court confirm the Plan and that it do so, if applicable, pursuant to section 1129(b) of the Bankruptcy Code notwithstanding any rejection of the Plan by an Impaired Class.

Dated: _____ March 11 , 2014

Respectfully submitted,

ABLEST INC., on behalf of itself and its affiliates listed
below

Name: D. Stephen Sorensen
Title: Chief Executive Officer

NEW KOOSHAREM CORPORATION
KOOSHAREM, LLC,
TANDEM STAFFING SOLUTIONS, INC.
SELECT PEO, INC.
SELECT SPECIALIZED STAFFING, INC.
SELECT TRUCKING SERVICES, INC.
SELECT NURSING SERVICES, INC.
REMEDY STAFFING, INC.
WESTAFF, INC.
WESTAFF (USA), INC.
WESTAFF SUPPORT, INC.
REAL TIME STAFFING SERVICES, INC.
SELECT TEMPORARIES, INC.
SELECT PERSONNEL SERVICES, INC.
SELECT CORPORATION
REMEDYTEMP, INC.
REMEDY TEMPORARY SERVICES, INC.
REMEDY INTELLIGENT STAFFING, INC.
REMX, INC.
REMSC LLC
REMUT LLC

SCHEDULE 1

The Debtors

The Debtors, along with the last four digits of each Debtor's federal tax identification number, are:

1.  Ablest Inc. (8462);

2.  New Koosharem Corporation (9356);

3.  Koosharem, LLC (4537);

4.  Real Time Staffing Services, Inc. (8189);

5.  Remedy Intelligent Staffing, Inc. (0963);

6.  Remedy Staffing, Inc. (0080);

7.  RemedyTemp, Inc. (0471);

8.  Remedy Temporary Services, Inc. (7385);

9.  RemX, Inc. (7388);

10. Select Corporation (6624);

11. Select Nursing Services, Inc. (5846);

12. Select PEO, Inc. (8521);

13. Select Personnel Services, Inc. (8298);

14. Select Specialized Staffing, Inc. (5550);

15. Select Temporaries, Inc. (7607);

16. Select Trucking Services, Inc. (5722);

17. Tandem Staffing Solutions, Inc. (5919);

18. Westaff, Inc. (6151);

19. Westaff (USA), Inc. (5781);

20. Westaff Support, Inc. (1039);

21. RemSC LLC (8072); and

22. RemUT LLC (0793).

Schedule 2

**Summary of Terms of
Treatment of Certain Related Party
and Other Transactions of
New Koosharem Corporation and its Subsidiaries**

*This term sheet (this "Term Sheet") describes the principal terms for the treatment of certain related party and other transactions in connection with the Prepackaged Joint Plan of Reorganization for Ablest Inc., et al., dated March 11, 2014 (the "Plan"), to which this Term Sheet is attached as an exhibit. This Term Sheet is a summary of the material terms of the transactions described herein and does not purport to be complete. Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Plan.*

| Transaction | Description |
|---|---|
| 1. Par Alma Note Receivable | On the Effective Date, as part of the restructuring, any claims arising under or in connection with the note from Par Alma, a limited liability company wholly owned by the Company's principal shareholder, the amount of which totaled approximately $47,245,000 as of December 29, 2013, will be released, waived, and discharged. |
| 2. Related Party Receivables | As set forth in more detail below, as part of the company's year-end review process of its accounts receivable, it has determined that the balance due from Trishan Air should be removed and written off, as this amount will be satisfied upon disposition of the related aircraft.   Further, as part of the Company's year-end review of its accounts receivable, it has determined certain other balances totaling $914,500, not intended to be included in the assets of the ongoing operation, have been written off. Accordingly, the Company has scheduled that such balances be written down to zero.<br><br>The balances that will be written down to zero includes the following:<br><br>• Trishan Air – $10,065,111.94<br>• Forage – $339,820.38<br>• Esperer – $17,076.17<br>• Top Dollar – $417,623.29<br>• Butler Precision – $122,557.00<br>• Diffraction – $4,905.66<br>• All Radiator – $12,496.11 |

| Transaction | Description |
|---|---|
| | In addition, the following receivables are owed to the Company by entities that will be acquired by the Company in connection with the restructuring, and will therefore become intercompany receivables upon consummation of the restructuring:<br><br>• Decca Consulting, Inc. – $123,100.20<br>• Decca Consulting, Ltd. – $70,217.73<br><br>The following related party receivables will remain outstanding following the Effective Date, and will not be released, waived or discharged in connection with the restructuring:<br><br>• POGO – $1,331,407.80<br>• Dave Tonick – $988,954.83<br>• PDP – $24,369.30 |
| 3.  Airplanes | Any claims arising under the lease and sublease agreements related to airplanes Tail Number N72PX and N8822SS, including any claims arising from or relating to the termination of such agreements, will be paid by the Company as a Class 7 General Unsecured Claim.  The Company projects an $11 million termination fee with respect to the lease associated with airplane Tail Number N72PX that will be payable on the Effective Date and a $4 million termination fee with respect to the lease for airplane Tail Number N8822SS. |
| 4.  Letter of Credit Recollateralization | On the Effective Date, as part of the restructuring, the Company will recollateralize certain letters of credit in the aggregate amount of approximately $14,200,000 that are currently backstopped by the Company's principal stockholder and/or certain of his affiliates. |
| 5.  Equity Sharing Arrangement for Employee Residences | The Company is a party to equity sharing arrangements with certain executives with respect to their houses.  In the aggregate, the Company pays $42,204.89 per month on account of these equity arrangements, excluding taxes, insurance, and repairs.  On the maturity dates of the equity arrangements, each house is scheduled to be transferred to the non-Company counterparty to such equity arrangement.  The Company and the Required Backstop Investors are currently evaluating the terms under which these equity arrangements may be terminated on the Effective Date, as part of the restructuring, in a manner that will terminate the Company's obligation to make additional payments under these arrangements, convey the subject houses to the |

| Transaction | Description |
|---|---|
|  | respective executives subject to the remaining payment obligations on the house, and reimburse, on a grossed up basis, the executives for the tax amounts that become payable by such executives as a result of the termination of the equity sharing arrangements. |
| 6. Commercial Relationships | The parties acknowledge that the Debtors and the Reorganized Debtors will continue to have commercial relationships with affiliates of the Sorensen Parties on and after the Effective Date. Such related party relationships, as disclosed in the documents delivered in connection with the Plan, will continue in the ordinary course of business, subject to the consent of the Required Backstop Parties, and will not be modified by the Plan or the releases contained therein. A schedule of such permitted related party transactions will be contained in the Plan Supplement. |