## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | **Chapter 11** |
| **ABLEST INC., et. al,**[1] | ) | |
|  Debtors. | ) | **Case No. _____** |
|  | ) | |
|  | ) | |
|  | ) | |

---

### DISCLOSURE STATEMENT FOR THE PREPACKAGED JOINT
### PLAN OF REORGANIZATION FOR ABLEST INC., et al.
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

Dated: March 11, 2014

Anthony W. Clark (I.D. No. 2051)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
T: (302) 651-3000
F: (302) 651-3001

– and –

Kenneth S. Ziman
Glenn S. Walter
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
T: (212) 735-3000
F: (212) 735-2000

– and –

Jeffrey N. Pomerantz
Debra Grassgreen
James E. O'Neill (I.D. No. 4042)
PACHULSKI STANG ZIEHL & JONES LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
T: (302) 652-4100
F: (302) 652-4400

Proposed Counsel to Debtors and Debtors in Possession

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are set forth on Schedule 1 hereto.

**TABLE OF CONTENTS**

**Page No.**

ARTICLE I EXECUTIVE SUMMARY ........................................................1

    A.    AN OVERVIEW OF THE CHAPTER 11 PROCESS ...........................2
    B.    SUMMARY OF THE PLAN ................................................................3
    C.    PURPOSE AND EFFECT OF THE PLAN...........................................4
    D.    CONSUMMATION OF THE PLAN ..................................................18
    E.    RISK FACTORS ................................................................................18

ARTICLE II BACKGROUND TO THE CHAPTER 11 CASES ...................................18

    A.    THE DEBTORS' CORPORATE HISTORY .....................................18
    B.    OVERVIEW OF THE DEBTORS' BUSINESS .................................19
    C.    OVERVIEW OF THE PREPETITION CAPITAL STRUCTURE.....................22
    D.    EMPLOYMENT TAX OBLIGATIONS.............................................27
    E.    EMPLOYEE AND RELATED PARTY TRANSACTIONS AND OBLIGATIONS................................................................................27
    F.    LITIGATION CLAIMS AND SCIF SETTLEMENT.........................31
    G.    EVENTS LEADING TO THE PROPOSAL OF PLAN AND POTENTIAL CHAPTER 11 FILING ................................................32
    H.    RESTRUCTURING SUPPORT AGREEMENT ................................34
    I.    REORGANIZATION STRATEGY ...................................................38
    J.    EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES................................................................................39
    K.    SUMMARY OF THE RIGHTS OFFERING AND BACKSTOP COMMITMENT................................................................................39
    L.    SUMMARY OF CERTAIN EMPLOYMENT AGREEMENTS.........................41
    M.    SUMMARY OF THE EQUITY CAPITALIZATION OF REORGANIZED PARENT................................................................42
    N.    SUMMARY OF POST-EMERGENCE FINANCING OF REORGANIZED DEBTORS................................................................42

ARTICLE III SUMMARY OF THE PLAN...........................................................43

    A.    ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS ..........43
    B.    CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS................................................................45
    C.    ACCEPTANCE OR REJECTION OF THE PLAN .............................52
    D.    MEANS FOR IMPLEMENTATION OF THE PLAN .......................53
    E.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES................................................................................61
    F.    PROVISIONS GOVERNING DISTRIBUTIONS ..............................65
    G.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS................................................................69
    H.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................71

I.      DEBTORS' RELEASES .................................................................................77
J.      RELEASE, INJUNCTION AND RELATED PROVISIONS.............................77
K.      THIRD PARTY RELEASE.............................................................................78
L.      BINDING NATURE OF PLAN.....................................................................82
M.      CONFIRMATION PROCEDURES................................................................83
N.      STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE
        PLAN ...........................................................................................................83
O.      CONSUMMATION OF THE PLAN ..............................................................93

ARTICLE IV RISK FACTORS ...................................................................................93

A.      CERTAIN BANKRUPTCY CONSIDERATIONS ..............................................93
B.      RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES
        TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER
        THE PLAN .................................................................................................98
C.      RISKS RELATING TO THE COMPANY'S INDUSTRY ................................100
D.      OPERATIONAL RISKS ..............................................................................104
E.      RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS.........112
F.      DISCLOSURE STATEMENT DISCLAIMER.................................................113

ARTICLE V ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ...............................................................................................................115

A.      LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE .......115
B.      FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION................116

ARTICLE VI EXEMPTIONS FROM SECURITIES ACT REGISTRATION .........117

A.      SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION
        4(A)(2) OF THE SECURITIES ACT................................................................117

ARTICLE VII SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME
TAX CONSEQUENCES OF THE PLAN ....................................................................120

A.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE
        DEBTORS ..................................................................................................121
B.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO
        HOLDERS ..................................................................................................122
C.      IMPORTANCE OF OBTAINING PROFESSIONAL TAX
        ASSISTANCE ............................................................................................128

ARTICLE VIII RECOMMENDATION ......................................................................128

Ablest Inc. and its debtor affiliates (collectively, the "Debtors" or the "Company")[2] are sending you this document and the accompanying materials (the "Disclosure Statement") because you are a creditor entitled to vote to approve the *Prepackaged Joint Plan of Reorganization for Ablest Inc., et al.*, dated March 11, 2014, as the same may be amended from time to time (the "Plan").  The Company is commencing this solicitation of your vote to approve the Plan (the "Solicitation") before the Company files voluntary cases under chapter 11 of the United States Bankruptcy Code, as amended (the "Bankruptcy Code").

The Debtors have not commenced reorganization cases under chapter 11 of the Bankruptcy Code as of the date of this Disclosure Statement.  If, however, the Debtors receive properly completed ballots indicating acceptances of the Plan, to meet the voting requirements prescribed by section 1126 of the Bankruptcy Code, the Debtors intend to file (but hereby expressly reserve the right not to file) with a United States Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"), and to seek, as promptly thereafter as practicable, Confirmation of the Plan.  The Debtors reserve the right to commence the Chapter 11 Cases prior to the Voting Deadline and to complete the Solicitation during the pendency of the Chapter 11 Cases.  Because the Chapter 11 Cases have not yet been commenced, this Disclosure Statement has not been approved by the Bankruptcy Court as containing "adequate information" within the meaning of section 1125(a) of the Bankruptcy Code.  If the Debtors file the Chapter 11 Cases, they will seek an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the Solicitation as having been in compliance with section 1126(b) of the Bankruptcy Code, and (c) confirming the Plan.  Notwithstanding anything to the contrary herein, the Debtors reserve the right to pursue Confirmation of the Plan through any alternative means.

---

**THE VOTING DEADLINE IS 5:00 P.M. PREVAILING PACIFIC TIME ON MARCH 27, 2014
(UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).
TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE VOTING AGENT MUST ACTUALLY RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.**

---

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

---

**IMPORTANT INFORMATION FOR YOU TO READ**

---

THE COMPANY IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016. THE INSTRUMENTS DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"),  OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT OR REGULATION D PROMULGATED THEREUNDER AND/OR OTHER APPLICABLE EXEMPTIONS. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL

COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER. RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO POTENTIAL CONTESTED MATTERS, POTENTIAL ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM OR EQUITY INTEREST IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT. EXCEPT AS PROVIDED UNDER THE PLAN, THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND CAUSES OF ACTION AND MAY OBJECT TO CLAIMS OR EQUITY INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR EQUITY INTERESTS OR OBJECTIONS TO CLAIMS OR EQUITY INTERESTS ON THE TERMS SPECIFIED IN THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN CONTEMPLATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL

PURPOSES.  EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS EXPRESSLY DESCRIBED AS AUDITED HEREIN).

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS SENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN ARTICLE IV HEREIN, "RISK FACTORS."

THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (PREVAILING PACIFIC TIME) ON MARCH 27, 2014, UNLESS EXTENDED BY THE DEBTORS IN THEIR DISCRETION.

**IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF EQUITY INTERESTS IN, THE DEBTORS WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.**

## **SCHEDULES**

SCHEDULE 1 – The Debtors

## **EXHIBITS**[3]

EXHIBIT A – Plan of Reorganization

EXHIBIT B – Organizational Chart of the Debtors

EXHIBIT C – The Reorganized Debtors' Financial Projections

EXHIBIT D – 2012 Audited Financial Statement

EXHIBIT E – 2013 Unaudited Financial Statement

EXHIBIT F – Liquidation Analysis

EXHIBIT G – Post-Emergence Capitalization Table

EXHIBIT H – DIP Term Sheet

EXHIBIT I – New Board Members –  Biographical Information

EXHIBIT J – Disclosure Statement Supplemental Materials

---

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH SCHEDULE AND
EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS
THOUGH FULLY SET FORTH HEREIN.

---

[3]     Disclosure Statement exhibits exclude schedules and exhibits thereto.

# ARTICLE I
# EXECUTIVE SUMMARY

Ablest Inc., a Delaware corporation ("Ablest"), New Koosharem Corporation, a California corporation and the indirect parent entity of Ablest (the "Parent"), Koosharem, LLC (f/k/a Koosharem Corporation), a California limited liability company, a wholly-owned subsidiary of the Parent, and the direct parent entity of Ablest (the "Borrower"), and each of the other debtors listed on Schedule 1 hereto (collectively, the "Debtors" or the "Company"), submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of votes on the *Prepackaged Joint Plan of Reorganization for Ablest Inc., et al.* dated March 11, 2014 (the "Plan"), which the Debtors intend to file with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A copy of the Plan is attached hereto as **Exhibit A**.

This Executive Summary is being provided as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto and to the Plan), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan. Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization. As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code. This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

- the events leading up to the solicitation of the Plan;

- the solicitation procedures for voting on the Plan;

- the Confirmation process and the voting procedures that Holders of Claims who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of Confirmation of the Plan, certain risk factors relating to the Debtors or the Reorganized Debtors, the Plan and the securities to be issued under the Plan and the manner in which distributions will be made under the Plan; and

- the proposed organization, operations and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

If, however, the Plan cannot be confirmed as to some or all of the Debtors, then, subject to the terms of the Lender RSA and the Backstop Agreement, in the Debtors' sole discretion, (a) the Plan may be revoked as to all of the Debtors or (b) the Debtors may revoke the Plan as to

any Debtor (and any such Debtor's Chapter 11 Case may be converted to a chapter 7 liquidation, continued or dismissed in the Debtors' sole discretion) and confirm the Plan as to the remaining Debtors to the extent required. The Debtors reserve the right to seek Confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims.

As discussed in further detail herein, the Plan contemplates: (i) the exchange of approximately $456 million in aggregate principal amount of secured Claims under the Prepetition First Lien Credit Agreement (calculated as of September 30, 2013) for $365 million in cash and Subscription Rights allowing the Holders of Prepetition First Lien Loan Claims to Participate in the Rights Offering and (ii) the exchange of approximately $121 million in aggregate principal amount of secured Claims under the Prepetition Second Lien Credit Agreement (calculated as of September 30, 2013) for $12 million in cash and New Warrants for the purchase of New Common Stock of the Reorganized Parent. Unsecured claims will be Reinstated and paid subject to the terms and conditions thereof. All existing Equity Interests in the Parent will be cancelled. Certain of the Sorensen Parties will receive, in settlement of any and all claims such Sorensen Party may have, in each case, against the Debtors: (a) New Common Stock of the Reorganized Parent in consideration for contributing new assets to the Reorganized Parent under the terms of the DRV Purchase Agreement, (b) New Common Stock under the terms of the Restricted Stock Award Agreement, (c) New Common Stock in connection with the conversion of certain Related Party Notes under the terms of the Sorensen Support Agreement, and (d) an option to designate and purchase additional New Common Stock for Cash in an aggregate amount of $4 million under the terms of the Sorensen Support Agreement. Distributions under the plan will be funded through a $175 million Rights Offering of New Common Stock, a $50 million equity investment in Cash pursuant to the Backstop Agreement, and a new $350 million first lien term credit facility. Operations of the Company following the restructuring will be financed through a new secured asset based revolving credit facility in a principal amount up to $120 million.

In connection with developing the Plan, the Company reviewed its current business operations and compared its prospects as an ongoing business enterprise with the estimated recoveries in various liquidation scenarios. As a result, the Company concluded that the Company's enterprise value would be maximized by continuing to operate as a going concern. The Company believes that its businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the liquidation analysis described herein, the value of the Company's assets would be considerably greater if the Company operates as a going concern instead of liquidating. Accordingly, the Company strongly recommends that you vote to accept the Plan if you are entitled to vote. As discussed in further detail below in Article I.C.4 of this Disclosure Statement, under certain circumstances, including, among other things, obtaining sufficient support from Lenders (as defined below), the restructuring defined herein may be completed out-of-court.

## A.    AN OVERVIEW OF THE CHAPTER 11 PROCESS

Chapter 11 is the principal business reorganization Chapter of the Bankruptcy Code. Pursuant to chapter 11 of the Bankruptcy Code, a debtor may remain in possession of its assets

and business and attempt to reorganize its business for the benefit of such debtor, its creditors and other parties in interest.

The commencement of a reorganization case creates an estate comprising all the legal and equitable interests of a debtor in property as of the date the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession," unless the bankruptcy court orders the appointment of a trustee. The filing of a bankruptcy petition also triggers the automatic stay provisions of section 362 of the Bankruptcy Code which provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the effective date of a plan of reorganization, following Confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a chapter 11 bankruptcy case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation.

Upon the commencement of a chapter 11 bankruptcy case, all creditors and equity interest holders have standing to be heard on any issue in the chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and Confirmation of a plan of reorganization is the principal objective of a chapter 11 case. The plan of reorganization sets forth the means of satisfying the claims against and equity interests in the debtor.

A "prepackaged" plan of reorganization is one in which a debtor seeks approval of a plan of reorganization before filing for bankruptcy from those affected creditors who are entitled to vote. Because solicitation of acceptances takes place before the bankruptcy filing, the amount of time required for the bankruptcy case is often less than in conventional bankruptcy cases. Greater certainty of results and reduced costs are other benefits generally associated with prepackaged bankruptcy cases.

## B.    SUMMARY OF THE PLAN

The Company, in consultation with its advisors, has been engaged since May 2013 in active and arm's-length negotiations with certain Holders of Prepetition First Lien Loan Claims and Prepetition Second Lien Loan Claims, including the Backstop Investors, on a prepackaged restructuring plan, including distributions under the Plan to Holders of Prepetition First Lien Loan Claims and Holders of Prepetition Second Lien Loan Claims, and the treatment of general unsecured claims. These negotiations resulted in prepetition agreements in principle with such Holders, and the Company believes that the prepackaged restructuring plan is the best restructuring alternative reasonably available to the Company. The Company has secured commitments for new equity investments aggregating $225 million, consisting of a commitment for an equity investment in Cash, to be consummated pursuant to the Rights Offering and the Backstop Commitment, on the terms set forth in the Plan and in the Backstop Agreement. The

Company has also engaged Credit Suisse to arrange a new $350 million secured term loan. The Company is also engaged in negotiations regarding a new secured asset based revolving credit facility in a principal amount up to $120 million, which will finance operations of the Company following the restructuring. The Company plans to utilize the proceeds of these investments and debt to fund obligations under the Plan as well as its working capital requirements.

The Plan represents a significant achievement for the Company and should greatly enhance the Company's ability to reorganize successfully and expeditiously through the addition of $225 million of new equity capital pursuant to the Rights Offering and the Backstop Commitment. The Plan will also provide an efficient restructuring through the prepackaged process, designed to minimize disruption to the Company's business endeavors, stabilize the Company's balance sheet, and provide a platform for renewed success. Through Confirmation of the Plan implementing the terms of the pre-packaged restructuring, the Company will restructure and substantially deleverage its balance sheet; reduce its cash interest expense to a level that is aligned with its expected future cash flows; and retain additional flexibility to invest in growth initiatives to maximize enterprise value. The Company also will improve its liquidity position from its operations during the forecasted period. For all of these reasons, the Company believes that it will have sufficient liquidity during the course of the Chapter 11 Cases and will be well-positioned going forward.

As of April 1, 2014, the Debtors will have outstanding secured debt in an aggregate amount, including accrued interest, of approximately $651 million. Upon emergence from chapter 11, the Reorganized Debtors expect to have outstanding term debt of approximately $350 million. The Reorganized Debtors also expect to have access to a new asset based revolving credit facility in a principal amount up to $120 million that will be used to finance operations. Accordingly, the Reorganized Debtors will have a significantly deleveraged and improved balance sheet and a more appropriate capital structure.

## C.    PURPOSE AND EFFECT OF THE PLAN

### 1.    Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. As a result, the Confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward; the Debtors will **NOT** be liquidated or forced to go out of business. Additionally, as discussed in greater detail in Article III.L herein, titled "Binding Nature of the Plan," a bankruptcy court's Confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the plan or affirmatively voted to reject the plan.

### 2.    Summary of Solicitation Package and Voting Instructions

The following materials constitute the solicitation package (the "Solicitation Package"):

- a solicitation cover letter from the Company addressed to the voting creditor;

- the Ballot and instructions for completing the Ballot;

- the Lender RSA and an execution page for the same;[4]

- this Disclosure Statement with all exhibits; and

- the Plan with all exhibits, including, but not limited to, the Backstop Agreement, the Lender RSA, the Sorensen Support Agreement, the DRV Purchase Agreement, the Option Agreement, and the Stockholders Agreement, among others.

Holders of Prepetition First Lien Lender Claims will also receive the following:

- the Subscription Documents and instructions for completing the Subscription Documents; and

- the Stockholders Agreement.

In soliciting votes for the Plan pursuant to this Disclosure Statement from the Holders of Claims in Classes 4 and 5, the Solicitation Package, including the Ballot to be used by Holders of Claims in such Class to vote to accept or reject the Plan, will be posted by the Prepetition Agents on Intralinks.  Any party who desires additional paper copies of these documents may request copies by writing to Ablest Ballot Processing Center, c/o KCC, 2335 Alaska Avenue, El Segundo, CA 90245 (the "Voting Agent").

The Voting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.

Only the Holders of Claims in Classes 4 and 5 are entitled to vote to accept or reject the Plan.  To be counted, Ballots cast by Holders must be received by the Voting Agent by 5:00 p.m. (prevailing Pacific Time) on March 27, 2014, the Voting Deadline.  Voting instructions are attached to each Ballot.

Unless the Company, in its discretion, decides otherwise, any Ballot received after the Voting Deadline shall not be counted.  The Voting Agent will process and tabulate received Ballots and will File a voting report as soon as practicable on or after the Petition Date.

For answers to any questions regarding solicitation procedures, parties may contact the Voting Agent with any questions related to the solicitation procedures applicable to their Claims and Equity Interests.

The Plan Supplement will be Filed by the Debtors no later than 10 days (unless otherwise ordered by the Bankruptcy Court) before the date fixed by the Bankruptcy Court to consider

---

[4]   Holders of Claims under the First Lien Credit Agreement and under the Second Lien Credit Agreement are not required to sign the Lender RSA in order to submit a Ballot or participate in the Rights Offering.

Confirmation of the Plan.  When Filed, the Plan Supplement will be available in both electronic and hard copy form.  The Plan Supplement will be available online at www.kccllc.net/Ablest. Further details about how to access the Plan Supplement will be provided in the notice sent to all parties in interest regarding the Confirmation Hearing of the Plan.

**Any Ballot that is properly executed by the Holder of a Claim, but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**Each Holder of a Claim in Class 4 or 5 must vote all of its Claims either to accept or reject the Plan and may not split its votes.  By signing and returning a Ballot, each Holder of a Claim in Class 4 or 5 will certify to the Bankruptcy Court and the Company that no other Ballots with respect to such Claim or Equity Interest have been cast or, if any other Ballots have been cast with respect to such Claim or Equity Interest, such other Ballots are revoked.**

**All Ballots are accompanied by voting instructions.  It is important to follow the specific instructions provided with the Ballot.**

**Each Eligible Participant who seeks to participate in the Rights Offering must execute and deliver the Stockholders Agreement in order to receive any New Common Stock through the Rights Offering.**

**The Company is relying on section 4(a)(2) of the Securities Act and similar exemptions from applicable "blue sky" laws with respect to the solicitation of the Rights Offering Securities.  The Company is relying on certain exemptions from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, to exempt the Solicitation and the issuance of new securities on account of treatment of Claims in connection with the Solicitation and the Plan from registration under the Securities Act and "blue sky" law.**

> 3.      **Financial Restructurings in Connection With the Plan**

The Plan contemplates certain transactions, including, without limitation, the following transactions (described in greater detail in Article III herein):

- Each Holder of a Prepetition First Lien Loan Claim will receive (A) its Pro Rata share of $365 million in Cash; and (B) a Subscription Right to participate in its Pro Rata share of the Rights Offering.

- Each Holder of a Prepetition Second Lien Loan Claim will receive (A) its Pro Rata share of $12 million in Cash; and (B) its Pro Rata share of the New Warrants.

- The Holder of the SCIF Claim will receive, (A) Cash equal to the unpaid amount under the SCIF Settlement Agreement; or (B) such other treatment as to which the Debtors or Reorganized Debtors and the Holder of the SCIF Claim will have agreed upon in writing.

- The Holders of all other Claims and Equity Interests will receive the treatment summarized in Article III herein.

- The Consenting Equity Holder will cause SB Group Holdings, Inc. to contribute to the Reorganized Parent on the Effective Date all of the issued and outstanding capital stock of Decca Consulting, Inc., Decca Consulting Ltd., Resdin Industries, Inc. and Vaughan Business Solutions, Inc., and will cause Esperer Holdings, Inc. to contribute to the Reorganized Parent on the Effective Date certain transferred agreements, in exchange for New Common Stock on the terms set forth in the DRV Purchase Agreement.

- Certain of the Sorensen Parties will receive, in settlement of any and all claims such Sorensen Party may have, in each case, against the Debtors: (a) New Common Stock of the Reorganized Parent in consideration for contributing new assets to the Reorganized Parent under the terms of the DRV Purchase Agreement, (b) New Common Stock under the terms of the Restricted Stock Award Agreement, (c) New Common Stock in connection with the conversion of certain Related Party Notes under the terms of the Sorensen Support Agreement, and (d) an option to designate and purchase additional New Common Stock for Cash in an aggregate amount of $4 million under the terms of the Sorensen Support Agreement.

- The Consenting Equity Holder shall grant the Reorganized Parent on the Effective Date an option to purchase Butler America Inc. ("Butler America"), Butler America TCS, Inc. ("Butler America TCS"), Butler America Staffing LLC ("Butler America Staffing") and Butler Technical Services India (P) Ltd. ("Butler India" and, together with Butler America, Butler America TCS and Butler America Staffing, the "Butler Companies" and, each individually, a "Butler Company"), on the terms set forth in the Option Agreement.

Attached hereto as Exhibit C are the financial projections for the Reorganized Debtors. The projections account for the contribution of Decca Consulting, Inc., Decca Consulting Ltd., Resdin Industries, Inc. and Vaughan Business Solutions, Inc.  Through implementation of the above transactions and the post-emergence business plan set forth in the Reorganized Debtors' Financial Projections attached hereto as Exhibit C, the Company believes that the Reorganized Debtors will emerge from this pre-packaged restructuring with a substantially deleveraged balance sheet, an improved liquidity position, reduced cash interest expenses to levels aligned with expected future cash flows, and additional flexibility to invest in growth initiatives.

(a)    No Fractional Shares.

No fractional New Common Stock or Warrants to purchase fractional New Common Stock shall be issued or distributed under the Plan.  Each Person entitled to receive any fractional New Common Stock or Warrants to purchase fractional New Common Stock shall receive the total number of whole New Common Stock or Warrants to purchase whole New Common Stock to which such Person is entitled.  Whenever any distribution to a particular Person would otherwise call for distribution of fractional New Common Stock or Warrants to purchase

7

fractional New Common Stock, as applicable, the actual distribution of shares of such stock or shares of stock subject to such warrants shall be rounded down to the next lower whole number.

(b)       Cancellation of Parent Equity Interests; Issuance of New Capital Stock.

On the Effective Date, the Parent Equity Interests will be cancelled, and Reorganized Parent will issue the New Common Stock and the New Warrants as set forth below.

(c)       The Rights Offering and Backstop Commitment

Concurrently herewith, and as part of the transactions to be effectuated by the Plan, the Debtors are commencing a rights offering of New Common Stock to be offered to each Eligible Participant as of the Rights Offering Record Date.  Pursuant to the Rights Offering, each Eligible Participant may subscribe for its Pro Rata share of New Common Stock for an aggregate purchase price in Cash equal to $175 million.  Pursuant to the Backstop Agreement, each Backstop Investor has committed to (i) subscribe for its Backstop Proportion of all of the New Common Stock that is eligible to be subscribed for by the Prepetition First Lien Lenders (that are Eligible Participants) that is not subscribed for by such Prepetition First Lien Lenders and (ii) subscribe for its Backstop Proportion of additional New Common Stock for an aggregate purchase price in Cash equal to $50 million.  The terms of the Rights Offering and Backstop Commitment are summarized in Article III.D.7 herein.  The Debtors will also reimburse the expenses of the Backstop Investors and provide them with a customary indemnification, all as set forth in Section 6 of the Backstop Agreement.  The Rights Offering Purchase Price will fund Cash payments required to be made under the Plan.  To participate in the Rights Offering, each Eligible Participant will need to execute and deliver the Subscription Documents and Stockholders Agreement included in the Solicitation Package and return them pursuant to the instructions provided in the Solicitation Package.

(d)       New Common Stock to Be Issued Under the Plan

On, or as soon as reasonably practicable after, the Effective Date, Reorganized Parent will issue New Common Stock pursuant to the Rights Offering to each of the Prepetition First Lien Lenders who (A) is an Eligible Participant, (B) has timely exercised its Subscription Rights as instructed in the Subscription Documents, (C) has timely tendered payment of the Rights Offering Purchase Price for that portion of the Subscription Rights sought to be exercised by each such Person, (D) has timely executed the Stockholders Agreement, and (E) has complied with any and all other requirements set forth in the Subscription Documents, by the Debtors, or by the Bankruptcy Court.  Further information regarding the post-Effective Date potential ownership of Reorganized Parent and the dilutive effects of all of the issuances under the Plan is set forth in the capitalization table attached hereto as Exhibit G.

On, or as soon as reasonably practicable after, the Effective Date, Reorganized Parent will issue New Common Stock pursuant to the Backstop Agreement to each of the Backstop Investors who (A) has timely exercised the Backstop Agreement, (B) has timely tendered payment of the Rights Offering Purchase Price for that portion of the Backstop Proportion committed or agreed to by each Backstop Investor as set forth in the Backstop Agreement, (C) has timely executed the Stockholders Agreement, and (D) has complied with any and all other

requirements set forth in the Backstop Agreement, or by the Bankruptcy Court.  Further information regarding the post-Effective Date potential ownership of Reorganized Parent and the dilutive effects of all of the issuances under the Plan is set forth in the capitalization table attached hereto as Exhibit G.

Additionally, on the Effective Date, then Reorganized Parent will issue to certain of the Sorensen Parties who have timely executed the Stockholders Agreement: (a) New Common Stock of the Reorganized Parent in consideration for contributing new assets to the Reorganized Parent under the terms of the DRV Purchase Agreement, (b) New Common Stock under the terms of the Restricted Stock Award Agreement, (c) New Common Stock in connection with the conversion of certain Related Party Notes under the terms of the Sorensen Support Agreement, and (d) an option to designate and purchase additional New Common Stock for Cash in an aggregate amount of $4 million under the terms of the Sorensen Support Agreement.  Further information regarding the post-Effective Date potential ownership of Reorganized Parent and the dilutive effects of all of the issuances under the Plan is set forth in the capitalization table attached hereto as Exhibit G.

The percentage ownership represented by the New Common Stock issued pursuant to the Rights Offering, the Backstop Agreement, the DRV Purchase Agreement, the Restricted Stock Award, the Sorensen Support Agreement, and other equity grants described herein, will be subject to dilution as set forth in the capitalization table attached hereto as Exhibit G.

The New Common Stock will be issued under the Plan in reliance on section 1145 of the Bankruptcy Code and/or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Article VI herein, titled "Exemptions From Securities Act Registration."

(e)    New Warrants to Be Issued Under the Plan

On the Effective Date, Reorganized Parent will issue the New Warrants to Holders of Prepetition Second Lien Loan Claims.  The New Warrants will have a term of five years, will be exercisable for New Common Stock, with an exercise price per share equal to a 35% premium to the price per share paid for the New Common Stock in the Rights Offering.  The percentage ownership represented by the shares of New Common Stock issued to Holders of Prepetition Second Lien Loan Claims upon conversion of the New Warrants is subject to dilution as set forth in the capitalization table attached hereto as Exhibit G.  The New Warrants will be issued in reliance on section 1145 of the Bankruptcy Code and/or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, in accordance with applicable bankruptcy law, and without registration under the Securities Act or any similar federal, state or local law as set forth in greater detail in Article VI herein, titled "Exemptions From Securities Act Registration."

Holders of Prepetition Second Lien Loan Claims should be aware that the value of the New Warrants is wholly dependent upon the future performance of the Debtors' business and the value of the capital stock of Reorganized Parent.  There can be no assurance that the value of the capital stock of Reorganized Parent will ever exceed the exercise price per share of the New Warrants (at any exercise price per share that falls within the range described in this Disclosure

Statement), or that the New Warrants will be "in the money" at any time prior to their expiration. Further, neither the New Warrants nor the capital stock of Reorganized Parent issuable upon exercise of the New Warrants will be registered under the Securities Act at the time the New Warrants are issued.  Accordingly, no public market will exist for the New Warrants or the capital stock of Reorganized Parent issuable upon exercise of the New Warrants, and a public market may never exist.  As a result, the value of the New Warrants is uncertain and highly speculative.

       (f)    <u>Management Incentive Plan for Management</u>

On the Effective Date, Reorganized Parent will adopt and implement the Management Incentive Plan, which would, subject to certain terms and conditions, provide for, the issuance of up to 9.35% of the New Common Stock of the Reorganized Parent to key executives of the Company, of which up to 4% may be granted to executives upon the Effective Date, and at least 5.35% to be held for future grants to executives at the discretion of the New Board.  The capitalization table attached hereto as <u>Exhibit G</u> sets forth the dilutive effects of all of the issuances under the Plan.

### 4.    Restructuring Transaction May be Consummated Out of Court

Notwithstanding anything to the contrary in this Disclosure Statement, and as set forth in more detail in the Lender RSA, the restructuring described above in Article I.C.3 of this Disclosure Statement (the "<u>Restructuring</u>") may be completed out-of-court (the "<u>Out-of-Court Restructuring</u>") if sufficient support is obtained from Lenders (as defined below) in accordance with the terms and conditions set forth in the Lender RSA and other documents relating to the Restructuring (the "<u>Restructuring Documents</u>") and if all conditions precedent to the Out-of-Court Restructuring have been satisfied.  The Out-of-Court Restructuring would be implemented prior to, and instead of, the commencement of the Chapter 11 Cases pursuant to applicable non-bankruptcy law.  The Out-of-Court Restructuring would be implemented if all (or such lesser amount as agreed pursuant to the terms of the Lender RSA) Prepetition First Lien Lenders and all Prepetition Second Lien Lenders (collectively with the Prepetition First Lien Lenders, the "<u>Lenders</u>") consent to the Restructuring.

### 5.    Plan Overview

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtors.  For classification and treatment of Claims and Equity Interests, the Plan designates Classes of Claims and Classes of Equity Interests.  These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests.

