## Annex 1

**Post-Emergence ABL Loan Agreement – Term Sheet**

The amount of the commitments, structure and pricing described in the attached term sheets are subject to change based upon market conditions.

NEW KOOSHAREM CORPORATION
(DBA SELECT STAFFING)

$120,000,000 Senior Secured Revolving Loan Facility

**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS**

*This Summary of Principal Terms and Conditions (this "Term Sheet") outlines certain terms of the Revolving Credit Facility (as defined below). This Term Sheet does not constitute a commitment on behalf of any of the parties referred to herein to participate in any capacity in the transactions described herein. This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the documentation relating to such transactions, to which reference should be made.*

| | |
|---|---|
| Borrowers and Guarantors: | Koosharem, LLC, dba Select Staffing ("Select Staffing" or "U.S. Borrower"), a wholly-owned subsidiary of New Koosharem Corporation ("Holdings"), and each other U.S. subsidiary of Holdings with assets to be included in the U.S. Borrowing Base referred to below (individually and collectively, "U.S. Borrower"). In connection with the transactions contemplated hereby, Holdings will be reorganized and incorporated as a Delaware corporation. Holdings and its subsidiaries are collectively referred to herein as the "Companies". |
| | Resdin Industries Ltd. ("Canadian Borrower" and, together with the U.S. Borrower, the "Borrowers"). |
| Transactions: | (a)  The Borrowers will obtain commitments under the Revolving Credit Facility described below under the caption "Revolving Credit Facility", |
| | (b)  Select Staffing will obtain a senior secured term loan facility (the "Term Loan Facility") in an aggregate principal amount of $350,000,000, |
| | (c)  Holdings will obtain $225,000,000 of new cash equity through a rights offering to be funded by certain existing lenders and investors (the "Rights Offering"), and will contribute all net cash proceeds of the Rights Offering to the Select Staffing as cash common equity, |
| | (d)  Select Staffing will (i) in accordance with the terms of a plan of restructuring (whether through an insolvency proceeding or otherwise) fully and finally satisfy all claims and other obligations of the applicable Companies relating to (x) the First Lien Credit and Guaranty Agreement dated as of July 12, 2007 (as amended, restated, supplemented or otherwise modified from time to time) by and among Select Staffing, as borrower, the subsidiary guarantors party thereto, Bank of the West, as administrative |

agent, collateral agent, documentation agent, co-lead arranger and co-bookrunner, BNP Paribas Securities Corp., as co-lead arranger and co-bookrunner, and the lenders party thereto from time to time (the "Existing First Lien Credit Agreement"), in exchange for a cash payment of a specified percentage of the face amount of the principal amount of such obligations and the right to participate in the Rights Offering and (y) the Second Lien Credit and Guaranty Agreement dated as of July 12, 2007 (as amended, restated, supplemented or otherwise modified from time to time) by and among Select Staffing, as borrower, the subsidiary guarantors party thereto, Wilmington Trust FSB, as successor to BNP Paribas Securities Corp. as administrative agent, collateral agent and documentation agent, Bank of the West, as co-lead arranger and co-bookrunner, BNP Paribas Securities Corp., as co-lead arranger and co-bookrunner, and the lenders party thereto from time to time (the "Existing Second Lien Credit Agreement" and, together with the Existing First Lien Credit Agreement, the "Existing Credit Agreements"), in exchange for a cash payment of a specified percentage of the face amount of the principal amount of such obligations and warrants for an aggregate of 10% of the equity of Holdings (after giving effect to the reorganization and incorporation of Holdings in connection with the transactions contemplated hereby, but without giving effect to dilution for certain restricted stock and shares issued pursuant to a management incentive plan), and (ii) in connection therewith, all cash collateral under or in respect of the Existing Credit Agreements shall be released and any and all commitments, security interests and guaranties in connection with the Existing Credit Agreements shall be terminated and released (the transactions described in this clause (d), collectively, the "Recapitalization Transactions"),

(e)  the Borrowers will satisfy certain other indebtedness and other liabilities and obligations of the Companies, including in connection with deferred payroll obligations, certain seller note obligations, settlement and payment of certain accounts payable and settlement and payment of certain claims by the California State Compensation Insurance Fund (the transactions described in this clause (e), collectively, the "Specific Liability Payments"),

(f)  certain existing equity holders in Holdings will contribute or cause to be contributed to Holdings (a) 100% of the equity interests of each of the following entities (collectively, the "Contributed Entities"):  (i) Decca Consulting, Ltd., (ii) Decca Consulting, Inc., (iii) Resdin Industries Ltd. and (iv) Vaughan Business Solutions Inc. and (b) certain service agreements (collectively, the "Contribution"),

(g)  certain existing equity holders in Holdings will grant, or cause to be granted, to Holdings an option to purchase 100% of the equity interests of the Butler Companies (consisting of Butler

America, Inc., Butler America TCS, Inc., Butler American Staffing LLC and Butler Technical Services India (P) Ltd.) for consideration set forth in the option agreement to be entered into relating thereto (the "Option Agreement"), and

(h)  fees and expenses incurred in connection with the foregoing (the "Transaction Costs") will be paid.

The transactions described above, together with the transactions related thereto, are collectively referred to herein as the "Transactions".

| | |
|---|---|
| Joint Lead Arrangers and Bookrunners: | RBC Capital Markets[1] and Credit Suisse Securities (USA) LLC (collectively, the "Arrangers"). |
| Lenders: | A syndicate of banks, financial institutions and other entities reasonably acceptable to Holdings and Borrowers (collectively, the "Lenders"), and which shall not include certain disqualified lenders ("Disqualified Lenders") specified by the Companies in writing prior to the Closing Date (as defined below). |
| Administrative Agent: | Royal Bank of Canada (in such capacity, the "Administrative Agent"). |
| Issuing Bank: | Royal Bank of Canada (in such capacity, the "Issuing Bank"). |
| Swing Lender: | Royal Bank of Canada (in such capacity, the "Swingline Lender"). |
| Revolving Credit Facility: | An asset-based revolving credit facility (the "Revolving Credit Facility") in an aggregate principal amount of $120 million (the "Revolving Loan Cap"), consisting of (i) a U.S. subfacility (the "U.S. Subfacility") of $110 million (the "U.S. Subfacility Cap") available to be advanced to the U.S. Borrower and (ii) a Canadian subfacility (the "Canadian Subfacility") of $10 million (the "Canadian Subfacility Cap") available to be advanced to the Canadian Borrower. |
| Available Currencies: | The U.S. Subfacility will be available in U.S. dollars and the Canadian Subfacility being available in U.S. dollars and Canadian dollars. |
| Purpose: | Proceeds of the Revolving Credit Facility will be used on the date of the closing for the Revolving Credit Facility (the "Closing Date"), together with the proceeds of the Rights Offering, the cash collateral released as part of the Recapitalization Transactions and the proceeds of the loans under the Term Loan Facility, to consummate the Recapitalization Transactions, to fund the Specific Liability Payments and to pay the Transaction Costs.  Following the Closing Date, the Revolving Credit Facility will be used for |

---

[1] RBC Capital Markets is a brand name for the capital markets activities of Royal Bank of Canada and its affiliates

working capital and general corporate purposes.

