IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABLEST INC., et al.,[1] | ) | Case No. 14-10717 (KJC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**DECLARATION OF BRUCE H. MENDELSOHN IN SUPPORT OF**
**JOINT PLAN OF REORGANIZATION FOR ABLEST INC., ET AL.**

I, Bruce H. Mendelsohn, hereby declare that the following is true to the best of my knowledge, information and belief:

A. **Introduction**

1. I am over the age of 18 and am competent to testify. I am a Managing Director and Head of the Americas Restructuring Group of Goldman, Sachs & Co. ("Goldman Sachs"), a financial advisory and investment banking firm with principal offices located at 200 West Street, New York, New York 10282.

2. I submit this declaration (the "Declaration") in support of the *Joint Plan of Reorganization for Ablest Inc., et al* [Docket No. 20] (the "Plan")[2] and the *Disclosure Statement*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification numbers are: Ablest Inc. (8462); Koosharem, LLC (4537); New Koosharem Corporation (9356); Real Time Staffing Services, Inc. (8189); Remedy Intelligent Staffing, Inc. (0963); Remedy Staffing, Inc. (0080); RemedyTemp, Inc. (0471); Remedy Temporary Services, Inc. (7385); RemX, Inc. (7388); Select Corporation (6624); Select Nursing Services, Inc. (5846); Select PEO, Inc. (8521); Select Personnel Services, Inc. (8298); Select Specialized Staffing, Inc. (5550); Select Temporaries, Inc. (7607); Select Trucking Services, Inc. (5722); Tandem Staffing Solutions, Inc. (5919); Westaff, Inc. (6151); Westaff (USA), Inc. (5781); Westaff Support, Inc. (1039); RemSC LLC (8072); and RemUT LLC (0793). The mailing address for each of the Debtors is: 3820 State Street, Santa Barbara, CA 93105.

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Plan or Disclosure Statement.

*for the Prepackaged Joint Plan of Reorganization for Ablest Inc., et al. under Chapter 11 of the Bankruptcy Code* ("Disclosure Statement") [Docket No. 21].

3. Except as otherwise indicated, I have personal knowledge of the information contained herein, either directly or through professionals at Goldman Sachs working at my direction, members of management of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company"), or the Debtors' other advisors, and am competent to testify as to the matters set forth herein. Specifically, I have overseen the Goldman Sachs team which has been one of the principal restructuring advisors for the Debtors for nearly two years, and in that capacity I have been directly involved in the matters leading up to these chapter 11 filings, including the pre-petition marketing process and valuation. I also have been directly involved in negotiations with key creditor constituencies with respect to the Debtors' restructuring. I am authorized to submit this declaration on behalf of the Debtors.

B. **Marketing Process**

4. The Company began the process culminating in the current Plan in October of 2012. Through Goldman Sachs, the Company contacted approximately 94 parties to explore potential acquisition scenarios. These parties included strategic buyers and financial sponsors, both domestic and international. Following this outreach, 46 of these parties signed non-disclosure agreements and were granted access to information about the Company. On January 24, 2013, six initial indications of interest were received. The Company chose not to proceed with three of these parties as two of them required exclusivity and the other did not provide a competitive indicative bid price from a valuation perspective. After January 24, 2013,

2

during the due diligence stage, two additional parties entered the process after providing competitive bid indications.

5. On April 8, 2013, three second round indications were received from the five parties remaining in the process. The other two parties chose not to proceed after they determined that their bid indications would not be competitive. The Company presented the indicative bids to the Steering Committee in May pursuant to the terms of the First Forbearance Agreement and continued to work with the parties to develop the bids following feedback from the Steering Committee.

6. By August, the sale process had narrowed to a single party ("Party A"). As set forth in the Disclosure Statement, the Company determined, however, that the proposal advanced by Party A was uncertain and was not viable.

7. Given the lack of viable purchasers, the Debtors were unable to complete a sale transaction which met the various criteria (including, among other things, meeting or exceeding the target sale price) set forth in the First Forbearance Agreement and the Second Forbearance Agreement. In July, 2013, a subset of lenders advised the Company of their intent to develop a proposal for a standalone restructuring, which ultimately developed into the Plan.

8. Since September, 2013, the Company has worked to implement the Plan through either an out of court restructuring or a pre-packaged chapter 11 plan. A minority of the prepetition lenders did not support the Plan. A settlement with this group of lenders was ultimately reached and documented in the *Interim Order (I) Authorizing Debtors to Obtain Interim Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2),*

*364(c)(3), 364(d)(1), 364(e) and 507, (II) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (III) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001* [Docket No. 47].

9. The Company also received an unsolicited proposal on February 25, 2014 regarding a potential alternative transaction involving an acquisition of the Company by a publicly-traded special purpose acquisition corporation (the "SPAC Proposal"). The SPAC Proposal is described in detail on slides 12-13 of Exhibit J to the Disclosure Statement. As set forth in the Disclosure Statement, the Debtors with the advice of its advisors, including Goldman Sachs, determined that the Plan was preferable to this or any proposed alternative restructuring transaction.

C.   **Valuation Analysis.**

10. In order to demonstrate confirmability of the Plan and provide information to parties in interest regarding the possible range of values of their distributions under the Plan, the Disclosure Statement ascribed an estimated value, or range of values, to the reorganized Company. Goldman Sachs, as financial advisor, advised the Debtors with respect to the estimated range of total enterprise values of the Company, including the Reorganized Debtors, on a going-concern basis.

