IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ABLEST INC., et al.,[1] | ) | Case No. 14-10717 (KJC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

### DECLARATION OF RANDALL S. EISENBERG IN SUPPORT OF
### JOINT PLAN OF REORGANIZATION FOR ABLEST INC., ET AL.

I, Randall S. Eisenberg, hereby declare that the following is true to the best of my

knowledge, information and belief:

### Introduction

1.      I am over the age of 18 and am competent to testify.  I am a Managing

Director at AlixPartners, LLP, which, through its subsidiary AP Services, LLC (together,

"AlixPartners"), has served as restructuring advisor to each of the above-captioned debtors and

debtors in possession (collectively, the "Debtors" or the "Company") since August 2013.  From

Spring 2012 until August 2013, I advised the Debtors while at FTI Consulting, Inc. ("FTI") and

thereafter through a subcontracting agreement between AlixPartners and FTI.

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification numbers are: Ablest Inc. (8462); Koosharem, LLC (4537); New Koosharem Corporation (9356); Real Time Staffing Services, Inc. (8189); Remedy Intelligent Staffing, Inc. (0963); Remedy Staffing, Inc. (0080); RemedyTemp, Inc. (0471); Remedy Temporary Services, Inc. (7385); RemX, Inc. (7388); Select Corporation (6624); Select Nursing Services, Inc. (5846); Select PEO, Inc. (8521); Select Personnel Services, Inc. (8298); Select Specialized Staffing, Inc. (5550); Select Temporaries, Inc. (7607); Select Trucking Services, Inc. (5722); Tandem Staffing Solutions, Inc. (5919); Westaff, Inc. (6151); Westaff (USA), Inc. (5781); Westaff Support, Inc. (1039); RemSC LLC (8072); and RemUT LLC (0793).  The mailing address for each of the Debtors is:  3820 State Street, Santa Barbara, CA 93105.

2.      I submit this declaration (the "Declaration") in support of the *Joint Plan of Reorganization for Ablest Inc., et al.* [Docket No. 20] (the "Plan") and the *Disclosure Statement for the Prepackaged Joint Plan of Reorganization for Ablest Inc., et al. under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement")[2] [Docket No. 21].

3.      On the Petition Date, I submitted a *Declaration of Randall S. Eisenberg in Support of First Day Motions* [Docket No. 3] (the "First Day Declaration"). The First Day Declaration, *inter alia*, summarized the Plan, outlined the extent of creditor support that exists for the Plan based on a prepetition solicitation process, and described the business of the Debtors and the developments that led to their filing for relief under chapter 11 of the Bankruptcy Code. I hereby reaffirm the declarations set forth in the First Day Declaration that are not updated by the declarations set forth herein and incorporate such declarations by reference herein.

4.      Except as otherwise indicated, I have personal knowledge of the information contained herein, either directly or through professionals at AlixPartners or FTI working at my direction, members of management of the Debtors, or the Debtors' other advisors, and am competent to testify as to the matters set forth herein. Specifically, I have been one of the principal restructuring advisors for the Debtors for nearly two years and in that capacity I have been directly involved in the matters leading up to these chapter 11 filings, including financial planning, forecasting, and the restructuring process. I also have been directly involved

---

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Plan or Disclosure Statement.

in negotiations with key creditor constituencies with respect to the Debtors' restructuring. I am authorized to submit this declaration on behalf of the Debtors.

### Background and Qualifications

5.      I have held the position of Managing Director at AlixPartners since January 2013, where I co-lead its Transformation and Restructuring Advisory Practice which is part of the Turnaround and Restructuring Services Group. Prior to that time, I was a Senior Managing Director in FTI's Corporate Finance Practice. I was a member of FTI's Corporate Finance Practice leadership team during most of the approximately 10 year period following the acquisition of PricewaterhouseCoopers, LLP's Business Recovery Services U.S. Practice by FTI in September 2002. Prior to this acquisition, I was a Partner at PricewaterhouseCoopers, LLP.