The following chart briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.  Amounts listed below are estimated.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for eleven Classes of Claims against and/or Equity Interests in the Debtors.  The Plan, though proposed jointly, constitutes a separate plan for each of the Debtors.  Therefore, except as expressly specified herein, all Claims against a particular Debtor are placed in Classes for each of the

Debtors (as designated by subclasses A through U for each of the twenty two Debtors).  Class 9 Claims shall not have any subclasses and Class 10 Claims shall only have subclasses A through T for each of the twenty one Subsidiaries.

**THE PROJECTED RECOVERIES AND ESTIMATED CLAIMS SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS OR EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED IN ARTICLE IV BELOW.  THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY.  FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS OR EQUITY INTERESTS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

| Class[5] | Type of Claim or Interest | Estimated Claim Amount (in millions) | Impairment | Entitled to Vote | Estimated Recovery Under Plan |
|---|---|---|---|---|---|
| 1 | Priority Claims | $140.6 | No | No | 100% |
| 2 | Other Secured Claims | $1.6 | No | No | 100% |
| 3 | Secured Tax Claims | $0 | No | No | 100% |
| 4 | Prepetition First Lien Loan Claims | $492.2 | Yes | Yes | 80% + Rights Offering[6] |
| 5 | Prepetition Second Lien Loan Claims | $158.8 | Yes | Yes | 10% + New Warrants[7] |

---

[5]   This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Projected Recoveries are based on midpoint valuation estimates of the Debtors.  References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.  The Plan, though proposed jointly, constitutes a separate plan for each of the Debtors.  This chart reflects the estimated claim amount and estimated recovery under the Plan for each class of claims on an aggregate basis for all Debtors.  Amounts set forth herein exclude prepetition liabilities that Debtors intend to pay under First Day Motions, including unpaid wages, withheld and accrued payroll taxes, franchisee payments, and trade payables that come due during the case.  Some amounts included in Class 1 – Priority Claims may be subject to filed liens.

[6]   Cash recovery based on outstanding debt balance as of September 29, 2013, excluding any accrued interest after September 30, 2013.  For value attributed to the New Common Stock issued pursuant to the Rights Offering and the Backstop Agreement, please see slide 11 of the Disclosure Statement Supplemental Materials, which provides an analysis of  indicative recoveries under the Plan.  The Disclosure Statement Supplemental Materials is attached hereto as Exhibit J.

[7]   Cash recovery based on outstanding debt balance as of September 29, 2013, excluding any accrued interest after September 30, 2013.  For value attributed to the Warrants issued pursuant to the Plan, please see slide 11 of the Disclosure Statement Supplemental Materials, which provides an analysis of  indicative recoveries under the Plan.  The Disclosure Statement Supplemental Materials is attached hereto as Exhibit J.

| Class[5] | Type of Claim or Interest | Estimated Claim Amount (in millions) | Impairment | Entitled to Vote | Estimated Recovery Under Plan |
|---|---|---|---|---|---|
| 6 | SCIF Claims | $22.5 | No | No | 100% |
| 7 | General Unsecured Claims | $32.6 | No | No | 100% |
| 8 | Prepetition Warrants | N/A | Yes | No | 0% |
| 9 | Equity Interests in Parent | N/A | Yes | No | 0% |
| 10 | Equity Interests in Subsidiaries | N/A | No | No | 100% |

### 6.    Who may Vote on the Plan

Each Holder of an Allowed Claim in Classes 4 and 5 is entitled to vote either to accept or to reject the Plan.  Only those votes cast by Holders of Allowed Claims in Classes 4 and 5 shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.  An Impaired Class of Claims shall have accepted the Plan if: (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims or Equity Interests actually voting in such Class have voted to accept the Plan, and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims or Equity Interests actually voting in such Class have voted to accept the Plan.  Classes 1, 2, 3, 6, 7, and 10 are Unimpaired under the Plan, are each deemed to accept the Plan by operation of law, and are not entitled to vote on the Plan.  Classes 8 and 9 are Impaired under the Plan, and deemed to reject the Plan by operation of law, and Holders of Claims in Classes 8 and 9 are not entitled to vote on the Plan.  Without limiting the foregoing, in the event that any Class of Claims or Equity Interests entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Debtors reserve the right to seek Confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

### 7.    Tabulation of Votes

**THE FOLLOWING IS IMPORTANT INFORMATION REGARDING VOTING THAT SHOULD BE READ CAREFULLY BY ALL HOLDERS OF CLAIMS IN VOTING CLASSES.**

- FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS **ACTUALLY RECEIVED** ON OR BEFORE **5:00 P.M. PREVAILING PACIFIC TIME ON MARCH 27, 2014** BY THE VOTING AGENT.

- A HOLDER OF A CLAIM MAY CAST ONLY ONE VOTE PER EACH CLAIM SO HELD.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM, SUCH EARLIER BALLOTS ARE THEREBY SUPERSEDED AND REVOKED.

- ANY BALLOT THAT IS RECEIVED <u>AFTER</u> THE VOTING DEADLINE WILL <u>NOT</u> BE COUNTED TOWARD CONFIRMATION OF THE PLAN UNLESS THE DEBTORS HAVE GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH BALLOT.

- ADDITIONALLY, THE FOLLOWING BALLOTS WILL <u>NOT</u> BE COUNTED:

  o  any Ballot that the Debtors determine is illegible or contains insufficient information to permit the identification of the Holder of the Claim;

  o  any Ballot cast by an entity that does not hold a Claim in a Class that is entitled to vote on the Plan;

  o  any Ballot that (a) is properly completed, executed and timely filed, but does not indicate an acceptance or rejection of the Plan, or (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan;

  o  any Ballot (other than courtesy copies of Ballots sent to the Voting Agent) sent to the Court, the Debtors, the Debtors' agents/representatives or the Debtors' financial or legal advisors;

  o  any Ballot transmitted by facsimile, telecopy or electronic mail; OR

  o  any unsigned Ballot.

**8.    Confirmation of the Plan**

(a)    <u>Generally</u>

"<u>Confirmation</u>" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation.  The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

(b)    <u>The Confirmation Hearing</u>

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

Following commencement of the Chapter 11 Cases, the Company intends to promptly schedule a Confirmation Hearing and will provide notice of the Confirmation Hearing and of any deadline for filing objections (the "Confirmation Objection Deadline") to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

### 9.    Confirming and Consummating the Plan

It is a condition to Confirmation of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors and the Required Backstop Investors.  Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of the Plan.

For further information, see Article IX of the Plan, entitled "Conditions Precedent to Confirmation and Consummation of the Plan."

### 10.    Rules of Interpretation

The following rules for interpretation and construction shall apply to this Disclosure Statement:  (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in Article I.B of the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Articles are references to Articles of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

### 11.    The Voting Record Date

**The Voting Record Date is March 20, 2014**.  Only Holders of Allowed Claims in the Voting Classes on the Voting Record Date received the Solicitation Package and are allowed to vote to accept or reject the Plan.

### 12.    Other Restructuring Documents

In addition to the Solicitation Package, Holders of Claims in the Voting Classes on the Voting Record Date will receive, after the commencement of the Chapter 11 Cases and as

14

ordered by the Bankruptcy Court, the following supplemental materials (the "Supplemental Materials"):

> (i)    a notice of the Confirmation Hearing approved by the Bankruptcy Court for transmission to Holders of Claims and other parties in interest; and

> (ii)    such other materials as the Bankruptcy Court may direct.

**13.    Distribution of Notices to Holders of Claims and Equity Interests in Non-Voting Classes and Holders of Disputed Claims**

As set forth above, certain Holders of Claims and Equity Interests are **not** entitled to vote on the Plan.  As a result, such parties have not received Solicitation Packages, will **not** receive Supplemental Materials and, instead, will receive the appropriate forms of notice, after the commencement of the Chapter 11 Cases, as follows:

- Unimpaired Claims and Equity Interests - Deemed to Accept.  As noted above, Administrative Claims, DIP Facility Claims and Priority Tax Claims are unclassified and are not entitled to vote on the Plan, and Allowed Claims in Classes 1, 2, 3, 6, and 7, and Equity Interests in Class 10 are Unimpaired under the Plan and, therefore, are presumed to have accepted the Plan.  As such, Holders of such Claims or Equity Interests will receive, in lieu of the Restructuring Documents, a "Non-Voting Status Notice With Respect to Unimpaired Classes Deemed to Accept the Plan" after the commencement of the Debtors' Chapter 11 Cases, which will contain instructions, among other things, on how to obtain a copy of the Plan and this Disclosure Statement, the Confirmation Objection Deadline and the Confirmation Hearing date and time.

- Impaired Claims – Deemed to Reject.  Holders of Equity Interests in Classes 8 and 9 are Impaired and will not receive or retain any value on account of such Equity Interests, and such Holders are, therefore, deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such Holders will receive, in lieu of the Restructuring Documents, a "Non-Voting Status Notice With Respect to Impaired Class Deemed to Reject the Plan" after the commencement of the Debtors' Chapter 11 Cases, which will contain instructions, among other things, on how to obtain a copy of the Plan and this Disclosure Statement, the Confirmation Objection Deadline and the Confirmation Hearing date and time.

- Contract and Lease Counterparties.  Parties to certain of the Debtors' executory contracts and unexpired leases may not have Claims pending the disposition of their contracts or leases by assumption or rejection under the Plan.  Such parties nevertheless will receive notice notifying them of the commencement of the Debtors' Chapter 11 Cases after such cases are filed, as well as notifying them of the projected disposition of their contracts and/or lease and the scheduled hearing to consider Confirmation of the Plan.

14. **Filing of the Plan Supplement**

The Debtors will file the Plan Supplement no later than 10 days before the Confirmation Hearing.  The Debtors will transmit a copy of the Plan Supplement to the "Distribution List," as defined below.  Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Plan Supplement by:  (a) calling the Voting Agent at 877-634-7178 (toll free) or 424-236-7224 (international callers); or (b) writing to Ablest Ballot Processing Center, c/o KCC, 2335 Alaska Avenue, El Segundo, CA 90245.  Parties may obtain copies of documents filed in the Chapter 11 Cases at www.kccllc.net/Ablest.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at https://ecf.deb.uscourts.gov/.

As used herein, the term "Distribution List" means (a) the Office of the United States Trustee, (b) counsel for the Committee, if any is appointed, (c) counsel to the DIP Agent, (d) counsel to the Steering Committee, (e) counsel to the Consenting Equity Holder, (f) counsel to the Prepetition First Lien Agent, (g) counsel to the Prepetition Second Lien Agent, (h) the Securities and Exchange Commission, (i) the Internal Revenue Service, (j) all parties that, as of the filing of the Plan Supplement, have filed requests for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002, and (k) any parties affected by an addition to Plan Schedules.

15. **The Confirmation Hearing**

**The Bankruptcy Court has not yet scheduled a Confirmation Hearing Date**.  Once scheduled, the Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

16. **The Deadline for Objecting to Confirmation of the Plan**

**The Bankruptcy Court has not yet scheduled a Confirmation Objection Deadline**.  Subject to order of the Bankruptcy Court, any objection to Confirmation of the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the applicable Debtor, the name of the objecting party and the amount and nature of the Claim of such Entity in each applicable Chapter 11 Case or the amount of Equity Interests held by such Entity in each applicable Chapter 11 Case; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "Notice Parties").

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.  INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH

RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF CONFIRMATION HEARING TO BE APPROVED BY THE BANKRUPTCY COURT.

**17.    Notice Parties**

(a)    <u>The Debtors</u>, Ablest Inc., 3820 State Street, Santa Barbara, CA 93105 (Attn: D. Stephen Sorensen);

(b)    <u>Counsel to the Debtors</u>, Pachulski Stang Ziehl & Jones, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA 90067-4100 (Attn:  Jeffrey N. Pomerantz), and 150 California Street, 15th Floor, San Francisco, CA 94111 (Attn:  Debra Grassgreen);

(c)    <u>Counsel to the Debtors</u>, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, NY 10036 (Attn: Kenneth S. Ziman), and 300 South Grand Avenue, Suite 3400, Los Angeles, CA 90071 (Attn: Glenn S. Walter);

(d)    <u>Counsel to the Steering Committee</u>, Milbank, Tweed, Hadley & McCloy LLP, 601 South Figueroa Street, 30th Floor, Los Angeles, CA 90017 (Attn:  Mark Shinderman and Brett Goldblatt), and Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 16th Floor, P.O. Box 1347, Wilmington, DE 19899-1347 (Attn: Robert J. Dehney);

(e)    <u>Counsel to the Prepetition First Lien Agent</u>, Katten Muchin Rosenman LLP, 515 S. Flower Street, Suite 1000, Los Angeles, CA 90071-2212 (Attn: William B. Freeman), and 575 Madison Avenue, New York, NY 10022-2585 (Attn: Karen B. Dine), and Cousins Chipman and Brown LLP, 1007 North Orange Street, Suite 1110, Wilmington, DE 19801 (Attn: Scott D. Cousins);

(f)    <u>Counsel to the Prepetition Second Lien Agent</u>, Dechert LLP, 1095 Avenue of the Americas, New York, NY 10036-6797 (Attn: Allan S. Brilliant and James O. Moore);

(g)    <u>Counsel to the Consenting Equity Holder</u>, Cole, Schotz, Meisel, Forman & Leonard, P.A., 301 Commerce Street, Suite 1700, Fort Worth, TX 76102 (Attn: Michael D. Warner), and Court Plaza North, 25 Main Street, Hackensack, NJ 07601 (Attn: Adam J. Sklar);

(h)    <u>The Office of the United States Trustee for the District of Delaware</u>, 844 King Street, Suite 2207, Wilmington, Delaware 19801.

**18.    Effect of Confirmation of the Plan**

The Plan contains certain provisions relating to (a) the compromise and settlement of Claims and Equity Interests, (b) the release of the Released Parties by the Debtors and the Holders of Claims or Equity Interests, and each of their respective Related Persons, and (c) exculpation of certain parties.

17

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES (IF ANY ARE FILED), OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## D.    CONSUMMATION OF THE PLAN

It will be a condition to Confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following Confirmation, the Plan will be consummated on the Effective Date.

## E.    RISK FACTORS

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS HAS BEEN URGED TO CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IV HEREIN TITLED, "RISK FACTORS."**

## ARTICLE II
## BACKGROUND TO THE CHAPTER 11 CASES

## A.    THE DEBTORS' CORPORATE HISTORY

Koosharem Corporation was incorporated in California in 1989.  In 2000, Koosharem purchased the stock of Select Temporaries Inc., founded in Santa Barbara, California in 1985, and began doing business as "Select Staffing." The Company's executive offices are located at 3820 State Street, Santa Barbara, CA 93105, and its telephone number is (800) 688-6162.  The Company operates under various names, including Select Staffing, Remedy Intelligent Staffing, RemX Financial Staffing, RemX IT Staffing, RemX OfficeStaff, RemX Scientific, RemX Engineering, Select Truckers Plus, Select Medical Staffing, SelectRemedy, Power Training Institute and Westaff.

On February 1, 2010, to create a new holding company structure, Koosharem Corporation entered into a merger agreement with New Koosharem Corporation, then a newly formed direct subsidiary of Koosharem Corporation, and New Koosharem Merger Sub, a newly formed direct subsidiary of New Koosharem Corporation.  Pursuant to this merger agreement, New Koosharem Merger Sub was merged with and into Koosharem Corporation and all of the shares of capital stock of Koosharem Corporation were exchanged for shares of capital stock of New Koosharem Corporation.  As a result, New Koosharem Corporation became the parent

entity of the reorganized group.  Immediately following the merger, Koosharem Corporation converted into a California limited liability company, and was renamed Koosharem LLC.

## B.    OVERVIEW OF THE DEBTORS' BUSINESS

The Company is a national provider of temporary staffing services in the United States and the largest provider of temporary staffing services in California.  The Company provides clerical, light industrial, accounting and finance, and information technology employees on a temporary, temp-to-hire and project-by-project basis through a network of 312 offices in 48 states.

### 1.    Business Operations and Sales

The Company is in the business of providing temporary employee and staffing services ranging from small- and medium-sized businesses to Fortune 1000 companies.  During the fiscal year ended December 29, 2013, the Company placed approximately 300,000 temporary employees and provided staffing services to approximately 11,500 customers.  In addition to helping companies increase the portion of their labor costs which is variable, the Company simplifies the talent supply chain for its customers by providing services supporting employment including recruiting, screening, orientation, payroll funding, payroll administration, benefits administration and legal compliance. The Company also has over 400 "onsite" customers where representatives reside onsite at the customer location and manage its outsourced workforce year-round.

Since its inception, the Company has grown both organically and through acquisitions from a single-office start-up into a large-scale enterprise that generated annual revenues of approximately $2 billion for the fiscal year ended December 29, 2013.  From 2002 to 2012, its revenues grew at a CAGR of 19.9% compared to 4.4% for the staffing industry as a whole according to the American Staffing Association (Employment and Sales Survey, 1990-2014), an independent staffing industry publication.

The Company operates 167 company-owned offices across the United States and, in 2013, revenues from these offices were $1.57 billion which represented 77% of total revenue. In addition to the company-owned offices, the Company also has a franchising business with franchise agent offices in geographic locations generally not serviced by company-owned offices. Franchise agents have the exclusive contractual right to sell certain of the Company's services and to use its service marks, business names and systems in a specific geographical region.  The franchise agent is generally responsible for establishing and maintaining an office and paying related administrative and operational expenses. The Company is the employer of record of the temporary employees and as such is responsible for paying all wages and all related taxes and insurance. The Company also manages customer accounts receivable generated by franchise licensees, thus providing a portion of the franchise agents' working capital. The Company typically receives approximately 30% of the gross margin generated by the franchise agent. Franchise offices have grown from 79 in 2008 to 145 in 2013. For 2013, franchise agents represented 23% of the Company's total revenue.

### 2.      Marketing and Development Strategy

The Company offers its temporary staffing services in suburban and rural markets, referred to as "secondary markets," and in urban centers of certain "primary markets" in the United States.  The Company currently has no foreign operations; however, following the Effective Date the Reorganized Company will have certain operations in western Canada through two Canadian entities, which will be acquired through the DRV Purchase Agreement.

In secondary markets, the Company targets primarily small to medium-sized customers, including divisions of Fortune 500 companies.  The Company believes that, in many cases, such markets are less competitive and less costly to operate in than in the more central areas of primary markets, where a large number of staffing services companies frequently compete for business and occupancy costs are relatively high.

The Company markets its services to local and regional customers through its network of company-owned and franchise agent offices.  New customers are generated by branch offices primarily through direct sales efforts and referrals.  The Company has targeted marketing programs and a consultative sales process that includes telemarketing, e-mail marketing, and direct mail campaigns.  Broader marketing efforts in regional markets are generally overseen by its national sales and marketing teams, which also market to national accounts primarily through a separate internal sales team.  As a result of the Company's service offerings, the Company is able to cross-sell its services from one service category to another.

The Company believes that it offers customers high-quality service and a compelling value proposition because the Company is able to offer all of the following:

- a flexible, "just-in-time" talent supply chain;

- simplified talent acquisition and management through its recruiting and payrolling services;

- employment-related risk management including worker's compensation; and

- customized service.

In order to increase operating leverage in the Company's business, one of its strategies is to operate larger branch offices in contiguous geographic areas, referred to as the "Fortress Branch Model." Larger offices generally have capacity for a substantial volume of qualified temporary employees with the skills and experience necessary to meet the staffing requirements of its customer base. This in turn drives more demand for the Company's services and greater operating leverage in the local markets which the Company serves. In addition, the Company's branches operate on a dual customer focus or "Barbell Strategy." On one end of the barbell, the Company has anchor accounts and, on the other end, it has smaller, retail customers. Traditionally, each branch has between two and seven anchor accounts that bring recruiting traffic and revenue stability, and cover fixed costs. In addition, each branch has a number of smaller customers that generally provide higher gross margins and revenue diversification.

### 3.    Competition and Risk Management

The temporary staffing industry in the United States is highly fragmented with over 17,000 firms operating approximately 35,000 offices (doing business for at least one year as of 2007, per the American Staffing Association).  According to 2013 statistics from Staffing Industry Analysts, no single competitor has more than a 6.2% share of the temporary staffing market in the United States.  The temporary staffing industry is highly competitive with few barriers to entry.  The Company believes that the majority of temporary staffing companies are local, full-service or specialized operations with fewer than five offices.  Within local markets, typically no single company has a dominant share of the market.  The Company competes for qualified candidates, customers, and potential acquisition targets.  Principal national competitors include Adecco SA, Kelly Services, Inc., Manpower, Inc., Express Personnel Services, Inc., and Spherion Corporation and its parent company Randstad North America.

The Company believes that excellent customer service, competitive pricing, and providing qualified candidates in a timely manner are the most important competitive factors in obtaining and retaining customers in the temporary staffing industry.  Other important competitive factors include an understanding of, and an ability to timely meet, a customer's specific job requirements, delivering accurate and timely electronic labor and cost data, implementing effective safety and risk management solutions, and monitoring quality of job performance.  The Company expects ongoing vigorous competition and pricing pressure from both national and local providers.

Workers' compensation costs make up one of the principal drivers of profitability in the temporary staffing industry, and the Company has devoted substantial resources to reducing these costs.  The Company's risk management efforts use a two-pronged approach to reduce workers' compensation costs: 1) lowering work force injuries through better safety programs, and 2) decreasing average cost per claim through its innovative claims management process.

The Company employs 58 full-time staff members on its risk management team, including claims analysts, safety professionals, investigators, auditors, and underwriters.  In addition, the Company has approximately 450 certified workers' compensation coordinators located in branch and on-site offices.  Overall, the company-wide risk control network consists of well over 2,000 people.

### 4.    Overview of Decca, Resdin and Vaughan Entities

Decca Consulting, Ltd., Decca Consulting, Inc., Resdin Industries Ltd. and Vaughan Business Solutions, Inc. (collectively, the "DRV Entities") are owned by SB Group Holdings, Inc., an entity affiliated with the Consenting Equity Holder.  For the avoidance of doubt, the DRV Entities will not be debtors in any case commenced by the debtor entities listed on Schedule 1 hereto under the Bankruptcy Code in connection with the restructuring contemplated herein and in the Plan.

On the Effective Date, the DRV Entities will be contributed by SB Group Holdings, Inc. to the Reorganized Parent pursuant to the terms of the DRV Purchase Agreement attached to the Plan as Exhibit D.  The representations, warranties and covenants of the parties to the DRV

Purchase Agreement will be made solely for the benefit of the parties thereto. In addition, such representations, warranties and covenants (a) will be made only for purposes of the DRV Purchase Agreement, (b) will be qualified by confidential disclosures made in the disclosure schedules to be delivered in connection with the DRV Purchase Agreement, (c) will be subject to materiality qualifications contained in the DRV Purchase Agreement that may differ from what may be viewed as material by investors, (d) will be made only as of the Effective Date of the restructuring, and (e) will be included in the DRV Purchase Agreement for the purpose of allocating risk between the contracting parties rather than establishing matters as fact. Accordingly, the DRV Purchase Agreement is included as an exhibit to this Disclosure Statement only to provide information regarding the terms of the DRV Purchase Agreement, and not to provide any other factual information regarding Decca Consulting, Ltd., Decca Consulting, Inc., Resdin Industries, Ltd., Vaughan Business Solutions, Inc. or their respective businesses. You should not rely on the representations, warranties and covenants or any descriptions thereof as characterizations of any actual state of facts or condition.

      (a)      Decca Consulting, Ltd. / Decca Consulting, Inc.

Decca Consulting, Ltd. ("Decca Ltd.") and Decca Consulting, Inc. ("Decca Inc.") contract with oil and gas production companies to provide consulting in the areas of drilling, completions, workovers and optimization, design and implementation, specialized fracking, pipeline construction and other matters relating to oil and gas production. Decca Ltd. is a Canadian company headquartered in Calgary, Alberta, and Decca Inc. is a Nevada corporation headquartered in Santa Barbara, California. The company was founded in 1983 and acquired by SB Group Holdings, Inc. in June 2011.

      (b)      Resdin Industries Ltd.

Resdin Industries Ltd. ("Resdin") is a Canadian company headquartered in Calgary, Alberta that contracts with midstream oil transport companies throughout western Canada to provide consulting in the areas of inspection, construction supervision and quality assurance for oil field-related construction. Resdin was founded in 1997 and acquired by SB Group Holdings, Inc. in January 2013.

      (c)      Vaughan Business Solutions, Inc.

Vaughan Business Solutions, Inc. ("Vaughan") provides drilling and completion consultants at oil and gas sites. Vaughan is a California corporation headquartered in Early, Texas. The company was founded in 1996 and acquired by SB Group Holdings, Inc. in September 2012.

## C.      OVERVIEW OF THE PREPETITION CAPITAL STRUCTURE

### 1.      Prepetition First Lien Loans

On July 12, 2007, the Company entered into the *First Lien Credit and Guaranty Agreement*, by and among the Borrower, the Prepetition Guarantors, as guarantors, the Prepetition First Lien Agent, as administrative and collateral agent, and the Prepetition First Lien Lenders party thereto, as amended by the *First Amendment to the First Lien Credit and Guaranty*

*Agreement*, dated December 8, 2009, the *Second Amendment to First Lien Credit and Guaranty Agreement*, dated March 15, 2010, the Letter Amendment to the *First Lien Credit and Guaranty Agreement*, dated March 31, 2010, the *Fourth Amendment of First Lien Credit and Guaranty Agreement*, dated April 15, 2010, and the *Fifth Amendment to First Lien Credit and Guaranty Agreement*, dated May 17, 2010 (the "First Lien Fifth Amendment").  The Company, the Prepetition Agents, the Prepetition First Lien Lenders, and the Prepetition Second Lien Lenders are also parties to that certain *Intercreditor Agreement*, dated July 12, 2007.

The Prepetition First Lien Credit Agreement provides for a term loan of $250 million, an accordion loan of up to $200 million, and a revolving loan commitment of up to $50 million.  Interest on borrowings for the term loan and the revolving loan commitment is based on the banks' base rate plus an applicable margin from 2.75% to 3.25% per annum (depending on the leverage ratio), or the adjusted Eurodollar rate plus an applicable margin of 3.75% to 4.25% per annum (depending on the leverage ratio), at the Company's option, and is payable quarterly.  As part of the First Lien Fifth Amendment, additional interest was added, payable as payment-in-kind, at a rate of 1.25% to 1.75% (depending on the leverage ratio).  The scheduled maturity date for the revolving loan commitment was July 12, 2012, and the scheduled maturity date for the term loan is June 30, 2014.  The outstanding aggregate principal amount at September 30, 2013 is approximately $456 million.  The outstanding amount as of April 1, 2014, including accrued interest, will be approximately $492 million.  Based on the current outstanding balance, interest payments are approximately $38.7 million annually.  The Company ceased making interest payments on June 30, 2013.

The Prepetition Guarantors jointly and severally guaranteed, irrevocably and unconditionally, the due and punctual payment in full of all obligations under the Prepetition First Lien Credit Agreement when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise.

The Prepetition First Lien Loans are secured by liens on substantially all of the assets of the Company, but excluding certain limited exclusions as set forth in the Prepetition First Lien Credit Agreement and the accompanying *First Lien Pledge and Security Agreement*, dated as of July 12, 2007.  This collateral specifically includes all right, title and interest of each Prepetition Guarantor and the Borrower in: (a) Accounts, (b) Chattel Paper, (c) Documents, (d) General Intangibles, (e) Goods, (f) Instruments, (g) Insurance, (h) Intellectual Property, (i) Investment Related Property, (j) Letter of Credit Rights, (k) Money, (l) Receivables and Receivable Records, (m) Commercial Tort Claims, (n) all Collateral Records, Collateral Support and Supporting Obligations related to any of the foregoing, and (o) all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (each as defined in the *First Lien Pledge and Security Agreement*).

The Prepetition First Lien Credit Agreement contains covenants that limit the ability of the Company to, without prior approval from the Prepetition First Lien Lenders or as otherwise allowed under the Prepetition First Lien Credit Agreement, *inter alia*: create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any indebtedness; create, incur, assume, or permit to exist any lien on or with respect to any property or asset of any kind of the Company; enter into any agreement prohibiting the creation or assumption of any lien upon the Company's property or assets; make certain restricted payments;

make certain investments in any person; impose certain restrictions on distributions by subsidiaries; transfer or dispose of assets; and merge, consolidate or alter their line of business.

The Prepetition First Lien Credit Agreement contains customary events of default. Pursuant to the *Forbearance Agreement*, dated as of November 19, 2012 (the "First Forbearance Agreement"), the Prepetition First Lien Lenders agreed to forbear from exercising their rights and remedies, during the term of the First Forbearance Agreement, in connection with (a) certain past events which constituted events of default under the Prepetition First Lien Credit Agreement and (b) certain prospective events which would constitute events of default under the Prepetition First Lien Credit Agreement. The First Forbearance Agreement was extended as of May 6, 2013 and expired by its terms on May 31, 2013. Pursuant to the *Second Forbearance Agreement*, dated as of July 12, 2013 (the "Second Forbearance Agreement"), the Prepetition First Lien Lenders again agreed to forbear from exercising their rights and remedies, during the term of the Second Forbearance Agreement, in connection with (a) certain past events which constituted events of default under the Prepetition First Lien Credit Agreement and (b) certain prospective events which would constitute events of default under the Prepetition First Lien Credit Agreement. The Second Forbearance Agreement expired by its terms on August 9, 2013. Since the expiration of the Second Forbearance Agreement, the Prepetition First Lien Agent has been forbearing on a day-to-day basis and has reserved all of the rights and remedies available to it as a result of the existing events of default under the Prepetition First Lien Credit Agreement.

## 2. Prepetition Second Lien Loans

On July 12, 2007, the Company entered into the *Second Lien Credit and Guaranty Agreement*, dated July 12, 2007, by and among the Borrower, the Prepetition Guarantors, as guarantors, the Prepetition Second Lien Agent, as administrative and collateral agent, and the Prepetition Second Lien Lenders party thereto, as amended by the *Agency Assignment and Amendment Agreement* dated as of October 27, 2009, the *Second Amendment to Second Lien Credit and Guaranty Agreement*, dated December 10, 2009, the *Third Amendment to Second Lien Credit and Guaranty Agreement* dated as of March 15, 2010, the Letter Amendment to *Second Lien Credit and Guaranty Agreement* dated as of April 15, 2010, and the *Fifth Amendment to Second Credit and Guaranty Agreement* dated as of May 17, 2010 (the "Second Lien Fifth Amendment"). The Company, the Prepetition Agents, the Prepetition First Lien Lenders, and the Prepetition Second Lien Lenders are also parties to that certain *Intercreditor Agreement*, dated July 12, 2007.

The Prepetition Second Lien Credit Agreement provides for a term loan of $100 million. Interest accrues based on the adjusted Eurodollar rate plus 12.25% during the period through but excluding the date upon which the 2010 Term Loan Obligations (as defined below) are paid in full, and thereafter, interest accrues at the base rate plus 5.25% or 6.25% per annum (based on the leverage ratio) or the adjusted Eurodollar rate plus 6.25% or 7.25% per annum (based on the leverage ratio), at the Company's option, and is payable quarterly or on shorter intervals for loans bearing interest at an adjustment Eurodollar rate. As part of the Second Lien Fifth Amendment, through the date upon which the 2010 Term Loan Obligations are paid in full, 1.00% of the interest is payable in cash, and the remainder is payable as PIK. The scheduled maturity date is December 1, 2014. The outstanding aggregate principal amount at September 30, 2013 is approximately $121 million. The outstanding amount as of April 1, 2014, including accrued

interest, will be approximately $159 million. Based on the current outstanding balance, interest payments are approximately $13.9 million annually. The Company ceased making interest payments in July 2011. Since June 14, 2013, interest has been accruing at the default rate set forth in Section 2.7 of the Prepetition Second Lien Credit Agreement.