| | |
|---|---|
| Incremental Facility: | Borrowers will have the right to increase commitments under the Revolving Credit Facility on one or more occasions (any such increase, an "Incremental Facility") in an aggregate amount of up to $50 million; provided that (a) as of the date of any such increase and after giving effect thereto, no event of default exists, (b) each such Incremental Facility shall be in a minimum amount equal to $5 million, (c) as of the date of each Incremental Facility, each of the conditions precedent to a borrowing shall be satisfied, (d) the terms of such Incremental Facility shall be the same as for all other Revolving Loans, (e) no Lender shall be required to provide additional commitments for such Incremental Facility and such Incremental Facility shall be subject to obtaining such additional commitments of Lenders as may be required, and (f) each Incremental Facility shall be subject to certain procedures to be agreed to by the parties (including the payment of applicable fees in respect of such increase and the offering of such additional commitments to existing Lenders before seeking additional Lenders). |
| Maturity Date: | 5 years from the Closing Date (the "Maturity Date") provided that the Revolving Credit Documentation shall provide the right for individual Lenders to agree to extend the maturity date of their outstanding loans upon the request of the applicable Borrower and without the consent of any other Lender (subject to customary terms and conditions). |
| Availability: | Upon satisfaction or waiver of the conditions precedent, borrowings may be made at any time on or after the Closing Date to but excluding the Maturity Date. |

The aggregate amount of the loans and letters of credit out-standing to the U.S. Borrower and the unreimbursed drawings under the letters of credit issued for the account of the U.S. Borrower under the Revolving Credit Facility shall not exceed the lesser of (a) the U.S. Borrowing Base (as defined below) and (b) the U.S. Subfacility Cap.

"U.S. Borrowing Base" shall mean: (i) 85% of the eligible billed accounts receivable of the U.S. Borrowers, plus (ii) 75% of the eligible unbilled accounts receivable of the U.S. Borrowers, minus (ii) the reserves applicable to the U.S. Borrowers established by Administrative Agent in its Permitted Discretion (the amount of such reserves must have a reasonable relationship to the event, condition or other matter which is the basis for such reserves).

"Permitted Discretion" means a determination made in good faith by the Administrative Agent in the exercise of its reasonable judgment from the perspective of an asset based lender based on how an asset based lender with similar rights providing a credit facility of the type described in this Term Sheet would act in

4

similar circumstances with the information then available to it.

The aggregate amount of the loans and letters of credit outstanding to the Canadian Borrower and the unreimbursed drawings under the letters of credit issued for the account of the Canadian Borrower under the Revolving Credit Facility shall not exceed the lesser of (a) the Canadian Borrowing Base (as defined below) and (b) the Canadian Subfacility Cap.

"Canadian Borrowing Base" shall mean: (i) 85% of the eligible billed accounts receivable of the Canadian Loan Parties (as defined below), plus 75% of the eligible unbilled accounts receivable of the Canadian Loan Parties minus (iii) the reserves applicable to the Canadian Loan Parties established by the Administrative Agent in its Permitted Discretion (the amount of such reserves must have a reasonable relationship to the event, condition or other matter which is the basis for such reserves).

Eligibility criteria shall be determined in accordance with the Administrative Agent's customary practices and as appropriate under the circumstances as determined by the Administrative Agent in its Permitted Discretion following its receipt of the field examination.

Revolving Credit Facility Documentation:

The definitive documentation for the Revolving Credit Facility (the "***Revolving Credit Documentation***") shall (a) be consistent with this Summary of Principal Terms and Conditions and shall contain only those conditions precedent, mandatory prepayments, representations, warranties, affirmative and negative covenants and events of default expressly set forth herein and, to the extent such terms are not expressly set forth herein, but are instead to be determined in accordance with a specified standard or principle, such terms will be negotiated in good faith and be consistent with this Summary of Principal Terms and Conditions, (b) give regard to the operational requirements of the Companies in light of their size, structure, capital structure, industries, businesses, business practices and proposed business plan and operations, (c) with respect to conditions precedent, representations, warranties, affirmative and negative covenants, and events of default, be consistent with the definitive documentation for the Term Loan Facility, except as set forth herein and with such changes that are customarily contained in financings of this type and (d) be negotiated in good faith by the Borrowers and the Arrangers to finalize such documentation.  This paragraph and the provisions herein are referred to as the "***Documentation Principles***".

Notwithstanding anything to the contrary herein, all leases of Holdings, the Borrowers and their subsidiaries that are treated as operating leases for purposes of GAAP on the date hereof shall continue to be accounted for as operating leases for purposes of the Revolving Credit Documentation, regardless of any change to

GAAP following such date that would otherwise require such leases to be treated as capital leases or "capital lease obligations" or similar terms.

The Revolving Credit Documentation will include customary "defaulting lender" provisions.

Letters of Credit:

Up to $75 million of the Revolving Credit Facility will be available for letters of credit to be issued to the U.S. Borrower and up to $5 million of the Revolving Credit Facility will be available for letters of credit to be issued to the Canadian Borrower, on terms and conditions to be set forth in the Revolving Credit Documentation. Each letter of credit shall expire not later than the earlier of (i) 12 months after its date of issuance and (ii) the fifth business day prior to the Maturity Date; provided, that, the letters of credit may contain customary "evergreen" provisions; provided, further, that, any letter of credit may extend beyond the Maturity Date so long as, on or prior to the date of issuance of such letter of credit (other than an "evergreen" letter of credit described in the immediately preceding proviso), such letter of credit is cash collateralized (by means of cash or supporting letters of credit) on terms reasonably acceptable to the Administrative Agent and the Issuing Bank.

Drawings under any letter of credit shall be reimbursed by the applicable Borrower on the next business day. To the extent that such applicable Borrower does not reimburse the Issuing Bank on the next business day, the Lenders under the U.S. Sub-facility or the Canadian Subfacility, as applicable, shall be irrevocably obligated to reimburse the Issuing Bank pro rata based upon their respective commitments.

The issuance of all letters of credit shall be subject to the customary procedures of the Issuing Bank.

Swingline Facility:

Up to $11 million of the Revolving Credit Facility will be available for swingline borrowings by the U.S. Borrower and up to $2 million of the Revolving Credit Facility will be available for swingline borrowings by the Canadian Borrower, on terms and conditions to be set forth in the Revolving Credit Documentation. Except for purposes of calculating the unused line fee described below, any swingline borrowings will reduce availability under the Revolving Credit Facility on a dollar-for-dollar basis.

Interest:

At Borrowers' option, loans will bear interest based on the Base Rate or LIBOR or, in the case of any borrowings made in Canadian dollars, Royal Bank of Canada's customary Canadian prime rate ("Prime Rate") and bankers' acceptance equivalent rate ("BA Rate"), as described below (except that all swingline borrowings will accrue interest based on the Base Rate or the Canadian Prime

Rate, as applicable):

A.  Base Rate Option

Interest will be at the Base Rate plus the applicable Interest Margin, calculated on the basis of the actual number of days elapsed in a year of 365 days and payable quarterly in arrears.  "Base Rate" is defined as the higher of the Federal Funds Rate, as published by the Federal Reserve Bank of New York, plus 1/2 of 1% and the prime commercial lending rate of Royal Bank of Canada.