11. As a result of Goldman Sachs' analyses, review, discussions, considerations and assumptions described herein (including in paragraphs 14-18 below), Goldman Sachs estimated that the range of total enterprise value ("TEV Range") of the

Reorganized Debtors is approximately $680 million to $780 million on a going concern, pro forma reorganized basis. The assumed TEV Range reflects work performed by Goldman Sachs on the basis of information with respect to the business and assets of the Debtors (after giving effect to the merger of Decca Consulting, Inc., Decca Consulting Ltd., Resdin Industries, Inc. and Vaughan Business Solutions, Inc.) available to Goldman Sachs as of February 26, 2014 (the "Valuation Date"). Based upon the assumed TEV Range of $680 million to 780 million and assumed post-reorganization funded debt of approximately $350 million, as set forth in the Financial Projections attached as Exhibit C to the Disclosure Statement, Goldman Sachs estimated the implied equity value range for the Reorganized Debtors at $330 million to $430 million (less the amount of any additional funded debt as a result of draws on the new ABL facility on the Effective Date).

12.    The valuation analysis was prepared by Goldman Sachs based on data, information (including the Financial Projections) and financial and market conditions as of the Valuation Date (the "Valuation Analysis").

13.    As discussed above, the Valuation Analysis assumed a $350 million term loan upon emergence. In light of demand to participate in the term loan facility, the principal amount was increased from $350 to $370 million, and the pricing became more favorable from what was assumed in the Valuation Analysis. As a result, Goldman Sachs' estimated range of the implied equity value for the Reorganized Debtors upon emergence would be reduced by the $20 million in increased debt (less the amount of any additional funded debt as a result of draws on the new ABL facility on the Effective Date), but such decrease would be largely offset by the

increase in valuation created by the lower cost of capital. Given the $100 million range in the estimated implied equity range and the increase in value created by the lower cost of capital, our views on value remain the same.

14. I am unaware of any other data, circumstances, developments, events, or any subsequent changes or modifications to any existing rules or regulations instituted by any regulatory authority, occurring after the Valuation that would render the Valuation Analysis inaccurate as of the date hereof.

15. In preparing the Valuation Analysis, Goldman Sachs, among other things: (i) reviewed certain internal financial and operating data of the Debtors; (ii) discussed with certain senior executives of the Debtors the current operations and prospects of the Debtors; (iii) reviewed certain operating and financial forecasts prepared by the Debtors, including the Financial Projections; (iv) discussed with certain senior executives of the Debtors key assumptions related to the Financial Projections; (v) prepared discounted cash flow analyses based on the Financial Projections, utilizing various discount rates and perpetuity growth rates; (vi) considered the prevailing trading multiples of certain publicly-traded companies in businesses reasonably comparable to the Debtors; (vii) considered the multiples in recent change-of-control transactions involving public companies in businesses Goldman Sachs deemed to be reasonably comparable to the Debtors; and (viii) considered such other factors as Goldman Sachs deemed appropriate under the circumstances.

16. Goldman Sachs has not conducted any independent evaluation or appraisal of the respective assets or liabilities of the Debtors or any other party. Goldman Sachs relied

upon and assumed, without independent verification, the accuracy and completeness of the financial, accounting, tax and other information provided to or discussed with it by the Debtors or obtained by it from public sources. Goldman Sachs has not assumed any responsibility for the independent verification of any such information, including, without limitation, the Financial Projections, and has further relied upon the assurances of the senior management of the Debtors that they are unaware of any facts that would make the information and Financial Projections incomplete or misleading in any respect. Goldman Sachs has not audited, reviewed or compiled the accompanying information in accordance with Generally Accepted Accounting Principles or otherwise. With respect to the Financial Projections furnished by the Debtors, Goldman Sachs has assumed that such Financial Projections have been reasonably prepared and reflect the best currently available estimates and judgments of the senior management of the Debtors as to the expected future performance of the Debtors.

17. In preparing the Valuation Analysis, Goldman Sachs relied upon the Financial Projections and the assumptions upon which the Financial Projections were prepared, including: (i) the Debtors will be reorganized in accordance with the Plan and the Effective Date occurs on or about May 25, 2014;[3] (ii) the Debtors are able to recapitalize and have adequate liquidity as of the Effective Date, as set forth in the Financial Projections; (iii) the Debtors are able to implement the Plan in the manner described herein; (iv) the debt level of the Debtors will

---

[3] An earlier Effective Date, would not render the Valuation inaccurate.

be approximately $350 million[4] immediately following the Effective Date; (v) general financial and market conditions and the financial and market outlook specifically for the staffing industry in which the Debtors operate as of the Effective Date will not differ, in any way meaningful to Goldman Sachs' analysis, from the conditions prevailing as of the Valuation Date.

18. As set forth in more detail in the Disclosure Statement, in estimating the range of TEV, Goldman Sachs has employed generally accepted valuation techniques and primarily relied upon a discounted cash flow analysis. Goldman Sachs also utilized a comparable public company analysis, and a transaction comparable analysis to value the Reorganized Debtors. Goldman Sachs believes that these valuation methodologies reflect both the market's current view, as well as a longer term focus, on the value of the Debtors.

19. The estimates of the enterprise value contained in the Disclosure Statement and this Declaration do not reflect values that could be attainable in public or private markets. The valuation information contained in this Declaration and the Disclosure Statement is not a prediction or guarantee of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan.

D. **The Plan is Fair and Equitable**

20. I do not believe that under the Plan, any Class of creditors is being paid more than what it is owed.

---

[4] As set forth above, the amount of the term loan has been increased to $370 million.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: May 1, 2014

                                                                  */s/ Bruce H. Mendelsohn*
                                                                  By:   Bruce H. Mendelsohn