6.      Over the past 23 years, I have advised senior management and boards of directors of companies in numerous industries on devising and implementing sound turnaround and restructuring strategies in out-of-court turnarounds, chapter 11 restructurings and foreign insolvency proceedings. In addition, I have advised creditor constituencies who often become the new owners of a business upon consummation of a restructuring. During the course of my career, I have been involved in numerous large and complex restructurings, including, but not limited to, Momentive Performance Materials, Inc., Delphi Corporation, US Airways Group, Inc., Visteon Corp., Jackson Hewitt, Vertis, Inc., Anthracite Capital, Inc., Kmart Corporation, Planet Hollywood International, Inc., RSL Communications, Ltd. and Rotech Healthcare, Inc. I am a Certified Turnaround Professional and a Certified Public Accountant. In addition, I am a Fellow in both the American College of Bankruptcy and the International Insolvency Institute.

During the course of my career, I have served as the President and Chairman of the Turnaround Management Association and the Association of Certified Turnaround Professionals, the latter of which was merged into the Turnaround Management Association.

### Development and Proposal of Plan and Disclosure Statement

**A.    Good Faith Proposal of Plan**

7.      The Plan and the transactions incorporated therein are the result of arm's length negotiations and have been proposed in good faith and for a proper purpose. As set forth in more detail in the *Declaration of Bruce Mendelsohn in Support of the Joint Prepackaged Plan of Reorganization of Ablest Inc., et al.* filed contemporaneously herewith [Docket No. 214] (the "Mendelsohn Declaration"), in October, 2012, the Company began exploring potential sales scenarios. In July, 2013, after the Debtors were unable to complete a sale transaction which met various criteria (including, among other things, meeting or exceeding a targeted sale price), a subset of lenders advised the Company of their intent to develop a proposal for a standalone restructuring, which ultimately became the Plan. Since September, 2013, the Company has worked to implement the Plan through either an out-of-court restructuring or a pre-packaged chapter 11 plan.

8.      Over this approximately seventeen month period, the Company has worked closely with the Steering Committee and Backstop Investors to reach a near unanimous deal. During this period, the parties had regular meetings to discuss, negotiate and arrive at the Plan which reflects the end product of active and extensive arm's length negotiations conducted in good faith.

4

9.      In summary, I believe the Plan has been proposed in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing businesses and enhancing the financial viability of the Reorganized Debtors, while providing recovery in full to the majority of the Debtors' creditors and significant recovery to the Holders of Prepetition First Lien Loan Claims and the Holders of Prepetition Second Lien Loan Claims. I believe that the support of the Debtors' primary constituencies and the overwhelming acceptance of the Plan by the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders reflect the overall fairness of the Plan and the acknowledgement by the Debtors' claimholders that the Plan has been proposed in good faith and for proper purposes. Accordingly, I believe that confirmation of the Plan proposed by the Debtors is in the best interests of all creditors and should be approved.

10.     Additionally, the principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 (15 U.S.C. § 77e).

**B.     The Disclosure Statement Contains Adequate Information**

11.     In connection with the Plan, the Debtors prepared the Disclosure Statement that describes the terms of the Plan and its effects on holders of Claims against and Equity Interests in the Debtors. I reviewed the Disclosure Statement prior to its dissemination to the impaired classes, namely the Holders of Prepetition First Lien Loan Claims and the Holders of Prepetition Second Lien Loan Claims, and believe it is accurate and comprehensive. It sets forth, among other things, descriptions and summaries of (a) the Debtor's corporate history and business (pages 18-22); (b) the prepetition capital structure and employee and related party

transactions (pages 22-32); (c) the events leading up to the filing of these Chapter 11 cases (pages 32-34); (d) transactions to be effectuated and securities to be issued under the Plan (pages 43-94); (e) a liquidation analysis setting forth the estimated return that holders of claims and equity interests would receive in a hypothetical chapter 7 case (Exhibit F); (f) financial information and valuations that would be relevant to creditors' determinations of whether to accept or reject the Plan (pages 86-91; Exhibits C, D, and E); (g) the risk factors affecting the Plan and the securities to be issued pursuant to the Plan and the agreements described therein (pages 94-116); (h) an analysis of the alternatives to confirmation and consummation of the Plan (pages 84-94 and 116-117); (i) an analysis of the exemptions from Securities Act registration for the securities to be issued pursuant to the Plan and the agreements described therein (pages 117-120); and (j) an analysis of certain United States federal income tax consequences of the Plan (pages 120-129).