The Prepetition Guarantors jointly and severally guaranteed, irrevocably and unconditionally, the due and punctual payment in full of all obligations under the Prepetition Second Lien Credit Agreement when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise.

The Prepetition Second Lien Loans are secured by liens, as set forth in the Prepetition Second Lien Credit Agreement and the accompanying *Second Lien Parent Pledge and Security Agreement*, dated as of March 17, 2010, on the certain Pledged LLC Interests (as defined in the *Second Lien Parent Pledge and Security Agreement*) and all proceeds of or in respect of any of the foregoing.

The Prepetition Second Lien Credit Agreement contains covenants that limit the ability of the Company to, without prior approval from the Prepetition Second Lien Lenders or as otherwise allowed under the Prepetition Second Lien Credit Agreement, *inter alia*: create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any indebtedness; create, incur, assume, or permit to exist any lien on or with respect to any property or asset of any kind of the Company; enter into any agreement prohibiting the creation or assumption of any lien upon the Company's property or assets; make certain restricted payments; make certain investments in any person; impose certain restrictions on distributions by subsidiaries; transfer or dispose of assets; and merge, consolidate or alter their line of business.

The Prepetition Second Lien Credit Agreement contains customary events of default. Pursuant to the First Forbearance Agreement, the Prepetition Second Lien Lenders agreed to forbear from exercising their rights and remedies, during the term of the First Forbearance Agreement, in connection with (a) certain past events which constituted events of default under the Prepetition Second Lien Credit Agreement and (b) certain prospective events which would constitute events of default under the Prepetition Second Lien Credit Agreement. The First Forbearance Agreement was extended as of May 6, 2013 and expired by its terms on May 31, 2013. Pursuant to the Second Forbearance Agreement, the Prepetition Second Lien Lenders again agreed to forbear from exercising their rights and remedies, during the term of the Second Forbearance Agreement, in connection with (a) certain past events which constituted events of default under the Prepetition Second Lien Credit Agreement and (b) certain prospective events which would constitute events of default under the Prepetition Second Lien Credit Agreement. The Second Forbearance Agreement expired by its terms on August 9, 2013. Since the expiration of the Second Forbearance Agreement, the Prepetition Second Lien Agent has reserved all of the rights and remedies available to it as a result of the existing events of default under the Second Lien Credit Agreement. For the avoidance of doubt, the exercise of any and all such rights and remedies under the Second Lien Credit Agreement by the Prepetition Second Lien Agent remains subject to the applicable provisions of the Intercreditor Agreement.

### 3.  Other Debt Financing

The Company has outstanding loans of lesser amounts that finance specific development projects.

Pursuant to the First Lien Fifth Amendment and the Second Lien Fifth Amendment, the Company entered into an additional term loan (the "2010 Term Loan", and the obligations thereunder, the "2010 Term Loan Obligations").  The 2010 Term Loan allowed the Company to obtain additional financing up to an aggregate of $45 million.  Interest on the 2010 Term Loan was based on the base rate plus 10%, or the adjusted Eurodollar rate plus 11%, at the Company's option.  The Company repaid the 2010 Term Loan on July 25, 2011, and there are no current outstanding 2010 Term Loan Obligations.

The Company also has several uncollateralized notes payable related to previous business acquisitions.  Some of these notes are payable to persons currently employed by the Company, referred to as "Seller Notes".  These Seller Notes have several interest rates ranging from 6.5% to 8.0% and have maturity dates ranging from 2010 through 2015.  As of December 29, 2013, the aggregate outstanding principal amount for such Seller Notes is approximately $1.9 million.  Holders of such Seller Notes will be treated as holders of Class 7 – General Unsecured Claims under the Plan; however, the balances of certain Seller Notes are disputed and accordingly remain subject to compromise.

Historically, the Debtors have sustained occasional working capital shortages during the normal course of their operations.  In order to bridge these shortages, the Debtors have required access to a short-term lending source on competitive terms offering minimal administrative disruption to their business.  To that end, the Debtors issued two one-year promissory notes with Fannich Investment Management Inc., a Delaware corporation solely owned by an offshore organization residing in New Zealand ("Fannich" and the "Fannich Note(s)", respectively).  The most recent Fannich Note was issued on January 1, 2014.

Each Fannich Note provides stop-gap liquidity to the Debtors and functions as a line of credit.  The Debtors can borrow up to $10 million annually, with all principal and interest due no later than calendar year-end.  Interest is charged at the rate of 7% per annum, plus a .5% accommodation fee is charged on advances honored on less than 24 hours' notice.  From time to time, the Debtors obtain working capital pursuant to the Fannich Note, typically in amounts ranging from $2 - $5 million on each occasion.  Each advance is typically paid back within one-to-five business days, in full including accrued interest.  As of February 21, 2014, the balance due on the Fannich Note was $3,763,000. The Debtors paid down the balance including all interest due prior to the Petition Date.  The Debtors do not anticipate borrowing from Fannich on a post-petition basis.

The Fannich Notes were negotiated at arm's-length with the director of Fannich.  Under the terms of the Fannich Notes, the Debtors paid commercially reasonable interest rates and had a ready solution when short term working capital issues arose.

The Company also incurs trade debt in the ordinary course of its business, and has been making payments with respect to such trade debt in the ordinary course.  As of the Petition Date,

the Company estimated that its outstanding unsecured trade debt totaled approximately $12.4 million.

### D.    EMPLOYMENT TAX OBLIGATIONS

In the ordinary course of its business, the Company collects and pays four different employment/payroll taxes.  Some of these taxes are employee withholdings and others are employer taxes.  Specifically, the Company collects and pays: (a) Federal Income Tax (employee withholding), (b) Social Security Tax (both employee withholding and employer taxes), (c) Medicare Tax (both employee withholding and employer taxes), and (d) State Income Tax (employee withholding) (collectively, the "Employment Tax Obligations").  In addition, the Company is liable for Federal unemployment tax ("FUTA") and State unemployment tax ("SUTA").  The Debtors estimate that as of the Petition Date, their deferred obligations total approximately $101.6 million of Federal Income Tax, Social Security Tax, and Medicare Taxes, $8.3 million FUTA, $11.6 million of SUTA, and $15.8 million in penalties.  In addition, there is a contingent, disputed liability to the Employment Development Department for $4.4 million.

### E.    EMPLOYEE AND RELATED PARTY TRANSACTIONS AND OBLIGATIONS

#### 1.    Variable Life Insurance Policy Program

For approximately 40 highly-compensated employees who do not participate in the Company's 401(k) plan, the Company offers a variable life insurance policy program.  Each variable life insurance policy is issued through NY Life Insurance in the name of the eligible employee.  Eligible employees make after-tax contributions to the policy, which invests in mutual funds.  The Company matches contributions at the same rate as for the 401(k) plan—25 cents or 50 cents up to 4% of contributions depending on the length of services of the employee.  The Company incurs $10,000 per month on account of the variable life insurance policy program matching component.

#### 2.    Health Reimbursement Accounts

The Company also provides 11 officers and Senior Vice-Presidents with health reimbursement accounts administered through Execucare.  These executives are reimbursed by Execucare up to $3,600 per year for out-of-pocket medical expenses on a calendar year basis.  Execucare invoices the Company for the amount of claims processed.  On average, the Company pays Execucare $43,000 on an annual basis account of these health reimbursement accounts.

#### 3.    Related Party Letters of Credit

Certain of the Company's workers' compensation obligations are secured by letters of credit guaranteed by the Company's principal shareholder.  The Company's principal shareholder has posted collateral in connection with these letters of credit. The Company has agreed to reimburse the principal shareholder solely for any fees and accrued interest charged in connection with such letters of credit.  The Company has not agreed to provide any additional fees or interest to the principal shareholder in connection with such letters of credit.  The Company recorded approximately $344,055 and $485,691 for the years ended December 29,

2013 and December 30, 2012, respectively, which is included in interest expense in the historical financial statements attached hereto as Exhibits D and E.

Additionally, certain third parties related to Company employees and officers have likewise guaranteed certain letters of credit securing the Company's workers' compensation obligations.  In connection with these arrangements, the Company has agreed to pay such related parties fees based upon the face amount of these letters of credit, and to reimburse such parties for the fees and accrued interest charged in connection with these letters of credit.  The Company has recorded interest of approximately $924,458 and $943,255 for the years ended December 29, 2013 and December 30, 2012, respectively.  Further details regarding the fees, interest, and other expenses incurred by the Company in connection with these arrangements are provided in the historical financial statements attached hereto as Exhibits D and E.

On the Effective Date, the Company will recollateralize such letters of credit as set forth in greater detail in Schedule 2 to the Plan.

### 4.    Housing Equity Sharing Arrangements

During 2007, the Company entered into equity sharing arrangements (each an "Equity Agreement") with the following executives with respect to their houses, which agreements are still in effect:  (i) Paul and Allyson Sorensen, Trustees of the Paul and Allyson Sorensen Family Trust; (ii) Keith and Dolores Kislow; (iii) Mark McComb and Dawn McComb; and (iv) Robert and Lee Ann Olson, Trustees of the Olson Family Trust.  Each Equity Agreement governs the equity interests in a limited liability company formed by the Company and applicable executive for the purpose of holding certain real property used as residences by such executive and his immediate family, and also provides for such executive to make lease payments to the Company for the use and occupancy of the residence.

The parties to each Equity Agreement are required to make certain periodic minimum capital contributions to the limited liability company to cover monthly mortgage payments, major improvements above $2,500 on each property, property taxes and insurance, and tax preparation fees.  In the aggregate, the Company pays $42,204.89 per month on account of these Equity Agreements, excluding taxes, insurance, and repairs.  As of December 29, 2013 and December 30, 2012, the Company's investment, net of impairment reserves, totaled approximately $0 and $465,000, respectively.  On the maturity dates of the Equity Agreements, each house is scheduled to be transferred to the non-Company counterparty to such Equity Agreement.  Further details regarding the Company's investment, the calculated impairment reserves, and the Equity Agreements are provided in the historical financial statements attached hereto as Exhibits D and E.

The Company and the Backstop Parties are currently evaluating the terms under which these equity arrangements may be terminated on the Effective Date, as part of the restructuring, in a manner that will terminate the Company's obligation to make additional payments under these arrangements, convey the subject houses to the respective executives subject to the remaining payment obligations on the house, and reimburse, on a grossed up basis, the executives for the tax amounts that become payable by such executives as a result of the termination of the equity sharing arrangements.

5. **Bonus Arrangements**

In the ordinary course of business and as a critical component of their wage and compensation structure, employees (including officers) are eligible to receive bonus and commissions based on established criteria.  Bonuses are calculated based on a combination of percentages of branch gross margin goals and other specified criteria.  Commissions are paid based on customer sales and earned upon realized sales receipts.  On average, such accrued bonuses and commissions total approximately $1.4 million per month, and such accrued amounts are paid at the end of each month for the month prior (for example, bonuses and commissions accrued during the month of January will be made at the end of the month of February).  The Company has historically paid accrued bonuses and commissions in the ordinary course.

6. **Plane Leases**

Until March 2012, the Company leased one Falcon 50 aircraft from G.E.C.C. and two Falcon 900B aircraft from related parties owned by the Sorensen Trust.  However, in June 2012, the Falcon 50 was surrendered back to G.E.C.C.  Thus, the Company is currently making payments on two aircraft.  The leases are 'dry' leases, where the Company pays for virtually all aircraft maintenance, fuel, insurance and other carrying costs.

Pursuant to an Aircraft Dry Lease Agreement, the Company leases a Dassault-Breguet Model Mystere Falcon 900 aircraft from Kerry Acquisitions, LLC, a company indirectly wholly owned by the Sorensen Trust (Kerry is owned by Trishan Air, Inc. which is owned by the Sorensen Trust).  The lease has a one-year term with automatic one-year renewals at the option of the lessor.  Monthly lease payments from the Company to Kerry Acquisitions, LLC are $136,000.  These monthly sublease payments are used to fund financing costs paid by Kerry Acquisitions, LLC, to a leasing company.

Pursuant to a Sublease Agreement entered into on May 19, 2008, the Company subleases a Dassault Falcon 900B aircraft from Trishan Air, LLC, a company wholly owned by the Sorensen Trust.  The Company remits monthly payments of approximately $139,000 directly to Trishan Air, LLC.

Both aircraft are leased by Trishan Air, Inc., Trishan Air, LLC, or an affiliate of the Trishan entities.  The monthly lease payments remitted by the Company to the Trishan entities are passed through the Trishan entities to the ultimate owners and lessors of the aircraft.  Any claims arising under these lease and sublease agreements, including any claims arising from or relating to the termination of such agreements, will be paid by the Company in the ordinary course as a Class 7 – General Unsecured Claim.

7. **Office/ Residential Leases**

As of December 29, 2013, the Company leased 14 office spaces and residential property from affiliated entities of The Sorensen Trust. Three of the premises are used for office branches, one is a condominium used for recruiting events and IT data servers, one is a ski in/ski out house in Park City, Utah used personally and for client entertaining, and one is a Santa Barbara townhome used to house entry level employees. The total monthly rental obligations under these leases are approximately $260,000 per month, and the expiration dates for these leases range to

2018.  For the years ended December 29, 2013 and December 30, 2012, rents of approximately $3,052,318 and $3,065,000, respectively, were paid to these affiliated entities.  Certain of these leases will be modified as set forth in greater detail in the Lease Amendments attached to the Plan as Exhibit J.

### 8.   Services Provided Among Related Entities

The Company has trade and other receivables from affiliates of the principal shareholder (unrelated to the business of the Company) which arose primarily out of (a) the placement of employees of the Company with such entities or (b) payments made by the Company to cover the costs of operations of such affiliates.  None of the entities are currently using services of the Company, and the Company is not currently providing any payments to fund the operations of these entities.  As part of the company's year-end review process of its accounts receivable, it has determined that the balance due from Trishan Air of approximately $10 million should be removed and written off, as this amount will be satisfied upon disposition of the related aircraft.  Further, as part of the Company's year-end review of its accounts receivable, it has determined certain other balances totaling $914,500, not intended to be included in the assets of the ongoing operation, have been written off.  Accordingly, the Company has scheduled that such balances, as set forth in more detail in Schedule 2 to the Plan, be written down to zero.

On the Effective Date, as part of the restructuring, any claims arising under or in connection with receivables owed by entities that are owned or controlled by the Consenting Equity Holder, or otherwise affiliated with the Company shall be treated as set forth in Schedule 2 to the Plan.

### 9.   Other Related Party Transactions

The Company borrowed $1,000,000 in November 2009 from a relative of the Company's principal shareholder.  Interest of 10% is payable in arrears monthly.  The first payment was due on December 1, 2009, and the final payment for interest and principal was due January 15, 2010 and has not been paid or extended.  As of December 29, 2013, the unpaid principal balance was $600,000.  On the Effective Date, as part of the restructuring, any claims arising under or in connection with such note will be converted to New Common Stock as described on Exhibit G.

The Company borrowed $2,000,000 in November 2009 from Aurora Pacific Insurance, Inc., an insurance company controlled by the Company's principal shareholder.  Interest of 10% is payable in arrears monthly.  All principal and interest was due on March 15, 2010 and has not been paid.  In June 2010, the note was transferred from Aurora Pacific Insurance, Inc. to Battle Mountain Specialty Insurance Company, another affiliated entity associated with a family member of the principal shareholder.  Under the new agreement with Battle Mountain Specialty Insurance Company, the final payment was due December 1, 2010 and has not been paid or extended.  On the Effective Date, as part of the restructuring, any claims arising under or in connection with such note will be converted to New Common Stock as described on Exhibit G.

From time to time, the Company makes advances to or payments on behalf of its principal shareholders.  Certain amounts are recorded as notes receivables from shareholders.

30

The note from Par Alma, a limited liability company wholly owned by the Company's principal shareholder, carries an interest rate of 4.95%, and requires annual interest payments with all principal due on the maturity date of July 12, 2016. As of December 29, 2013 and December 30, 2012, the balance of the note receivable from Par Alma totaled approximately $47,245,000 and $47,245,000, respectively. Par Alma does not have any assets and the ability to collect amounts owed by Par Alma are uncertain. On the Effective Date, as part of the restructuring, any claims arising under or in connection with the note from Par Alma will be released, waived, and discharged.

The Company has provided certain financing and guaranteed certain obligations for staffing companies servicing government and commercial businesses. Further details regarding such financing payments and guarantee obligations made by the Company are set forth in the historical financial statements attached hereto as Exhibits D and E.

## F.    LITIGATION CLAIMS AND SCIF SETTLEMENT

On May 20, 2009, the State Compensation Insurance Fund ("SCIF") filed an action against Select Personnel Service, Inc. ("SPS"), and other entities, entitled *State Compensation Insurance Fund v. Onvoi Business Solutions, Inc. et al.*, Case No. CGC 07-470352, in the Superior Court of the State of California, County of San Francisco (the "State Court Action"). SCIF alleged, among other things, fraud in connection with the submission of workers' compensation claims of SPS employees under the workers' compensation policies of other entities which paid lower premiums for such coverage than SPS otherwise would have independently.

On September 1, 2011, after a jury trial, the California Superior Court entered a judgment in favor of SCIF in the amount of $50,779,165 (the "SCIF Judgment"), which included a substantial award of prejudgment interest and $2,000,000 in punitive damages. Both SCIF and SPS appealed from the SCIF Judgment. SCIF's appeal sought to increase the SCIF Judgment by up to $300,000,000 based on a statutory damages multiplier.

On November 16, 2011, SCIF filed a Motion to Amend the Judgment ("Motion to Amend"). Pursuant to the Motion to Amend, SCIF was attempting to extend the judgment to parties who were not originally named in the State Court Lawsuit, including, but not limited to, SPS's parent company and its CEO.

On November 7, 2011, SCIF commenced a separate lawsuit against, *inter alia*, SPS, Koosharem, LLC, their CEO, and certain of their affiliates and related parties, in the United States District Court, Central District of California, in Los Angeles in a case entitled *State Compensation Fund v. Koosharem, LLC, et al.*, Case No. CV11-9233-MMM (Ex) (the "Federal Lawsuit"). In the Federal Lawsuit, SCIF contended that the defendants were liable under Civil RICO for essentially the same conduct that gave rise to the SCIF Judgment. SCIF also asserted certain state law fraudulent transfer claims.

During the course of the months that followed the filing of the Federal Lawsuit and the Motion to Amend, SCIF and the Company, among other things, entered into several forbearance agreements with respect to the Motion to Amend in the State Court Action, the Federal Court

Action and the Appeals, the last of which ended effective October 1, 2012. The Company and SCIF later agreed to settle the SCIF Judgment in a reduced amount of $25,000,000, which amount has been reduced to $22,900,000 as of December 29, 2013 by way of certain principal paydowns pursuant to the parties' settlement agreement.

The Company is also involved in various claims and litigation arising principally in the ordinary course of business. Such claims and litigation involve, among other issues, employer related litigation, contract, workers' compensation insurance and subrogation matters.

## G.    EVENTS LEADING TO THE PROPOSAL OF PLAN AND POTENTIAL CHAPTER 11 FILING

Since unemployment rates and labor productivity both have a large impact on a firm's hiring rate, the staffing market is highly correlated with GDP growth and therefore strongly influenced by economic cycles. The economic slowdown that began in 2007 depressed demand for both permanent and temporary staffing. To cope with the economic downturn and the liquidity issues it was facing, the Company entered into a definitive agreement and plan of merger in December of 2009 with Atlas Acquisition Holding Corporation, a special purpose acquisition company, or SPAC, established in January of 2008. However, the agreement failed to receive approval from the SPAC shareholders in early 2010 and that entity was liquidated.

In light of the continuing economic turbulence and its liquidity position at that point, in May of 2010 the Company was not able to deliver audited financial statements to its Prepetition Secured Lenders for fiscal year 2009, as required under the terms of the Prepetition Secured Loan Agreements. Since that date the Company has been in default under the Prepetition Secured Loan Agreements and the Company has continued to suffer from the effects of the economic downturn. Accordingly, the Company and the Prepetition Secured Lenders began to work towards a resolution of the defaults which had already occurred and that were anticipated to occur in the near future, and to implement a comprehensive restructuring of the Company's debt.

### 1.    Prepetition Forbearance Agreements

On November 19, 2012, the Company entered into the First Forbearance Agreement with two-thirds of its lenders under both Prepetition Secured Loans. The First Forbearance Agreement provided for a forbearance by the lenders under the Prepetition Secured Loans of their remedies under the applicable loan documents for a specified period of time in order for the Company to provide for the refinancing of its debt through the combination of debt financing and the sale of equity and assets. The First Forbearance Agreement provided for differing levels of debt payoffs based on the total value of the financing obtained. The First Forbearance Agreement was extended on May 6, 2013 and expired by its terms on May 31, 2013.

On July 12, 2013, the Company entered into the Second Forbearance Agreement with two-thirds of its lenders under both Prepetition Secured Loans. The Second Forbearance Agreement provided for a forbearance by the lenders under the Prepetition Secured Loans of their remedies under the applicable loan documents for a specified period of time in order for the Company to provide for the refinancing of its debt through the combination of debt financing

and the sale of equity and assets.  The Second Forbearance Agreement provided for differing levels of debt payoffs based on the total value of the financing obtained.  The Second Forbearance Agreement expired by its terms on August 9, 2013.  Since the expiration of the Second Forbearance Agreement, the Prepetition Agents have been forbearing on a day-to-day basis and have reserved all of the rights and remedies available to them as a result of the existing events of default under the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement, as applicable.

### 2.      Evaluation of Strategic Alternatives; Restructuring Preparations

The Company began the process culminating in the current Plan in October of 2012.  Through Goldman Sachs, its financial advisor, the Company contacted approximately 94 parties to explore potential acquisition scenarios.  These parties included strategic buyers and financial sponsors, both domestic and international.  Following this outreach, 46 of these parties signed non-disclosure agreements and were granted access to information about the Company.  On January 24, 2013, six initial indications of interest were received.  The Company chose not to proceed with three of these parties as two of them required exclusivity and the other did not provide a competitive bid from a valuation perspective.  After January 24, 2013, during the due diligence stage, two additional parties entered the process after providing competitive bid indications.

On April 8, 2013, three second round indications were received from the five parties remaining in the process.  The other two parties chose not to proceed after they determined that their bids would not be competitive.  The Company presented the bids to the Lenders in May pursuant to the terms of the First Forbearance Agreement and continued to work with the parties to develop the bids following feedback from the Lenders.

By August, the sale process had narrowed to a single party ("Party A").  The Company determined, however, that the proposal advanced by Party A was uncertain and was not viable because, among other concerns:

- Party A refused to finalize certain key transaction terms without further significant due diligence, which Party A refused to complete without substantial expense reimbursement and the Company's agreement to deal exclusively with Party A;
- Party A's proposal contemplated a contemporaneous combination of the Company with one of its competitors, and Party A was unwilling to provide the Company with information relating to that combination or the conditionality associated with it; and
- Party A's proposal had failed to obtain support from the largest holders of the Company's debt.

Given the lack of viable purchasers, the Debtors were unable to complete a sale transaction which met the various criteria (including, among other things, meeting or exceeding the target sale price) set forth in the First Forbearance Agreement and the Second Forbearance Agreement.  In July, 2013, a subset of Lenders advised the Company of their intent to develop a proposal for a standalone restructuring (the "Creditor-Led Plan"), which is outlined in the Plan.

Since September, 2013, the Company has worked to implement the Creditor-Led Plan through either an out of court workout or a pre-packaged chapter 11 plan.  A minority of the prepetition lenders did not support the Creditor-Led Plan, and on December 16, 2013 commenced a lawsuit[8] against the Company's principal shareholder – D. Stephen Sorensen – alleging that Sorensen breached his fiduciary duty by proceeding with the Creditor-Led Plan in light of the alternative offers and threatened to commence involuntary bankruptcy proceedings against the Debtors pre-petition.

The Company also received a proposal on February 25, 2014 regarding a potential alternative transaction involving an acquisition of the Company by a publicly-traded special purpose acquisition corporation (the "SPAC Proposal").  The SPAC Proposal is described in detail on slides 12-13 of the Disclosure Statement Supplemental Materials.  Although the SPAC Proposal includes a headline price and recoveries which purport to be higher than those provided by the Creditor-Led Plan, the Company's advisors have concluded that it is highly unlikely such recoveries would actually be achievable, for a number of reasons, including: a) the lack of creditor support for the SPAC Proposal, b) the likelihood that the SPAC Proposal cannot be consummated before September 30, 2014, c) the substantial diminution of recoveries available to creditors under the SPAC Proposal due to increasing liabilities and obligations during the delay in consummation of the transaction, and d) the material risks to closure of the transaction outlined in the SPAC Proposal.  For these reasons, it is the opinion of the Debtors that the Creditor-Led Plan, as described in this Disclosure Statement, is preferable to this or any proposed alternative restructuring transaction.

## H.   RESTRUCTURING SUPPORT AGREEMENT

### 1.   Lender RSA[9]

The Company has entered into the Lender RSA with certain holders of outstanding Prepetition First Lien Loan Claims as well as certain holders of outstanding Prepetition Second Lien Loan Claims.  Pursuant to the Lender RSA, each Participating Lender agreed to exercise all votes to which it is entitled subject to the Lender RSA to accept the Plan.  A copy of the Lender RSA is attached to the Plan as Exhibit B thereto.  Further information regarding certain termination events are set forth in the Lender RSA and in Article IV.A.10 below.

Nothing in the Lender RSA shall require the Companies or their affiliated entities or any of their respective directors or officers (in such person's capacity as a director or officer) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such person's fiduciary obligations under applicable law.

---

[8]   *Bowery Opportunity Fund, L.P., et al v. Sorensen*, Case No. CV-19275(C.D. Cal) (the "Bowery Complaint").  The Company and D. Stephen Sorensen vigorously dispute the allegations in the Bowery Complaint.

[9]   Capitalized terms used in this Article II.H.1 without other definitions have the meanings assigned to those terms in the Lender RSA.

## 2. Proposed DIP Financing and Use of Cash Collateral[10]

A critical goal of the Debtors' business stabilization efforts was to ensure the Debtors maintain sufficient liquidity to operate their businesses during the pendency of the Chapter 11 Cases. Therefore, the Debtors negotiated a term sheet with the DIP Lenders as to the terms of the proposed debtor-in-possession financing facility. The Debtors do not believe they would have been able to obtain postpetition financing or other financing accommodations from any prospective lender or group of lenders on more favorable terms and conditions than those contained in the DIP Facility and described below. Specifically, the Debtors are unable to obtain debtor-in-possession financing without providing senior priming liens. The DIP Facility was negotiated in good faith and at arm's length, extensively and diligently considered by the Debtors' management and submitted to the Parent board of directors for approval. The management of the Debtors believes that the proposed terms of the DIP Facility are fair and reasonable in light of current market conditions (particularly the lack of a ready market for any financing, including debtor-in-possession financing) and will be in the best interests of the Debtors' Estates.

On the Petition Date, the Debtors intend to file a motion seeking approval of the DIP Facility. In this motion, the Debtors will seek permission from the Court to enter into the DIP Facility among all Debtors, the DIP Agent and the other DIP Lenders. The DIP Facility will grant super-priority administrative claim status to the Debtors' obligations under the DIP Facility, and to grant first priority priming liens on substantially all of the properties and assets of Parent and the other Debtors, to secure those obligations. A copy of the DIP Term Sheet is attached hereto as Exhibit H.

As adequate protection of the interests of the Prepetition Agents, the Prepetition First Lien Lenders, and the Prepetition Second Lien Lenders in the prepetition collateral against any diminution in value of such interests, the Debtors propose to grant to the Prepetition First Lien Agent, for the benefit of itself and the Prepetition First Lien Lenders, the senior adequate protection lien and the senior superpriority claim. The Debtors also propose to grant to the Prepetition Second Lien Agent, for the benefit of itself and the Prepetition Second Lien Lenders, the junior adequate protection lien and the junior superpriority claim. All intercompany liens of the Debtors and other Obligors, if any (other than any liens securing the Prepetition Facilities), will be contractually subordinated to the DIP Facility and to the adequate protection on terms satisfactory to the DIP Lenders.

The financing to be provided under the DIP Facility and the use of Cash Collateral during the pendency of the Chapter 11 Cases will allow the Debtors to, among other things: (a) continue to operate their businesses in an orderly manner; (b) maintain their valuable relationships with vendors, shippers, suppliers, customers and employees; (c) pay various interest, fees and expenses under the DIP Facility; and (d) support the Debtors' working capital, general corporate and overall operational needs - all of which are necessary to preserve and maintain the going-concern value of the Debtors' businesses and, ultimately, help ensure a successful reorganization.

---

[10]    Capitalized terms used herein and not otherwise defined in the Disclosure Statement or in the Plan shall have the meanings ascribed thereto in the DIP Term Sheet.

### 3.    Employment of Advisors

To assist the Debtors in carrying out their duties as debtors in possession and to otherwise represent the Debtors' interests in the potential Chapter 11 Cases, the Debtors will file applications seeking authorization to retain and employ certain advisors, whose terms of retention will be subject to approval by the Bankruptcy Court including:  (a) Alix Partners and certain of its affiliates as financial advisors to the Debtors; (b) Goldman Sachs and certain of its affiliates as investment banker to the Debtors; (c) Pachulski, Stang, Ziehl & Jones LLP as general insolvency co-counsel to the Debtors; (d) Skadden, Arps, Slate, Meagher, & Flom LLP as general insolvency co-counsel to the Debtors; and (e) FTI Consulting, Inc. as operational performance advisors to the Debtors.

### 4.    First-Day Motions for Relief to Enable the Debtors to Continue Operating their Businesses

The Debtors intend to file the first-day motions listed below:[11]

(a)    Joint Creditor Matrix Motion – Debtors' Motion for Entry of an Order Authorizing the Debtors to Prepare a Single List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor;

(b)    Joint Administration Motion – Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only;

(c)    Utilities Motion – Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment;

(d)    Sales and Use Tax Motion – Motion of the Debtors for Entry of an Order (I) Authorizing, But Not Requiring, the Debtors to Remit and Pay Certain Prepetition Sales and Use and Similar Taxes in the Ordinary Course of Business, and (II) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto;

(e)    Customer Programs Motion – Motion for Entry of an Order Pursuant to Sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to Honor Prepetition Obligations to Customers and to Otherwise Continue Customer Practices and Programs in the Ordinary Course of Business;

(f)    Claims Agent Retention Motion – Application of Debtors Pursuant to 28 U.S.C. § 156(c) and Local Rule 2002-1(f) for an Order Authorizing the Retention of

---

[11]    This list is for illustrative purposes only.  The Debtors reserve their rights not to file all of the motions listed below and/or to file additional motions and applications, in their discretion.

Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors, Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and LBR 2002-1(f);

(g)     Cash Management Motion – Motion of Debtors for Order Under Sections 105, 363, 503(b), 1107 and 1108 of the Bankruptcy Code Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, and (IV) Continued Performance of Intercompany Transactions and Providing Administrative Priority Status to Postpetition Intercompany Claims;

(h)     Employee Benefits Motion – Debtors' Motion Pursuant to Bankruptcy Code Sections 105(a), 362, 363, and 507(a) for an Order Authorizing the Debtors to (I) Pay and/or Honor Prepetition Wages, Salaries, Employee Benefits, and Other Compensation; (II) Remit Withholding Obligations; (III) Maintain Employee Compensation and Benefits Programs and Pay Related Administrative Obligations; and (IV) Have Applicable Banks and Other Financial Institutions Receive, Process, Honor, and Pay Certain Checks Presented for Payment and Honor Certain Fund Transfer Requests;

(i)     Insurance Premium Financing Motion – Motion of the Debtors for Order Under Sections 105, 361, 362, 363, 364 1107 and 1108 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6003: (A) Authorizing the Debtors to (I) Maintain and Renew Existing Insurance Policies; (II) Continue Insurance Premium Financing Programs, (III) Pay Insurance Premium Financing Obligations Arising Thereunder, and (B) Authorizing Financial Institutions to Honor All Obligations Related Thereto;

(j)     Critical Vendors Motion – Motion of Debtors Pursuant to Sections 105(a) and 363 of Bankruptcy Code for Order Authorizing (I) Debtors to Pay Prepetition Claims of Unimpaired Creditors Not Covered in Other First Day Motions in the Ordinary Course of Business and (II) Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers;

(k)     DIP Financing/Cash Collateral Motion – Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Obtain Interim Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507, (II) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001;

(l)     Employment Application for Administrative Agent – Application of the Debtors Pursuant to 11 U.S.C. § 327(a) and Fed. R. Bankr. P. 2014 for Authorization to Employ and Retain Kurtzman Carson Consultants LLC as Administrative Agent, Nunc Pro Tunc to the Petition Date;

37

(m)    Employment Applications for Professionals;

(n)    Motion of Debtors for an Order Authorizing the Debtors to (I) Assume the Restructuring Support Agreement with Certain Secured Lenders, (II) Pay and Reimburse Related Fees and Expenses, and (III) Assume the Sorensen Support Agreement;

(o)    Motion of Debtors for Order Authorizing (I) Assumption of Backstop Agreement, (II) Payment of Related Fees and Expenses, and (III) Indemnification of Backstop Parties; and

(p)    Motion for Entry of an Order (A) Scheduling Combined Hearing to Consider Arrpoval of Disclosure Statement and Prepackaged Plan; (B) Establishing Deadline for Objections to the Plan and Disclosure Statement; (C) Approving Solicitation Procedures; and (D) Granting Related Relief.

These motions, if granted, will enable the Debtors, among other things, to;

- pay prepetition obligations to vendors in respect of prepetition obligations so that sales may continue in the ordinary course of business;

- determine adequate assurance for future utility service and establish procedures for utility providers to object to such assurance;

- pay prepetition insurance obligations and to continue insurance coverage;

- maintain customer care programs;

- maintain existing bank accounts, continue operation of their existing cash management system;

- continue to operate and satisfy trade claims in the ordinary course of business; and

- remit and pay certain prepetition taxes and fees.

## I.    REORGANIZATION STRATEGY

### 1.    Enhancing the Debtors' Business Operations

With the assistance of their advisors, the Debtors have been focused on developing and executing a reorganization strategy to (a) maximize the value of their Estates, (b) address the factors that led to the bankruptcy filing, and (c) enable the Debtors to emerge from chapter 11 a stronger, more viable company.  Specifically, this reorganization strategy is primarily (though not exclusively) focused on restructuring the Debtors' balance sheet and emerging from chapter 11 with a long-term capital structure conducive to future profitability.

### 2.     Appropriate Capital Structure, Conversion of Debt and Rights Offering

As of April 1, 2014, the Debtors will have outstanding debt in an aggregate amount, including accrued interest, of approximately $651 million.  Upon emergence from chapter 11, the Reorganized Debtors expect to have outstanding debt in an aggregate principal amount of approximately $350 million.  Accordingly, the Reorganized Debtors will have a significantly deleveraged and improved balance sheet and a more appropriate capital structure.  These improvements will result from (i) the conversion of approximately $492 million in the aggregate principal amount of Prepetition First Lien Loan Claims (calculated as of April 1, 2014) into $365 million in Cash and Subscription Rights for New Common Stock of Reorganized Parent, (ii) the conversion of approximately $159 million in the aggregate principal amount of Prepetition Second Lien Loan Claims (calculated as of April 1, 2014) into $12 million in Cash and New Warrants, and (iii) the issuance and sale for $225 million in Cash of New Common Stock of Reorganized Parent in the Rights Offering and pursuant to the Backstop Agreement.  In addition to the reduction of leverage of the Reorganized Debtors upon emergence from chapter 11, the Reorganized Debtors also expect to benefit from an annual decrease in total credit facility interest expense obligations of approximately $30 million, subject to Article IV.A.11 hereof, which sets forth certain risk factors relating to pricing, commitments, and other issues relating to the Reorganized Debtors' proposed exit financing.

## J.     EXCLUSIVE PERIOD FOR FILING A PLAN AND SOLICITING VOTES

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief.  If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the Petition Date to solicit acceptances to the plan.  During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

## K.     SUMMARY OF THE RIGHTS OFFERING AND BACKSTOP COMMITMENT

As described below, the Debtors intend to offer all Eligible Participants the opportunity to participate in the Rights Offering.  However, it is possible that the Debtors will be unable to obtain sufficient commitments from the Eligible Participants to purchase all of the Rights Offering Securities for the full Rights Offering Purchase Price.  Accordingly, to ensure the successful consummation of the Rights Offering, and the receipt by the Company of the Rights Offering Purchase Price in Cash, subject to entry of the Backstop Agreement Assumption Order by the Bankruptcy Court, the Backstop Investors have agreed to "backstop" the Rights Offering and purchase any and all of the shares of New Common Stock that are not subscribed for upon the subscription expiration date.  The Backstop Investors are those certain parties who are signatories to the Backstop Agreement, their respective affiliates, or any permitted assignee under the Backstop Agreement.

In consideration for entry into the Backstop Agreement, the Debtors have agreed, pursuant to Section 6 of the Backstop Agreement, to indemnify the Backstop Investors (and their respective successors and assigns, their respective affiliates, and the officers, directors, managing

directors, employees, agents, members, partners, managers, advisors, controlling persons, attorneys, investment bankers and financial advisors of any of the foregoing (each, an "Indemnified Person")) from and against any and all losses, claims, damages and liabilities and reasonable fees and expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with (i) any third party claim, challenge, litigation, investigation or proceeding with respect to the Rights Offering or the Backstop Agreement, (ii) any breach by the Company of the Backstop Agreement, or (iii) or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, and to reimburse each Indemnified Person upon demand for any legal or other costs and expenses incurred in connection with investigating or defending, participating or testifying in any of the foregoing; provided, however, that the foregoing indemnity will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court to have been incurred as a direct result of the willful misconduct, bad faith or gross negligence of such Indemnified Person.  The Debtors have committed to seek approval of the Rights Offering and Backstop Agreement by filing motions to approve these transactions, after they commence their Chapter 11 Cases.  The Debtors will also seek approval of the procedures described below with respect to the Rights Offering.

(i)     Rights Offering Record Date:  March 20, 2014.

(ii)    Issuance of Rights:  Each Eligible Participant may subscribe to buy its Pro Rata share of the Rights Offering Securities.  Each Rights Offering Purchaser that pays its share of the Rights Offering Purchase Price will receive Rights Offering Securities in the proportion that such Rights' Offering Purchaser's purchase price bears to the entire Rights Offering Purchase Price.

(iii)   Rights Offering Purchase Price:  Means $175.0 million in Cash for the Rights Offering Securities.  When used with respect to a particular Rights Offering Purchaser, an amount of Cash equal to $175.0 million of the Rights Offering Purchase Price multiplied by such Rights Offering Purchaser's subscribed-for portion of the Rights Offering Securities.

(iv)    Backstop Commitment:  Each Backstop Investor will commit to fund: (a) an amount of Cash equal to $50.0 million multiplied by such Backstop Investor's Backstop Proportion; and (b) an amount of Cash equal to the Rights Offering Purchase Price of all of the Rights Offering Securities that are eligible to be subscribed for by the Prepetition First Lien Lenders (that are Eligible Participants) that are not subscribed for by such Prepetition First Lien Lenders multiplied by such Backstop Investor's Backstop Proportion.

(iv)    Stockholders Agreement: Each Rights Offering Purchaser and Backstop Investor must execute the Stockholders Agreement prior to receiving any Rights Offering Securities or New Common Stock.

(v)     <u>No Assignment; No Oversubscription Rights</u>:  Except as set forth in the Backstop Agreement, the Subscription Rights cannot be assigned by the Eligible Participants, and no Eligible Participant will have oversubscription rights.  Any impermissible assignment or attempted assignment will be null and void.  Once an Eligible Participant has exercised any of its Subscription Rights by properly executing and delivering Subscription Documents to the Debtors or other Entity specified in the Subscription Documents, such exercise may only be revoked, rescinded or annulled in the sole discretion of the Debtors or Reorganized Debtors or as provided in the Backstop Agreement.

(vi)    <u>Validity of Exercise of Subscription Rights</u>:  All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights shall be determined by the Debtors.  The Debtors, in their discretion reasonably exercised in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights.  The Subscription Documents shall be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in their discretion reasonably exercised in good faith.  The Debtors will use commercially reasonable efforts to give written notice to any Eligible Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Person and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors, Reorganized Debtors, nor any of their Related Persons shall incur any liability for giving, or failing to give, such notification and opportunity to cure.

## L.    SUMMARY OF CERTAIN EMPLOYMENT AGREEMENTS

The Plan provides that the Company will enter  into a three-year employment contract with D. Stephen Sorensen, providing for $650,000 annual salary.  Mr. Sorensen will be eligible for performance bonuses not to exceed 200% of the annual salary on the basis of actual performance relative to specific, pre-determined performance goals developed by the compensation committee appointed by the New Board within the first three months of each calendar year, which goals shall be the same as goals for other senior executives.  Mr. Sorensen will also be eligible for retention payments during the three-year term of $500,000 annually.  Mr. Sorensen will be entitled to receive certain restricted stock, severance payments, other stock options and other benefits as set forth in the Employment Agreement attached as <u>Exhibit H</u> to the Plan.

On the Effective Date of the restructuring, Reorganized Parent will commit to retain certain current employees of the Debtors who are related to the principal shareholder as employees of the Debtors or one or more of their subsidiaries, and to receive annual salaries in the aggregate annual amount of approximately $340,000, until the earlier of (i) the third

anniversary of the Effective Date and (ii) the occurrence of certain liquidity events.  In order to remain employed under this arrangement, each such person must continue to provide substantially the same or greater services to Reorganized Parent and its subsidiaries that have been provided prior to the Effective Date.

## M.  SUMMARY OF THE EQUITY CAPITALIZATION OF REORGANIZED PARENT

The post-emergence equity capitalization of Reorganized Parent on a pro forma basis is set forth in Exhibit G hereto.  Exhibit G gives effect to the transactions contemplated by the Plan, including the initial distributions of New Common Stock pursuant to the Rights Offering, the Backstop Agreement, the DRV Purchase Agreement, and the Sorensen Support Agreement. Exhibit G also sets forth the dilution effected by all of the issuances under the Plan, including the exercise of New Warrants under the Plan, the issuance of New Common Stock under the Management Incentive Plan.  The share numbers set forth in Exhibit G are provided for illustrative purposes only, and such numbers may be adjusted proportionally based upon changes to the assumed share issue price.

## N.  SUMMARY OF POST-EMERGENCE FINANCING OF REORGANIZED DEBTORS

### 1.  Post-Emergence Term Loan Agreement

The Debtors have engaged Credit Suisse AG to arrange a senior secured term loan facility in an aggregate principal amount of up to $350 million with a maturity date of six years from closing. Obligations under this facility will be guaranteed by each of the Debtors other than the Borrower (other than immaterial entities), in addition to certain other entities (together with the Borrower, the "loan parties").  This facility will be secured by a first priority lien on substantially all assets (subject to customary exceptions) of the loan parties that are not secured by a first priority lien under the Post-Emergence ABL Loan Agreement, along with a second priority lien on substantially all assets of the loan parties that are secured by a first priority lien under the Post-Emergence ABL Loan Agreement.

This facility shall be subject to customary conditions and contain customary representations, warranties, covenants and events of default for facilities of this type.  The facility shall also contain customary expense reimbursement and indemnification provisions and shall be governed by New York law.  The interest rates under this facility will be, at the option of the Borrower, adjusted LIBOR plus an additional percentage at a market rate, or ABR plus an additional percentage at a market rate.  In addition, loans under this facility may be issued at an original issue discount.

This financing is not committed.  There are no assurances that this financing will be consummated or, if consummated, that actual terms will not be less favorable than those disclosed herein or assumed in the projection.  Please see the risk factor outlined in Article IV.A.11.

### 2.        Post-Emergence ABL Loan Agreement

The Debtors have engaged Royal Bank of Canada to arrange an asset-based revolving credit facility in an aggregate principal amount of $120 million with a maturity date of five years from closing. This facility will also provide for the issuance of letters of credit and for swingline borrowing. Obligations under this facility will be guaranteed by each of the loan parties other than the borrowers thereunder. This facility will be secured by a first priority lien on substantially all accounts, inventory, chattel paper, deposit accounts and certain other assets relating to the foregoing (subject to customary exceptions) of the loan parties, along with a second priority lien on substantially all assets of the loan parties that are secured by a first priority lien under the Post-Emergence Term Loan Agreement.

This facility shall contain customary representations, warranties, covenants and events of default for facilities of this type. The facility shall also contain customary expense reimbursement and indemnification provisions and shall be governed by New York law. The interest rates under this facility will be, at the option of the Borrower, adjusted LIBOR plus an additional percentage at a market rate pegged to excess availability under the facility, or ABR plus an additional percentage at a market rate pegged to excess availability under the facility. In addition to other fees customary for facilities of this type, unused borrowing availability will be subject to an unused line fee at a market rate.

This financing is not committed. There are no assurances that this financing will be consummated or, if consummated, that actual terms will not be less favorable than those disclosed herein or assumed in the projection. Please see the risk factor outlined in Article IV.A.11.

## ARTICLE III
## <u>SUMMARY OF THE PLAN</u>

**THIS ARTICLE III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS ARTICLE III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN**

### A.        ADMINISTRATIVE, DIP FACILITY AND PRIORITY TAX CLAIMS

### 1.        Administrative Claims

Subject to sub-paragraph (a) below, on the later of the Effective Date or the date on which an Administrative Claim becomes an Allowed Administrative Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Claim will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim

either (i) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

(a)      Professional Compensation and Reimbursement Claims

*Professional Fee Claims*.  Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must File and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim; provided that the Reorganized Debtors will pay Professionals in the ordinary course of business for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.  Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 60 days after the Effective Date or (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim.

*Professional Fee Escrow Account*.  On the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.  If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such Allowed Professional Fee Claim by the Reorganized Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.  All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to the Debtors and be distributed pursuant to the Plan.

*Professional Fee Reserve Amount*.  Prior to the Effective Date, the Professionals have provided good faith estimates of their Professional Fee Claims through the Effective Date for the purpose of determining the amount held in the Professional Fee Escrow Account and have deliver such estimates to the Debtors. If a Professional has not provided such an estimate, the Debtors may, in their reasonable discretion, estimate the Professional Fee Claims of such Professional for the purpose of determining the amount held in the Professional Fee Escrow Account.

44

*Transaction Expenses, DIP Agent Fees and Expenses, DIP Lenders' Fees and Expenses.*
The Transaction Expenses and the reasonable fees and expenses, including the reasonable fees
and expenses of attorneys or financial advisors, incurred by the Backstop Investors, the
Prepetition Agents, the DIP Agent's, the DIP Lenders' and the Steering Committee members'
professionals will be paid as administrative expenses as set forth in any applicable orders entered
by the Bankruptcy Court or in the ordinary course or pursuant to the Backstop Agreement or the
Lender RSA, as the case may be.  Nothing herein shall require any professionals, including the
Prepetition First Lien Agent Professionals, the Prepetition Second Lien Agent Professionals,
other parties entitled to be paid its Transaction Expenses, DIP Agent fees and expenses, DIP
Lenders' fees and expenses, or Prepetition Agents' fees and expenses, to file an application with,
or otherwise seek approval of, the Bankruptcy Court as a condition precedent to the payment of
such fees and expenses.

## 2. DIP Facility Claims

Unless otherwise agreed to by the DIP Lenders, the Allowed DIP Facility Claims will be
indefeasibly paid and satisfied in full in Cash on the Effective Date in full satisfaction,
settlement, discharge and release of, and in exchange for, such DIP Facility Claims in
accordance with any applicable order entered by the Bankruptcy Court.  Upon indefeasible
payment and satisfaction in full of all Allowed DIP Facility Claims, the DIP Facility Secured
Loan Agreement as well as all related and ancillary documents thereto, and all Liens and security
interests granted to secure the DIP Facility Claims, will be immediately terminated, extinguished
and released, and the DIP Agent will promptly execute and deliver to the Reorganized Debtors,
at the Reorganized Debtors' sole cost and expense, such instruments of termination, release,
satisfaction and/or assignment (in recordable form) as may be reasonably requested by the
Reorganized Debtors.  Notwithstanding the above, any indemnity provisions contained in any
agreement or related document in connection with the DIP Facility will survive such termination,
release and satisfaction in the manner and to the extent set forth therein.

## 3. Priority Tax Claims

On or as soon as reasonably practicable after, the later of (i) the Initial Distribution Date
if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the
date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of
an Allowed Priority Tax Claim due and payable on or prior to the Effective Date will receive in
full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority
Tax Claim, at the election of the Debtors or Reorganized Debtors:  (a) Cash in an amount equal
to the amount of such Allowed Priority Tax Claim; or (b) such other less favorable treatment as
agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder;
provided, however, that such parties may further agree for the payment of such Allowed Priority
Tax Claim at a later date.  Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will
be made at all appropriate times until the entry of a final decree or order converting or dismissing
the Chapter 11 Cases provided, however, that the Debtors may prepay any or all such Claims at
any time, without premium or penalty.

## B. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

1.      **Summary**

The Plan is a single plan of reorganization for the jointly administered Chapter 11 Cases, but does not constitute a substantive consolidation of the Debtors' Estates.  The Plan, though proposed jointly, constitutes a separate plan for each of the Debtors.  Therefore, except as expressly specified herein, all Claims against a particular Debtor are placed in Classes for each of the Debtors (as designated by subclasses A through V for each of the twenty two Debtors).  Class 9 Claims shall not have any subclasses and Class 10 Claims shall only have subclasses A through U for each of the twenty one Subsidiaries.  All Claims and Equity Interests, except Administrative Claims, DIP Facility Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified as described in Article III.B of the Plan.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

**Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Secured Tax Claims | Unimpaired | Deemed to Accept |
| 4 | Prepetition First Lien Loan Claims | Impaired | Entitled to Vote |
| 5 | Prepetition Second Lien Loan Claims | Impaired | Entitled to Vote |
| 6 | SCIF Claims | Unimpaired | Deemed to Accept |
| 7 | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 8 | Prepetition Warrants | Impaired | Deemed to Reject |
| 9 | Equity Interests in Parent | Impaired | Deemed to Reject |
| 10 | Equity Interests in Subsidiaries | Unimpaired | Deemed to Accept |

2.      **Classification and Treatment of Claims and Equity Interests**

(a)     Class 1 - Priority Claims

- *Classification*:  Class 1 consists of the Priority Claims.

- *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 1 Claims are unaltered by the Plan.  With respect to each Class 1 Claim that becomes due and payable prior to the Effective Date, on or as

46

soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 1 Claim is an Allowed Class 1 Claim on the Effective Date or (ii) the date on which such Class 1 Claim becomes an Allowed Class 1 Claim, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtors or Reorganized Debtors:  (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.

- *Voting*:  Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

(b)     Class 2 - Other Secured Claims

- *Classification*:  Each Class 2 Claim is an Other Secured Claim against the applicable Debtors.  With respect to each applicable Debtors this Class will be further divided into subclasses designated by letters of the alphabet (Class 2.1, Class 2.2 and so on), so that each holder of any Other Secured Claim against such Debtor is in a Class by itself, except to the extent that there are Other Secured Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Other Secured Claims.

- *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 2 Claims are unaltered by the Plan.  With respect to each Class 2 Claim that becomes due and payable prior to the Effective Date, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 2 Claim is an Allowed Class 2 Claim on the Effective Date or (ii) the date on which such Class 2 Claim becomes an Allowed Class 2 Claim, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim, at the election of the Debtors or Reorganized Debtors:  (A) Cash equal to the amount of such Allowed Class 2 Claim; (B) such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 2 Claim will have agreed upon in writing; (C) any defaults shall be cured and shall be paid or satisfied in accordance with and pursuant to the terms of the applicable agreement between the Debtors and the Holder of the Allowed Class 2 Claim; or (D) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code.  Each Holder of an Allowed Other Secured Claim will retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment

of such Allowed Other Secured Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Other Secured Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

- *Voting*: Class 2 is an Unimpaired Class, and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims will not be entitled to vote to accept or reject the Plan.

(c)     Class 3 - Secured Tax Claims

- *Classification*: Each Class 3 Claim is a Secured Tax Claim against the applicable Debtors. With respect to each applicable Debtor, this Class will be further divided into subclasses designated by letters of the alphabet (Class 3.1, Class 3.2 and so on), so that each holder of any Secured Tax Claim against such Debtor is in a Class by itself, except to the extent that there are Secured Tax Claims that are substantially similar to each other and may be included within a single Class, and except for a precautionary class of otherwise unclassified Secured Tax Claims.

- *Treatment*: The legal, equitable and contractual rights of the Holders of Class 3 Claims are unaltered by the Plan. On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is an Allowed Class 3 Claim as of the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 3 Claim, at the election of the Debtors or Reorganized Debtors: (A) Cash in an amount equal to the amount of such Allowed Class 3 Claim; or (B) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder; provided, however, that such parties may further agree for the payment of such Allowed Class 3 Claim at a later date; provided, further, that Class 3 Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court. Each Holder of an Allowed Class 3 Claim will retain the Liens securing its Allowed Class 3 Claim as of the Effective Date until full and final payment of such Allowed Class 3 Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Class 3 Claim will be deemed released, terminated and extinguished, in each case without further notice to or order of the

48

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

- *Voting*: Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3 Claims will not be entitled to vote to accept or reject the Plan.

(d)   Class 4 - Prepetition First Lien Loan Claims

- *Classification*: Class 4 consists of all Allowed Prepetition First Lien Loan Claims.

- *Allowance*: The Prepetition First Lien Loan Claims are deemed Allowed in an aggregate principal amount equal to $492 million, plus accrued interest and fees.

- *Treatment*: On the Initial Distribution Date, in full and final satisfaction, settlement, release, and discharge and in exchange for all Allowed Class 4 Claims, all Allowed Class 4 Claims shall be indefeasibly satisfied through the distribution by the Reorganized Debtors to each Holder of an Allowed Class 4 Claim of:

  1) its Pro Rata share of $365 million in Cash; and

  2) a Subscription Right.

- *Voting*: Class 4 is Impaired, and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

(e)   Class 5 – Prepetition Second Lien Loan Claims

- *Classification*: Class 5 consists of all Allowed Prepetition Second Lien Loan Claims.

- *Allowance*: The Prepetition Second Lien Loan Claims are deemed Allowed in an aggregate principal amount equal to $159 million, plus accrued interest and fees.

- *Treatment*: On the Initial Distribution Date, in full and final satisfaction, settlement, release, and discharge and in exchange for all Allowed Class 5 Claims, all Allowed Class 5 Claims shall be indefeasibly satisfied through the distribution by the Reorganized Debtors to each Holder of an Allowed Class 5 Claim of:

  1) its Pro Rata share of $12 million in Cash; and

  2) its Pro Rata share of the New Warrants.

49

- *Voting*:  Class 5 is Impaired, and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

(f)    Class 6 – SCIF Claims

- *Classification*:  Class 6 consists of the SCIF Claims.

- *Allowance*:  On the Effective Date, the SCIF Claims will be deemed Allowed in an aggregate amount equal to all amounts outstanding under the SCIF Settlement Agreement.

- *Treatment*:  The legal, equitable and contractual rights of the Holders of Class 6 Claims are unaltered by the Plan.  On the Initial Distribution Date, the Holders of Allowed Class 6 Claims will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 6 Claims: (A) Cash equal to the unpaid amount under the SCIF Settlement Agreement; or (B) such other treatment as to which the Debtors or Reorganized Debtors and the Holders of Allowed Class 6 Claims will have agreed upon in writing with the consent of the Required Backstop Investors.

- *Voting*:  Class 6 is an Unimpaired Class, and the Holders of Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

(g)    Class 7 – General Unsecured Claims

- *Classification*:  Class 7 consists of the General Unsecured Claims.

- *Treatment*:  With respect to each Class 7 Claim that becomes due and payable prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date, solely to the extent that any of the legal, equitable and contractual rights in respect of any Class 7 Claim under applicable non-bankruptcy law, each Allowed Class 7 Claim will be, at the Debtors' option:  (i) Reinstated, and paid without default interest, subject to the terms and conditions thereof, in Cash on the later to occur of the Effective Date or when such Claims become due in the ordinary course of the Debtors' business operations; or (ii) otherwise rendered not impaired pursuant to section 1124 of the Bankruptcy Code, including with respect to payment on the Effective Date or as soon as practicable thereafter, except to the extent that the Reorganized Debtors and such Holder agree to other less favorable treatment in writing.

- *Related Party Notes*:  On the Initial Distribution Date, in full and final satisfaction, settlement and discharge of all Claims related to or arising under the Related Party Notes, the Holders of Related Party Notes shall

50

contribute such Related Party Notes to the Company in exchange for New Common Stock as set forth in the Sorensen Support Agreement.

- *Specified Related Party Claims*:  In full and final satisfaction, settlement and discharge of certain specified related party claims identified in <u>Schedule 2</u> to the Plan, the Debtors and certain non-debtor parties have agreed to the treatment of such claims as set forth in <u>Schedule 2</u> to the Plan.

- *Voting*: Class 7 is an Unimpaired Class, and the Holders of Class 7 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, Therefore, Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.

(h)   <u>Class 8 – Prepetition Warrants</u>

- *Classification*:  Class 8 consists of the Prepetition Warrants.

- *Treatment*:  On the Effective Date, all Class 8 Prepetition Warrants will be deemed canceled, settled, released, and discharge and the Class 8 Prepetition Warrants will be of no further force and effect, whether surrendered for cancellation or otherwise.  Holders of Class 8 Claims will not receive any distribution on account of their Prepetition Warrants.

- *Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are deemed to reject the Plan.

(i)   <u>Class 9 – Equity Interests in Parent</u>

- *Classification*:  Class 9 consists of the Parent Equity Interests.

- *Treatment*:  On the Effective Date, all Class 9 Parent Equity Interests will be deemed canceled and Class 9 Parent Equity Interests will be of no further force and effect, whether surrendered for cancellation or otherwise. Holders of Class 9 Claims will not receive any distribution on account of their Parent Equity Interests.

- *Voting*:  Class 9 is Impaired, and the Holders of Class 9 Claims are deemed to reject the Plan.

(j)   <u>Class 10 – Equity Interests in Subsidiaries</u>

- *Classification*:  Class 10 consists of the Equity Interests in the Subsidiaries.

- *Treatment*:  On the Effective Date, the Reorganized Parent or the Reorganized Borrower, as applicable, will own, directly or indirectly, 100% of the Equity Interests in the Subsidiaries.

51

- *Voting*:  Class 10 is an Unimpaired Class, and the Holders of Class 10 Equity Interests will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 10 Equity Interests are not entitled to vote to accept or reject the Plan.

### 3.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to cure any arrears or defaults that may exist with respect to contracts to be assumed under the Plan.

### 4.    Discharge of Claims

Except as otherwise provided in the Plan and effective as of the Effective Date:  (i) the rights afforded herein and the treatment of all Claims and Equity Interests will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) all Entities will be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

## C.    ACCEPTANCE OR REJECTION OF THE PLAN

### 1.    Presumed Acceptance of Plan

Classes 1, 2, 3, 6, 7, and 10 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

### 2.    Presumed Rejection of Plan

Classes 8 and 9 are Impaired and Holders of Class 8 and 9 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

### 3.    Voting Classes

Each Holder of an Allowed Claim as of the applicable Voting Record Date in each of the Voting Classes (Classes 4 and 5) will be entitled to vote to accept or reject the Plan.

### 4.     Acceptance by Impaired Classes of Claims

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

### 5.     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors (subject to any consents that may be required under the Lender RSA or the Backstop Agreement) reserve the right to modify the Plan or any Exhibit thereto or Plan Schedule in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## D.     MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.     General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan (including, without limitation, the treatment of the Consenting Equity Holder under the Plan) will constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan.  Without limiting the foregoing, the treatment of the Sorensen Parties as set forth in the Plan will constitute a good faith compromise and settlement of all Claims and Equity Interests among the Sorensen Parties and the Debtors pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases and other benefits provided under the Plan.

### 2.     Corporate Existence

On or prior to the Effective Date, the Parent will be merged with and into a newly formed Delaware corporation, with the newly formed Delaware corporation surviving the merger and becoming the parent entity of the Debtor entities.  Following this merger, the certificate of incorporation and by-laws of the surviving  corporation will be substantially in the form of the Reorganized  Parent Organizational Documents.  All other Debtors will continue to exist after the Effective Date as separate legal entities, with all the powers of corporations, limited liability companies, memberships and partnerships pursuant to the applicable law in their respective jurisdictions of incorporation or organization.

### 3.     Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all property and assets of the Estates (including, without limitation, Causes of Action and, unless otherwise waived or released pursuant to an order of the Bankruptcy Court or the Plan, Avoidance Actions) and any property and assets acquired by the Debtors pursuant to

the Plan will vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances.  Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

### 4. Post-Emergence Term Loan Agreement, Post-Emergence ABL Loan Agreement, and Sources of Cash for Plan Distribution

On the Effective Date, the applicable Reorganized Debtors will be authorized to execute and deliver the Post-Emergence Term Loan Agreement and the Post-Emergence ABL Loan Agreement, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the Post-Emergence Term Loan Agreement or the Post-Emergence ABL Loan Agreement, as applicable).

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the Reorganized Debtors' Cash balances, including Cash from operations, the Rights Offering Purchase Price, and the Post-Emergence Term Loan Agreement.  Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

### 5. New Common Stock Issued Under the Plan

On the Effective Date, Reorganized Parent will distribute the New Common Stock pursuant to the terms set forth in the Plan, including, without limitation, pursuant to the Rights Offering, the Backstop Agreement, the DRV Purchase Agreement, the Restricted Stock Award Agreement, and the Sorensen Support Agreement, in each case subject to each such recipient entering into the Stockholders Agreement.

### 6. New Warrants Issued Under the Plan

On the Effective Date, Reorganized Parent will issue the New Warrants to the Holders of Class 5 Claims, pursuant to the terms set forth herein and in the Reorganized Parent Organizational Documents.

### 7. Rights Offering and Backstop Commitment

(a)    Issuance of Subscription Rights.

Each Prepetition First Lien Lender (that is an Eligible Participant) will receive Subscription Rights to subscribe for its Pro Rata share of the Rights Offering Securities for an aggregate purchase price in Cash equal to $175 million.  In accordance with the terms and conditions of the Backstop Agreement, each Backstop Investor (that is an Eligible Participant) has committed to subscribe for its Backstop Proportion of all of the Rights Offering Securities that are eligible to be subscribed for by the Prepetition First Lien Lenders (that are Eligible Participants) that are not subscribed for by such Prepetition First Lien Lenders.  Furthermore, in accordance with the terms and conditions of the Backstop Agreement, each Backstop Investor (that is an Eligible Participant) has committed to subscribe for its Backstop Proportion of additional Rights Offering Securities for an aggregate purchase price in Cash equal to $50 million.  The Rights Offering Securities will be issued to the Eligible Participants (including the Backstop Investors), for the Rights Offering Purchase Price.