Base Rate and Prime Rate borrowings (other than swingline borrowings which may be made with same day's notice) will require one business day's prior notice.

B.  LIBOR Option

Interest will be determined for periods to be selected by Borrowers ("Interest Periods") of one, two, three or six months (or, if acceptable to each Lender, nine or twelve months) and will be at an annual rate equal to the London Interbank Offered Rate ("LIBOR") for the corresponding deposits of U.S. dollars, plus the applicable Interest Margin. LIBOR will be determined by the Administrative Agent at the start of each Interest Period and will be fixed through such period. Interest will be paid at the end of each Interest Period or, in the case of Interest Periods longer than three months, quarterly, and will be calculated on the basis of the actual number of days elapsed in a year of 360 days. LIBOR will be adjusted for maximum statutory reserve requirements (if any).

BA Rate shall be defined in accordance with, and BA Rate Loans shall be subject to, the Administrative Agent's customary practices.  Interest on BA Rate Loans will be calculated on the basis of the actual number of days elapsed in a year of 360 days.

For the purposes of the Interest Act of Canada, the yearly rate of interest to which any rate calculated on the basis of 360 days is equivalent is the stated rate multiplied by the number of days in the year (365 or 366) and divided by 360.

LIBOR and BA Rate borrowings will require three business days' prior notice and will be in minimum amounts to be agreed upon.

|  |  |
|---|---|
| Default Interest and Fees: | Upon the occurrence and during the continuance of a Specified Event of Default (as defined below), any overdue principal, interest and Letter of Credit Fees (as defined below) shall bear interest at the applicable interest rate plus 2.0% per annum, and any other overdue amounts shall bear interest at the interest rate applicable to loans bearing interest at the Base Rate plus 2.0% per annum, and in each case, shall be payable on demand and shall |

begin to accrue from the date of such Specified Event of Default.

"**Specified Event of Default**" means any of the following events of default: (a) a payment default, (b) a bankruptcy default, (c) a cross default to other indebtedness, (d) a financial covenant default, (e) a default of a covenant relating to the delivery of borrowing base reports or a compliance certificate, (f) a default of a covenant relating to the cash management system, and (g) the breach of any representation or warranty relating to borrowing base reports.

| Interest Margins: | The applicable Interest Margins for the Revolving Credit Facility will initially be 2.00% for LIBOR and BA Rate loans and 1.00% for Base Rate and Canadian prime rate loans; *provided* that commencing on the last day of the second full calendar quarter after the Closing Date, the Interest Margins with respect to the Revolving Credit Facility will be determined based on the average daily aggregate Unused Borrowing Availability (as defined below) for the immediately preceding quarter in accordance with the following grid: |

| Average Daily Unused Borrowing Availability | LIBOR Loans and BA Rate Loans | Base Rate Loans and Canadian Prime Rate Loans |
| --- | --- | --- |
| Greater than or equal to 66-2/3% of the Revolving Credit Facility | 1.75% | 0.75% |
| Greater than or equal to 33-1/3% of the Revolving Credit Facility but less than 66-2/3% of the Revolving Credit Facility | 2.00% | 1.00% |
| Less than 33-1/3% of the Revolving Credit Facility | 2.25% | 1.25% |

| Unused Line Fee: | An unused line fee shall accrue on the unused amounts of the commitments under the Revolving Credit Facility and shall initially be 0.50%; *provided* that commencing on the last day of the second full calendar quarter after the Closing Date, the unused line fee will be determined based on the average daily unused portion of the Revolving Credit Facility for the immediately preceding quarter in accordance with the following grid: |

| Average Daily Unused Portion of the | Unused Line Fee |

Revolving Credit Facility

| | |
|---|---|
| Greater than or equal to 50% of the Revolving Credit Facility | 0.500% |
| Less than 50% of the Revolving Credit Facility | 0.375% |

Accrued unused line fees will be payable quarterly in arrears (calculated on a 360-day basis) for the account of the Lenders from the Closing Date.

"Unused Borrowing Availability" means the sum of (a) the difference between (i) the lesser of (A) the U.S. Borrowing Base and (B) the U.S. Subfacility Cap, minus (ii) the Revolving Loans and letters of credit outstanding to the U.S. Borrower under the Revolving Credit Facility and the unreimbursed drawings under the letters of credit issued for the account of the U.S. Borrower, plus (b) the difference between (i) the lesser of (A) the Canadian Borrowing Base and (B) the Canadian Subfacility Cap, minus (ii) the Revolving Loans and letters of credit outstanding to the Canadian Borrower under the Revolving Credit Facility and the unreimbursed drawings under the letters of credit issued for the account of the Canadian Borrower.

Letter of Credit Fees:

Borrowers will pay the Administrative Agent (i) for the account of the Issuing Bank, a fronting fee equal to 12.5 basis points per annum and (ii) for the account of the Lenders, letter of credit participation fees ("Letter of Credit Fees") equal to the Interest Margin for LIBOR Loans under the Revolving Credit Facility, in each case on the undrawn amount of all outstanding letters of credit. In addition, Borrowers will pay the customary issuance fees of the Issuing Bank.

Mandatory Prepayments:

At any time that the aggregate principal amount of the outstanding loans and letters of credit to the U.S. Borrower plus the unreimbursed drawings under the letters of credit issued for the account of the U.S. Borrower exceeds the U.S. Borrowing Base then in effect, the loans to the U.S. Borrower shall be prepaid immediately or, if no such loans are outstanding, letters of credit issued for the U.S. Borrower shall be cash collateralized in an amount equal to 105% of the face amount thereof, in an amount equal to such excess.

At any time that the aggregate principal amount of the outstanding loans and letters of credit to the Canadian Borrower plus the unreimbursed drawings under the letters of credit issued for the account of the Canadian Borrower exceeds the Canadian Borrowing Base then in effect, the loans to the Canadian Borrower shall be prepaid immediately or, if no such loans are outstanding, letters of credit issued for the Canadian Borrower shall be cash

collateralized in an amount equal to 105% of the face amount thereof, in an amount equal to such excess.  In no event will proceeds of the Collateral of any Canadian Loan Parties (as defined below) be applied in respect of obligations of the U.S. Loan Parties (as defined below).

At any time a Cash Dominion Trigger  Event (as defined below) exists, all proceeds of ABL Priority Collateral (as defined below) shall be applied to the obligations under the Revolving Credit Facility.

There will be no prepayment penalties (except LIBOR or BA Rate breakage costs) for mandatory prepayments.

Optional Prepayments:

Permitted in whole or in part, without premium or penalty (except LIBOR or BA Rate breakage costs).

Application of Prepayments:

Mandatory and optional prepayments will be applied to any outstanding loans (and, to the extent provided above, to cash collateralize letters of credit) under the Revolving Credit Facility without any reduction in the commitments under the Revolving Credit Facility.  In no event will proceeds of the Collateral of any Canadian Loan Parties be applied in respect of obligations of the U.S. Loan Parties.