12.    Based on the foregoing, I believe that the Disclosure Statement contains adequate information within the meaning of section 1125(a), (b) and (g) of the Bankruptcy Code and applicable securities laws, as those provisions have been explained to me.

## Primary Terms of the Plan

### A.    Classification of Claims and Interests Pursuant to the Plan

13.    As set forth in Article III, the Plan contains separate Classes of Claims against and Equity Interests in each of the Debtors. This classification scheme was not designed with an eye toward fashioning (nor, given the overwhelming and across-the-board acceptance, did it create) a single impaired accepting class.

6

14.     Specifically, Class 1 – Priority Claims are separately classified based on the specific priority provided to such Claims under the Bankruptcy Code.  Class 2 – Other Secured Claims, Class 3 – Secured Tax Claims, Class 4 – Prepetition First Lien Loan Claims, Class 5 – Prepetition Second Lien Loan Claims, and Class 6 – SCIF Claims are all secured claims, but are separately classified based upon the different rights and different collateral (or priority with respect to common collateral) securing such Claims.  Class 7 – General Unsecured Claims are general unsecured trade claims that are unimpaired and will ride through the bankruptcy.  Class 8 – Prepetition Warrants, Class 9 – Equity Interests in Parent and Class 10 – Equity Interests in Subsidiaries represent different types of equity interests (as opposed to claims) and are therefore classified separately from Classes 1 through 7.

15.     The separate classification reflects the various nature of the Claims and Equity Interests in such Classes that requires separate classification.  I believe that valid business reasons exist for the various Classes of Claims and Equity Interest created under the Plan, and I believe that such Classes do not unfairly discriminate between holders of Claims or Equity Interests.

## B.     Adequate Means for Implementing the Plan

16.     I believe the various provisions of the Plan will provide adequate means for the Plan's implementation.  The Plan contemplates: (i) the exchange of approximately $492 million in aggregate principal amount of secured Claims under the Prepetition First Lien Credit Agreement (calculated as of the Petition Date) for $365 million in cash and Subscription Rights allowing the Holders of Prepetition First Lien Loan Claims to Participate in the Rights Offering

and (ii) the exchange of approximately $159 million in aggregate principal amount of secured

Claims under the Prepetition Second Lien Credit Agreement (calculated as of the Petition Date)

for $12 million in cash and New Warrants for the purchase of New Common Stock of the

Reorganized Parent. Allowed unsecured claims will be paid in full. All existing Equity Interests

in the Parent will be cancelled.

17.     Certain of the Sorensen Parties will receive, in settlement of any and all

claims such Sorensen Party may have, in each case, against the Debtors: (a) New Common Stock

of the Reorganized Parent in consideration for contributing new assets to the Reorganized Parent

under the terms of the DRV Purchase Agreement, (b) New Common Stock under the terms of

the Restricted Stock Award Agreement, (c) New Common Stock in connection with the

conversion of certain Related Party Notes under the terms of the Sorensen Support Agreement,

and (d) an option to designate and purchase additional New Common Stock for Cash in an

aggregate amount of $4 million under the terms of the Sorensen Support Agreement.

18.     Distributions under the plan will be funded through a $175 million Rights

Offering of New Common Stock, a $50 million equity investment in Cash pursuant to the

Backstop Agreement, and a new $370 million first lien term credit facility (the "Term Facility").[3]

Operations of the Company following the restructuring will be financed through a new secured

---

[3] In light of demand for the Term Facility, the principal amount was increased from $350 million described in the Disclosure Statement to $370 million, and the pricing became more favorable from what was anticipated (including a decrease of 50 basis points from the interest rate set forth in the term sheet filed as Annex 2 to the Plan Supplement on April 25, 2014 [Docket No. 196]).

asset based revolving credit facility in a principal amount of up to $120 million (the "Revolving Facility" and together with the Term Facility, the "Exit Financing").