(b)    Subscription Period.

The Rights Offering will commence on the Subscription Commencement Date and expire on the Subscription Deadline.  Each Eligible Participant that wishes to participate in the Rights Offering will be required to affirmatively elect to exercise its Subscription Rights, and provide written notice thereof to the Entities specified in the Subscription Documents, on or prior to the Subscription Deadline in accordance with the terms of the Plan and the Subscription Documents. All remaining Rights Offering Securities will be allocated to the Backstop Investors on the Subscription Deadline, and will be purchased by the Backstop Investors on the Effective Date, all in accordance with the terms and conditions of the Backstop Agreement.

(c)    Exercise of Subscription Rights and Payment of Rights Offering Purchase Price.

On the Subscription Commencement Date, the Prepetition First Lien Agent posted on the Prepetition First Lien Lenders' website on Intralinks the Subscription Documents and the related materials listed below.  Each Eligible Participant known as of the Rights Offering Record Date had access through Intralinks to the Subscription Documents, together with appropriate instructions for the proper completion, due execution, and timely delivery of the Subscription Documents, as well as instructions for the payment of the eventual Rights Offering Purchase Price for that portion of the Subscription Rights sought to be exercised by such Person.  The Debtors may adopt such additional detailed procedures consistent with the provisions of the Plan as the Debtors may deem necessary to effectuate, or desirable to more efficiently administer the exercise of the Subscription Rights and ascertain payment of the Rights Offering Purchase Price, to the extent authorized by the Bankruptcy Court.

(d)    No Assignment; No Revocation.

Except as set forth in the Backstop Agreement, the Subscription Rights will not be assignable, and cannot be assigned by the Eligible Participants. Any impermissible assignment, or attempted assignment, will be null and void. Once an Eligible Participant has exercised any of its Subscription Rights by properly executing and delivering the Subscription Documents to the Debtors or other Entity specified in the Subscription Documents, such exercise may only be revoked, rescinded or annulled in the sole discretion of the Debtors or Reorganized Debtors or as provided for in the Backstop Agreement.

(e)    <u>Distribution of Rights Offering Securities</u>.

On the Effective Date, Reorganized Parent or another applicable Distribution Agent will distribute the Rights Offering Securities purchased by each Rights Offering Purchaser or Backstop Investor to such Rights Offering Purchaser or Backstop Investor; provided, however, that, as a condition precedent to the Rights Offering Purchaser or Backstop Investor to receive its share of Rights Offering Securities, such Rights Offering Purchaser or Backstop Investor must first execute the Stockholders Agreement.

(f)    <u>Validity of Exercise of Subscription Rights</u>.

All questions concerning the timeliness, validity, form, and eligibility of any exercise, or purported exercise, of Subscription Rights will be determined by the Debtors or Reorganized Debtors.  The Debtors, in their discretion reasonably exercised in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as they may determine, or reject the purported exercise of any Subscription Rights.  The Subscription Documents will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in their discretion reasonably exercised in good faith.  The Debtors will use commercially reasonable efforts to give written notice to any Eligible Participant regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Person and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that neither the Debtors and Reorganized Debtors nor any of their Related Persons will incur any liability for giving, or failing to give, such notification and opportunity to cure.

(g)    <u>Rights Offering Proceeds</u>.

The proceeds of the Rights Offering will fund Cash payments required to be made under the Plan, including, without limitation, payments in respect of Allowed Claims, Chapter 11 Transaction Expenses and repayment of the DIP Facility Claims, and be used for general corporate purposes by the Debtors to the extent approved by the Bankruptcy Court, and by the Reorganized Debtors after the Effective Date.

**8.    Sorensen Party Transactions**

On the Effective Date, the applicable Reorganized Debtors will be authorized to deliver the DRV Purchase Agreement and the Restricted Stock Award Agreement and will be authorized to execute and deliver any other agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the DRV Purchase Agreement or the Restricted Stock Award Agreement).

Concurrently with the closing of the Rights Offering, the Reorganized Parent will deliver or grant to certain of the Sorensen Parties who have timely executed the Stockholders Agreement: (a) New Common Stock of the Reorganized Parent in consideration for contributing new assets to the Reorganized Parent under the terms of the DRV Purchase Agreement, (b) New Common Stock under the terms of the Restricted Stock Award Agreement, (c) New Common

Stock in connection with the conversion of certain Related Party Notes under the terms of the Sorensen Support Agreement, and (d) an option to designate and purchase additional New Common Stock for Cash in an aggregate amount of $4 million under the terms of the Sorensen Support Agreement.

The Stockholders Agreement also provides that in the event of a cash sale of the Company or an initial public offering of the Company's equity securities (each as defined in the Stockholders Agreement), Mr. Sorensen will pay to the Company up to a maximum of $7,500,000 from the after-tax proceeds to which he would be entitled from the cash sale or the after-tax proceeds from sales of shares of the Company's common stock owned by him after the IPO.

On the Effective Date, the applicable Reorganized Debtors will be authorized to deliver the Option Agreement, and will be authorized to execute and deliver any other agreements in connection therewith without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the Option Agreement).

### 9.    Management Incentive Plan

Following the Effective Date, the Reorganized Parent will adopt and implement the Management Incentive Plan, which would, subject to certain terms and conditions, provide for, the issuance of up to 9.35% of the New Common Stock for grant to key executives of the Company, of which, up to 4% may be granted to executives of the Company, other than the Consenting Equity Holder, on the Effective Date. At least 5.35% of such New Common Stock will be held for potential future grants to executives, including the Consenting Equity Holder, at the discretion of the compensation committee of the New Board. The capitalization table attached hereto as Exhibit G sets forth the dilutive effects of all of the issuances under the Plan.

### 10.    Issuance of New Securities and Related Documentation

On the Effective Date, the Reorganized Parent will be authorized to, and will, issue and execute, as applicable, the New Securities and Debt Documents, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. The (a) issuance, distribution and exercise of the Subscription Rights, (b) issuance and distribution of the New Common Stock in connection with the Subscription Rights, Backstop Agreement, DRV Purchase Agreement, Sorensen Support Agreement, and Restricted Stock Award Agreement, (c) issuance and distribution of the New Warrants, and (d) issuance and distribution of New Common Stock upon exercise of the New Warrants, will be made in reliance on the exemption from registration provided by section 1145(a) of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and will be exempt from registration under applicable securities laws. Without limiting the effect of section 1145 of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, all financing documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including, without limitation, the Post-Emergence Term Loan Agreement, the Post-Emergence ABL Loan Agreement, the Post-Emergence Term

Loan Agreement, the DRV Purchase Agreement, the Sorensen Support Agreement, the New Common Stock and any other agreement or document related to or entered into in connection with any of the foregoing, will become, and the Backstop Agreement will remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of the Reorganized Debtors will be that number of shares of New Capital Stock as may be designated in the Reorganized Parent Organizational Documents.  In connection with the distribution of New Capital Stock to current or former employees of the Debtors, the Reorganized Parent may take whatever actions are necessary to comply with applicable federal, state, local and international tax withholding obligations, including withholding from distributions a portion of the New Capital Stock and selling such securities to satisfy tax withholding obligations including, without limitation, income, social security and Medicare taxes.

## 11.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens or interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors.

## 12.    Certificate of Incorporation and Bylaws

The Reorganized Parent Organizational Documents shall succeed the certificate of incorporation, by-laws and other organizational documents of the Parent to satisfy the provisions of the Plan and the Bankruptcy Code, and will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code; (ii) authorize the issuance of New Capital Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan; and (iii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.  After the Effective Date, the Reorganized Parent may amend and restate its certificate of incorporation, by-laws, and other applicable organizational documents, as permitted by applicable law.

### 13. Directors and Officers of Reorganized Parent

The New Board will initially be comprised of the following five individuals: Alvaro Jose Aguirre, Greg Netland, Steve Giusto, Gary DiCamillo and D. Stephen Sorensen.  Other than the Consenting Equity Holder, members of the New Board were chosen, following the evaluation of over thirty candidates, through an independent executive search firm appointed by the Backstop Investors.  Members of the New Board include: a former chief executive officer of a top five United States staffing company, a former partner in a United States private equity firm with business services and public company board and operating experience, a former chief financial officer of a New York Stock Exchange-listed human resources services company, and a former chief executive officer of a large United States staffing company with experience as a turnaround board leader.  Further details regarding these individuals is provided in Exhibit I hereto.

At least 80% of the members of the New Board will be appointed by the Backstop Investors and will qualify as "independent" under the applicable rules of the New York Stock Exhange.  Only directors who so qualify as "independent" will serve as Chairman of the New Board and members of the audit and compensation committees.  The New Board will implement "best practices" and further bolster the internal audit and risk management practices already in place.

As of the Effective Date, D. Stephen Sorensen will be the Chief Executive Officer of the Reorganized Parent, employed on the terms set forth in the employment agreement, substantially in the form attached to the Plan as Exhibit H thereto.  As of the Effective Date, the initial officers of the Reorganized Debtors, other than as described above will be the officers of the Debtors existing immediately prior to the Effective Date and the existing directors of the Reorganized Debtors, other than Reorganized Parent, will be the directors of such Debtors existing immediately prior to the Effective Date.

To the extent not previously disclosed, the Debtors will disclose, prior to the Confirmation Hearing, the affiliations of each Person proposed to serve on the initial board of directors or as an officer of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person.  Each such director and each officer will serve from and after the Effective Date pursuant to applicable law and the terms of the Reorganized Parent Organizational Documents and the other constituent and organizational documents of the Reorganized Debtors.  The existing board of directors of Parent will be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

### 14. Corporate Action

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors and in each case without further notice to or order of the Bankruptcy Court, act or action under

applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors and as applicable or by any other Person (except for those expressly required pursuant to the Plan).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, directors or members of any Debtor (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, directors, managers or partners of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtors, as applicable, and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of any Debtor or any Reorganized Debtors, as applicable, or by any other Person.  On the Effective Date, the appropriate officers of each Debtor and each Reorganized Debtors, as applicable, are authorized to issue, execute, and deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and each Reorganized Debtors, as applicable, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  The secretary and any assistant secretary of each Debtor and each Reorganized Debtor as applicable, will be authorized to certify or attest to any of the foregoing actions.

### 15.    Cancellation of Notes, Certificates and Instruments

On the Effective Date and provided that the New Securities and Debt Documents have been authorized by the Bankruptcy Court, executed by the Reorganized Debtors and delivered, all notes, stock, instruments, certificates, agreements and other documents evidencing the DIP Facility Claims, the Prepetition First Lien Loan Claim, the Prepetition Second Lien Loan Claim, the Prepetition Intercreditor Agreement, the Related Party Notes, the Prepetition Warrants and the Parent Equity Interests will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.  On the day following the date that the final distribution is made by Prepetition Agents, the Prepetition Agents will be released and discharged from any further responsibility under the Prepetition Secured Loan Agreements; provided, however, that any and all rights of indemnification applicable to the Prepetition Agents, respectively, under the Prepetition Secured Loan Agreements and related documents shall survive and remain in full force and effect; provided further, however, until the Prepetition Agents' fees and expenses have

been paid in full, the Prepetition Agents will retain their respective charging liens under the Prepetition Secured Loan Agreements with respect to any cash distributions to be made under the Plan by the Prepetition Agents.

**16.    Intercompany Claims**

On the Effective Date, all net Allowed Intercompany Claims (taking into account any setoffs of Intercompany Claims) held by the Debtors between and among the Debtors or between one or more Debtors and any Affiliate of one of the Debtors that is not itself a Debtor shall, at the election of the Reorganized Debtors, be either (a) Reinstated, (b) released, waived, and discharged, (c) treated as a dividend, or (d) contributed to capital or exchanged for equity.

**17.    Lease Amendments**

On the Effective Date, the applicable Reorganized Debtors will be authorized to deliver the Lease Amendments and will be authorized to execute and deliver any other agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the Lease Amendments).

**18.    Plan Supplement, Other Documents and Orders and Consents Required Under the Lender RSA and the Backstop Agreement**

So long as the Lender RSA or the Backstop Agreement, as applicable, have not been terminated, the Plan, the Confirmation Order and all other documents to be Filed as part of the Plan Supplement and the other documents and orders referenced herein, or otherwise to be executed in connection with the transactions contemplated hereunder, shall be subject to the consents and the approval rights, as applicable, of (a) the Backstop Investors to the extent set forth in the Lender RSA and the Backstop Agreement, (b) the Participating Lenders to the extent set forth in the Lender RSA and (c) the Consenting Equity Holder to the extent set forth in the Lender RSA and the Sorensen Support Agreement. To the extent that there is any inconsistency between the Lender RSA, the Backstop Agreement, or the Sorensen Support Agreement, on the one hand, and the Plan, on the other hand, as to such consents and the approval rights and the Lender RSA, the Backstop Agreement, or the Sorensen Support Agreement, as applicable, has not been terminated, then the consents and the approval rights required in the Lender RSA, the Backstop Agreement, or the Sorensen Support Agreement, as applicable, shall govern.

**E.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**1.    Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including, without limitation, employment agreements) and Unexpired Leases that:

- have been rejected by order of the Bankruptcy Court;

61

- are the subject of a motion to reject pending on the Effective Date;

- are identified in the Plan Supplement with the consent of the Required Backstop Investors (in either case which list may be amended by the Debtors to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an amended list and serving it on the affected contract parties at least ten (10) days prior to the Confirmation Hearing); or

- are rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article of the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### 2.    Assignment of Executory Contracts or Unexpired Leases

In the event of an assignment of an Executory Contract or Unexpired Lease, at least twenty (20) days prior to the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will:  (a) list the applicable cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed cure amounts.  Any applicable cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by the Debtors at least five (5) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease.  The Confirmation Order will constitute an order of the Bankruptcy Court

approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment.  If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

### 3.    Rejection of Executory Contracts or Unexpired Leases

All Executory Contracts and Unexpired Leases designated for rejection in the Plan Supplement will be deemed rejected as of the Effective Date.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in this Article of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

### 4.    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  The Debtor or Reorganized Debtor, as the case may be, will provide notice of such rejection and specify the appropriate deadline for the filing of such Proof of Claim.

Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  All such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article XII.D of the Plan.  All claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law. Rejection damages claims are Class 7 Claims.

### 5.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash as and when due in the ordinary course or on

such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be filed, served and actually received by the Debtors at least ten (10) days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented and will be deemed to have forever released and waived any objection to the proposed assumption other than with respect to any alleged cure amount, which may be asserted at any time. In the event of a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. If an objection to cure is sustained by the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**6.       Assumption of Director and Officer Insurance Policies**

The Debtors, and upon the Effective Date, the Reorganized Debtors, will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under the D&O Liability Insurance Policies.

**7.       Indemnification Provisions**

All indemnification provisions currently in place (whether in the by-laws, certificate of incorporation, board resolutions, contracts, or otherwise) for the following: (i) Prepetition Agents; (ii) Prepetition Secured Lenders; (iii) the current and former members of the Steering Committee; (iv) the Backstop Investors; (v) the Participating Lenders; and (vi) directors, officers and employees of the Debtors who served in such capacity as of the Petition Date with respect to or based upon any act or omission taken or omitted in such capacities will be Reinstated (or assumed, as the case may be), and will survive effectiveness of the Plan. No such Reinstatement or assumption shall in any way extend the scope or term of any indemnification provision beyond that contemplated in the underlying contract or document as applicable.

### 8.    Compensation and Benefit Programs

Except as otherwise provided in the Plan (including the compensation for the Consenting Equity Holder pursuant to an employment agreement as described herein, which will exclusively address the benefits for the Consenting Equity Holder), or any order of the Bankruptcy Court, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors applicable to its employees, retirees, and non-employee directors and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans (other than equity incentive plans, which will be replaced by the Management Incentive Plan), life, and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Any payment obligations under any assumed employment contracts and benefit plans that have been or purport to have been accelerated as a result of the commencement of the Chapter 11 Cases or the consummation of any transactions contemplated by the Plan will be Reinstated and such acceleration will be rescinded and deemed not to have occurred.

The Debtors maintain what is commonly referred to as a non-qualified deferred compensation plan that defers payment of compensation of approximately 50 current or former employees of the Debtors. Such plan is administered pursuant to that certain Select Staffing Amended and Restated Deferred Compensation Plan, effective December 28, 2008 (the "Deferred Compensation Plan"), and that certain Amended and Restated Trust Under the Select Staffing Deferred Compensation Plan, dated December 18, 2008 (the "Trust"). The Deferred Compensation Plan was frozen or suspended on December 27, 2011 such that further deferrals are no longer permitted under the Deferred Compensation Plan. As of November 3, 2013, the cash surrender value of the assets in the Trust was $4,797,196.70 and the benefit liability to Deferred Compensation Plan participants was $5,394,831.89. The Trustee of the Deferred Compensation Plan is Reliance Trust Company and the Third Party Plan Administrator is The Newport Group.

### 9.    Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under:  (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance, All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

## F.    PROVISIONS GOVERNING DISTRIBUTIONS

### 1.       Dates of Distributions

Except as otherwise provided in the plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions provided in the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Reorganized Debtors shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order.  All payments and all distributions made by the Reorganized Debtors under the Plan shall be in full and final satisfaction, settlement and release of all Claims against the Reorganized Debtors.

### 2.       Distribution Agent

Except as provided therein, all distributions under the Plan shall be made by the Reorganized Parent or the Prepetition Agents, respectively, as Distribution Agent, or by such other Entity designated by the Reorganized Parent as a Distribution Agent on the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of the Reorganized Debtors' duties as Distribution Agent unless otherwise ordered by the Bankruptcy Court.  For purposes of distributions under this Plan to the Holders of Allowed DIP Facility Claims and Allowed Prepetition Secured Loan Claims, the DIP Agent and the Prepetition Agents, respectively, will be and shall act as the Distribution Agent.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.  If the Distribution Agent is an entity other than the Reorganized Parent, such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

### 3.       Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash

payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 4. Rounding of Payments

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one dollar. To the extent Cash, notes, warrants, shares, stock are to be distributed under the Plan remain undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash, notes, or shares shall be treated as "Unclaimed Property" under the Plan.

Whenever payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar. To the extent that any Cash or any shares of New Capital Stock to be distributed under the Plan remain undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash or shares shall be treated as "Unclaimed Property" under the Plan.

No fractional shares shall be issued or distributed under the Plan. Each Person entitled to receive shares of New Capital Stock shall receive the total number of whole shares of New Capital Stock to which such Person is entitled. Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of New Capital Stock, the actual distribution of shares of such stock shall be rounded to the next lower whole number.

### 5. Distributions on Account of Claims Allowed After the Effective Date

Except as otherwise agreed by the Holder of a particular Claim, or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order. Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim). Whenever any payment of a fraction of a dollar would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest dollar.

### 6. General Distribution Procedures.

The Reorganized Debtors, or any other duly appointed Distribution Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

### 7. Address for Delivery of Distributions.

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the address set forth on any proofs of claim filed by such Holders (to the

extent such proofs of claim are filed in the Chapter 11 Cases), (2) at the addresses set forth in any written notices of address change delivered to the Debtors, (3) at the addresses in the Debtors' books and records, (4) in accordance with the DIP Facility Secured Loan Agreement, (5) in accordance with the Prepetition First Lien Credit Agreement, or (6) in accordance with the Prepetition Second Lien Credit Agreement.

### 8.    Undeliverable Distributions and Unclaimed Property.

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtors as undeliverable, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder, unless and until the Reorganized Debtors is notified in writing of such Holder's then current address.

Any Entity which fails to claim any Cash within one year from the date upon which a distribution is first made to such entity shall forfeit all rights to any distribution under the Plan. Entities which fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtors or the Reorganized Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Reorganized Debtors.

### 9.    Withholding Taxes.

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.  From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on it by any Governmental Unit in accordance with applicable law with respect to such withholding taxes. As a condition to receiving any distribution under the Plan, the Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws.

### 10.    Setoffs.

The Reorganized Debtors may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claims, rights and causes of action that the Reorganized Debtors possesses against such Holder.

### 11.    Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation

canceled pursuant to Article V.O of the Plan, the Holder of such Claim will tender the applicable instruments, securities, notes or other documentation evidencing such Claim (or a sworn affidavit identifying the instruments, securities, notes or other documentation formerly held by such Holder and certifying that they have been lost), to Reorganized Parent or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.

### 12.    Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to Reorganized Parent and other applicable Distribution Agents:  (x) evidence reasonably satisfactory to Reorganized Parent and other applicable Distribution Agents of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by Reorganized Parent and other applicable Distribution Agents to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Allowed Equity Interest.  Upon compliance with Article VII.K of the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to Reorganized Parent and other applicable Distribution Agents.

### G.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

### 1.    Disputed Claims

In the event a Claim is not an Allowed Claim as of the Effective Date, the Holder of such Claim or the Reorganized Debtors may commence an action or proceeding to determine the amount and validity of such Claim in (a) any venue in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced, or (b) the Bankruptcy Court; provided, that the parties may agree that any dispute will be determined, resolved or adjudicated in the appropriate non-bankruptcy forum and not before the Bankruptcy Court.

### 2.    Procedures Regarding Disputed Claims

No payment or other distribution or treatment shall be made on account of a Disputed Claim, even if a portion of the Claim is not disputed, unless and until such Disputed Claim becomes an Allowed Claim and the amount of such Allowed Claim is determined by a Final Order or by stipulation between the Debtors and the Holder of the Claim.  No distribution or other payment or treatment shall be made on account of a Disallowed Claim at any time.

The Debtors (prior to the Effective Date) or the Reorganized Debtors (after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether

the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to such objection. Any Final Order of the Bankruptcy Court that estimates a Disputed Claim pursuant to the Plan shall irrevocably constitute and be a conclusive and final determination of the maximum allowable amount of Claim, should it become an Allowed Claim. Accordingly, the Holder of a Disputed Claim that is estimated by the Bankruptcy Court pursuant to the Plan will not be entitled to any subsequent reconsideration or upward adjustment of the maximum allowable amount of such Claim as a result of any subsequent adjudication or actual determination of the allowed amount of such Disputed Claim or otherwise, and the Holder of such Claim shall not have recourse to the Debtors or the Reorganized Debtors in the event the allowed amount of the Claim of such Holder is at any time later determined to exceed the estimated maximum allowable amount.

### 3.    Allowance of Claims

Following the date on which a Disputed Claim becomes an Allowed Claim after the Initial Distribution Date, the Reorganized Debtors shall pay directly to the Holder of such Allowed Claim the amount provided for under the Plan, as applicable, and in accordance therewith.

(a)    <u>Allowance of Claims</u>

Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtors will have and will retain any and all rights and defenses that the Debtors had with respect to any Claim or Equity Interest, except with respect to any Claim or Equity Interest deemed Allowed under the Plan or by orders of the Bankruptcy Court. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order and the DIP Orders), no Claim or Equity Interest will become an Allowed Claim unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Equity Interest.

(b)    <u>Prosecution of Objections to Claims and Equity Interests</u>

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors, will have the exclusive authority to File objections to Claims and settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims or Equity Interests are in an Unimpaired Class or otherwise; <u>provided</u>, <u>however</u>, this provision will not apply to Professional Fee Claims, the Transaction Expenses, or the DIP Facility Claim. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim or Equity Interest without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtors will have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court.

(c)     Estimation

After the Confirmation Date but before the Effective Date, the Debtors, and after the Effective Date, the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Equity Interest pursuant to applicable law and (b) any contingent or unliquidated Claim or Equity Interest pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Equity Interest, contingent Claim or Equity Interest or unliquidated Claim or Equity Interest, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned Claim or Equity Interests and objection, estimation and resolution procedures are cumulative and not exclusive of one another, Claim or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

## H.     CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.     Conditions Precedent to Confirmation

Confirmation of the Plan will be conditioned upon the satisfaction or waiver pursuant to the provisions of Article IX.C of the Plan of the following:

- The Plan and all schedules, documents, supplements and exhibits to the Plan will have been filed in form and substance acceptable to the Debtors, the Required Backstop Investors and the Consenting Equity Holder and consistent with the terms of the Lender RSA and Backstop Agreement.

- None of the Plan, the Disclosure Statement or any other Plan-related documents, notices, exhibits, appendices of the Debtors, or orders of the Bankruptcy Court (including, without limitation, documents included in the Plan Supplement), shall have been amended or modified, or shall have become the subject of a motion seeking to amend or modify same, if such amendment, modification or filing is materially inconsistent with the Lender RSA or the Backstop Agreement in a manner that is not acceptable to the Required Backstop Investors and the Majority Participating Lenders, in their sole discretion.

- The Lender RSA Order shall have been entered by the 45th day after the Petition Date (or, if such day is not a Court Date (as defined in the Lender RSA), the next succeeding Court Date), (ii) the Confirmation Hearing shall have concluded by the 90th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date) and (iii) the Confirmation Order shall have been entered by the Bankruptcy Court by the earlier of the 92nd day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date) and June 30, 2014.

- The entry of an order by the Bankruptcy Court approving the Disclosure Statement and other Solicitation materials shall have occurred by the 60th day after the Petition Date (or, if such day is not a Court Date, the next

succeeding Court Date), (ii) the Confirmation Hearing shall have concluded by the 100th day after the Petition Date (or if such day is not a Court Date, the next succeeding Court Date) and (iii) the Confirmation Order shall have been entered by the Bankruptcy Court by the 102nd day after the Petition Date (or if such day is not a Court Date, the next succeeding Court Date).

- The Confirmation Order, as entered, is in form and in substance reasonably satisfactory to the Debtors, the Required Backstop Investors and the Consenting Equity Holder and consistent with the terms of the Lender RSA and the Backstop Agreement.

- The Debtors shall have filed the Lender RSA Motion, the Backstop Agreement Assumption Motion and the SSA Motion by the third Court Date after the Petition Date.

- Each of the Lender RSA Order, the SSA Order and the Backstop Agreement Assumption Order shall have been entered by the Bankruptcy Court by the 45th day after the Petition Date (or, if such day is not a Court Date, the next succeeding Court Date) and shall be in form and in substance reasonably satisfactory to the Debtors, the Required Backstop Investors and the Consenting Equity Holder and consistent with the terms of the Lender RSA and the Backstop Agreement.

- The Debtors shall have filed the DIP Facility Motion on or before the first Court Date after the Petition Date.

- Each of the DIP Orders shall be in form and substance acceptable to the Required Backstop Investors. The Interim DIP Order shall have been entered on by the 7th day after the Petition Date and the Final DIP Order shall have been entered by the 45th day after the Petition Date.

- No Debtor shall have breached any of its representations, warranties, covenants and agreements under the Lender RSA or the Backstop Agreement in any material respect.

- The Lender RSA shall not have been terminated by the Required Backstop Investors, the Debtors or the Consenting Equity Holder.

- The Sorensen Support Agreement shall not have been terminated.

- No Event of Default (as defined in the DIP Facility Secured Loan Agreement) under the DIP Facility shall have occurred.

- Neither of the DIP Orders shall have been vacated by any court of competent jurisdiction.

- No material term or condition of the DIP Facility or either DIP Order shall have been modified, amended, or supplemented in a manner that is materially adverse to the Backstop Investors without the prior consent of the Required Backstop Investors,

- Each of the Reorganized Parent Organizational Documents and the organizational documents of each of the other Debtors are in form and substance satisfactory to the Required Backstop Investors.

- There has been no material breach by any of the Debtors or by the Consenting Equity Holder of any of their respective obligations under the Lender RSA, or any other agreement governing the restructuring contemplated therein, or, if any such breach has occurred and is curable, such breach has been cured by 10 days after receipt of written notice and opportunity to cure from the Majority Participating Lenders or the Required Backstop Investors.

- No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, or prohibiting the restructuring transactions contemplated in the Lender RSA or this Plan, in a manner that cannot be reasonably remedied by the Debtors or the Backstop Investors.

- None of the Debtors or the Consenting Equity Holder has filed any motion in the Chapter 11 Cases under section 363, 364, or 365 of the Bankruptcy Code that is materially inconsistent with the terms and conditions of the Lender RSA in a manner that is not reasonably acceptable to the Required Backstop Investors and the Majority Participating Lenders.

- The Backstop Agreement has not terminated or been terminated and remains in full force and effect.

- No order has been entered by the Bankruptcy Court invalidating or disallowing any Prepetition First Lien Lender Claim or any Prepetition Second Lien Lender Claim of any Backstop Investor or any documents governing or giving rise to such Claim.

- No governmental authority, including any regulatory authority or court of competent jurisdiction, shall have issued of any ruling or order enjoining the consummation of a material portion of the Plan.

- No event, development, condition or state of affairs will exist or have occurred which resulted, or would reasonably be expected to result in, a material adverse effect on (i) the business, properties, financial condition or results of operations of the Companies, taken as a whole, or (ii) the ability of the Debtors to implement the restructuring of the Companies in accordance with the Lender RSA (together, a "Material Adverse Effect"); provided, however, that the voluntary filing or announcement of the voluntary Chapter 11 Cases made pursuant to the Lender RSA shall not constitute a Material Adverse Effect, or be taken into account in determining whether any Material Adverse Effect has occurred.

- Each other Backstop Investor shall have fulfilled its obligations under Section 2 of the Backstop Agreement; provided, however, that such condition shall be deemed to be satisfied and each non-defaulting Backstop Investor shall be obligated to fund its share of such defaulting Backstop Party's Purchase Commitment (as defined in the Backstop Agreement) and Backstop Commitment (as defined in the Backstop Agreement), each to the extent provided in Section 5(c) of the Backstop

73

Agreement, if (x) the aggregate amount to be funded by the non-defaulting Backstop Investors pursuant to Section 2 of the Backstop Agreement and after giving effect to the funding contemplated by this proviso is less than or equal to (y) the amount that would have been required to be funded by the non-defaulting Backstop Investors pursuant to Section 2 of the Backstop Agreement assuming no other persons participated in the Rights Offering and the defaulting Backstop Investors performed their respective obligations under Section 2 of the Backstop Agreement.

- The representations and warranties of the Debtors contained in the Backstop Agreement shall be true and correct in all material respects at and as of the Confirmation Date as if made at and as of such time (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period), and the Debtors shall have performed or complied in all material respects with all agreements and covenants required by the Backstop Agreement to be performed or complied with by them prior to or at and as of the Confirmation Date.

- Each of the Plan and all documents related to the Plan that are to be approved by the Bankruptcy Court are be in form and substance reasonably acceptable to the Required Backstop Investors.

- One of the Debtors or a non-Debtor subsidiary of a Reorganized Debtor shall have entered into an employment agreement with each of Barry Ahearn and Dean Foley, in each case, in form and substance reasonably acceptable to the Required Backstop Investors.

- No taxing authority having appropriate jurisdiction over the Company shall have reasonably and in good faith asserted a claim for the payment of taxes by the Company relating to periods on or prior to the consummation of the restructuring that exceeds, in the aggregate, the amount of tax liabilities of the Company reasonably expected by the Backstop Investors to exist as of the date of consummation of the restructuring.

- The Required Backstop Investors shall be reasonably satisfied with the proposed allocation of shares of common stock to be issued on or promptly following the Effective Date under the MIP (as defined in the Lender RSA).

- The Subscription Documents shall be in form and substance reasonably acceptable to the Required Backstop Investors.

- Each of the Debtors and the Consenting Equity Holder and the other Sorensen Parties have performed all obligations required of them under the Lender RSA, the Backstop Agreement and the Sorensen Support Agreement.