Guarantees:

The obligations of the U.S. Borrower under the Revolving Credit Facility and any hedging or treasury management obligations of the U.S. Loan Parties to which a Lender, an Arranger or an affiliate of a Lender or an Arranger is a counterparty will be fully and unconditionally guaranteed by Holdings and all of the existing and future wholly-owned U.S. subsidiaries of U.S. Borrower (collectively, the "U.S. Guarantors and, together with the U.S. Borrowers, collectively the "U.S. Loan Parties"), except as to such hedging obligations for certain U.S. Guarantors to the extent a guarantee therefrom would violate the Commodity Exchange Act; provided, that, the U.S. Guarantors shall not include (i) any immaterial subsidiary, (ii) any special purpose subsidiary, (iii) any U.S. subsidiary that is a subsidiary of a foreign subsidiary, (iv) any U.S. subsidiary that has no material assets other than the capital stock of one or more foreign subsidiaries, (v) any subsidiary for which the cost of providing such guarantee is excessive in relation to the value afforded thereby  and (vi) other exclusions to be mutually agreed but the U.S. Guarantors will include any entity which is an obligor under the Term Loan Facility. The obligations of the Canadian Borrower under the Revolving Credit Facility and any hedging or treasury management obligations of the Canadian Loan Parties to which a Lender, an Arranger or an affiliate of a Lender or an Arranger is a counterparty will be fully and unconditionally guaranteed on a joint and several basis by the U.S. Loan Parties and all other wholly-owned U.S. and Canadian subsidiaries of Holdings (each a

"Canadian Obligation Guarantor", and collectively, the "Canadian Obligation Guarantors" and, together with the U.S. Guarantors, the "Guarantors"), except as to such hedging obligations for certain U.S. entities to the extent a guarantee therefrom would violate the Commodity Exchange Act; provided, that, Canadian Obligation Guarantors will not include (i) any immaterial subsidiary, (ii) any special purpose subsidiary, (iii) any subsidiary for which the cost of providing such guarantee is excessive in relation to the value afforded thereby and (iv) other exclusions to be mutually agreed but the Canadian Obligation Guarantors will include any non-U.S. entity which is an obligor under the Term Loan Facility. The Canadian Borrower and the Canadian Obligation Guarantors that are Canadian subsidiaries of Holdings are collectively referred to herein as the "Canadian Loan Parties" and, together with the U.S. Loan Parties, collectively the "Loan Parties").

Security:

The obligations of the U.S. Borrower under the Revolving Credit Facility and any hedging or treasury management obligations of the U.S. Loan Parties to which a Lender, an Arranger or an affiliate of a Lender or an Arranger is a counterparty will be secured by perfected first priority security interests in the following assets of the U.S. Loan Parties, whether now owned or hereafter acquired (other than the Excluded Assets (as defined below), the "U.S. ABL Priority Collateral", together with all such assets and properties owned by Canadian Loan Parties, the "ABL Priority Collateral"): (i) accounts, (ii) inventory, (iii) chattel paper, (iv) deposit accounts and, to the extent of any cash or cash equivalents on deposit therein, securities accounts (and all cash, checks and other negotiable instruments, funds and other evidences of payment held therein), (iv) to the extent evidencing, governing, securing or otherwise relating to any of the foregoing, all general intangibles, instruments, commercial tort claims, supporting obligations (including letter of credit rights), books, records, and documents (including databases, customer lists and other records, whether tangible or electronic, which contain any information relating to any of the foregoing) and (vi) all proceeds and products of any or all of the foregoing in whatever form received, including proceeds of business interruption insurance. The obligations of the U.S. Borrower under the Revolving Credit Facility and any hedging or treasury management obligations of the U.S. Loan Parties to which a Lender, an Arranger or an affiliate of a Lender or an Arranger is a counterparty will also be secured by perfected second priority security interests in, and mortgages on, all other assets of the U.S. Loan Parties, wherever located, now or hereafter owned, other than the U.S. ABL Priority Collateral (the "U.S. Term Loan Priority Collateral", and together with such assets of the Canadian Loan Parties, the "Term Loan Priority Collateral" and, together with the ABL Priority Collateral, the "Collateral"); provided, that, the Collateral shall not include any Excluded Assets (as defined below).

The obligations of the Canadian Borrower under the Revolving Credit Facility and any hedging or treasury management obligations of the Canadian Loan Parties to which a Lender, an Arranger or an affiliate of a Lender or an Arranger is a counterparty will be secured by perfected first priority security interests in all of the ABL Priority Collateral of the Loan Parties. The obligations of the Canadian Borrower under the Revolving Credit Facility and any hedging or treasury management obligations of the Canadian Loan Parties to which a Lender, an Arranger or an affiliate of a Lender or an Arranger is a counterparty will also be secured by perfected security interests in, and mortgages on, all Term Priority Collateral of the Loan Parties, subordinate only to the liens, if any, on such Collateral of the Term Loan Agent (as defined below) that secure the Term Loan Facility.

Notwithstanding anything to the contrary, the Collateral shall exclude the following: (i) any fee owned real property with a value of less than an amount to be agreed (with all required mortgages being permitted to be delivered post-closing to the extent necessary after the Loan Parties' using commercially reasonable efforts to deliver such mortgages on or prior to the Closing Date) and all leasehold property (it being understood there shall be no requirement to obtain any landlord waivers, estoppels or collateral access letters), (ii) motor vehicles and other assets subject to certificates of title, letter of credit rights (except to the extent constituting a support obligation for other Collateral as to which perfection of the security interest in such other Collateral is accomplished solely by the filing of a UCC or Personal Property Security Act ("PPSA") financing statement) and commercial tort claims below a threshold to be agreed, (iii) pledges and security interests prohibited by law, (iv) equity interests (A) constituting margin stock or (B) in any person (other than wholly owned subsidiaries or a subsidiary controlled by a Borrower or any wholly owned subsidiary) to the extent not permitted by the terms of such subsidiary's organizational or joint venture documents, except to the extent a security interest can be granted therein under the applicable provisions of the UCC or PPSA, (v) any intellectual property, lease, license, or other agreement or any property subject to a purchase money security interest, capital lease obligation or similar arrangements in each case to the extent that a grant of a security interest therein would violate or invalidate such intellectual property, lease, license, or agreement, purchase money, capital lease or similar arrangement or create a right of termination in favor of any other party thereto (other than a Loan Party), (vi) any property and assets the pledge of which would require governmental consent, approval, license or authorization that has not been obtained, (vii) "intent-to-use" trademark applications, (viii) assets in circumstances where the Administrative Agent and the Borrowers agree the cost, burden or consequences (including adverse tax consequences) of obtaining or perfecting a security interest in such assets is excessive in relation to the practical

benefit afforded thereby and (ix) other exceptions to be set forth in the Revolving Credit Documentation (the foregoing assets described in clauses (i) through (ix) above are, collectively, the "Excluded Assets"); provided that in the case of clauses (iv)(B), (v) and (vi), such exclusion shall not apply (x) to the extent the prohibition is ineffective under applicable anti-nonassignment provisions of the UCC, the PPSA or other applicable law or (y) to proceeds and receivables of the assets referred to in such clause, the assignment of which is expressly deemed effective under applicable anti-nonassignment provisions of the UCC, the PPSA or other applicable law notwithstanding such prohibition. In addition, (1) no actions shall be required to perfect a security interest in letter of credit rights below an agreed threshold other than the filing of a UCC or PPSA financing statement and (2) the Loan Parties shall not be required to take any actions outside the United States or Canada to perfect security interests in any Collateral.