19.    Moreover, as discussed in greater detail below, AlixPartners was intimately involved in the preparation of the pro forma financial projections attached to the Disclosure Statement as Exhibit C (the "Projections") and believe there is a good faith basis for the assumptions and the conclusions set forth in the Projections. Accordingly, based upon the Projections and the liquidity to be provided pursuant to the Rights Offering, the Backstop Agreement, the Post-Emergence Term Loan Agreement and the Post-Emergence ABL Loan Agreement, I believe the Reorganized Debtors should have sufficient liquidity to meet their debts as such debts mature in the ordinary course of business.

**C.    Post-Confirmation Corporate Governance**

20.    The Debtors have disclosed the initial officers and members of the new board of each of the Reorganized Debtors, including the identity of any insider that will be employed or retained by the Reorganized Debtors. The Disclosure Statement and Plan Supplement disclose the identity of the officers and members of the new board of each of the Reorganized Debtors, as well as the nature of the compensation that will be received by any insider of the Debtors. The appointment to, or continuance in, such office of each individual, and the methods established therefore, are consistent with the interests of holders of Claims and Equity Interests, and with public policy.

21.    The Debtors' existing management team, which is highly experienced and intimately familiar with the Debtors' affairs, will stay in place on the Effective Date. I believe

that the existing officers under the supervision of the new Board of Directors are qualified to manage the Reorganized Debtors.

22.      Furthermore, the Backstop Investors designated the members of the New Board other than D. Stephen Sorenson, who will remain Chief Executive Officer of the Reorganized Parent. Based on the biographical information of the New Board members set forth in Exhibit I of the Disclosure Statement, I believe the New Board is qualified.

23.      As the Backstop Investors will own a majority of the equity in the Reorganized Debtors upon consummation of the Plan, I also believe that the Backstop Investors selection of the members of the New Boards and approval of the continuation of existing officers is consistent with the interests of holders of Claims and Equity Interests and with public policy.

**D.      Treatment of Contracts and Leases**

24.      Article VI of the Plan pertains to the assumption and rejection of the Debtors' executory contracts and unexpired leases. Specifically, Article VI.A of the Plan provides that, on the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts (including, without limitation, employment agreements) and Unexpired Leases that: (a) have been rejected by order of the Bankruptcy Court; (b) are the subject of a pending motion to reject on the Effective Date; (c) are identified in the Plan Supplement with the consent of the Required Backstop Investors (in either case which list may be amended by the Debtors to add or remove Executory Contracts and Unexpired Leases by filing with the Bankruptcy Court an

amended list and serving it on the affected contract parties at least ten (10) days prior to the

Confirmation Hearing); or (d) are rejected pursuant to the terms of the Plan. As of the date

hereof, other than modification of executory contracts and leases under the Plan, including the

modification of Mr. Sorensen's employment arrangement and modification of certain related

party real property leases and other business relationships, the Debtors have not designated any

executory contracts or leases to be rejected.

        25.     As rejection damages claims would be paid in full, subject to any

applicable statutory caps, as Class 7 General Unsecured Claims, I believe the Debtors have

exercised their reasonable business judgment in determining whether to assume or reject their

executory contracts and unexpired leases pursuant to Article VI of the Plan.

        26.     In addition, for the reasons stated below regarding feasibility of the Plan,

I believe that the Debtors will have more than sufficient liquidity to make required payments

with respect to assumed leases and contracts, both immediately after the Effective Date and

going forward.   Accordingly, I believe that the Debtors have provided adequate assurance of

future performance with respect to any executory contracts or unexpired leases that may be

deemed assumed pursuant to the Plan.

**E.      The Releases and Exculpations are Fair and Necessary**

i.  *The Plan's Debtor Release Provisions Should Be Approved*

27.    Pursuant to Article XI.B of the Plan, the Debtors and Reorganized Debtors will provide a  release to the Released Parties,[4] subject to certain limited standard exceptions outlined in the Plan, including a carve-out from the release for acts of fraud, gross negligence or willful misconduct.

28.    I believe that the Debtors have exercised their reasonable business judgment in proposing the release set forth in Article XI (the "Debtor Release") and that the Debtor Release is reasonable.  First, both creditor classes entitled to vote on the Plan voted overwhelmingly in favor of the Plan.  Further, to the best of my knowledge, there is no pending litigation that would be discontinued by such release, and the Debtors do not believe there is any basis for the assertion of any estate claims against the Released Parties, including in particular any breach of fiduciary duty claims against the Debtors' directors and officers related to the development, negotiation, and formulation of the Plan.