## 2.    Conditions Precedent to Consummation

Consummation of the Plan will be conditioned upon the satisfaction or waiver pursuant to the provisions of Article IX.C of the Plan of the following:

- Immediately prior to the effectiveness of the Plan pursuant to Article IX, each of the conditions precedent to confirmation of the Plan either remain satisfied or have been waived pursuant to the provisions of Article IX.C of the Plan.

- The Confirmation Order shall have been entered and either (a) become a Final Order or (b) the 14-day stay contemplated by Bankruptcy Rule 3020(e) in respect thereof shall have been terminated unless waived by the Debtors, and (c) the Confirmation Order shall otherwise be in a form and in substance reasonably satisfactory to the Debtors, the Required Backstop Investors and the Consenting Equity Holder and consistent with the terms of the Lender RSA and Backstop Agreement, and no stay of the Confirmation Order will have been entered and be in effect.  The Confirmation Order will provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases and other agreements or documents created in connection with or described in the Plan.

- The Bankruptcy Court will have entered one or more Final Orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the Debtors as contemplated in the Plan and the Plan Supplement.

- The representations and warranties of the Debtors contained in the Backstop Agreement shall be true and correct in all material respects at and as of the Effective Date as if made at and as of such time (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be true and correct as of such date or with respect to such period), and the Debtors shall have performed or complied in all material respects with all agreements and covenants required by the Backstop Agreement to be performed or complied with by them prior to or at and as of the Effective Date.

- All documents and agreements and all schedules, exhibits, and ancillary agreements thereto necessary to implement the Plan, including, without limitation, the Post-Emergence Term Loan Agreement, the Post-Emergence ABL Loan Agreement and the Subordination and Intercreditor Agreement will have been (a) approved by the Required Backstop Investors, (b) tendered for delivery, and (c) effected by, executed by, or otherwise deemed binding upon, all Entities party thereto.  All conditions precedent to such documents and agreements will have been satisfied or waived pursuant to the terms of such documents or agreements.

- All material consents, actions, documents, certificates and agreements necessary to implement the Plan will have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

- The Debtors will have received the Rights Offering Purchase Price, in Cash, net of any fees or expenses authorized by order of the Bankruptcy Court to be paid from the Rights Offering Purchase Price.

- The Debtors will have received (i) the stock to be purchased under the DRV Purchase Agreement, (ii) any and all consents necessary to consummate the transactions set forth in the DRV Purchase Agreement, (iii) the Transferred Agreement (as defined in the DRV Purchase Agreement), and (iv) the Option Agreement.

- All Transaction Expenses have been paid in full.

- The Confirmation Date will have timely occurred.

- The Effective Date will have occurred within 17 days after the entry of the Confirmation Order.

### 3.    Waiver of Conditions

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article IX of the Plan may be waived by the Debtors without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan subject to any consents that may be required under the Lender RSA or the Backstop Agreement to the extent that such agreements have not been terminated.  To the extent that a condition to Consummation of the Plan requires the consent of the Required Backstop Investors, or the Majority Participating Lenders, respectively, such conditions may only be waived by the Debtors with the consent of the Required Backstop Investors or the Majority Participating Lenders, as the case may be.  The failure to satisfy or waive a condition to Consummation may be asserted by the Debtors or the Reorganized Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtors or Reorganized Debtors to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

### 4.    Effect of Non Occurrence of Conditions to Consummation

If the Consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (c) constitute an allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

I.      **DEBTORS' RELEASES**

Notwithstanding anything to the contrary in the Plan, the failure of the Bankruptcy Court to approve any or all of the provisions set forth in Article XI of the Plan shall not constitute a failure of any condition to either Confirmation or the effectiveness of the Plan, but without prejudice to the respective parties' rights under the Lender RSA or the Backstop Agreement.

J.      **RELEASE, INJUNCTION AND RELATED PROVISIONS**

1.      **General**

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan will be settled, compromised, terminated and released pursuant to the Plan; provided, however, that nothing contained in the Plan will preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan.

In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (1) the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle Claims against them and (2) the Reorganized Debtors may, in their sole and absolute discretion, compromise and settle Causes of Action against other Entities.

2.      **Release**

EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTORS AND REORGANIZED DEBTORS, IN THEIR INDIVIDUAL CAPACITIES AND AS DEBTORS-IN-POSSESSION (COLLECTIVELY, THE "RELEASING PARTIES") WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER AND RELEASE TO THE RELEASED PARTIES (AND EACH SUCH RELEASED PARTY SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, LITIGATION CLAIMS AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND

LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, CONTRACT, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY IN WHOLE OR IN PART TO THE DEBTORS, THE CHAPTER 11 CASES, INCLUDING, WITHOUT LIMITATION, THE PREPETITION SECURED LOANS, THE BACKSTOP AGREEMENT, THE LENDER RSA, THE RIGHTS OFFERING, THE SORENSEN SUPPORT AGREEMENT, THE DIP FACILITY, THE DISCLOSURE STATEMENT, THE PLAN OR THE SOLICITATION OF VOTES ON THE PLAN THAT SUCH RELEASING PARTY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF THE DEBTORS, THEIR ESTATES OR THE REORGANIZED DEBTORS (WHETHER DIRECTLY OR DERIVATIVELY) AGAINST ANY OF THE RELEASED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT; (II) ANY CAUSES OF ACTION ARISING FROM FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT AS DETERMINED BY FINAL ORDER OF THE BANKRUPTCY COURT OR ANY OTHER COURT OF COMPETENT JURISDICTION; AND/OR (III) THE RIGHTS OF SUCH RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT.  THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS RELEASE.  NOTWITHSTANDING THE FOREGOING, THE DEBTORS ARE NOT RELEASING THE DEBTORS (BUT THEY ARE RELEASING THE RELATED PERSONS TO THE DEBTORS PURSUANT TO THIS PARAGRAPH.

**K.     THIRD PARTY RELEASE**

The third party releases set forth in Article XII of the Plan are voluntary and mutual. None of the releases cover transactions or documents contemplated by the Plan. A brief outline of these releases is set forth below:

- Creditors entitled to vote on the Plan may opt-in to these releases by checking the appropriate box on the Ballot, while the DIP Agent, the

Prepetition Agents and creditors not entitled to vote on the Plan may opt-in by giving written notice to the Notice Parties prior to the Effective Date.

- **Any entity that elects to grant the release set forth in Article XII.A of the Plan, will grant such release to (i) each other creditor that grants a release set forth in Article XII.A of the Plan and (ii) the Sorensen Parties and their non-Debtor Affiliates.**

- **The Sorensen Parties and their non-Debtor Affiliates will grant the release set forth in Article XII.B of the Plan to each of the entities that elect to grant the release set forth in Article XII.A of the Plan. The Sorensen Parties and their non-Debtor Affiliates will not grant the releases set forth in Article XII.B of the Plan to any entity that does not elect to grant the Sorensen Parties and their non-Debtor Affiliates the releases sets forth in Article XII.A of the Plan.**

- **In addition to the transactions to be consummated under the Plan, the parties granting releases acknowledge that the Debtors and the Reorganized Debtors will continue to have commercial relationships with non-Debtor Affiliates of the Sorensen Parties on and after the Effective Date. Such related party relationships, as disclosed in the documents delivered in connection with the Plan, will continue in the ordinary course of business, subject to the consent of the Required Backstop Parties, and will not be modified by the Plan or the releases contained therein. A schedule of such permitted related party transactions will be contained in a Plan Supplement.**

### 1.    Creditors Release

AS OF AND SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, EACH CREDITOR RELEASING PARTY[12], FOR ITSELF AND ITS RESPECTIVE RELATED PERSONS, IN EACH CASE IN THEIR CAPACITY AS SUCH RELATED PERSON, SHALL BE DEEMED TO HAVE RELEASED (I) EACH OTHER CREDITOR RELEASING PARTY AND (II) THE SORENSEN PARTIES AND EACH NON-DEBTOR AFFILIATE OF ANY SORENSEN PARTY FROM ANY AND ALL DIRECT CLAIMS AND CAUSES OF ACTION HELD BY SUCH CREDITOR RELEASING PARTY WHATSOEVER, OR IN ANY MANNER ARISING FROM OR RELATED TO, IN WHOLE OR IN PART, THE RELEASE MATTERS[13]; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS

---

[12]     For the purposes of this section, "Creditor Releasing Party" means (a) each Holder of a Claim in the Voting Classes that affirmatively elects to grant the third party release provided in Article XII of the Plan by checking the appropriate box on the Ballot provided to such Holder in connection with solicitation of such Holder's vote to accept or to reject the Plan and (b) each of the following parties that affirmatively elects to grant the third party release provided in Article XII of the Plan by giving written notice to that effect to each of the Notice Parties: (i) the DIP agent, (ii) the Prepetition Agents and (iii) any other creditor in the Chapter 11 Cases that is not entitled to vote on the Plan.

[13]     For the purposes of this section, "Release Matter" means: (a) the Debtors, (b) the Debtors' restructuring, (c) the conduct of the Debtors' businesses, (d) the Chapter 11 Cases, (e) the Prepetition Secured Loans, (f) the subject matter of, or the transactions or events giving rise to, any Claim or interest that is treated in the Plan, (g) the business or contractual arrangements between any Debtor and any agent thereof, (h) the Rights Offering, (i) the Backstop Agreement, (j) the Lender RSA, (k) the Sorensen Support Agreement, (l) the DIP Facility, (m) the Disclosure

RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (i) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT AND/OR (ii) THE RIGHTS OF SUCH CREDITOR RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT.

THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS RELEASE.

2.      **Sorensen Parties and Affiliates Release**

AS OF AND SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, EACH OF THE SORENSEN PARTIES AND EACH OF THEIR NON-DEBTOR AFFILIATES SHALL BE DEEMED TO HAVE RELEASED EACH OF THE CREDITOR RELEASING PARTIES AND THEIR RESPECTIVE RELATED PERSONS, EACH IN ITS CAPACITY AS SUCH  RELATED PERSON, FROM ANY AND ALL DIRECT CLAIMS AND CAUSES OF ACTION HELD BY SUCH SORENSEN PARTY OR ANY NON-DEBTOR AFFILIATE OF SUCH SORENSEN PARTY WHATSOEVER, OR IN ANY MANNER ARISING FROM OR RELATED TO, IN WHOLE OR IN PART, THE RELEASE MATTERS; <u>PROVIDED, HOWEVER</u>, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (i) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT AND/OR (ii) THE RIGHTS OF SUCH SORENSEN PARTY OR ANY NON-DEBTOR AFFILIATE OF SUCH SORENSEN PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT.

THE FOREGOING RELEASES SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THESE RELEASES.

3.      **Discharge of Claims**

---

Statement, (n) the Plan, (o) the solicitation of votes on the Plan and any transactions related thereto, and (p) the restructuring of Claims and interests prior to or in the Chapter 11 Cases, which Claims are based in whole or in part on any act, omission, transaction, event or other occurrence taking place before the Effective Date.

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtors or any of their assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### 4.    Exculpation

The Exculpated Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Consummation of the Plan, the Disclosure Statement, the Lender RSA, the Backstop Agreement, the Sorensen Support Agreement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or confirmation or Consummation of the Plan; provided, however, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement.

### 5.    Preservation of Rights of Action

(a)    Maintenance of Causes of Action

Except as otherwise provided in Article XI or elsewhere in the Plan or the Confirmation Order, after the Effective Date, the Reorganized Debtors will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action and Litigation Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Cases. The Reorganized Debtors, as the successors in, interest to the Debtors and the Estates, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to

do any of the foregoing) any or all of the Litigation Claims without notice to or approval from the Bankruptcy Court.

      (b)    <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>

Unless a Cause of Action or Litigation Claim against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtors expressly reserve such Cause of Action or Litigation Claim for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, Causes of Action and Litigation Claims not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action or Litigation Claims upon or after the Confirmation of the Plan or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action or Litigation Claims have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the Release contained in Article XI of the Plan) or any other Final Order (including, without limitation, the Confirmation Order).  In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

      **6.**    **Injunction**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.  BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION.  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

## L.    BINDING NATURE OF PLAN

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF

CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## M.    CONFIRMATION PROCEDURES

### 1.    Confirmation Hearing

**The date has not yet been set for the Confirmation Hearing**.  Once scheduled, the Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors, with the consent of the Required Backstop Investors, without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

**The date has not yet been set for the Confirmation Objection Deadline**.  All Confirmation objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Confirmation Objection Deadline.

CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE.

### 2.    Filing Objections to the Plan

Any objection to Confirmation of the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the objecting party and the amount and nature of the Claim or the amount of Equity Interests held by such Entity; (iv) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the Notice Parties, as defined in Article I.C.17 herein.

## N.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy

Code; (ii) the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied and will comply with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment:  (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after Confirmation of the Plan.

- The Debtors will disclose the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in the plan with the Debtors, or a successor to the Debtors under the Plan.  The appointment to, or continuance in, such office by such individual, will be consistent with the interests of creditors and equity security holders and with public policy and the Debtors will have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

- Either each Holder of an Impaired Claim or Equity Interest in Parent will (A) have accepted the Plan or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, or (B) if section 1111 (b)(2) applies to such Claim, receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of such Holder's interest in the estate's interest in the property that secures such claims;

- Each Class of Claims that is entitled to vote on the Plan will either have accepted the Plan or will not be Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as

is reasonably practicable, and that Priority Tax Claims will be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code;

- At least one Class of Impaired Claims will accept the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor thereto under the Plan;

- The Debtors have paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits.

**1.     Best Interests of Creditors Test/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to Confirmation of a chapter 11 plan, that each holder of a claim or equity interest in each impaired class:  (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if each of the debtors were liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the bankruptcy court must:  (1) estimate the Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if each Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (2) determine the distribution (the "Liquidation Distribution" that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (3) compare each Holder's Liquidation Distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

To assist the Bankruptcy Court in making the findings required under section 1129(a)(7) of the Bankruptcy Code, the Debtors' management, together with Alix Partners, the Debtors' restructuring and financial advisors, prepared a Liquidation Analysis, a copy of which is attached hereto as Exhibit F.

The Liquidation Analysis presents "Higher" and "Lower" estimates of Liquidation Proceeds, thus representing a range of management's assumptions relating to the costs incurred during a liquidation and the proceeds realized as a result thereof.  The "Higher" and "Lower" estimates of Liquidation Proceeds for the Chapter 11 Cases are $154 million and $208 million, respectively.  For additional detail with respect to such estimates, refer to the Liquidation Analysis attached hereto as Exhibit F.  It is assumed that the liquidation would occur over a period of nine months.  The projected date of conversion to a hypothetical chapter 7 liquidation is May 25, 2014.  In each case, it is assumed that the chapter 7 trustee would enter into an agreement with the Debtors' Prepetition Secured Lenders, as applicable, to wind-down operations and sell the remainder of the Debtors' assets on a piecemeal basis.

THE STATEMENTS IN THE LIQUIDATION ANALYSIS, INCLUDING ESTIMATES OF ALLOWED CLAIMS, WERE PREPARED SOLELY TO ASSIST THE BANKRUPTCY COURT IN MAKING THE FINDINGS REQUIRED UNDER SECTION 1129(a)(7) AND THEY MAY NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE.  THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, COMPETITIVE AND OPERATIONAL UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE.  NEITHER THE LIQUIDATION ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.

## 2.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that Confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the plan contemplates such liquidation.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources.  The Debtors' management, with the assistance of its financial advisors, developed a business plan and prepared financial projections for fiscal years 2012 through 2017 (the "Financial Projections").  The Financial Projections, together with the assumptions on which they are based, are attached hereto as Exhibit C.

In general, as illustrated by the Financial Projections, the Debtors believe that with the significantly de-leveraged capital structure provided under the Plan and the return to trade terms and increased liquidity, the Reorganized Debtors should have sufficient Cash flow and availability to make all payments required pursuant to the Plan while conducting ongoing businesses operations.  The Debtors believe that Confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(1 1) of the Bankruptcy Code.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.

WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.  THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS.

The Financial Projections have not been examined or compiled by independent accountants.  The Debtors make no representation as to the accuracy of the Financial Projections or their ability to achieve the projected results.  Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management, Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the 5-year period of the Financial Projections may vary from the projected results and the variations may be material.  All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

### 3.    Valuation

In order to provide information to parties in interest regarding the possible range of values of their distributions under the Plan, it is necessary to ascribe an estimated value, or range of values, to the Company.  The Debtors have been advised by Goldman Sachs, their financial advisor, with respect to the estimated range of total enterprise values of the Company, including the Reorganized Debtors, on a going-concern basis.

The estimates of the enterprise value contained in this section do not reflect values that could be attainable in public or private markets.  The valuation information contained in this section is not a prediction or guarantee of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan.

### 4.    Summary Results of Valuation Analysis

In conjunction with the allocation of distributions under the Plan, the Debtors determined that it was necessary to estimate the post-Confirmation reorganization enterprise and equity values of the Reorganized Debtors.  Accordingly, the Debtors directed Goldman Sachs to prepare a valuation analysis of the Reorganized Debtors.

As a result of Goldman Sachs' analyses, review, discussions, considerations and assumptions described herein, Goldman Sachs estimates that the range of total enterprise values ("TEV Range") of the Reorganized Debtors is approximately $680 million to $780 million on a going concern, pro forma reorganized basis.  The assumed TEV Range reflects work performed by Goldman Sachs on the basis of information with respect to the business and assets of the Debtors (after giving effect to the merger of Decca Consulting, Inc., Decca Consulting Ltd., Resdin Industries, Inc. and Vaughan Business Solutions, Inc. ) available to Goldman Sachs as of February 26, 2014 (the "Valuation Date") .  Based upon the assumed TEV Range of $680 million

to 780 million and assumed post-reorganization debt of approximately $350 million, as set forth in the Financial Projections, the implied equity value range for the Reorganized Debtors is $330 million to $430 million.

The valuation analysis was prepared by Goldman Sachs based on data, information (including the Financial Projections) and financial and market conditions as of the Valuation Date (the "Valuation Analysis") and Goldman Sachs did not undertake, and has no responsibility to update, revise or reaffirm the Valuation Analysis, including without limitation, as a result of data, circumstances, developments, events, or any subsequent changes or modifications to any existing rules or regulations instituted by any regulatory authority, occurring after such date.

In preparing the Valuation Analysis, Goldman Sachs has, among other things: (i) reviewed certain internal financial and operating data of the Debtors; (ii) discussed with certain senior executives of the Debtors the current operations and prospects of the Debtors; (iii) reviewed certain operating and financial forecasts prepared by the Debtors, including the Financial Projections; (iv) discussed with certain senior executives of the Debtors key assumptions related to the Financial Projections; (v) prepared discounted cash flow analyses based on the Financial Projections, utilizing various discount rates and  perpetuity growth rates; (vi) considered the prevailing trading multiples of certain publicly-traded companies in businesses reasonably comparable to the Debtors; (vii) considered the multiples in recent change-of-control transactions involving public companies in businesses Goldman Sachs deemed to be reasonably comparable to the Debtors; and (viii) considered such other factors as Goldman Sachs deemed appropriate under the circumstances.

Goldman Sachs has not conducted any independent evaluation or appraisal of the respective assets or liabilities of the Debtors or any other party.  Goldman Sachs relied upon and assumed, without independent verification, the accuracy and completeness of the financial, accounting, tax and other information provided to or discussed with it by the Debtors or obtained by it from public sources.  Goldman Sachs has not assumed any responsibility for the independent verification of any such information, including, without limitation, the Financial Projections, and has further relied upon the assurances of the senior management of the Debtors that they are unaware of any facts that would make the information and Financial Projections incomplete or misleading in any respect.  Goldman Sachs has not audited, reviewed or compiled the accompanying information in accordance with Generally Accepted Accounting Principles or otherwise.  With respect to the Financial Projections furnished by the Debtors, Goldman Sachs has assumed that such Financial Projections have been reasonably prepared and reflect the best currently available estimates and judgments of the senior management of the Debtors as to the expected future performance of the Debtors.

In preparing the Valuation Analysis, Goldman Sachs relied upon the Financial Projections and the assumptions upon which the Financial Projections were prepared, including: (i) the Debtors will be reorganized in accordance with the Plan and the Effective Date occurs on or about May 25, 2014; (ii) the Debtors are able to recapitalize and have adequate liquidity as of the Effective Date, as set forth in the Financial Projections; (iii) the Debtors are able to implement the Plan in the manner described herein; (iv) the debt level of the Debtors will be approximately $350 million, immediately following the Effective Date; (v) general financial and market conditions and the financial and market outlook specifically for the staffing industry in

which the Debtors operate as of the Effective Date will not differ, in any way meaningful to Goldman Sachs' analysis, from the conditions prevailing as of the Valuation Date.

In estimating the range of TEV, Goldman Sachs has employed generally accepted valuation techniques and primarily relied upon a discounted cash flow ("DCF") analysis. Goldman Sachs also utilized a comparable public company analysis ("Comparable Public Company Analysis"), and a transaction comparable analysis ("Transaction Comparable Analysis") to value the Debtors. Goldman Sachs believes that these valuation methodologies reflect both the market's current view, as well as a longer term focus, on the value of the Debtors.

(a)    DCF Analysis

Goldman Sachs utilized a DCF analysis to determine the TEV of the Debtors. The discounted cash flow of an enterprise represents the present value of unleveraged, after-tax cash flows available to all providers of capital using an appropriate set of discount rates. The DCF analysis takes into account the projected operating cash flows of the subject company by using company projections as the basis for the financial model. The underlying concept of the DCF analysis is that debt-free, after-tax cash flows are estimated for a projection period and a terminal value is estimated to determine the going concern value of the subject company at the end of the projection period. For the projection period cashflows, the forecast assumes an effective tax rate consistent with the Company's Financial Projections (see Exhibit C hereto). When calculating the terminal value, the applicable effective tax rate is assumed to be 35.0%. These cash flows and terminal value are then discounted at the subject company's assumed weighted average cost of capital ("WACC"), which is determined pursuant to the capital asset pricing model (the "CAPM"), a financial theory which assumes a linear relationship between risk and return, widely used in estimating cost of capital for DCF valuation purposes.

In performing the calculation, Goldman Sachs made assumptions both for the WACC, which is used to value future cash flows, and terminal cash flow perpetuity growth rates, which are used to determine the future value of the enterprise after the end of the projection period. In performing this analysis, Goldman Sachs used a range of discount rates (the "Discount Rates") that reflect a number of company and market-specific factors utilized under the CAPM, including the cost of equity and an estimated cost of debt at the target capitalization for the Company upon emergence.

(b)    Comparable Public Company Analysis

In a Comparable Public Company Analysis, a subject company is valued by comparing it with selected publicly held companies in reasonably similar lines of business. The comparable public companies are chosen based on, among other attributes and factors, their similarity to the subject company's size, profitability and market presence. The price that investors are willing to pay in the public markets for each company's publicly traded securities represents the market's value of that company's current and future prospects as well as the rate of return required on the investment.

In selecting comparable public companies, Goldman Sachs considered multiple factors, including, among other things, the focus of the comparable companies' businesses as well as such companies' current and projected operating performance. Numerous financial multiples and ratios were developed to measure each company's valuation and relative performance. Some of

the specific analyses entailed comparing the enterprise value (defined as market value of equity plus market value of debt, market value of preferred stock and minority interest minus excess cash) for each of the comparable public companies to their projected EBITDA.  These multiples were calculated and were then applied to the Financial Projections to determine the range of enterprise value using this methodology.  In performing the Comparable Public Company Analysis, Goldman Sachs relied upon the Financial Projections as they relate to the Debtors and various publicly available analyst reports relating to the current and projected operating performance, including projected EBITDA, of the comparable public companies.

      (c)     Transaction Comparable Analysis

Goldman Sachs also utilized a Transaction Comparable Analysis to determine the TEV of the Debtors.  The Transaction Comparable Analysis approach entails calculating EBITDA multiples based upon implied values (including any debt assumed and equity purchased) in change of control transactions of companies determined to be similar to a particular subject company.  These multiples are then applied to the subject company projections to determine an implied range of enterprise values.  In performing the Transaction Comparable Analysis, Goldman Sachs evaluated various public merger and acquisition and restructuring transactions that have occurred in the staffing and business services industry over the past several months.

      (d)     Valuation Summary

As a result of such analyses, review, discussions, considerations and assumptions (all as of the Valuation Date), Goldman Sachs provided to the Debtors an estimate that, as of the Effective Date, the TEV Range of the Debtors is approximately $680 million to $780 million.

The above estimated TEV Range represents hypothetical value that reflect the estimated intrinsic values of the Debtors derived through the application of the above-described valuation methodologies.  Goldman Sachs' estimates are based on economic, market, financial and other conditions as they existed, and on the information made available to Goldman Sachs, as of the Valuation Date.

The summary set forth above does not purport to be a complete description of the Valuation Analysis performed by Goldman Sachs.  The preparation of an estimated TEV Range involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description.  The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial results, financial condition and prospects of such a business.  As a result, any estimates of TEV Range set forth herein are not necessarily indicative of actual outcomes.  In addition, estimates of TEV Range do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were sold.  The estimated TEV Range does not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan.  The estimated TEV Range does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.  The estimates prepared by Goldman Sachs assume that, upon confirmation of the Plan and occurrence of the Effective Date, the Reorganized Debtors and their

subsidiaries will own and operate all, or substantially all, of the Debtors' businesses and assets and will continue as the owners and operators of such businesses and assets.  Depending on the results of such operations or changes in the financial markets, actual TEV and/or actual equity value may differ significantly from Goldman Sachs' Valuation Analysis set forth herein.

**5.    Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to Confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default— (A) cures any such default that occurred before or after the commencement of the Chapter 11 Cases, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (B) reinstates the maturity of such claim or interest as such maturity existed before such default; (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of equity interests in that class actually voting to accept or to reject the plan.

Classes 1, 2, 3, 6, 7, and 10 are Unimpaired under the Plan, and, as a result, the Holders of such Claims and Equity Interests are deemed to have accepted the Plan.

Classes 8 and 9 are Impaired and Holders of Class 8 and 9 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

Claims in Classes 4 and 5 are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan.  Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims or Equity Interests in the Voting Classes must accept

the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein.  As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

### 6.      Confirmation Without Acceptance by Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, provided that the plan has been accepted by at least one impaired class of claims, Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

### 7.      No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 8.      Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtors or transferred to another entity under the Plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any

Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Equity Interest any property.

The condition that a plan be "fair and equitable" to a non-accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

To the extent that any class of Claims or Class of Equity Interests either reject the Plan or are deemed to have rejected the Plan, the Debtors reserve the right to seek (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XV.D of the Plan.

Notwithstanding the rejection of any Class that votes to reject the Plan, the Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual Confirmation of the Plan.

## O.    CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to the consummation of the Plan and the impact of failure to meet such conditions, see Article IX.B of the Plan.

## ARTICLE IV
## RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

## A.    CERTAIN BANKRUPTCY CONSIDERATIONS

1.      **Parties in interest may object to the Debtors' classification of Claims and Equity Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.      **The Debtors may fail to satisfy the vote requirement.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan or other in or out of court restructuring.  There can be no assurance that the terms of any such alternative restructuring would be similar or as favorable to the Holders of Allowed Claims or Equity Interests as those proposed in the Plan or the Debtors may be forced to liquidate.

3.      **The Debtors may not be able to secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for Confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) Confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Equity Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

Confirmation of the Plan is also subject to certain conditions as described in Article IX.A of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of

Allowed Claims or Equity Interests would receive with respect to their Allowed Claims or Equity Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan. Section 1127 of the Bankruptcy permits the Debtors to modify the Plan at any time before Confirmation, but not if such modified Plan fails to meet the requirements for Confirmation. The Debtors or the Reorganized Debtors may modify the Plan at any time after Confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and this Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for Confirmation. The Debtors will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan. Any Holder of a Claim or Equity Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by this Court, such Holder changes their previous acceptance or rejection.

> **4.      Non-consensual Confirmation of the Plan may be necessary.**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such non-consensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that a Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

> **5.      The Debtors may object to the amount or classification of a Claim or Equity Interest.**

Except as otherwise provided in the Plan, the Debtors and Reorganized Debtors reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Equity Interest where such Claim or Equity Interest is or may become subject to an objection, counterclaim or other suit by the Debtors. Any Holder of a Claim or Equity Interest that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

6. **The Debtors may not obtain the Rights Offering Purchase Price, or the Backstop Agreement may terminate.**

The Plan is predicated on, among other things, Parent's receipt of the Rights Offering Purchase Price. Notwithstanding the Backstop Agreement, because the Rights Offering has not been completed, there can be no assurance that the Debtors will receive any or all of the Rights Offering Purchase Price. In addition, under the Backstop Agreement, the Backstop Investors have the contractual right to terminate the Backstop Agreement, if among other reasons, the deadlines set forth in such agreement or the various conditions precedent to enforcement of the Backstop Investors' obligations are not satisfied. If Parent does not receive the Rights Offering Purchase Price, the Company will not be able to consummate the Plan in its current form. The Rights Offering is a funding mechanism and not a distribution on account of Claims. Holders of Prepetition Secured Loan Claims are receiving participation rights, not Rights Offering Securities, on account of their Prepetition Secured Loan Claims. The Rights Offering is only available to accredited investors to comply with applicable securities laws. Accordingly, the Debtors do not believe any holder of a Prepetition Secured Loan Claims that is unaccredited has any right to participate in the Rights Offering.

7. **The Effective Date may not occur.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

8. **Contingencies will not affect validity of votes of Impaired Classes to accept or reject the Plan.**

The distributions available to Holders of Allowed Claims and Equity Interests under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan, will not affect the validity of the vote taken by the Voting Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes,

9. **The Debtors may default under the DIP Facility.**

The Debtors' DIP Facility contains numerous covenants and events of default. If the Debtors fail to comply with the covenants, or are otherwise in default of the DIP Facility, the DIP Lenders have the right to accelerate the total amount due under the DIP Facility and require the immediate payment in full in Cash of such amounts. Following such a demand, if the Debtors were unable to obtain emergency relief from the Bankruptcy Court, the DIP Lenders and the Prepetition Secured Lenders would have the right, subject to the terms of the DIP Orders, to foreclose upon the assets of the Debtors. Such a result would also cause the Lender RSA and the Backstop Agreement to terminate.

10. **The Restructuring Support Agreement may terminate.**

The Lender RSA may terminate if, among, other things, the deadlines set forth therein are not met or if the conditions precedent to the respective parties' obligation to support the Plan or

to confirm the Plan are not satisfied in accordance with the terms of such Agreements.  If the Lender RSA terminates, Parent may not be able to obtain the support of the Prepetition Secured Lenders required to confirm the Plan.

**11.     The Debtors may not obtain favorable pricing with respect to exit financing or may not be able to secure commitments for exit financing.**

The occurrence of the Effective Date is predicated on, among other things, the receipt of financing under the Post-Emergence ABL Loan Agreement and the Post-Emergence Term Loan Agreement.  The Debtors do not have committed financing for either of these credit facilities.  Although the Debtors have been engaged in negotiations with Credit Suisse AG (with respect to the Post-Emergence Term Loan Agreement) and Royal Bank of Canada (with respect to the Post-Emergence ABL Agreement), there can be no assurance that the Debtors will be able to negotiate definite documents and receive any or all of the exit financing provided for therein, or that the Debtors will receive exit financing on the current terms or on comparably favorable terms.  If Parent does not receive the necessary exit financing, the Company will not be able to effectuate the transactions which are scheduled for consummation on the Effective Date.

**12.     Restructuring under chapter 11 of the Bankruptcy Code may adversely affect the Company's business**

An element of the Company's business strategy includes serving large corporate customers through high-volume service agreements. While this element of its strategy is intended to enable it to increase its revenues and earnings from its major corporate customers, the strategy also exposes the Company to increased risks arising from the possible loss of major customer accounts. Although the Company intends to continue servicing its customers during its restructuring under chapter 11 of the Bankruptcy Code, there is no guarantee that its customers will continue to conduct business with it.  The loss of any major customer accounts would result in a significant decrease in the Company's revenues and earnings.