The relative rights and priorities of the Administrative Agent and the agent under the Term Loan Facility (the "Term Loan Agent") with respect to the Collateral will be set forth in an intercreditor agreement, in form and substance reasonably satisfactory to the Administrative Agent, the Term Loan Agent and the Borrowers.

Representations and Warranties:    Consistent with the Documentation Principles and limited to the following (to be applicable to Holdings, the Borrowers and their subsidiaries and subject, in each case, to materiality thresholds, baskets and other exceptions and qualifications to be agreed upon): financial statements (i) presenting fairly in all material respects the financial position and results of operations of the Borrowers and their subsidiaries at the respective dates of such information and for the respective periods covered thereby and (ii) having been prepared in accordance with U.S. GAAP consistently applied (except to the extent provided in the notes thereto); absence of undisclosed liabilities; no material adverse change; corporate existence; compliance with laws (including the USA PATRIOT Act, The Proceeds of Crime (Money Laundering) and Terrorist Financing Act of Canada, ERISA, Pension Benefits Act or similar act of any applicable jurisdiction, margin regulations, environmental laws, laws applicable to sanctioned persons, OFAC and the Foreign Corrupt Practices Act); no "defined benefit plans" in Canada; licenses and permits; corporate power and authority; due authorization and enforceability of Revolving Credit Documentation; no conflict with laws or material contractual obligations; effectiveness of governmental approvals; absence of material litigation; no default under Revolving Credit Facility; ownership of properties; location of real property; liens; intellectual property; payment of taxes; inapplicability of the Investment Company Act; subsidiaries; Federal Reserve regulations; environmental matters; insurance; solvency on a consolidated basis; labor matters; and accuracy of disclosure; validity, priority and perfection of security interests in the

Collateral; and eligible accounts.  If the Recapitalization Transactions are consummated pursuant to an insolvency proceeding, the foregoing representations and warranties shall reflect exceptions customary for "exit" or similar financings.

Collateral Reporting:

Collateral reporting and field examinations shall consist of:

(a) as to collateral reports, monthly, unless a Cash Dominion Trigger Event (as defined below) exists, then weekly; provided, that, reporting as to Qualified Cash (as defined below) shall be furnished with the periodic collateral reports and upon the request of the Administrative Agent; and

(b) as to field examinations, (i) no more than 2 field examinations in any 12 month period at the expense of Borrowers so long as a Cash Dominion Trigger Event does not exist during such 12 month period, (ii) no more than 3 field examinations in any 12 month period at the expense of Borrowers if a Cash Dominion Trigger Event existed during such twelve month period, and (iii) such other field examinations as Administrative Agent may reasonably request at any time an event of default under the Revolving Credit Facility exists.

Affirmative Covenants:

Consistent with the Documentation Principles and limited to the following (to be applicable to Holdings, the Borrowers and their subsidiaries and subject, in each case, to materiality thresholds, baskets and other exceptions and qualifications to be agreed upon): maintenance of corporate existence and rights; performance of obligations; delivery of annual audited consolidated financial statements, quarterly consolidated financial statements (other than the fourth quarter) and, if a Cash Dominion Trigger Event exists, monthly financial statements, projections  and other information, including information required under the USA PATRIOT Act and other applicable "know your customer" legislation; delivery of notices of default, litigation, change of name or collateral location, ERISA events or similar events under other applicable Canadian pension legislation; maintenance of properties in good working order; maintenance of insurance; collateral administration; compliance with laws (including ERISA, Canadian pension and environmental laws); inspection of books and properties; further assurances; and payment of taxes.

Negative Covenants:

Consistent with the Documentation Principles and limited to the following to be applicable to Holdings, the Borrowers and their subsidiaries and subject, in each case, to materiality thresholds, baskets and other exceptions and qualifications to be agreed upon):

Indebtedness.  Holdings shall not, nor shall it permit any of its subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any indebtedness, subject to customary

exceptions and consistent with the Documentation Principles, including without limitation:

- obligations under the Revolving Credit Facility, any Incremental Facilities, the Term Loan Facility and any incremental facilities thereunder (and any refinancings of the foregoing);

- intercompany indebtedness among Holdings and its subsidiaries to the extent constituting a permitted investment;

- any indebtedness permitted to survive after the Closing Date;

- indebtedness with respect to capital leases and purchase money indebtedness in an amount to be agreed;

- indebtedness of foreign subsidiaries (whether unsecured or secured by assets of the foreign subsidiary incurring such indebtedness) provided that the aggregate amount of such indebtedness shall not exceed $15,000,000 and, in the case of indebtedness secured by assets of any Canadian subsidiary, such security shall be subject to a reasonably acceptable intercreditor agreement;

- indebtedness assumed in connection with a Permitted Acquisition (as defined below) and not incurred in contemplation thereof, provided that the aggregate amount of such indebtedness that is secured and assumed during the term of the Revolving Credit Facility shall not exceed $25,000,000;

- unsecured indebtedness incurred in connection with a Permitted Acquisition (as defined below), provided that the aggregate amount of such indebtedness shall not exceed $20,000,000; and

- other indebtedness in an aggregate amount not to exceed at any time the greater of (a) $15,000,000 and (b) 5% of consolidated total assets (excluding goodwill and other intangibles) of Holdings and its subsidiaries.

Liens.  Holdings shall not, nor shall it permit any of its subsidiaries to, directly or indirectly, create, incur or assume any lien on or with respect to any of its properties or assets, subject to customary permitted liens consistent with the Documentation Principles and other exceptions to be agreed.

Dispositions.  Holdings shall not, nor shall it permit any of its subsidiaries to, sell, transfer or otherwise dispose of all or any part of its business, assets or property, subject to customary exceptions

and consistent with the Documentation Principles.

<u>Sale Lease-back Transactions</u>. Holdings shall not, nor shall it permit any of its subsidiaries to, enter into sale lease-back transactions, subject to customary exceptions consistent with the Documentation Principles.

<u>Investments</u>.  Holdings shall not, nor shall it permit any of its subsidiaries to, directly or indirectly, make or own any investment in any other person, subject to customary exceptions and consistent with the Documentation Principles, including without limitation:

- intercompany investments among Holdings  and its subsidiaries (including intercompany loans, subject to customary pledges as set forth above under the heading entitled "Security"), subject to limitations to be specified in respect of investments in subsidiaries that are not Loan Parties;

- loans and advances to officers, directors, employees and consultants of Holdings (or any direct or indirect parent thereof) and its subsidiaries in an aggregate principal amount not to exceed at any time  $1,000,000;

- acquisitions ("***Permitted Acquisition***"); <u>provided</u> that (a) no event of default has occurred and is continuing immediately before any such acquisition or would result immediately after giving effect to such acquisition, (b) acquired entities must be in substantially the same line of business as Holdings and its subsidiaries or a business that is corollary, ancillary or complementary thereto, (c) the Payment Conditions shall be satisfied and (d) with respect to Permitted Acquisitions of entities that do not become Guarantors, the total consideration paid in respect of the acquisition of such entities shall not exceed $10,000,000; provided, that, such cap will not apply to any Permitted Acquisition effected by a non-Loan Party subsidiary

- investments in joint ventures and subsidiaries in an aggregate principal amount not to exceed $10,000,000;

- investments in an aggregate amount not to exceed at any time the greater of (a) $15,000,000 and (b) 5% of consolidated total assets (excluding goodwill and intangibles) of Holdings and its subsidiaries; and

- other investments so long as the Payment Conditions (as defined below) shall be satisfied.