29.    Finally, the Released Parties were actively involved in negotiating and formulating the Plan, and the release provisions were a key element of the Plan.  I believe that the Debtor Release is well-considered and reasonable and represents a valid settlement of whatever claims or causes of action the Debtors may have against the Released Parties and, for these reasons, should be approved as a valid exercise of the Debtors' business judgment to

---

[4] The term "Released Party" means collectively, each in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the current and former members of the Steering Committee; (d) the DIP Agent; (e) the DIP Lenders; (f) the Prepetition Secured Lenders; (g) the Backstop Investors; (h) the Prepetition Agents; (i) the Sorensen Parties; (j) the Participating Lenders and (k) the respective Related Persons of each of the foregoing Entities.

include a settlement of any claims it might own against such parties as a discretionary provision of the Plan.

### ii. *The Plan's Third Party Release Provisions Should Be Approved*

30.     Pursuant to section XII.A and XII.B of the Plan, each holder of a Claim who affirmatively elected to opt-in to the releases contained in Section XII.A and XII.B agreed to release each Creditor Releasing Party and Sorensen Party. A party could opt-in by checking the appropriate box on its timely submitted ballot, or, if the party in interest was not in a voting class, by providing written notice of its election. These releases are entirely voluntary and mutual.

31.     I believe that the release set forth in Article XII (the "Third Party Release") is essential to the Plan, and that circumstances exist in these Chapter 11 cases that warrant the approval of the Third Party Release. Participation in the Third Party Release is voluntary and mutual. The Third Party Release does not cover transactions or documents contemplated by the Plan. Creditors entitled to vote on the Plan were able to opt-in to the Third Party Release by checking the appropriate box on the Ballot, while the DIP Agent, the Prepetition Agents and stakeholders not entitled to vote on the Plan are able to opt-in to the Third Party Release by giving written notice prior to the Effective Date. Any entity that elects to participate in the Third Party Release, will grant a release to (i) each other creditor that participates in the Third Party Release and (ii) the Sorensen Parties and their non-Debtor Affiliates. The Sorensen Parties and their non-Debtor Affiliates will grant a Third Party Release to each of the entities that elect to participate in the Third Party Release.

13

32.     As set forth above, the Debtors formulated the Plan after negotiating extensively with numerous parties, including the Creditor Releasing Parties and the Sorensen Parties, in good faith.  The Third Party Release provisions were specifically negotiated among the Creditor Releasing Parties and the Sorensen Parties as part of this process.  I believe negotiation and compromise were critical to the formulation of a feasible Plan, and could not have occurred without the protection from liability that the Third Party Release provisions provide to the constituents involved in negotiating and supporting the Plan.  Moreover, the Debtors have agreed to indemnify certain parties subject to the Third Party Release provisions.  Thus, failure to approve the Third Party Release could negatively and directly impact the Reorganized Debtors.  In light of all of the circumstances, I believe the Third Party Release provisions contained in the Plan are necessary to the Debtors' reorganization and are fair and reasonable and should be approved.

33.     Finally, I believe the releases are appropriate because they are entirely consensual and were granted by highly sophisticated parties who are intimately familiar with the Debtors' affairs.

iii. _The Plan's Exculpation Provisions Should Be Approved_

34.     Pursuant to Article XII.D of the Plan, the Exculpated Parties[5] will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or

---

[5] The term "Exculpated Parties" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the current and former members of the Steering Committee; (d) the DIP Agent; (e) the DIP Lenders; (f) the Prepetition Secured Lenders; (g) the Backstop Investors; (h) the Prepetition Agents; (i) the Sorensen Parties; (j) the Participating Lenders and (k) the respective Related Persons of each of the foregoing Entities.

after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be

taken in connection with, or related to formulating, negotiating, preparing, disseminating,

implementing, administering, confirming or effecting the Consummation of the Plan, the

Disclosure Statement, the Lender RSA, the Backstop Agreement, the Sorensen Support