Additionally, the Company's business is substantially dependent upon its ability to attract and retain contract professionals who possess the skills, experience and licenses, as required, to meet the specified requirements of its clients. The Company competes for such contract professionals with other temporary staffing companies and with its clients and potential clients. There can be no assurance that qualified professionals will be available to the Company in adequate numbers to staff its operating segments in light of the uncertainties inherent in the chapter 11 process. If the Company is unable to attract and retain a sufficient number of contract professionals to meet client demand, it may be required to forgo staffing and revenue opportunities, which may hurt the growth of its business.

Moreover, the Company's success is dependent in large part upon its ability to maintain and enhance the value of its brands, its customers' connection to its brands and a positive relationship with its franchisees.  A chapter 11 process may harm the Company's brand image and reputation, which in turn could materially and adversely affect the Company's business and operating results.  Finally, although the Company intends to continue its business relationship with its franchisees, which constitutes a significant portion of the Company's business, it is possible that certain of the Company's franchisees will choose to terminate or fail to extend their

relationship with the Company.  A significant loss of the Company's franchise licensees, as a result of the chapter 11  process, and any associated loss of customers and sales could have a material adverse effect on its results of operations.

**B.**    **RISK FACTORS THAT MAY AFFECT THE VALUE OF SECURITIES TO BE ISSUED UNDER THE PLAN AND/OR RECOVERIES UNDER THE PLAN**

**1.**    **The New Common Stock will be subject to restrictions on resale under applicable securities laws and under the terms of the Stockholders Agreement.**

The New Common Stock sold in the Rights Offering has not been registered under the Securities Act or any state securities laws. Absent registration, the New Common Stock may only be offered or sold in transactions that are not subject to, or that are exempt from, the registration requirements under the Securities Act and applicable state securities laws. Unless the Reorganized Parent files a registration statement with the U.S. Securities and Exchange Commission (the "SEC") covering the resale of the New Common Stock, New Common Stock may be transferred or resold only in transactions exempt from the securities registration requirements of federal and applicable state securities laws.  The Stockholders Agreement contains certain additional restrictions and procedural requirements regarding transfer of New Common Stock.

**2.**    **To service the Reorganized Debtors' indebtedness and to meet their operational needs, the Reorganized Debtors will require a significant amount of Cash.  Their ability to generate Cash depends on many factors beyond their control.**

The Reorganized Debtors' ability to make payments on and to refinance their indebtedness and to fund planned capital expenditures will depend on their ability to generate cash in the future.  This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory, and other factors that are beyond their control.

The Reorganized Debtors' businesses may not generate sufficient cash flow from operations.  Although the Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized.  The Reorganized Debtors may not be able to meet their projected financial results or achieve projected revenues and cash flows assumed in projecting future business prospects.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, The Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet its operational needs.  A failure of the Reorganized Debtors to meet their projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital.  The Reorganized Debtors may not be able to obtain such working capital when it is required.

In addition, if the Reorganized Debtors' cash flows and capital resources are insufficient to fund their debt service obligations, they may be forced to reduce or delay capital expenditures, sell material assets or operations, obtain additional equity capital or refinance all or a portion of their indebtedness.  In the absence of such operating results and resources, the Reorganized Debtors could face substantial cash flow problems and might be required to sell material assets or operations to meet their debt service and other obligations.  The Reorganized Debtors will be unable to predict the timing of such asset sales or the proceeds which they could realize from such sales and that they will be able to refinance any of their indebtedness, including indebtedness incurred under the Post-Emergence ABL Loan Agreement and the Post-Emergence Term Loan Agreement, on commercially reasonable terms or at all.

**3.      The estimated valuation of the Reorganized Debtors and the New Capital Stock and the estimated recoveries to Holders of Allowed Claims and Equity Interests are not intended to represent the private or public sale values of the New Capital Stock.**

The Debtors' estimated recoveries to Holders of Allowed Claims and Equity Interests are not intended to represent the private or public sale values of Reorganized Parent's securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which is beyond the control of the Reorganized Debtors), including, without limitation:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; and (d) the Debtors' ability to maintain adequate liquidity to fund operations.

**4.      The issuance of Equity Interests to Reorganized Parent's management will dilute the equity ownership interest of other Holders of the New Capital Stock.**

The New Board intends to adopt a Management Incentive Plan for directors and management, consisting of issuances from time to time of shares of the New Capital Stock of Reorganized Parent, including the grant of incentive stock options within the meaning of section 422 of the Internal Revenue Code of 1986, as amended.  If the New Board distributes equity interests, or options to acquire such equity interests, to directors, management or employees, it is contemplated that such distributions will dilute the New Capital Stock issued on account of Claims and Equity Interests under the Plan and the ownership percentage represented by the New Capital Stock distributed under the Plan.

**5.      The issuance of Equity Interests to the Consenting Equity Holder upon exercise of the option to purchase the Butler Companies may dilute the equity ownership interest of other Holders of the New Capital Stock.**

Pursuant to the Option Agreement, the Consenting Equity Holder will grant the Reorganized Parent an option to purchase the Butler Companies for New Capital Stock.  If the Reorganized Parent exercises this option and distributes New Capital Stock to the Consenting Equity Holder pursuant to the Option Agreement, it is contemplated that such distribution will dilute the New Capital Stock issued on account of Claims and Equity Interests under the Plan and the ownership percentage represented by the New Capital Stock distributed under the Plan.

6. **It is unlikely that Reorganized Parent will pay dividends in the foreseeable future.**

All the of the Reorganized Debtors' cash flow will be required to be used in the foreseeable future (a) to make payments under the Post-Emergence ABL Loan Agreement and the Post-Emergence Term Loan Agreement, (b) to fund Reorganized Parent's other obligations under the Plan, and (c) for working capital and capital expenditure purposes.  In addition, the Post-Emergence ABL Loan Agreement and the Post-Emergence Term Loan Agreement will contain certain restrictions on Reorganized Parent's ability to pay dividends.  Accordingly, Reorganized Parent does not anticipate paying cash dividends on the New Common Stock in the foreseeable future.

7. **Tax implications of the Plan.**

The United States federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors currently do not intend to seek any ruling from the IRS on the tax consequences of the Plan.  Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date.  In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request.  Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.  See "Summary of Certain United States Federal Income Tax Consequences of the Plan."

8. **Disputed Litigation Claims May Exceed Amounts Estimated.**

As the General Unsecured Claims are impaired under the Plan, the Reorganized Debtors will pay creditors in full on their claims.  Certain Claims are disputed by the Debtors, and, depending on the outcome of litigation over same, the actual amounts to which the Debtors could be liable could be higher or lower than has been estimated by the Debtors.  There can be no assurance that the Reorganized Debtors will not experience losses as a result of such Claims that exceed present estimates.

## C. RISKS RELATING TO THE COMPANY'S INDUSTRY

1. **The temporary staffing industry is highly competitive with low barriers to entry, and the Company may be unable to compete successfully against existing or new competitors.**

The temporary staffing industry is highly competitive with limited barriers to entry.  The Company competes in national, regional and local markets with full-service and specialized temporary staffing companies. While the majority of its competitors are smaller than the Company, several competitors, including Kelly Services, Inc., Adecco S.A., Manpower, Inc., Randstad Holding N.V. and its affiliate Spherion Corporation, Allegis Group, and Robert Half International, Inc., have substantial marketing and financial resources. In particular, Kelly Services, Inc., Adecco S.A., Manpower, Inc., and Randstad Holding N.V. are considerably larger than the Company and have significantly more marketing and financial resources. Price

competition in the staffing industry is intense, particularly for the placement of temporary employees in light industrial and clerical/administrative positions. The Company expects that the level of competition will remain high, which could limit its ability to maintain or increase its market share or profitability.

There has been a significant increase in the number of customers consolidating their staffing services purchases with a single provider or small group of providers. The trend to consolidate purchases provides a competitive advantage to larger companies and, accordingly, has in some cases made it more difficult for the Company to obtain or retain customers. The Company also faces the risk that its current or prospective customers may decide to provide similar services internally. As a result, there can be no assurance that the Company will not encounter increased competition in the future.

**2.      The temporary staffing industry is significantly affected by fluctuations in general economic conditions.**

Demand for temporary staffing services is significantly affected by the general level of economic activity and unemployment in the United States. When economic activity increases, temporary employees are often added before full-time employees are hired. As economic activity slows, however, many companies reduce their use of temporary employees before laying off full-time employees. The Company may also experience more competitive pricing pressure during periods of economic downturn. Any significant economic downturn is reasonably likely to have a material adverse effect on its business, financial condition and results of operations.  The Company cannot predict the level of economic activity or when and to what extent general economic conditions will affect the temporary staffing industry. The Company also cannot ensure that the actions the Company may take in the future in response to such challenges will be successful or that its business, financial condition or results of operations will not be adversely impacted by these conditions.

**3.      The temporary staffing industry is highly competitive in attracting and recruiting qualified temporary employees with professional skills.**

Temporary staffing services providers depend on their ability to attract qualified temporary employees who possess the skills and experience necessary to meet the staffing requirements of their customers. As a result, the Company must continually evaluate and upgrade its base of available qualified temporary employees through recruiting and training programs to keep pace with changing customer needs and emerging technologies and to replace a substantial number of its temporary employees that accept full-time employment with customers. Competition for individuals with proven professional skills, particularly temporary employee candidates with accounting and technical skills, is intense, and demand for these individuals is expected to remain strong for the foreseeable future. There can be no assurance that qualified temporary employee candidates will continue to be available in sufficient numbers and on acceptable terms of employment. The Company's success is substantially dependent on its ability to recruit and retain qualified temporary employees to meet client needs.

4.      **Temporary staffing service providers are exposed to employment-related claims and losses, including class action lawsuits, that could have a material adverse effect on their businesses.**

Temporary staffing services providers employ and assign personnel in the workplaces of other businesses. The risks of these activities sometimes give rise to claims relating to:

- discrimination and harassment;

- wrongful termination or denial of employment;

- violations of employment rights related to employment screening or privacy issues;

- workers' compensation;

- classification of employees including independent contractors;

- employment of illegal aliens;

- violations of wage and hour requirements;

- retroactive entitlement to employee benefits; and

- errors and omissions by temporary employees.

Temporary staffing services providers are also subject to potential risks relating to misuse of customer proprietary information, misappropriation of funds, damage to customer facilities due to negligence of temporary employees, criminal activity and other similar claims. As a result, the Company may incur fines and other losses or negative publicity with respect to these problems.  For example, one of the Company's customers is alleging overbilling for services provided. In addition, these claims may give rise to litigation, which could be time-consuming and expensive.  In the United States, new employment and labor laws and regulations have been proposed or adopted that may increase the potential exposure of employers to employment-related claims and litigation.  For example, California Assembly Bill 442 adds liquidated damages to existing penalties for wage and hour violations.  California Assembly Bill 263 gives employees additional retaliation protection to those asserting their rights under the California Labor Code. There can be no assurance that the corporate policies the Company has in place to help reduce its exposure to these risks will be effective or that the Company will not experience losses as a result of these risks. There can also be no assurance that the insurance policies the Company has purchased to insure against certain risks will be adequate or that insurance coverage will remain available on reasonable terms or be sufficient in amount or scope of coverage.

**5.    Temporary staffing services providers are exposed to credit risks on collections from their customers due to, among other things, their assumption of the obligation to make wage, tax and regulatory payments to their temporary employees.**

As with other temporary staffing services providers, the Company is exposed to the credit risk of its customers. Temporary employees are typically paid on a weekly basis while payments from customers are often received 30 to 60 days after billing. The Company generally assumes responsibility for and manages the risks associated with its payroll obligations, including liability for payment of salaries and wages, payroll taxes, workers' compensation insurance as well as group health insurance. These obligations are fixed and become the Company's liability, whether or not the associated client to whom these employees have been assigned makes payments required by its service agreement, which exposes the Company to credit risks. The Company attempts to mitigate these risks by billing customers on a weekly basis. In addition, the Company establishes an allowance for doubtful accounts for estimated losses resulting from the inability of its customers to make required and timely payments. Further, the Company carefully monitors the timeliness of customers' payments and imposes strict credit standards. However, there can be no assurance that such steps will be effective in reducing these risks. Additionally, to the extent that recent turmoil in the credit markets makes it more difficult for some customers to obtain financing, those customers' ability to pay could be adversely impacted, which in turn could have a material adverse effect on the Company's business, financial condition, or results of operations.

**6.    United States healthcare legislation could negatively impact our results of operations.**

In March 2010, the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act of 2010 (collectively, the "Healthcare Acts") were signed into United States law. The Healthcare Acts represent comprehensive healthcare reform legislation that, in addition to other provisions, will require that the Company provide healthcare coverage to its temporary employees in the United States or incur penalties. Although the Company's intent is to bill these costs to its customers, there can be no assurance that the Company will be able to increase client bill rates in a sufficient amount to cover the increased costs. This may reduce the Company's gross and operating margins and negatively impact its financial results. Additionally, possible future changes to the Healthcare Acts could significantly impact any estimates the Company develops during that period. While the Company is unable at this time to estimate the net impact of the Healthcare Acts, it believes the net financial impact on its results of operations could be significant.

**7.    The temporary staffing services industry is subject to extensive government regulation, which may restrict the types of employment services the Company is permitted to offer or result in additional or increased tax or other costs that reduce the Company's revenues and earnings.**

The temporary staffing industry is heavily regulated. Changes in laws or government regulations may result in prohibition or restriction of certain types of employment services the Company is permitted to offer or the imposition of new or additional benefit, licensing or tax requirements could reduce revenues and earnings. For example, additional health care legislation

may subject the Company to additional regulations and impose enhanced benefit requirements for temporary and regular staff employees which could increase costs significantly. There can be no assurance that the Company will be able to increase the fees charged to its customers in a timely manner and in a sufficient amount to cover increased costs as a result of any changes in laws or government regulations. Any future changes in laws or government regulations may make it more difficult or expensive to provide staffing services and could have a material adverse effect on the Company's business, financial condition and results of operations.

**8.    The cost of unemployment insurance for temporary employees may rise and reduce the Company's margins.**

The Company is responsible for and pays unemployment insurance premiums for its temporary and regular employees. At times, these costs have risen as a result of increased claims, general economic conditions, including the recent economic downturn, and government regulations. Should these costs continue to increase, there can be no assurance that the Company will be able to increase the fees charged to its customers to keep pace with these increased costs and, as a result, the Company's results of operations, financial condition and liquidity could be adversely affected.

**D.    OPERATIONAL RISKS**

**1.    The Company may be unsuccessful consummating future acquisitions or selling of franchises, which could adversely affect its ability to expand its market share in the future.**

Historically, one of the Company's primary business strategies was based on expanding United States market share through acquisitions and sales of franchises. Its ability to consummate acquisitions in the future may be limited by a lack of attractive acquisition targets and competition to acquire such targets from other temporary staffing companies, some of which may have greater financial resources. In addition, the Company may have insufficient access to liquidity or other resources to consummate future acquisitions or attract future franchisees. If the Company's strategy to expand US market share through future acquisitions and sale of franchises is unsuccessful, its ability to maintain and grow current market share, revenues and overall profitability could be adversely affected.

**2.    Managing or integrating past and future acquisitions may strain the Company's resources and could have a material adverse effect on the Company's business due to unexpected or underestimated costs.**

The Company has aggressively pursued acquisitions to augment organic growth.  Since 2006, the Company has completed six material acquisitions, including the most recent Company acquisition of Westaff in 2009.  In addition, the Company may make additional acquisitions in the future to expand its service offerings, broaden its customer base and/or expand its geographic presence.

Acquisitions, including that of the Butler Companies pursuant to the Option Agreement, involve a number of additional risks, including the diversion of management's attention from existing operations, the failure to retain key personnel or customers of an acquired business, the

104

assumption of unknown liabilities of the acquired business for which there are inadequate indemnifications, the potential impairment of acquired intangible assets, and the ability to successfully integrate the business. The Company could experience financial or other setbacks if any of the businesses that it acquires have liabilities or problems of which the Company is not aware.  Further, the Company cannot provide assurances that any past and future acquired businesses will generate anticipated revenues or earnings. As a result, the anticipated benefits from acquisitions may not be achieved.

These risks could have a material adverse effect on the Company's business because they may result in substantial costs and disrupt business. In addition, future acquisitions could materially adversely affect the Company's business, financial condition, results of operations, and liquidity because they would likely result in the incurrence of additional debt or dilution, contingent liabilities, an increase in interest expense, and amortization expenses related to separately identified intangible assets. Possible impairment losses on goodwill and intangible assets with an indefinite life, or restructuring charges could also occur.

3.      **The Company's loss of major customers or the deterioration of those customers' financial condition or prospects could have a material adverse effect on its business.**

An element of the Company's business strategy includes serving large corporate customers through high-volume service agreements. While this element of its strategy is intended to enable it to increase its revenues and earnings from its major corporate customers, the strategy also exposes the Company to increased risks arising from the possible loss of major customer accounts. In addition, some of the Company's customers are in industries, such as the automotive and manufacturing industries, that have experienced adverse business and financial conditions in recent years. Other customers are in industries that, because of technical or other innovations in those industries, require fewer temporary employees. The deterioration of the financial condition or business prospects of the Company's customers could reduce their need for temporary employment services, and result in a significant decrease in the revenues and earnings it derives from these customers.

In addition, during economic downturns companies may slow the rate at which they pay their vendors or become unable to pay their debts as they become due. If any of the Company's significant clients does not pay amounts owed to the Company in a timely manner or becomes unable to pay such amounts to the Company at a time when it has substantial amounts receivable from such client, the Company's cash flow and profitability may suffer.

4.      **Most of the Company's customer contracts can be terminated by the customer without penalty, causing uncertainty with regard to future revenues and earnings.**

Most of the Company's customer contracts can be terminated by the customer on short notice without penalty. The Company's customers are, therefore, not contractually obligated to continue to do business with it in the future. Most commonly, customers provide the Company with 30 days' advance notice of termination. The ability of the Company's customers to terminate their contracts on short notice creates uncertainty with respect to the revenues and earnings the

Company may recognize with respect to its customer contracts. The Company believes it is very likely that, in the ordinary course of business, customers will continue to terminate their contracts on short notice in the future.

**5.      The Company's failure or inability to perform under customer contracts could result in damage to its reputation and give rise to legal claims against the Company.**

If customers are not satisfied with the Company's level of performance, the Company's reputation in its industry may suffer, which could materially and adversely affect its business, financial condition, results of operations and cash flow. Certain areas of the Company's business require it to assume a greater level of responsibility for developing or maintaining processes on behalf of the Company's customers.  Many of these processes are critical to the operation of the Company's customers' businesses. The Company's failure or inability to complete these engagements satisfactorily could have a material adverse effect on its customers' operations and consequently may give rise to claims against the Company for actual or consequential damages or otherwise damage the Company's reputation.  Examples would include the Company's alleged failure to adhere to certain contractual responsibilities as outlined in its Customer Service Agreements, including but not limited to properly screening applicants, taking and retaining I-9 forms, and/or adhering to various State and Federal employment laws.  Any of these claims could have a material adverse effect on the Company's business, financial condition or results of operations.

**6.      The Company derives a significant portion of its revenue from franchise licensee operations.**

Franchise licensee operations comprise a significant portion of the Company's revenues. There can be no assurances that the Company will be able to attract new licensees or that it will be able to retain its existing licensees. A significant loss of the Company's franchise licensees and any associated loss of customers and sales could have a material adverse effect on its results of operations.

**7.      The Company's franchisees could take actions that could harm its business.**

The Company's franchisees are contractually obligated to operate their franchises in accordance with the operations standards set forth in its agreements with them. However, franchisees are independent third parties whom the Company does not control. The franchisees own, operate and oversee the daily operations of their franchises. As a result, the ultimate success of any franchise rests with the franchisee. If franchisees do not successfully operate franchises in a manner consistent with required standards, license income will be adversely affected and brand image and reputation could be harmed, which in turn could materially and adversely affect the Company's business and operating results.

**8.      The Company's success depends substantially on the value of its brands.**

The Company's success is dependent in large part upon its ability to maintain and enhance the value of its brands, its customers' connection to its brands and a positive relationship with its franchisees. Brand value can be severely damaged even by isolated incidents,

particularly if the incidents receive considerable negative publicity or result in litigation. Some of these incidents may relate to the way the Company manages its relationship with its franchisees, its growth strategies, its development efforts, or the ordinary course of its, or its franchisees', business. Other incidents may arise from events that are or may be beyond the Company's ability to control and may damage its brands, such as actions taken (or not taken) by one or more franchisees or their employees relating to health, safety, welfare or otherwise; litigation and claims; security breaches or other fraudulent activities; and illegal activity targeted at the Company or others. Customer demand for the Company's services and its brands' value could diminish significantly if any such incidents or other matters erode customer confidence in the Company or its services, which could materially and adversely affect the Company's business and operating results.

9.    **Unexpected changes in the Company's workers' compensation claims and benefit plans may negatively impact its financial condition.**

The Company self-insures, or otherwise bears financial responsibility for, a significant portion of claims under its workers' compensation program and medical benefits plans. The Company has from time to time updated its workers compensation accrual based on advice from its actuaries.  Unexpected changes in claim trends, including the severity and frequency of claims, actuarial estimates, and medical cost inflation could result in costs that are significantly different than initially reported.  If future claims-related liabilities increase due to unforeseen circumstances, the Company's costs could increase significantly. There can be no assurance that the Company will be able to increase the fees charged to its customers in a timely manner and in a sufficient amount to cover increased costs as a result of any changes in claims-related liabilities.

10.    **The Company's reserves for workers' compensation claims may be inadequate to cover its ultimate liability and the Company may incur additional charges if the actual amounts exceed the reserved amounts.**

The Company maintains reserves to cover its estimated liabilities for workers' compensation claims based upon actuarial estimates of the future cost of claims and related expenses which have been reported but not settled, and that have been incurred but not yet reported. The determination of these reserves is based on a number of factors, including current and historical claims activity, medical cost trends and developments in existing claims. Reserves do not represent an exact calculation of liability and are affected by both internal and external events, such as adverse development on existing claims, changes in medical costs, claims handling procedures, administrative costs, inflation, legal trends and legislative changes. Reserves are adjusted as necessary to reflect new claims and existing claims development, and such adjustments are reflected in the results of the periods in which the reserves are adjusted. Additionally, the Company relies on outside actuaries to determine the reserve amount which is very subjective due to the variety of methods that can be used.  While the Company believes its judgments and estimates are adequate, if the Company's reserves are insufficient to cover its actual losses, an adjustment could be charged to expense that may be material to the Company's earnings.  For example, in 2012 the Company increased the yearend workers' compensation liability by approximately $11.6 million in response to workers' compensation claims incurred in 2011 and prior that had increased above the initial reserve for those claims.

107

**11.    Workers' compensation costs for temporary employees may rise and reduce the Company's margins and require more liquidity.**

The Company is responsible for and pays workers' compensation costs for its regular staff and temporary employees. At times, these costs have risen substantially as a result of increased claims, general economic conditions, increases in healthcare costs and government regulations. Should these costs increase in the future or should the Company be required to increase the amount of collateral it provides to its insurer to backstop the Company's obligations under its workers' compensation policies, there can be no assurance that the Company will be able to either increase the fees charged to the Company's customers to recoup these costs or access alternative sources of liquidity. In such event, the Company's results of operations, financial condition, and liquidity could be adversely affected.

**12.    The Company's information technology systems are critical to the operations of the Company's business.**

The Company's information technology systems are essential for data exchange and operational communications with branch offices spread across large geographical distances. Any future interruption, impairment or loss of data integrity or malfunction of these systems could severely impact the Company's business, especially its ability to timely and accurately pay employees and bill customers.  During such disruptions in capacity and/or accessibility, the Company's productivity in affected areas was temporarily reduced. In addition, the Company may experience disruptions to its information technology systems as it integrates recent and future acquisitions.  The Company believes it is very likely that, in the ordinary course of business, it will continue to experience similar such disruptions to capacity and/or accessibility in the future.

**13.    Damage to the Company's key data centers could affect the Company's ability to sustain critical business applications.**

Many business processes critical to the Company's continued operation are housed in its data center situated within the Company's corporate headquarters complex as well as regional data centers in El Paso, Texas; Tampa, Florida; Shelby Township, Michigan; and Salt Lake City, Utah. Those processes include, but are not limited to, payroll, customer reporting and order management. While the Company has taken steps to protect its operations, the loss of a data center would create a substantial risk of business interruption.

**14.    The Company may experience business interruptions that could have an adverse effect on the Company's operations.**

The Company could be negatively affected by natural disasters, severe weather, fire, power loss, telecommunications failures, hardware or software malfunctions and break-downs, computer viruses or similar events. Although the Company has disaster recovery plans in place, the Company may not be able to adequately execute these plans in a timely fashion. If the Company's critical information systems fail or are otherwise unavailable, this could temporarily impact its ability to pay employees, bill customers, service customers, maintain billing and payroll records reliably, and pay taxes, which could adversely affect the Company's revenues,

operating expenses and financial condition. A prolonged outage could seriously impact the Company's ability to service customers or hire temporary employees and could seriously threaten the organization.

**15.    Improper disclosure of employee and client data could result in liability and harm the Company's reputation.**

The Company's business involves the use, storage and transmission of information about its employees, its clients and employees of its clients. The Company and its third party service providers have established policies and procedures to help protect the security and privacy of this information. It is possible that the Company's security controls over personal and other data and other practices the Company and its third party service providers follow may not prevent the improper access to or disclosure of personally identifiable or otherwise confidential information. Such disclosure could harm the Company's reputation and subject it to liability under its contracts and laws that protect personal data and confidential information, resulting in increased costs or loss of revenue. Further, data privacy is subject to frequently changing rules and regulations, which sometimes conflict among the various jurisdictions in which the Company provides services. The Company's failure to adhere to or successfully implement processes in response to changing regulatory requirements in this area could result in legal liability or impairment to its reputation in the marketplace.

**16.    The Company is highly dependent on its senior management and the continued performance and productivity of its local management and field personnel.**

The Company is highly dependent on the continued efforts of the members of its senior management, including the Company's Chief Executive Officer, D. Stephen Sorensen, who has been with the Company since 1987. The Company is also highly dependent on the performance and productivity of its local management and field personnel. The loss of any of the members of the Company's senior management may cause a significant disruption in its business. In addition, the loss of any of the Company's local managers or field personnel may jeopardize existing customer relationships with businesses that use its services based on relationships with these individuals. The loss of the services of members of the Company's senior management could have a material adverse effect on its business.

**17.    Until the option to purchase the Butler Companies pursuant to the Option Agreement is exercised, the Chief Executive Officer of the Reorganized Parent will own and operate the Butler Companies.**

As of the Effective Date, D. Stephen Sorensen will be the Chief Executive Officer of the Reorganized Parent, employed on the terms set forth in Exhibit H to the Plan.  Until the option to purchase the Butler Companies pursuant to the Option Agreement is exercised, a newly-formed holding company will hold all issued and outstanding capital stock of the Butler Companies and will operate this entity.  D. Stephen Sorensen and his affiliates will control a substantial majority of the issued and outstanding shares of such newly-formed holding company.  This may require D. Stephen Sorensen to spend a significant amount of time and effort dealing with the business

operations of the Butler Companies instead of focusing exclusively on business operations of the Reorganized Parent.

**18.     The Company's auditors have identified areas of improvement in its internal accounting controls.**

On May 15, 2013, the Company received certain correspondence (the "Internal Control Recommendations") from its auditors, PricewaterhouseCoopers LLP ("PWC") outlining certain deficiencies in the internal control over the Company's financial reporting as of and for the year ended December 30, 2012.  The Internal Control Recommendations described deficiencies in three major areas: (1) preparing, reviewing, and posting journal entries to the general ledger; (2) review, monitoring, and oversight of the Company's workers' compensation self-insurance program; and (3) documentation of formal IT policies and procedures.  The Company has taken certain steps to resolve the deficiencies described in the Internal Control Recommendations; however, there can be no assurances that the remedial measures taken by the Company are adequate to address the deficiencies raised by PWC.

**19.     Regulatory challenges to the Company's tax filing positions could result in additional taxes.**

The Company files tax returns with various governmental entities within the United States. The filings include returns with the Federal government, the states, and numerous cities, counties and municipalities. When the Company prepares these tax filings, it is required to follow numerous and complex legal and technical requirements where interpretation of rules and regulations is required. The Company believes that it has appropriately filed its tax returns and properly reported taxable transactions, but the final tax amounts are subject to regulatory audit and interpretation. The Company believes it has established adequate reserves with respect to any tax liabilities that may arise in relation to these transactions should its position be successfully challenged by tax authorities, however, an unfavorable settlement could result in higher payments and additional charges to income above the amounts reserved. The Company believes it is reasonably likely that it will face regulatory challenges in connection with future tax filings.

**20.     Outsourcing certain aspects of the Company's business could result in disruption and increased costs.**

The Company has outsourced certain aspects of its business to third-party vendors, and may outsource additional aspects of its business in the future. Such outsourcing subjects the Company to a variety of risks, including potential disruptions to its business and increased costs. For example, the Company has engaged a third party to host and manage certain aspects of its data center information and technology infrastructure. Accordingly, the Company is subject to the risks associated with the vendor's ability to provide information technology services to meet its needs. The Company's operations will depend significantly upon such vendor's ability to make its servers, software applications and websites available and to protect the Company's data from damage or interruption from human error, computer viruses, intentional acts of vandalism, labor disputes, natural disasters and similar events. If the cost of hosting and managing certain aspects of the Company's data center information technology structure is more than expected, or

if the vendor is unable to adequately protect its data and information is lost or the Company's ability to deliver its services is interrupted, then the Company's business and results of operations will be negatively impacted.

**21.    The Company's principal shareholders will have significant control over the Company, and their interests may differ from those of the Company.**

Immediately following the Effective Date, the Backstop Investors (including certain holders of the Prepetition Secured Loans or their assignees) will control a majority of the voting power. As a result, the Backstop Investors will have the ability to influence the outcome of matters submitted to shareholders for approval, including the election of directors.  The Backstop Investors, therefore, will be in a position to direct the Reorganized Parent's management, business, and affairs and may cause the Reorganized Parent to enter into transactions or take other actions that are not in, or that conflict with, the Company's other creditors' best interests, as well as matters relating to the Reorganized Parent's governance and business strategy.

**22.    If the Company is unable to attract and retain qualified contract professionals, its business could be negatively impacted.**

The Company's business is substantially dependent upon its ability to attract and retain contract professionals who possess the skills, experience, and licenses, as required, to meet the specified requirements of its clients. The Company competes for such contract professionals with other temporary staffing companies and with its clients and potential clients. There can be no assurance that qualified professionals will be available to the Company in adequate numbers to staff its operating segments. Moreover, the Company's contract professionals are often hired to become regular employees of its clients. Attracting and retaining contract professionals depends on several factors, including the Company's ability to provide contract professionals with desirable assignments and competitive benefits and wages. The cost of attracting and retaining contract professionals may be higher than the Company anticipates and, as a result, if the Company is unable to pass these costs on to its clients, the Company's likelihood of achieving or maintaining profitability could decline. In periods of high unemployment, contract professionals frequently opt for full-time employment directly with clients and, due to a large pool of available candidates, clients are able to directly hire and recruit qualified candidates without the involvement of staffing agencies. If the Company is unable to attract and retain a sufficient number of contract professionals to meet client demand, it may be required to forgo staffing and revenue opportunities, which may hurt the growth of its business.