<u>Restricted Payments</u>.  Holdings shall not, nor shall it permit any of its subsidiaries to, pay any dividends or distributions on, or

redemptions of, Holdings' or such subsidiary's equity, subject to customary exceptions and consistent with the Documentation Principles, including without limitation:

- restricted payments to Holdings to pay (or to make restricted payments to any direct or indirect parent of Holdings to pay) (a) franchise taxes and other fees, taxes and expenses required to maintain its or their legal existence, (b) customary salary, bonus and other benefits payable to officers and employees to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrowers and their subsidiaries, (c) operating and overhead costs and expenses to the extent such costs and expenses are attributable to the ownership or operation of the U.S. Borrower and its subsidiaries, (d) fees and expenses related to any debt or equity offering (whether or not successful) and any investment otherwise permitted under the investments negative covenant and (e) cash payments in lieu of issuing fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for equity interests of the Holdings or any direct or indirect parent of the Holdings;

- tax distributions in amounts sufficient to permit Holdings (or any direct or indirect parent thereof) to pay its consolidated, combined or similar tax liability (including franchise or similar taxes) in respect of the U.S. Borrower and its subsidiaries;

- restricted payments consisting of the cashless exercise of options and warrants of the equity interests of Holdings or any of its subsidiaries;

- so long as no event of default is continuing, restricted payments to any present, former or future director, officer, employee, member of management or consultant of Holdings (or any direct or indirect parent thereof) or any of its subsidiaries (or their respective estates, heirs, family members, spouses or former spouses) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or arrangement or upon such person's death, disability, retirement or termination of employment, in an aggregate amount not to exceed $1,000,000 in any year (with rollover of unused basket amounts from prior fiscal years); and

- any other restricted payments to Holdings and from Holdings to its shareholders, so long as the Payment Conditions (as defined below) shall be satisfied.

"Payment Conditions" means, at the time of determination with

respect to any specified transaction or payment, the following conditions:

(a)      as of the date of any such transaction or payment, and after giving effect thereto, no event of default under the Revolving Credit Facility shall exist,

(b)      either (i) the Excess Availability would be at least the greater of (x) 20% of the Line Cap and (y) $20 million, in each case, on a pro forma basis immediately after giving effect to such transaction or payment and on a pro forma basis has been greater than such amount during the 30 consecutive days immediately prior to such transaction or payment, or (ii) (A) Excess Availability would be at least the greater of (x) 17.5% of the Line Cap and (y) $18 million, on a pro forma basis immediately after giving effect to such transaction or payment and on a pro forma basis has been greater than such amount during the 30 consecutive days immediately prior to such transaction or payment; and (B) on a pro forma basis after giving effect to such transaction or payment, Holdings and its subsidiaries would have had a fixed charge coverage ratio of not less than 1.1 to 1.0 for the four quarter (or, if a Cash Dominion Trigger Event exists, twelve month) period ended immediately prior to the date of such transaction or payment as if it had occurred on the first day of such period; and

(c)      In the case of any transaction or payment in excess of an amount to be agreed, Agent shall have received, on or prior to the date of such transaction or payment, a certificate from Holdings certifying as to compliance with the preceding clauses and demonstrating (in reasonable detail) the calculations required thereby.

"Line Cap" means the lesser of (a) the aggregate of the U.S. Borrowing Base and the Canadian Borrowing Base and (b) the Revolving Loan Cap.

Payments on/Modifications to Subordinated or Junior Lien Debt. Holdings shall not, nor shall it permit any of its subsidiaries to, directly or indirectly, (a) make payments in cash on permitted subordinated debt, permitted unsecured debt incurred in connection with a Permitted Acquisition, or junior lien debt prior to the scheduled maturity thereof (other than (i) regularly scheduled payments of interest and payment of fees, expenses and indemnification obligations (subject to the limitations contained in any applicable subordination provisions), (ii) refinancings, conversions or exchanges of such debt for like or junior debt, subject to conditions to be mutually agreed, (iii) payments with, or conversions to, equity (other than disqualified stock), (iv) so long as no event of default is continuing, payments as part of an "AHYDO catch-up payment", or (v) other payments, prepayments, redemptions and repurchases so long as the Payment Conditions

shall be satisfied; or (b) modify the terms of any such permitted subordinated, unsecured or junior lien debt to the extent such modification is materially adverse to the applicable Lenders or is in violation of the terms of the applicable subordination or intercreditor agreement(s) (it being understood that the foregoing limitation shall not otherwise prohibit refinancing, replacing or exchanging debt subject to limitations to be mutually agreed).

<u>Transactions with Affiliates</u>.  Holdings shall not, nor shall it permit any of its subsidiaries to, directly or indirectly, enter into or permit to exist any transaction with any affiliate of Holdings on terms that are less favorable in any material respect to Holdings or that subsidiary, as the case may be, than those that might be obtained at the time from a person who is not such an affiliate; subject to customary exceptions and consistent with the Documentation Principles.

<u>Negative Pledge Restrictions</u>.  Holdings shall not, nor shall it permit any of its subsidiaries to, enter into any agreement prohibiting the creation or assumption of any lien upon any of its properties or assets to secure the obligations under the Revolving Credit Facility or restricting distributions by subsidiaries, subject to customary exceptions and consistent with the Documentation Principles.

<u>Fundamental Changes</u>.  Holdings shall not, nor shall it permit any of its subsidiaries to, enter into any transaction of merger, amalgamation or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution) or sell, transfer or otherwise dispose of all or substantially all of its assets, subject to customary exceptions and consistent with the Documentation Principles.

<u>Lines of Business</u>.  Holdings shall not, nor shall it permit any of its subsidiaries to, engage in new lines of business, subject to customary exceptions and consistent with the Documentation Principles.

<u>Canadian Defined Benefit Plans</u>.  Holdings shall not, nor shall it permit any of its subsidiaries to, have any "defined benefit plans" in Canada.

<u>Cash Management</u>:    The Loan Parties will establish and maintain a cash management system reasonably acceptable to the Administrative Agent providing for springing cash dominion and control of the deposit accounts of the Loan Parties, <u>provided</u>, <u>that</u>, the Administrative Agent will not exercise such dominion unless a Cash Dominion Trigger Event exists.

"<u>Cash Dominion Trigger Event</u>" means any period (a) commencing on the date that a Specified Event of Default has occurred and

ending on the date on which such Specified Event of Default has been waived or cured or (b) commencing on the date that Excess Availability is less than the greater of (i) twelve and a half (12.5%) percent of the Line Cap and (ii) $12 million for five (5) consecutive business days, and ending on the date that Excess Availability has been greater than the greater of (ii) twelve and a half (12.5%)percent of the Line Cap and $12 million, for any consecutive thirty (30) day period thereafter.

"Excess Availability" means (a) the Line Cap , plus (b) Qualified Cash in an amount not to exceed $40 million minus (c) Revolving Loans and the outstanding letters of credit under the Revolving Credit Facility and unreimbursed drawings under letters of credit.