Agreement, or any other contract, instrument, release or other agreement or document created or

entered into in connection with the Plan or any other prepetition or postpetition act taken or

omitted to be taken in connection with or in contemplation of the restructuring of the Debtors,

the approval of the Disclosure Statement or confirmation or Consummation of the Plan;

provided, however, that the foregoing provisions will have no effect on the liability of any Entity

that results from any such act or omission that is determined in a Final Order of the Bankruptcy

Court or other court of competent jurisdiction to have constituted gross negligence or willful

misconduct; provided, further, that each Exculpated Party will be entitled to rely upon the advice

of counsel concerning its duties pursuant to, or in connection with, the above referenced

documents, actions or inactions; provided, further, however that the foregoing provisions will not

apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in

and preserved by the Plan or the Plan Supplement.

       35.    As set forth above, the Debtors formulated the Plan after negotiating

extensively with numerous parties in good faith.  The exculpation provisions set forth in Article

XII.D of the Plan (the "Exculpation Provisions") were specifically negotiated among the

Exculpated Parties as part of this process.  As noted above, I believe negotiation and compromise

were critical to the formulation of a feasible Plan, and could not have occurred without the

protection from liability that the Exculpation Provisions provide to the constituents involved in negotiating and supporting the Plan. Moreover, the Debtors have agreed to indemnify certain Exculpated Parties. Thus, failure to approve the Exculpation Provisions could negatively and directly impact the Reorganized Debtors. In light of all of the circumstances, I believe the Exculpation Provisions contained in the Plan are necessary to the Debtors' reorganization and are fair and reasonable and should be approved.

**F.       The Plan Does Not Discriminate Unfairly and Is Fair and Equitable**

36.       The Holders of Class 8 Prepetition Warrants Claims and Class 9 Equity Interests in Parent Claims (together, the "Rejecting Classes") are not receiving a distribution or retaining any property under the Plan and are therefore deemed to reject the Plan. No other Classes have rejected the Plan. Pursuant to Bankruptcy Code section 1129(b), I understand that the Plan may be confirmed notwithstanding the deemed rejection of the Plan by the Rejecting Classes as long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to such Classes.

37.       I believe that the Plan does not discriminate unfairly with respect to the Rejecting Classes because members within each class are treated similarly. Specifically, all of the Class 8 and Class 9 Claims are placed into their individual Classes and given the same respective treatment. Further, I believe that the Plan is fair and equitable with respect to the Rejecting Classes, because there are no Holders of Claims or Equity Interests junior to the holders of Class 8 and Class 9 Claims who will receive or retain any property under the Plan.

Moreover, pursuant to the Plan, no Holders of Claims senior to the Rejecting Classes are receiving more than full payment on account of such Claims.

38.    With respect to Class 10 Equity Interests in Subsidiaries Claims that are not impaired and deemed to accept the Plan, preservation of such Equity Interests is a means to preserve the Reorganized Debtors' corporate structure that does not have any economic substance and does not enable any Holder of any Claims or Equity Interests junior to the Rejecting Classes to retain or recover any value under the Plan. Accordingly, the unimpaired status of Class 10 is consistent with the requirement that no holders of Claims or Equity Interests junior to the holders of Claims or Equity Interests in the Rejecting Classes will receive or retain any property under the Plan on account of such Claims or Interests.

G.    **The Plan Has Been Accepted by at Least One Impaired Class Determined Without Any Acceptance of the Plan by Any Insider**

39.    As set forth in the *Declaration of Michael J. Paque of Kurtzman Carson Consultants LLC Regarding the Mailing, Voting, and Tabulation of Ballots Accepting and Rejecting the Prepackaged Joint Plan of Reorganization Ablest Inc., et al.* [Docket No. 19], as supplemented by the *Supplemental Declaration of Michael J. Paque of Kurtzman Carson Consultants LLC Regarding the Mailing, Voting, and Tabulation of Ballots Accepting and Rejecting the Prepackaged Joint Plan of Reorganization of Ablest Inc., et al.* filed contemporaneously herewith, each of the impaired classes entitled to vote-- Classes 4 and 5-- have accepted the Plan. I have reviewed the list of claimants in Classes 4 and 5 and I believe that each of these Classes is comprised exclusively of non-insider Claims. As a result, at least

17

one Class of Claims that is impaired under the Plan has accepted the Plan, determined without

including any acceptance of the Plan by any insider.