**23.    The Company, as a sub-lessee of sub-leases for certain of the office space that it rents, could lose its ability to operate from such office space if the sub-lessor defaults on its own lease obligations to the owner/landlord.**

The Company subleases certain of the office space from which it operates its business. There is a possibility that, should the Company's sub lessor default on its lease obligations to the owner-landlord, and should such default result in the termination of such lease, the Company's own right to occupy such space under its sublease might terminate as well.

24. **Notwithstanding the releases and exculpations contained in the Plan, the Company could have liability to one or more indemnified parties, if such indemnified parties are sued.**

As set forth in, and subject to the terms and conditions of, the Plan, the Company has agreed to assume existing indemnification obligations to its officers and directors and to indemnify the Backstop Investors under certain circumstances. If any such indemnified parties are the subject of lawsuits or claims, the Company could be liable to pay such parties' litigation expenses, including, without limitation, attorneys' fees, and to pay judgments issued against them. There can be no assurance that the Company will not experience losses as a result of these indemnification risks. Furthermore, there can also be no assurance that the insurance policies the Company has assumed or purchased to insure against certain risks will be adequate or that insurance coverage will be sufficient in amount or scope of coverage.

## E. RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS

1. **The financial information contained herein is based on the Debtors' books and records and, unless otherwise stated, no audit was performed.**

**Except as otherwise specifically stated herein, the financial information contained in this Disclosure Statement has not been audited.** In preparing this Disclosure Statement, the Debtors relied on financial data derived from its books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is in accordance with GAAP and presents fairly in all material respect the financial position, etc. of the Company as of and for periods described therein.

2. **Financial Projections and other forward looking statements are not assured, are subject to inherent uncertainty due to the numerous assumptions upon which they are based and, as a result, actual results may vary.**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtor's operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic

conditions; (d) overall industry performance and trends; (e) the Debtors' ability to maintain market strength and receive vendor support by way of favorable purchasing terms; and (f) consumer preferences continuing to support the Debtors' business plan.

DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES.  WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.

## F.   DISCLOSURE STATEMENT DISCLAIMER

### 1.   The information contained herein is for soliciting votes only.

The information contained in this Disclosure Statement is for purposes of soliciting votes on the Plan and may not be relied upon for any other purposes.

### 2.   This Disclosure Statement was not approved by the Securities and Exchange Commission.

This Disclosure Statement has not been filed with the SEC or any state regulatory authority.  Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3.   The Debtors relied on certain exemptions from registration under the Securities Act.

The offer and issuance of New Common Stock and New Warrants to Holders of Claims in Classes 4 and 5 have not been registered under the Securities Act or similar state securities or "blue sky" laws.  To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable nonbankruptcy law, the Solicitation, the issuance of the New Common Stock and the New Warrants, and any shares of New Common Stock reserved for issuance upon exercise of the New Warrants, or under the Management Incentive Plan, will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, Regulation D and/or Rule 701 promulgated under the Securities Act.

### 4.   This Disclosure Statement contains forward looking statements.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all

forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims and Equity Interests may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**5.      No legal or tax advice is provided to you by this Disclosure Statement.**

**This Disclosure Statement is not legal or tax advice to You**. The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to Confirmation of the Plan.

**6.      No admissions are made by this Disclosure Statement.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors, the Consenting Equity Holder, the Backstop Investors, the Steering Committee, the Prepetition Agents, or the Prepetition Secured Lenders) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests or any other parties in interest.

Notwithstanding any rights of approval, pursuant to the Lender RSA, the Backstop Agreement or otherwise, as to the form of substance of this Disclosure Statement, the Plan or any other document relating to the transactions contemplated thereunder, neither the Prepetition Secured Lenders, the Prepetition Agent, the Steering Committee, the Backstop Investors, nor their respective representatives, members, affiliates, financial or legal advisors or agents, has independently verified the information contained herein or takes any responsibility therefor and none of the foregoing entities or persons makes any representations or warranties, or should be relied upon, whatsoever concerning the information contained herein.

**7.      No reliance should be placed on any failure to identify litigation Claims or projected objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors may seek to investigate, File and prosecute Claims and Equity Interests and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims or Equity Interests or objections to Claims or Equity Interests.

8. **Nothing herein constitutes a waiver of any right to object to Claims or Equity Interests or recover transfers and assets.**

The vote by a Holder of an Allowed Claim or Equity Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim or Equity Interest regardless of whether any Claims or Causes of Action of the Debtors or their Estate are specifically or generally identified herein.

9. **The information used herein was provided by the Debtors and was relied upon by the Debtors' advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

10. **The potential exists for inaccuracies, and the Debtors have no duty to update.**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11. **No representations made outside the Disclosure Statement are authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the United States Trustee.

## ARTICLE V
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

A. **LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

If no chapter 11 plan can be confirmed, some or all of the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets. A discussion of the effect that a chapter 7

liquidation would have on the recovery of Holders of Claims and Equity Interests is set forth in Article III.N herein, titled "Statutory Requirements for Confirmation of the Plan."  In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims will be determined to have "claims" that are entitled to share in the proceeds, if any, from any such liquidation.  The Debtors believe that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors and Equity Interests holders than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iii) the failure to realize the greater, going-concern value of all of the Debtors' assets.

## B.       FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets.  During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan will enable the Debtors to emerge from chapter 11 successfully and expeditiously, preserves its business and allows creditors to realize the highest recoveries under the circumstances.  In a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed.  Accordingly, creditors would receive greater recoveries than in a chapter 7 liquidation.  Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 is a much less attractive alternative to creditors and interest holders than the Plan because the Plan provides for a greater return to creditors and interest holders.

Moreover, the prolonged continuation of the Chapter 11 Cases is likely to adversely affect the Debtors' business and operations.  So long as the Chapter 11 Cases continue, senior management of the Debtors will be required to spend a significant amount of time and effort dealing with the Debtors' reorganization instead of focusing exclusively on business operations. Prolonged continuation of the Chapter 11 Cases will also make it more difficult to attract and retain management and other key personnel necessary to the success and growth of the Debtors' business.  In addition, the longer the Chapter 11 Cases continue, the more likely it is that the Debtors' customers, suppliers, distributors, and agents will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.  Furthermore, so long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the proceedings.  The prolonged continuation of the Chapter 11 Cases may also require the Debtors to seek additional financing, either under the DIP Facility or otherwise, in order to service its debt and other obligations.  It may not be possible for the Debtors to obtain additional financing during the pendency of the Chapter 11 Cases on commercially favorable terms or at all.  If the Debtors were to require additional financing during the Chapter 11 Cases and were unable to

obtain the financing on favorable terms or at all, it is unlikely the Debtors could successfully reorganize.

**ARTICLE VI**
**EXEMPTIONS FROM SECURITIES ACT REGISTRATION**

**A.     SECTION 1145 OF THE BANKRUPTCY CODE AND SECTION 4(A)(2) OF THE SECURITIES ACT**

**1.     Securities Issued in Reliance on Section 1145 of the Bankruptcy Code**

Under the Plan, (1) the New Common Stock will be issued to the Rights Offering Purchasers, the Backstop Investors, the Controlling Equity Holder, and the Sorensen Parties, and (2) the New Warrants will be issued to Holders of Class 5 Claims, in each case in reliance upon section 1145 of the Bankruptcy Code and/or Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

Section 1145 of the Bankruptcy Code provides that the securities registration requirements of federal and state securities laws do not apply to the offer or sale of stock, warrants or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor; and (c) the securities are issued in exchange for a claim against or an interest in a debtor or are issued principally in such exchange and partly for Cash and property.

New Capital Stock issued pursuant to section 1145 of the Bankruptcy Code may be resold without registration under either (a) state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states or (b) the Securities Act, pursuant to an exemption provided by section 4(a)(1) of the Securities Act unless the holder is an "underwriter" (as such term is defined in the Bankruptcy Code) with respect to the securities or an affiliate of the debtor.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning the debtor, if that purchase is with a view to distributing any security received or to be received in exchange for such a claim or interest;

- offers to sell securities offered or sold under a plan of reorganization for the holders of those securities;

- offers to buy those securities offered or sold under a plan of reorganization from the holders of the securities, if the offer to buy is (a) with a view to distributing those securities and (b) under an agreement made in connection with the plan of reorganization, the consummation of the plan of reorganization or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is used in section 2(11) of the Securities Act.

117

The reference contained in section 1145(b)(1)(D) of the Bankruptcy Code to section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by or are under common control with, an issuer of securities.  "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "control person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the securities of a reorganized debtor may be presumed to be a "control person."

Section 4(a)(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act will not apply to the offer and sale of a security in connection with transactions not involving any public offering.  The term "issuer," as used in section 4(a)(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.  Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(a)(2) of the Securities Act.

New Capital Stock not issued pursuant to the Plan in reliance on section 1145 of the Bankruptcy Code will be issued to such persons pursuant to section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  New Capital Stock issued pursuant to section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder shall be restricted securities (as described in Article VI.A.2 below) and resales of such New Capital Stock will be subject to the limitations described in Article VI.A.2 below.

## 2.   Restricted Securities

To the extent that persons who receive the New Capital Stock cannot rely on section 1145 of the Bankruptcy Code or are otherwise deemed to be "underwriters" (the "Restricted Holders"), resales by Restricted Holders of such securities, would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Restricted Holders would, however, be permitted to sell New Capital Stock or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below, or if such securities are registered with the SEC pursuant to a registration statement or otherwise subject to an exemption from registration.  With respect to the New Capital Stock issued pursuant to section 1145 of the Bankruptcy Code, any person who is an "underwriter" but not an "issuer" with respect to an issue of securities is, in addition, entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b)(1) of the Bankruptcy Code.

### 3.    Rule 144

Under certain circumstances, Restricted Holders may be entitled to resell their securities pursuant to the limited safe harbor resale provisions under Rule 144 of the Securities Act, to the extent available and in compliance with applicable state and foreign securities laws.

Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include a one-year hold period, the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold in any three-month period, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC.  Generally, Rule 144 of the Securities Act provides that persons who are not affiliates of an issuer, who is not a reporting person, may resell their securities after six months (subject to the requirement that current public information with respect to the issuer be available) and without restriction following a one-year hold period.

Certificates evidencing Securities received by Restricted Holders and Rights Offering Securities will bear a legend substantially in the form below:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS'") AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD AND TRANSFERRED IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT."

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF THE REORGANIZED DEBTOR WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTOR EXPRESSES NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF THE REORGANIZED DEBTORS.  ACCORDINGLY, THE DEBTOR RECOMMENDS THAT POTENTIAL RECIPIENTS OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

## ARTICLE VII
## SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME
## TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and to U.S. Holders (as defined below) of allowed Prepetition First Lien Loan Claims and of Prepetition Second Lien Loan Claims that are entitled to vote to accept or reject the Plan. This summary is for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described herein. No opinion of counsel has been obtained as to any of the tax consequences of the Plan and no ruling will be sought from the Internal Revenue Service ("IRS") with respect to any statement or conclusion in this summary. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any creditor, and there can be no assurance that the IRS would not assert, or that a court would not sustain, positions different from those discussed herein.

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation applicable to special classes of taxpayers (including without limitation, banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, partnerships or other pass-through entities, real estate investment trusts, regulated investment companies, controlled foreign corporations, passive foreign investment companies, Non-U.S. Holders, persons whose functional currency is not the U.S. dollar, dealers subject to the mark-to-market rules of Section 475 of the Tax Code, employees of the Debtors, and persons who received their Prepetition First Lien Loan Claims or Prepetition Second Lien Loan Claims, as the case may be, pursuant to the exercise of an employee stock option or otherwise as compensation). This summary assumes that the Prepetition First Lien Loan Claims and Prepetition Second Lien Loan Claims are held as capital assets for U.S. federal income tax purposes and that the Subscription Rights, New Warrants and Common Stock received in connection with the Subscription Rights and exercise of New Warrants will each be held as a capital asset for U.S. federal income tax purposes. Furthermore, the following discussion does not address U.S. federal taxes other than income taxes (including, without limitation, estate and gift taxes). U.S. Holders should consult their tax advisors regarding the tax consequences to them of the transactions contemplated by the Plan, including U.S. federal, state, local and foreign tax consequences.

For purposes of this discussion, a "U.S. Holder" is a beneficial holder of allowed Prepetition First Lien Loan Claims or Prepetition Second Lien Loan Claims that is, for U.S. federal income tax purposes (1) an individual that is a citizen or resident of the United States, (2) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (3) an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or (4) a trust if (i) a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to

120

control all of the substantial decisions of such trust or (ii) such trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person. A "Non-U.S. Holder" is a beneficial holder (other than any entity treated as a partnership for U.S. federal income tax purposes) of allowed Prepetition First Lien Loan Claims or Prepetition Second Lien Loan Claims that is not a U.S. Holder.

If a partnership (including any entity treated as a partnership for U.S. federal income tax purposes) holds allowed Prepetition First Lien Loan Claims or Prepetition Second Lien Loan Claims, as the case may be, the U.S. federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership considering participating in the Plan should consult its tax advisor regarding the consequences to the partnership and its partners of the Plan.

**TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE, (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## A.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

The discharge of certain indebtedness of the Debtors pursuant to the Plan may result in cancellation of indebtedness ("COD") income.  In general, the discharge of a debt obligation in exchange for an amount of cash and other property (including the Subscription Rights and New Warrants) having a fair market value less than the sum of (x) the adjusted issue price of the debt that is discharged and (y) the amount of any unpaid accrued interest on debt to the extent previously deducted by a debtor, gives rise to COD income to such debtor.  However, COD income is not taxable to a debtor if the debt discharge occurs in a title 11 bankruptcy case, and the discharge is granted by the court or pursuant to a plan approved by the court (the "Bankruptcy Exception").  Rather, under the Tax Code, such COD income will reduce certain tax attributes of a debtor by the amount of the excluded COD income.  Tax attributes subject to reduction include a debtor's tax basis in its assets (including stock of subsidiaries and possibly tax attributes of such subsidiaries).  In addition, if the Bankruptcy Exception applies, a debtor's tax basis in its assets generally may not be reduced below the amount of liabilities remaining immediately after the discharge of indebtedness.  Any excess COD income over the amount of tax attributes available for reduction is not subject to United States federal income tax and should have no other United States federal income tax impact.

If the Bankruptcy Exception applies to the transactions consummated pursuant to the Plan, the Debtors will not be required to recognize any COD income realized as a result of the implementation of the Plan as taxable income for U.S. federal income tax purposes.  However,

the application of the Bankruptcy Exception in respect of COD income of the Debtors may result in a reduction of the Debtors' tax attributes.  The ultimate effect of the attribute reduction rules is uncertain because, among other things, it will depend on the amount of COD income realized by the Debtors, if any, and the amount of liabilities remaining immediately after the discharge of indebtedness of the Debtors.

If the debt discharge does not occur in a title 11 bankruptcy case pursuant to a Plan approved by the court and as a result the Bankruptcy Exception does not apply, the COD income would not be taxable to a Debtor if, and to the extent, that such Debtor is insolvent at the time of the discharge of the indebtedness (the "Insolvency Exception").  For this purpose, the term insolvent means the excess of liabilities of a debtor over the fair market value of assets of such debtor, and is determined by the amount of the debtor's assets and liabilities immediately before the discharge of indebtedness.  If the Bankruptcy Exception is inapplicable, the Debtors intend to take the position that COD income realized as a result of implementation of the Plan is not taxable income to the Debtors for U.S. federal income tax purposes pursuant to the Insolvency Exception, although no assurances can be provided regarding the Debtors' insolvency, and the amount by which each Debtor is insolvent.  If the COD income realized by the Debtors as a result of the implementation of the Plan is excluded from taxable income under the Insolvency Exception, then certain of the Debtors' tax attributes may be reduced as discussed above with respect to the Bankruptcy Exception.

In addition, Parent was treated as a "qualified subchapter S corporation" under the Tax Code, and generally was not subject to U.S. federal income tax.  In connection with the Plan, Reorganized Parent will become, and will be subject to tax as, a regular "C" corporation for U.S. federal income tax purposes and is expected to be required to include non-cash items in taxable income as a result of a change in method of accounting occurring in connection with the Plan.

## B.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS

The U.S. federal income tax consequences of the transactions contemplated by the Plan to holders of Prepetition First Lien Loan Claims and Prepetition Second Lien Loan Claims (collectively, the "Loan Claims") (including the character, timing and amount of income, gain, or loss recognized) will depend upon, among other things, (1) whether a Loan Claim and the consideration received in respect thereof are "securities" for United States federal income tax purposes; (2) the manner in which a holder acquired a Loan Claim; (3) the length of time the Loan Claim has been held; (4) whether the Loan Claim was acquired at a discount; (5) whether the holder has taken a bad debt deduction with respect to the Loan Claim in the current or prior years; (6) whether the holder has previously included in its taxable income accrued but unpaid interest with respect to the Loan Claim; (7) whether the holder has made an election to include accruing market discount in its taxable income; and (8) the holder's method of tax accounting.  Therefore, holders of Loan Claims should consult their own tax advisors for information that may be relevant based on their particular situations and circumstances regarding the particular tax consequences to them of the transactions contemplated by the Plan.  This discussion assumes that the holder has not taken a bad debt deduction with respect to a Loan Claim (or any portion thereof) in the current or any prior year.

1.      **Holders of Prepetition First Lien Loan Claims**

(a)      General.

Pursuant to the Plan, in full satisfaction and discharge of its Claim, each holder of an allowed Prepetition First Lien Loan Claim will receive its *pro rata* share of cash and Subscription Rights (collectively, the "First Lien Loan Exchange").

(b)      The First Lien Loan Exchange.

The U.S. federal income tax consequences of the First Lien Loan Exchange will depend, in part, on whether the holders' allowed Prepetition First Lien Loan Claims and the Subscription Rights constitute "securities" for U.S. federal income tax purposes. Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances. Generally, most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are other factors that may be relevant to the determination, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into equity of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The allowed Prepetition First Lien Loan Claims have a term of more than five years but less than ten years. In addition, the Subscription Rights should constitute securities if they are treated as "rights to acquire New Common Stock" for U.S. federal income tax purposes. It is unclear whether holders' allowed Prepetition First Lien Loan Claims and Subscription Rights constitute "securities" for U.S. federal income tax purposes, and each holder should consult its tax advisor regarding the treatment of such obligations as "securities."

The Debtors intend to take the position that each of the allowed Prepetition First Lien Loan Claims and the Subscription Rights constitute "securities" for U.S. federal income tax purposes.

(i)      Treatment as a Recapitalization.

If the Prepetition First Lien Loan Claims and the Subscription Rights are characterized as "securities" for U.S. federal income tax purposes, the First Lien Loan Exchange should be treated as a "recapitalization" for U.S. federal income tax purposes. If the First Lien Loan Exchange is treated as a recapitalization, a holder of an allowed Prepetition First Lien Loan Claim generally will recognize gain (but not loss) in such exchange in an amount equal to the lesser of (x) the amount of "gain realized" and (y) the amount of cash received by such holder of a First Lien Loan Claim in the exchange (less the amount of cash, if any, allocable to accrued interest, which is discussed below). The "gain realized" is the excess, if any, of (x) the amount of cash and fair market value of the Subscription Rights received by such holder in exchange for its First Lien Loan Claim (other than the amount of cash and Subscription Rights, if any, allocable to accrued interest discussed below) over (y) such holder's adjusted tax basis in its

allowed Prepetition First Lien Loan Claim surrendered in exchange therefor. Any such gain recognized should generally be treated as capital gain and should be long-term capital gain if the holder's holding period for its allowed Prepetition First Lien Loan Claim exceeded one year at the time of the exchange, subject to the "market discount" rules discussed below. In addition, a holder's aggregate tax basis in the Subscription Rights received in the exchange should be equal to the aggregate tax basis in its First Lien Loan Claim surrendered in exchange therefor, increased by the amount of any gain recognized and decreased by the amount of cash received (other than the amount of cash, if any, allocable to accrued interest discussed below); provided, however, to the extent that any Subscription Right is treated as received in satisfaction of accrued but untaxed interest, the tax basis of such Subscription Right should equal the amount of such accrued interest income. A holder's holding period for its Subscription Rights received pursuant to the Plan should generally include the holding period of its First Lien Loan Claim surrendered in exchange therefor; provided, however, to the extent any Subscription Rights are treated as received in satisfaction of accrued but untaxed interest, the holding period for such Subscription Rights should begin on the day following the Effective Date. A holder will generally recognize ordinary interest income to the extent that cash or Subscription Rights are treated for U.S. federal income tax purposes as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the First Lien Loan Claim, (see "Accrued Interest" discussion below.)

(ii)     Treatment as a Taxable Exchange.

If either the allowed Prepetition First Lien Loan Claims or the Subscription Rights are not characterized as "securities" for U.S. federal income tax purposes and as a result the First Lien Loan Exchange is not treated as a "recapitalization," the First Lien Loan Exchange should generally be a fully taxable transaction to holders of Prepetition First Lien Loan Claims for U.S. federal income tax purposes. In this event, a holder should recognize gain or loss in an amount equal to the difference between (x) the sum of the amount of cash and the fair market value of the Subscription Rights received by such holder in exchange for its First Lien Loan Claim (other than the amount of cash and Subscription Rights, if any, allocable to accrued interest discussed below) and (y) such holder's adjusted tax basis in its allowed Prepetition First Lien Loan Claim surrendered in exchange therefor. Such gain or loss should be capital gain or loss and should generally be long-term capital gain or loss if the holder's holding period for its surrendered allowed Prepetition First Lien Loan Claim exceeded one year at the time of the exchange, subject to the "market discount" rules discussed below. The deductibility of capital loss may be subject to limitations. A holder's tax basis in its Subscription Rights received in the exchange should be equal to the fair market value of such Subscription Rights on the Effective Date. A holder's holding period for its Subscription Rights received pursuant to the Plan should begin on the day following the Effective Date.

(c)     Accrued Interest.

To the extent that any consideration is distributed or deemed distributed for U.S. federal income tax purposes with respect to accrued but unpaid interest, a holder of an allowed Prepetition First Lien Loan Claim that has not previously included such accrued interest in taxable income for U.S. federal income tax purposes should recognize ordinary income equal to the fair market value of any property received (including the holder's *pro rata* share of the cash and the Subscription Rights) with respect to such Claim for accrued but unpaid interest.

124

Pursuant to the terms of the Plan, Reorganized Parent will allocate for U.S. federal income tax purposes all distributions in respect of any Claim first to the principal amount of such Claim, and thereafter to accrued but unpaid interest. No assurance can be given that the IRS will not challenge such allocation. Holders of Claims for accrued interest which have included such accrued interest in taxable income generally may be able to take a loss to the extent that such Claim is not fully satisfied under the Plan (after allocating the distribution between principal and accrued interest), even if the underlying Claim is held as a capital asset. The adjusted tax basis of any property received in exchange for a Claim for accrued interest should equal the fair market value of such property on the Effective Date, and the holding period for the property should begin on the day after the Effective Date. Holders should consult their tax advisors regarding the particular U.S. federal income tax consequences applicable to them under the Plan in respect of allowed Prepetition First Lien Loan Claims for accrued interest, including the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

(d)    Market Discount.

A holder that purchased its allowed Prepetition First Lien Loan Claim from a prior holder at a discount to the revised issue price of such allowed Prepetition First Lien Loan Claim may be subject to the market discount rules of the Tax Code. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having "original issue discount," the revised issue price) exceeds the adjusted tax basis of the bond in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount. Under those rules, assuming such holder has not made an election to amortize the market discount into income on a current basis, any gain recognized on the exchange of an allowed Prepetition First Lien Loan Claim for cash and Subscription Rights as discussed above generally should be characterized as ordinary income to the extent of the accrued market discount on such allowed Prepetition First Lien Loan Claim as of the Effective Date.

Although not free from doubt, the Company believes that a holder should not be required to recognize any accrued but unrecognized market discount upon the exercise of a Subscription Right received in exchange for its Prepetition First Lien Loan Claim. Instead, a holder may be required to recognize any remaining accrued but unrecognized market discount upon a subsequent taxable disposition of its New Common Stock received upon exercise of a Subscription Right. However, the treatment of accrued market discount in a nonrecognition transaction is subject to the issuance of Treasury regulations that have not yet been promulgated. In the absence of such regulations, the application of the market discount rules to the receipt and exercise of a Subscription Right received in exchange for a Prepetition First Lien Loan Claim is uncertain. Holders of allowed Prepetition First Lien Loan Claims should consult their tax advisors as to the tax consequences of the market discount rules, including, without limitation, the possible application of such rules on the First Lien Loan Exchange and receipt and disposition of New Common Stock received in connection with the Subscription Rights.

(e)    The Subscription Rights.

A holder generally should not recognize any gain or loss upon the exercise of the Subscription Rights for New Common Stock received pursuant to the Plan. The tax basis of the shares of New Common Stock acquired through exercise of a Subscription Right should equal the sum of the offering price for such shares and the holder's tax basis in such Subscription Right as described above. The holding period for the shares of New Common Stock acquired through exercise of Subscription Rights should begin on the day following the Effective Date.

A holder that allows a Subscription Right it received to expire generally should recognize a capital loss equal to the holder's tax basis in such expired Subscription Right, which should be long-term capital loss if the holder's holding period for such Subscription Right exceeded one year. The deductibility of capital loss may be subject to limitations. Each holder should consult its tax advisor as to the tax consequences of allowing the Subscription Rights it received pursuant to the Plan to expire unexercised.

## 2.    Holders of Prepetition Second Lien Loan Claims

(a)    General.

Pursuant to the Plan, in full satisfaction and discharge of its Claim, each holder of an allowed Prepetition Second Lien Loan Claim will receive its *pro rata* share of cash and a New Warrant (collectively, the "Second Lien Loan Exchange").

(b)    The Second Lien Loan Exchange.

The U.S. federal income tax consequences of the Second Lien Loan Exchange should generally be the same as described in "— CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS — Holders of Prepetition First Lien Loan Claims" above (substituting Second Lien Loan Claim for First Lien Loan Claim, New Warrant for Subscription Right and Second Lien Loan Exchange for First Lien Loan Exchange therein).

(c)    Sale or Other Taxable Disposition of New Warrants.

A holder generally should recognize gain or loss upon the sale or other taxable disposition of a New Warrant in an amount equal to the difference between (x) the sum of the fair market value of any property and the amount of cash received in such disposition and (y) such holder's adjusted tax basis in such New Warrant at the time of the disposition. Subject to the treatment of a portion of any gain as ordinary income to the extent of any market discount carried over to the New Warrant from the Prepetition Second Lien Loan Claim (discussed above), such gain or loss should generally be capital gain or loss. Any such gain or loss will be long-term if the holding period of the New Warrant exceeded one year. The deductibility of capital loss may be subject to limitations.

## 3.    Ownership and Disposition of New Common Stock

(a)    Distributions.

A distribution paid by Reorganized Parent in respect of New Common Stock will generally constitute a dividend for U.S. federal income tax purposes to the extent the distribution

is paid out of Reorganized Parent's current or accumulated earnings and profits, as determined under U.S. federal income tax principles. The gross amount of any such dividend to a holder will be included in income of the holder as ordinary dividend income. In general, distributions in excess of the Reorganized Parent's current and accumulated earnings and profits will not be taxable to a holder to the extent that such distributions to the holder do not exceed the holder's adjusted tax basis in the shares of New Common Stock with respect to which the distribution is paid, but rather will reduce the holder's adjusted tax basis in such New Common Stock (but not below zero). To the extent that distributions exceed the Reorganized Parent's current and accumulated earnings and profits as well as the holder's adjusted tax basis in the New Common Stock, such distributions generally should be taxable as capital gain realized in respect of the New Common Stock.

Under current U.S. federal income tax law, dividends paid to certain non-corporate holders, including individuals, generally will constitute qualified dividend income eligible for preferential rates of U.S. federal income tax, with a maximum rate of 20%, provided certain conditions and requirements are satisfied, such as minimum holding period requirements. Holders that are corporations may be eligible for a partial dividends-received deduction with respect to dividend distributions that are paid in respect of New Common Stock, subject to certain conditions and requirements, such as minimum holding period requirements. There can be no assurance that the Reorganized Parent will have sufficient current or accumulated earnings and profits for distributions in respect of New Common Stock to qualify as dividends for U.S. federal income tax purposes.

(b)      Sale or Other Taxable Disposition of New Common Stock.

A holder generally should recognize gain or loss upon the sale or other taxable disposition of New Common Stock in an amount equal to the difference, if any, between (x) the sum of the fair market value of any property and the amount of cash received in such disposition and (y) such holder's adjusted tax basis in the New Common Stock at the time of the disposition. Subject to the treatment of a portion of any gain as ordinary income to the extent of any market discount carried over to the New Common Stock from the Prepetition First Lien Loan Claim and Prepetition Second Lien Loan Claim (discussed above), such gain or loss generally should be capital gain or loss. Any such gain or loss will be long-term if the holding period of the New Common Stock exceeded one year. The deductibility of capital loss may be subject to limitations.

**4.      Backup Withholding and Information Reporting**

Certain payments are generally subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories and, when required, demonstrates this fact or (ii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and such

holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

## C. IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM OR HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE VIII
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors and interest holders than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  Although certain alternatives have been proposed, such alternatives, in the opinion of the Debtors, include higher levels of execution, timing, and consummation risk than the Plan.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Allowed Equity Interests than that which is proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.

Dated: March 11 , 2014

Respectfully submitted,

ABLEST INC., on behalf of itself and its affiliates listed below

Name: D. Stephen Sorensen
Title: Chief Executive Officer

NEW KOOSHAREM CORPORATION
KOOSHAREM, LLC,
TANDEM STAFFING SOLUTIONS, INC.
SELECT PEO, INC.
SELECT SPECIALIZED STAFFING, INC.
SELECT TRUCKING SERVICES, INC.
SELECT NURSING SERVICES, INC.
REMEDY STAFFING, INC.
WESTAFF, INC.
WESTAFF (USA), INC.
WESTAFF SUPPORT, INC.
REAL TIME STAFFING SERVICES, INC.
SELECT TEMPORARIES, INC.
SELECT PERSONNEL SERVICES, INC.
SELECT CORPORATION
REMEDYTEMP, INC.
REMEDY TEMPORARY SERVICES, INC.
REMEDY INTELLIGENT STAFFING, INC.
REMX, INC.
REMSC LLC
REMUT LLC

## SCHEDULE 1

### The Debtors

The Debtors, along with the last four digits of each Debtor's federal tax identification number, are:

1. Ablest Inc. (8462);

2. New Koosharem Corporation (9356);

3. Koosharem, LLC (4537);

4. Real Time Staffing Services, Inc. (8189);

5. Remedy Intelligent Staffing, Inc. (0963);

6. Remedy Staffing, Inc. (0080);

7. RemedyTemp, Inc. (0471);

8. Remedy Temporary Services, Inc. (7385);

9. RemX, Inc. (7388);

10. Select Corporation (6624);

11. Select Nursing Services, Inc. (5846);

12. Select PEO, Inc. (8521);

13. Select Personnel Services, Inc. (8298);

14. Select Specialized Staffing, Inc. (5550);

15. Select Temporaries, Inc. (7607);

16. Select Trucking Services, Inc. (5722);

17. Tandem Staffing Solutions, Inc. (5919);

18. Westaff, Inc. (6151);

19. Westaff (USA), Inc. (5781);

20. Westaff Support, Inc. (1039);

21. RemSC LLC (8072); and

22. RemUT LLC (0793).