"Qualified Cash" means cash and cash equivalents owned by Loan Parties which (a) is available for use by a Borrower, without condition or restriction (other than in favor of Administrative Agent or Term Loan Agent), (b) is located in an account in the United States or Canada which is subject to an account control agreement in favor of the Administrative Agent, and (c) is subject to the perfected first priority security interest in favor of Administrative Agent and is free and clear of any pledge, security interest, lien, claim or other encumbrance (other than in favor of Administrative Agent, Term Loan Agent and the securities intermediary or financial institution where such cash is maintained for its customary fees and charges).

| | |
|---|---|
| Financial Covenant: | None, so long as a Covenant Compliance Period does not exist.  If a Covenant Compliance Period exists, then a minimum fixed charge coverage ratio covenant of 1.0:1.0 will apply for the most recently ended period of four consecutive quarters (or, if a Cash Dominion Trigger exists, twelve consecutive months) for which financial statements have been delivered (the "Financial Covenant"). |

"Covenant Compliance Period" means the period commencing on the date on which Excess Availability is less than the greater of $10 million and 10% of the Line Cap and ending on the date that Excess Availability has been greater than the greater of $10 million and 10% of the Line Cap, for any consecutive thirty (30) day period thereafter.

| | |
|---|---|
| Equity Cure: | If the Loan Parties fail to comply with the Financial Covenant, Holdings shall have the right to issue for cash consideration capital stock to, or receive a cash capital contribution (which equity shall be common equity on terms and conditions reasonably acceptable to the Administrative Agent) from, then existing shareholders, the cash proceeds of which must be contributed to the U.S. Borrower, at any time after the end of the relevant test period until the tenth business day after the required delivery of the compliance certificate for the relevant test period (the "Equity Cure") in an |

aggregate amount equal to the amount necessary to cure the default. The Equity Cure may not be used more than five times in the aggregate since the Closing Date, and no more than twice in any consecutive four fiscal quarter period.

The proceeds from the Equity Cure shall be (i) added to EBITDA for the applicable fiscal quarter or month, as applicable (solely for purposes of determining compliance with the Financial Covenant for such fiscal quarter and the subsequent three fiscal quarters or, if applicable, for such fiscal month and the subsequent eleven fiscal months) and (ii) disregarded for the purposes of determining financial ratio-based conditions and covenant baskets. There shall be no pro forma or other reduction in indebtedness with the proceeds from the Equity Cure for determining compliance with the Financial Covenant for the fiscal quarter or month in which the Equity Cure is used.

Events of Default:    Subject to materiality thresholds, exceptions and/or grace periods to be set forth in the Revolving Credit Documentation and limited to: nonpayment of principal, interest or other amounts; failure to observe or perform covenants, conditions or other agreements; incorrectness of representations and warranties in any material respect; cross default and cross acceleration to material indebtedness of the Borrowers or their subsidiaries; bankruptcy or insolvency event with respect to the Borrowers and their material subsidiaries; material judgments against the Borrowers or their subsidiaries; ERISA or other Canadian pension events; invalidity of Guarantees, security documents or subordination provisions of the agreements evidencing any material subordinated indebtedness; and change of control (to be defined in a mutually acceptable manner and consistent with the Documentation Principles).

Conditions Precedent
to Each Borrowing:    The conditions to all loans and letters of credit will consist of (a) customary prior written notice of the request for the loan or letter of credit in accordance with the Revolving Credit Documentation, (b) the accuracy of representations and warranties in the Revolving Credit Documentation in all material respects, (c) the absence of any default or event of default at the time of, and after giving effect to, the making of the loan or letters of credit or the issuance (or amendment or extension) of the letter of credit, (d) after giving effect to the requested loans or letter of credit, the aggregate amount of loans and letters of credit outstanding to the U.S. Borrower under the Revolving Credit Facility and the unreimbursed drawings under the letters of credit issued for the account of the U.S. Borrower will not exceed the lesser of the U.S. Borrowing Base or the U.S. Subfacility Cap, (e) after giving effect to the requested loan or letter of credit, the aggregate amount of loans and letters of credit outstanding to the Canadian Borrower under the Revolving Credit Facility and the unreimbursed drawings under the letters of credit issued for the account of the

Canadian Borrower will not exceed the lesser of the Canadian Borrowing Base or the Canadian Subfacility Cap, and (f) the Confirmation Order (as defined below) shall be in full force and effect, shall not have been reversed or stayed, and shall not have been amended or modified in any manner which is adverse to the Lenders in any material respect.

<u>Conditions Precedent to Initial Borrowing</u>: Satisfaction of all conditions precedent to the closing and effectiveness of the Term Loan Facility; substantially simultaneous receipt of proceeds of the Rights Offering; substantially simultaneous consummation of the Recapitalization Transactions and making of the Specific Liabilities Payments (and after giving effect thereto, no outstanding indebtedness or preferred stock at closing other than (a) the loans under the Revolving Facility, (b) loans under the Term Loan Facility and (c) other limited indebtedness not to exceed $1 million; consummation of the Contribution and execution and delivery of the Option Agreement; delivery of customary legal opinions, customary corporate documents and officers' and public officials' certifications; receipt of solvency certificate; accuracy of representations and warranties and no default or event of default (and receipt of officer's certificate relating thereto); perfected security interests in the Collateral (free and clear of all liens other than liens securing the Term Loan Facility and subject to customary and limited exceptions to be agreed upon); no Material Adverse Effect (as defined below); minimum Unused Borrowing Availability under the Revolving Credit Facility (after giving effect to the initial extensions of credit thereunder); receipt of customary lien and judgment searches and estoppel letters; receipt of the Intercreditor Agreement, borrowing base certificate and other loan documents, completion of field examination; customary evidence of authority; payment of fees and expenses; receipt of Patriot Act and other applicable "know your customer" information; delivery of financial statements; obtaining of customary insurance (together with a customary lenders loss payable endorsement). If the Recapitalization Transactions are consummated pursuant to an insolvency proceeding, the Revolving Credit Documentation will contain conditions customary for "exit" or similar financings, including entry of an order (which order shall be immediately effective, not vacated or stayed and not subject to any pending appeal), in form and substance satisfactory to the Administrative Agent (the "Confirmation Order") confirming the Chapter 11 reorganization plan (the "Chapter 11 Plan"), and authorizing Holdings and all of its subsidiaries that are debtors in the bankruptcy proceeding to execute and deliver the Revolving Credit Documentation, the definitive documentation for the Term Loan Facility, the Intercreditor Agreement and all ancillary documentation relating to the foregoing; substantially simultaneous repayment in full of, and termination of all guarantees and security interests relating to, any debtor-in-possession financing agreement (a "<u>DIP Facility</u>"); no waiver,

amendment or modification of the Chapter 11 Plan or Confirmation Order that is adverse to the Lenders in any material respect, and the occurrence of effective date of the Chapter 11 Plan, satisfaction of all conditions precedent thereto and substantially simultaneous substantial consummation of the Chapter 11 Plan (and receipt of officer's certificate as to the foregoing).

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, assets, operations or financial condition of the Borrowers and their Subsidiaries, taken as a whole and (b) the ability of the Loan Parties, taken as a whole, to perform its payment obligations under the Revolving Credit Facility.