### The Plan is Feasible

40.    In connection with the development of the Plan, the Debtors analyzed their

ability to satisfy their financial obligations while maintaining sufficient liquidity and capital

resources.  In this regard, the management of the Debtors and of the acquired businesses at

emergence, with the assistance of AlixPartners as it pertains to the Company and FTI as it relates

to the acquired businesses at emergence, with both firms working under direction of the Debtors,

developed and refined a business plan and prepared the Projections for the years ending

December 28, 2014 through December 30, 2018, which were attached to the Disclosure

Statement as Exhibit C.  The Projections were prepared on a consolidated basis and includes all

Debtor entities, and Decca Consulting, Inc., Decca Consulting Ltd, Resdin Industries, Inc. and

Vaughan Business Solutions, Inc.

41.    In general, the Projections demonstrate that with the significantly de-

leveraged capital structure provided under the Plan, the Reorganized Debtors should have

sufficient cash flow and availability to make all payments required pursuant to the Plan while

conducting ongoing businesses operations.  The Projections demonstrate that confirmation and

consummation of the Plan, therefore, is not likely to be followed by the liquidation or further

reorganization of the Reorganized Debtors.

42.    AlixPartners supported the Debtors in the development of the Projections

and worked directly with management in reviewing the various assumptions and the build-up of

the revenue and cost projections. In addition, AlixPartners assisted the Debtors in their market

research, and supported the Debtors in preparing various presentations to stakeholders and

potential investors. Due to AlixPartners' involvement in the business planning process,

AlixPartners has extensive knowledge of the analysis, key assumptions and underlying data that

was used to develop the Projections. AlixPartners has continued to analyze and review the

Projections and projected Effective Date sources and uses. The current projected sources and

uses show approximately a 5% variance from those set forth in the Disclosure Statement. I

believe that such variance is not material and does not change the overall feasibility analysis.

43.     Based on the extensive business planning process that the Debtors

undertook in developing the Projections, as well as my understanding of the assumptions

underlying them and the analysis above, and under the assumption that the Company will be well

managed and will follow the business plan underlying the Projections, I believe that the

Projections are reasonable, subject to the risks described in the Disclosure Statement. Further, as

discussed above, upon emergence, the Company will be significantly deleveraged and have

increased liquidity.

44.     As set forth above, distributions under the Plan will be funded through a

$225 million equity investment under the Rights Offering and Backstop Agreement and the $370

million Term Facility, while operations of the Company following the restructuring will be

financed through the $120 million Revolving Facility. I am not aware of any impediments to the

consummation of the Rights Offering or Backstop Agreement. Further, the Debtors have

engaged Royal Bank of Canada ("RBC") to arrange the Revolving Facility and  Credit Suisse

Securities (USA) LLC ("Credit Suisse") to arrange the Term Facility. The terms of the engagement of RBC and Credit Suisse were approved by an Order[6] of this Court. RBC and Credit Suisse have regularly updated the Debtors and their professionals on the progress in arranging such financing. The Debtors, RBC and Credit Suisse have commenced and made substantial progress toward completing definitive documentation of the Exit Financing. Accordingly, it is my belief that, if the Plan is confirmed, the Debtors will likely be able to successfully consummate the Exit Financing or something similar to provide sufficient financing as contemplated in the Projections.

45.    Based on the above, I believe that the Reorganized Debtors will have sufficient operating cash to pay interest and scheduled amortization on all of their outstanding indebtedness and to fund anticipated capital expenditures relating to ongoing business operations as contemplated by the Plan. Moreover, based on my review of the Projections, I believe that, as of the Effective Date and after taking into account the transactions contemplated by the Plan, the Reorganized Debtors will, on a consolidated basis, and subject to the risks described in the Disclosure Statement, (i) be able to meet their debts as such debts mature, (ii) not be left with unreasonably small capital to operate their businesses as a result of the Plan or any transactions contemplated by the Plan, and (iii) be solvent.