<u>Amendments and Waivers</u>:

Amendments, waivers and consents with respect to the provisions of the Revolving Credit Documentation will require the approval of the Required Lenders, provided that, in addition to the approval of Required Lenders, (a) the consent of each Lender directly and adversely affected thereby will be required with respect to matters relating to (i) increases in the commitment of such Lender, (ii) reductions of principal, interest or fees (provided that a waiver of default interest shall not constitute a reduction of interest for this purpose), (iii) extensions of final maturity or the due date of any interest, fee or other payments (other than waivers of default interest), and (iv) changes to the order of application of funds and (b) the consent of all Lenders will be required with respect to (i) modifications of the pro rata sharing requirements of the Revolving Credit Documentation, (ii) modifications of the voting percentages or changes in the definition of "Required Lenders", "Supermajority Lenders" or any other provisions specifying the number of Lenders or portion of the loans or commitments required to take any action under the Revolving Credit Documentation, and (iii) releases of all or substantially all of the value of the Collateral or guarantees (other than in connection with transactions permitted pursuant to the Revolving Credit Documentation).  Increases in the percentages applied to eligible assets in the U.S. Borrowing Base or Canadian Borrowing Base and other modifications to the U.S. Borrowing Base, Canadian Borrowing Base or any components thereof which would result in an increase in the amount of availability  (but exclusive of the right of the Administrative Agent to add, increase, eliminate or reduce the amount of reserves or to exercise other discretion it may have pursuant to such provisions) may be subject to the approval of the Supermajority Lenders.  Matters affecting the Administrative Agent, the Swingline Lender or the Issuing Bank will require the approval of such party.  The commitments of one or more Lenders under the U.S. Subfacility or the Canadian Subfacility (each, a "Subfacility") may be increased so long as the commitments under the other Subfacility are concurrently decreased by an amount equal to such increase so that the aggregate commitments under the Revolving Credit Facility remain unchanged after giving effect

to such increase and decrease, it being agreed that such reallocation of commitments between each Subfacility may be effected with the consent of the Borrowers, the Administrative Agent and each Lender increasing  its commitment under each Subfacility, provided, that, (a) the Canadian Subfacility, after giving effect to any increase, shall not exceed the Canadian Subfacility Cap (as such Canadian Subfacility Cap has been increased as part of an Incremental Facility but without giving effect to any decrease that occurred under a reallocation from the Canadian Subfacility to the U.S. Subfacility) and (b) any such decrease in a Subfacility shall result in a pro rata reduction in the commitment of each lender under such Subfacility.

"Required Lenders" means those non-defaulting Lenders who collectively hold more than 50% of the total commitments or exposure under the Revolving Credit Facility, provided, that, at any time that there are 2 or more unaffiliated Lenders, "Required Lenders" must include at least 2 unaffiliated Lenders.

"Supermajority Lenders" means those non-defaulting Lenders holding more than 66 2/3% of total commitments or exposure under the Revolving Credit Facility provided, that, at any time that there are two (2) or more unaffiliated Lenders, "Supermajority Lenders" must include at least two (2) unaffiliated Lenders.

| | |
|---|---|
| Governing Law and Forum: | The laws of the State of New York. Each party to the Revolving Credit Documentation will waive the right to trial by jury and will consent to exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan in the City of New York. |
| Cost and Yield Protection: | Usual for facilities and transactions of this type, including customary tax gross-up provisions and including, but not limited to, provisions relating to Dodd-Frank and Basel III. |
| Assignments, Participations and CAM Provisions: | The Lenders will be permitted to assign loans and commitments under the Revolving Credit Facility with, so long as no event of default has occurred and is continuing, the consent of the Borrowers (not to be unreasonably withheld or delayed which consent shall be deemed to have been given if the Borrowers have not responded within 8 business days of a request for such consent); provided, that, the consent of the Borrowers shall not be required for assignments to any Lender, affiliate of any Lender or an approved fund of any Lender.  All assignments will require the consent of the Administrative Agent, not to be unreasonably withheld or delayed; provided, that, no assignments shall be made to Holdings or its affiliates.  Each assignment will be in an amount of an integral multiple of $5 million except in the case of an assignment to a Lender, an affiliate of a Lender or an approved fund. |

The Lenders will be permitted to sell participations (other than to

Disqualified Lenders (to be defined in the Revolving Credit Documentation) to the extent a list of Disqualified Lenders has been made available to all Lenders) in loans and commitments without restriction.  Voting rights of participants shall be limited to matters in respect of (a) increases in commitments of such participant, (b) reductions or forgiveness of principal, interest or fees payable to such participant, (c) extensions of final maturity or scheduled amortization of, or the date for payment of interest or fees on the loans or commitments in which such participant participates and (d) releases of all or substantially all of the value of the Guarantees, or all or substantially all of the Collateral.

The Revolving Credit Documentation will contain customary collateral allocation mechanism provisions which will be triggered upon the occurrence of a bankruptcy default or an acceleration of obligations following the occurrence of any other event of default.

| | |
|---|---|
| <u>Expenses and Indemnification</u>: | The Borrowers will indemnify the Arrangers, the Administrative Agent, the Issuing Bank, the Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "<u>Indemnified Person</u>") and hold them harmless from and against all costs, expenses (including reasonable fees, disbursements and other charges of counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless whether such matter is initiated by a third party or by Holdings, the Borrowers or any of their respective affiliates or equity holders) that relates to the Transactions, including the financing contemplated hereby; provided that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from (i) the bad faith, gross negligence or willful misconduct of such Indemnified Person or any of its controlled affiliates or controlling persons or any of the officers, directors or employees of any of the foregoing or (ii) disputes solely between and among Indemnified Persons to the extent such disputes do not arise from any act or omission of the Borrowers or any of their affiliates (other than with respect to a claim against an Indemnified Person acting in its capacity as an agent or Arranger or similar role under the Revolving Credit Documentation).  In addition, the Borrowers shall pay (a) all reasonable and documented out-of-pocket expenses (including, without limitation, reasonable fees, disbursements and other charges of counsel (but limited to one primary counsel in each of the U.S. and Canada and local counsel in each applicable jurisdiction)) of the Arrangers and the Administrative Agent in connection with the syndication of the Revolving Credit Facility, the preparation and administration of the Revolving Credit Documentation, and amendments, modifications and waivers thereto and (b) all out-of-pocket |

expenses (including, without limitation, fees, disbursements and other charges of counsel (but limited to one primary counsel in each of the U.S. and Canada and local counsel in each applicable jurisdiction (and, in the case of an actual or perceived conflict of interest, another counsel for each affected Indemnified Person)) of the Arrangers, the Administrative Agent and the Lenders for enforcement costs associated with the Revolving Credit Facility. None of Holdings, the Borrowers, any of their respective subsidiaries or any Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) arising out of, related to or in connection with any aspect of the Transactions, except to the extent of (i) direct, as opposed to indirect, special, punitive or consequential, damages and (ii) with respect to Holdings, the Borrowers or any of their respective subsidiaries, any such damages incurred or paid by an Indemnified Person to a third party.

Counsel to Administrative Agent:       Otterbourg P.C.

Canadian Counsel to Administrative
Agent:                                 Osler, Hoskin & Harcourt LLP