46.    Finally, based on my analysis of, among other things, the Debtors' business strategy, Projections and exit financing facilities, I am of the opinion, to a reasonable

---

[6] [Docket No. 159].

degree of certainty, that the Plan is feasible - that is, confirmation of the Plan is not likely to be followed by the liquidation of the Reorganized Debtors or by the need for a further financial reorganization of the Reorganized Debtors under chapter 11 of the Bankruptcy Code.

## Best Interests

47.     The Debtors, with the assistance of AlixPartners, performed a liquidation analysis, attached to the Disclosure Statement as Exhibit F (the "Liquidation Analysis"), to determine whether the Plan satisfies the "best interests" test and to assist creditors in determining whether to accept the Plan.  As set forth in Exhibit F to the Disclosure Statement, the overall values that may be realized by the holders of Claims in hypothetical chapter 7 cases are significantly less than the value of the recoveries to these holders under the Plan.

48.     Specifically, Class 4 – Prepetition First Lien Loan Claims, will receive an aggregate of $365 million plus the ability to participate in the Rights Offering under the Plan but would receive an aggregate projected recovery of between $113,691,000 and $168,430,000 in a liquidation.  Holders of Class 5 Prepetition Second Lien Claims will receive an aggregate of $12 million and New Warrants under the Plan but would not receive any recovery in a liquidation. Class 8 Prepetition Warrants and Class 9 Equity Interests in Parent, which are deemed to have rejected the Plan, will receive the same distribution under the Plan as in liquidation, i.e. zero.

49.     The Liquidation Analysis has been prepared assuming that the Debtors' Chapter 11 cases convert to Chapter 7 cases on May 25, 2014 (the "Liquidation Date"), which is the last day of the projected fifth fiscal period of 2014, the operations are wound down on an orderly basis and their assets are liquidated. The assets and claims in the Liquidation Analysis

21

are forecast as of the Liquidation Date based upon the Debtors' financial projection model.  Each

legal entity was analyzed independently; however, each entity is jointly and severally liable on

the Prepetition First Lien Loan Claims and Prepetition Second Lien Loan Claims and no

individual entity generated sufficient recovery to repay the Prepetition First Lien Loan Claims;

the Liquidation Analysis, therefore, is presented on a consolidated basis to show the best case for

potential recoveries of creditors.

      50.    Based on my experience, it is my belief that the methodology used to

prepare the Liquidation Analysis is appropriate and that the assumptions and conclusions set

forth therein, including the estimates of the potential proceeds that would be realized from

chapter 7 liquidations of the Debtors and available to satisfy Claims and Equity Interests under

the assumptions set forth therein, are fair and reasonable under the circumstances and represent a

reasonable exercise of the Debtors' business judgment with respect to such matters.  In summary,

the Liquidation Analysis indicates that, using a reasonable set of assumptions, the values that

may be realized by each Impaired Class of Claims in a hypothetical chapter 7 scenario are equal

to or less than the value of the recoveries to these Classes under the Plan. The Plan therefore is in

the best interests of all Impaired Classes of Claims and Equity Interests.

### Conclusion

      51.    Based on the foregoing, I believe that the Plan and the transactions

embodied therein have been structured to accomplish the Debtors' goal of maximizing the returns

available to stakeholders.  I believe that the Plan is feasible and that the Holders of Claims and

Equity Interests that are impaired under the Plan will retain or receive property that is at least

equal to the amount that they would receive if the Debtors were liquidated under a hypothetical

chapter 7. I believe that the overwhelming support of the Prepetition First Lien Lenders and the

Prepetition Second Lien Lenders reflects the overall fairness and reasonableness of the Plan and

that the Plan has been proposed in good faith and for proper purposes. As a result, I believe that

the Plan will position the Reorganized Debtors to operate successfully upon their emergence

from chapter 11.

        52.    I hereby reserve my right to amend the testimony set forth herein as

necessary at the hearing to consider confirmation of the Plan.


        I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


Dated: May 1, 2014

                      /s/ *Randall S. Eisenberg*
                      By:    Randall S. Eisenberg

1077082-NYCSR03A - MSW